[ORAL ARGUMENT NOT YET SCHEDULED]

**No. 25-5279**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF
THEIR FAITHFUL SERVICE TO THE UNITED STATES, *On Their Own and
On Behalf of Others Similarly Situated*,

*Plaintiffs-Appellees*,

v.

MARCO A. RUBIO, in his official capacity as
Secretary of the United States Department of State, *et. al.*,

*Defendants-Appellants*.

---

On Appeal from the United States District Court for the District of Columbia
No. 1:18-cv-1388 (Hon. Tanya S. Chutkan)

---

**BRIEF FOR DEFENDANTS-APPELLANTS**

---

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANTHONY P. NICASTRO
Acting Director
Office of Immigration Litigation

RUTH ANN MUELLER
DAVID J. BYERLEY
Senior Litigation Counsel

JOSHUA A. CLEM
LARISSA K. JOHNSON
JAIME A. SCOTT
Trial Attorneys

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rules 12(c) and 28(a)(1), Defendants-Appellants certify as follows:

**A. Parties and Amici.** The following lists all the parties who appeared before the district court and will appear before this Court.

- Plaintiffs-Appellees: Afghan and Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States, on their own and on behalf of others similarly situated.

- Defendants-Appellants: Marco A. Rubio, Secretary of State, in his official capacity, Mora Namdar, Assistant Secretary of Consular Affairs, in her official capacity, U.S. Department of State, Markwayne Mullin, Secretary of Homeland Security, in his official capacity, Joseph B. Edlow, Director of U.S. Citizenship and Immigration Services, in his official capacity, Connie Nolan, Associate Director of Service Center Operations Directorate, in her official capacity, and U.S. Department of Homeland Security.

- Amici: There are currently no amici on appeal. The Afghan-American Foundation, Association of Wartime Allies, Former Ambassador Ryan C. Crocker, and Veterans for American Ideals all appeared as amici curiae in the district court.

**B. Rulings Under Review.** Defendants-Appellants appeal the entry of final judgment. The district court granted summary judgment as to Counts I and II in its September 20, 2019 Memorandum Opinion & Order (Dkt No. 75, 76), and the court subsequently entered the corresponding injunctive-relief Approved Adjudication Plan on June 14, 2020 (Dkt. No. 113-1) and Revised Adjudication Plan, on June 5, 2025 (Dkt. No. 272-1). This Court dismissed with prejudice Plaintiffs' Count III on June 6, 2025 (Dkt. No. 273, 274). The parties stipulated to dismissal of Counts IV and V on September 18, 2024 (Dkt. No. 248).

Defendants-Appellants also appeal District Court Judge Tanya S. Chutkan's June 5, 2025 Order and Memorandum Opinion, *Afghan & Iraqi Allies v. Rubio*, No. CV 18-1388 (TSC) (MAU), 2025 WL 1591738 (D.D.C. June 5, 2025), adopting the Revised Adjudication Plan. Both appeals were consolidated on January 5, 2026.

**C. Related Cases.** This case has been on appeal to this court three times. Defendants-Appellants filed a notice of appeal on August 12, 2020. *See* Case No. 20-5251. The appeal was dismissed on September 16, 2021, upon Defendants-Appellants' unopposed motion for voluntary dismissal of the appeal.

Plaintiffs-Appellees filed a notice of appeal on June 22, 2022. *See* Case No. 22-5183. On November 10, 2022, in a *per curiam*, unpublished order, the Court dismissed for lack of jurisdiction.

ii

Finally, Defendants-Appellants filed a notice of appeal on January 30, 2023. *See* Case No. 23-5025. The Court affirmed the district court's decision on June 7, 2024. *Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807 (D.C. Cir. 2024).

Counsel for Defendants-Appellants are unaware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Jaime A. Scott*
JAIME A. SCOTT
Trial Attorney

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................1

STATEMENT OF JURISDICTION, TIMELINESS, AND VENUE........................4

STATEMENT OF THE ISSUES.....................................................................6

PERTINENT STATUTES AND POLICIES ......................................................7

STATEMENT OF THE CASE.........................................................................7

I.    STATUTORY FRAMEWORK.................................................................7
   A.   Overview of the Iraqi and Afghan SIV Program .........................7
   B.   Congressional Oversight of the SIV Program ..........................10
II.   FACTUAL BACKGROUND.................................................................12
   A.   Commencement of Litigation .................................................12
   B.   Class Certification................................................................13
   C.   Order Adopting an Adjudication Plan .....................................14
   D.   Proceedings After Entry of the Approved Adjudication Plan ...15
   E.   District Court Decision Granting Modification of Plan and Referral to Magistrate Judge ...................................................................16
   F.   Magistrate Proceedings, Appeal, and Entry of a Proposed Revised Adjudication Plan....................................................................17
   G.   Final Judgment ...................................................................17

SUMMARY OF THE ARGUMENT .................................................................18

STANDARD OF REVIEW ...........................................................................20

ARGUMENT ...........................................................................................21

I.    The District Court Abused its Discretion When it Certified a Class of Factually Distinct SIV Applicants............................................................21
   A.   The district court abused its discretion when it found commonality among SIV applicants. ..............................................................23
   B.   The district court abused its discretion when it found typicality among SIV applicants................................................................29
   C.   The district court abused its discretion when it determined the *Allies* class met the requirements under Rule 23(b)(2)(A). .............31
II.   The District Court Erred in Finding Unreasonable Delay Under the APA. .................................................................................................35
   A.   The Agencies Do Not Owe the Allies a Discrete, Nondiscretionary Duty.....................................................................................35
   B.   The Agencies Did Not Unreasonably Delay SIV Adjudications..............38

i.   The district court erred in its "rule of reason analysis" by overemphasizing the nine-month benchmark ..............................................38

ii. The district court erred in its analysis of the remaining TRAC factors..............................................................................................43

III.   The District Court Erred in Determining That a Refusal Under 8 U.S.C. § 1201(G) Does Not Discharge the Duty Owed Under the Acts. ..........................46

IV.   The District Court Abused Its Discretion by Failing to Modify the Injunction in Accordance with Significant Changed Circumstances to the SIV Program.....................................................................................................48

CONCLUSION .............................................................................................54

## TABLE OF AUTHORITIES

Page(s)

Cases

*Action on Smoking & Health v. Dep't of Labor*,
100 F.3d 991 (D.C. Cir. 1996)................................................................44

*Afghan & Iraqi Allies v. Blinken*,
103 F.4th 807 (D.C. Cir. 2024) ................................. 2, 17, 20, 21, 37, 38

*Agostini v. Felton*,
521 U.S. 203 (1997) ..............................................................................49

*ALPO Petfoods, Inc. v. Ralston Purina Co.*,
913 F.2d 958 (D.C. Cir. 1990)................................................................53

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
946 F.3d 615 (D.C. Cir. 2020)................................................................35

*Am. Council of the Blind v. Mnuchin*,
878 F.3d 360 (D.C. Cir. 2017)................................................................49

*American Hosp. Ass'n v. Price*,
867 F.3d 160 (D.C. Cir. 2017)................................................................53

*Anglers Conservation Network v. Pritzker*,
809 F. 3d 664 (D.C. Cir. 2016)...............................................................37

*Bennett v. Spear*,
520 U.S. 154 (1997) ..............................................................................46

*Bynum v. District of Columbia*,
214 F.R.D. 27 (D.D.C. Mar. 31, 2003) ..................................................24

*Crowe v. Fed. Bureau of Prisons*,
No. 24-CV-3582 (APM), 2025 WL 1635392 (D.D.C. June 9, 2025)..................34

*Ctr. for Sci. in the Pub. Int. v. U.S. Food & Drug Admin.*,
   74 F. Supp. 3d 295 (D.D.C. 2014)......................................................44
*Cutler v. Hayes*,
   818 F. 2d 879 (D.C. Cir. 1987).........................................................40
*D.L. v. District of Columbia*,
   860 F.3d 713 (D.C. Cir. 2017)......................................... 20, 27, 28, 32
*Da Costa v. Immigr. Investor Program Office*,
   80 F.4th 330 (D.C. Cir. 2023) ............................................... 19, 40
*Daskalea v. Washington Humane Soc.*,
   275 F.R.D. 346 (D.D.C. 2011) ........................................................31
*EMR Network v. FCC*,
   391 F.3d 269 (D.C. Cir. 2004).........................................................44
*Fiallo v. Bell*,
   430 U.S. 787 (1977) .......................................................................45
*For. Sumter Tours, Inc. v. Babbitt*,
   202 F.3d 349 (D.C. Cir. 2000)........................................................21
*Fund for Animals, Inc., v. U.S. Bureau of Land Mgmt*,
   460 F.3d 13 (D.C. Cir. 2006)..........................................................36
*General Telephone Co. of Southwest v. Falcon*,
   457 U.S. 147 (1982) ............................................................... 25, 31
*Gov't of Province of Manitoba v. Zinke*,
   849 F.3d 1111 (D.C. Cir. 2017).......................................................49
*Grand Canyon Air Tour Coal.*,
   154 F.3d ......................................................................................45
*Gulf Oil Corp. v. Brock*,
   778 F.2d 834 (D.C. Cir. 1985).........................................................53
*Horne v. Flores*,
   557 U.S. 433 (2009) .......................................................................49
*Hussein v. Beecroft*,
   782 F. App'x 437 (6th Cir. 2019) ...................................................47
*I.C.C. v. New York, N.H. & H.R. Co.*,
   287 U.S. 178 (1932) .......................................................................47
*In re Am. Fed'n of Gov't Emps.*,
   837 F.2d 503 (D.C. Cir. 1988).........................................................41
*In re Barr Labs.*,
   930 F.2d 72 (D.C. Cir. 1991)............................................ 41, 43, 44, 45
*In re Lorazepam & Clorazepate Antitrust Litig.*,
   202 F.R.D. 12 (D.D.C. 2001) ..........................................................30
*In re Navy Chaplaincy*,
   306 F.R.D. 33 (D.D.C. 2014) ..........................................................33

*In re Pub. Emps. for Env't. Resp.*,
  957 F.3d 267 (D.C. Cir. 2020)..................................................................40

*In re United Mine Workers of Am. Int'l Union*,
  190 F.3d 545 (D.C. Cir. 1999)..................................................................39

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004)..................................................................36

*J.D. v. Azar*,
  925 F.3d 1291 (D.C. Cir. 2019)................................................................20

*Jamie S. v. Milwaukee Pub. Sch.*,
  668 F.3d 481 (7th Cir. 2012) ...................................................................32

*Jennings v. Rodriquez*,
  583 U.S. 281 (2018) .................................................................................28

*Jolly v. Listerman*,
  672 F.2d 935 (D.C. Cir. 1982)..................................................................37

*Karimova v. Abate*,
  No. 23-5178, 2024 WL 3517852 (D.C. Cir. July 24, 2024) ............. 19, 36, 47, 48

*Klayman v. Porter*,
  104 F.4th 298 (D.C. Cir. 2024) ................................................................21

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) .................................................................................41

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) .................................................................................26

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
  336 F.3d 1094 (D.C. Cir. 2003)........................................................ 39, 45

*Muwekma Tribe v. Babbitt*,
  133 F. Supp. 2d 30 (D.D.C. 2000).............................................................45

*Nine Iraqi Allies v. Kerry*,
  168 F. Supp. 268 (D.D.C. Mar. 7, 2016)...................................................48

*Nio v. U.S. Dep't of Homeland Sec.*,
  323 F.R.D. 28 (D.D.C. Oct. 27, 2017) ......................................................24

*North Carolina v. Covington*,
  581 U.S. 486 (2017*)* ...............................................................................53

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ...................................................................................35

*Parker v. Bank of Am., N.A.*,
  99 F. Supp. 3d 69 (D.D.C. 2015)..............................................................29

*Potomac Elec. Power Co. v. ICC*,
  702 F.2d 1026 (D.C. Cir. 1983).................................................................38

*Radosti v. Envision EMI, LLC*,
  717 F. Supp. 2d 37 (D.D.C. 2010).............................................................29

vii

*Rufo v. Inmates of Suffolk County Jail*,
  502 U.S. 367 (1992) ................................................................ 49, 53
*Saavedra Bruno v. Albright*,
  197 F.3d 1153 (D.C. Cir. 1999) ............................................................42
*Skalka v. Kelly*,
  246 F. Supp. 3d 147 (D.D.C. 2017) ......................................................42
*Telecoms. Rsch. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) .............. 6, 13, 19, 24, 31, 34, 38, 39, 40, 43, 44, 45
*United States v. Maria*,
  186 F.3d 65 (2d Cir. 1999) ...................................................................37
*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................ 25, 27, 28, 29, 32, 34
*Wang v. Blinken*,
  3 F.4th 479 (D.C. Cir. 2021) ................................................................41
*Wayte v. United States*,
  470 U.S. 598 (1985) .............................................................................42
*Yazdanpanahderav v. U.S. Dep't of State*,
  No. 1:23-CV-3688 (ACR), 2024 WL 3010874 (D.D.C. June 14, 2024) .............52

Statutes

22 U.S.C. § 3902(3) ....................................................................................9
28 U.S.C. § 1291 ........................................................................................4
28 U.S.C. § 1292(a)(1) ...............................................................................5
28 U.S.C. § 1331 ........................................................................................4
5 U.S.C. § 555(b) ......................................................................................47
5 U.S.C. 701(a)(2) .....................................................................................26
8 U.S.C. § 1101 ..........................................................................................8
8 U.S.C. § 1105(a) ....................................................................................43
8 U.S.C. § 1153(f) .....................................................................................42
8 U.S.C. § 1157 ..........................................................................................8
8 U.S.C. § 1181(a)(1) .................................................................................7
8 U.S.C. 1201(g) ..................................................... 3, 7, 19, 20, 46, 47, 48
Pub. L. No. 110-181, § 1244, 122 Stat. 395 (2008) ..............................8, 13
Pub. L. No. 111-8, § 602, 123 Stat. 807 (2009) ...................................8, 13
Pub. L. No. 113-291,§ 1227 (2014) .........................................................11
Pub. L. No. 114-92, § 1216(a)(2) (2015) ................................................11
Pub. L. No. 116-6, § 7076, 113 Stat. 13 ..................................................12
Pub. L. No. 117-31,§ 401(a)(3), tit. IV, 135 Stat 309 .............................11

Rules

Fed. R. Civ. P. 23 .............................................................. 6, 23, 30, 32
Fed. R. Civ. P. 54(b) ............................................................... 15, 17
Fed. R. Civ. P. 58(b)(2)(B) ...............................................................5
Fed. R. Civ. P. 60(b)(5)–(6)............................................................15
Fed. R. Civ. P. 65(a)(2)...................................................................13
Federal Rules of Civil Procedure Rule 23(a)......................................21

Regulations

22 C.F.R. § 42.81 ..........................................................................47
22 C.F.R. § 42.81(a).......................................................................46

Other Authorities

Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L. Rev. 97
(2009)...........................................................................................34

## GLOSSARY OF ABBREVIATIONS

AAP        Approved Adjudication Plan of 2020

AAPA       Afghan Allies Protection Act of 2009

DOS        Department of State

Dkt.       District Court Docket Citation, followed by page number

ESSAA      Emergency Security Supplemental Appropriations Act, 2021

JA         Joint Appendix, followed by page number

COM        Chief of Mission

RAP        Revised Adjudication Plan of 2025

RCIA       Refugee Crisis in Iraq Act of 2007

SIV        Afghan and Iraqi Special Immigrant Visa

USCIS      U.S. Citizenship and Immigration Services

**INTRODUCTION**

This case concerns unreasonable-delay claims brought against the Department of State and the Department of Homeland Security (the "Agencies") regarding the processing of applications for Special Immigrant Visas (SIV) under the Refugee Crisis in Iraq Act of 2007 (RCIA) and the 2009 Afghan Allies Protection Act (AAPA), which establish a program to resettle Iraqis and Afghans who experienced an ongoing and serious threat because of their assistance to the U.S. Government or the International Security Assistance Force during U.S. military operations in Iraq and Afghanistan. Under the statutes, applicants undergo a multiple-step application process, which requires, among other things, a review of the applicant's assistance to the U.S. government by the relevant Chief of Mission (COM) and intensive background screening. Congress also provided that the Secretaries of State and Homeland Security "shall improve the efficiency" of processing applications and adopted a precatory goal that steps within the government's control "should be completed" within 9 months. Nonetheless, Congress expressly made clear that "[n]othing" in the statutes precluded the Secretaries from exercising discretion to take a longer time to vet "high risk" cases for national security purposes.

Plaintiffs in this case are applicants for SIVs under those statutes who allege that the Agencies have unreasonably delayed adjudicating their applications (the "Allies"). Despite the statutes' clear statement that the Agencies may take longer to

1

review applications due to national security concerns, the Allies brought unreasonable-delay claims seeking to force the Agencies to adjudicate *all* visa applications under an expedited timeline. The district court—and this Court in a prior appeal—recognized that expeditious resolution of applications has become extraordinarily difficult following the U.S. withdrawal from Afghanistan and the consequent closure of the U.S. embassy in Kabul, which has led to tens of thousands more applications in an 8-fold surge and has made processing and in-person interviews far more difficult. *See Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807, 814 (D.C. Cir. 2024) ("*Allies 2024 Appeal*").

Nonetheless, the district court imposed a sprawling "adjudication plan" to govern the Agencies' adjudication of *all* applications under these statutes. That decision is based on erroneous legal premises. First, the district court imposed that injunction across a class of "all" applicants whose applications have been pending longer than 9 months, even though each unreasonable-delay claim depends on equitable factors that necessarily vary based on individual circumstances, such as differing national security risks that the governing statutes expressly recognize must be treated differently. Second, despite the statutes' clear statement that the Secretaries may exercise discretion to take "longer than 9 months" to review cases that, in their discretion, are "high-risk," the district court found a *mandatory* duty to expedite processing for *all* cases. And third, the district court found unreasonable

2

delay by applying a 9-month "rule of reason" (regardless of differing risks and difficulties for reviewing such risks, which, again, the statute expressly acknowledges to be significant). In doing so, the district court improperly imposed a plan to judicially superintend a sensitive process involving foreign affairs and national security that Congress made clear that it did not want to bind up with inflexible rules.

Moreover, even if a class-wide injunction were appropriate, the district court's injunction is erroneous in two ways. First, the district court disregarded the State Department's final decision of a large number of visa applications in which the aliens had not demonstrated eligibility and the agency had therefore refused the applications under 8 U.S.C. 1201(g) for "administrative processing," which means that the application is refused but that the agency may, in its discretion, reconsider the application if it obtains further information. Despite the statutory and regulatory authority making clear that those decisions were final subject only to the agency's unreviewable discretion to consider new information, the district court ordered the State Department to effectively reopen those adjudications and conduct additional processing under the court-imposed "adjudication plan." That interference in consular decisions is error.

Second, even though the district court acknowledged that the U.S. withdrawal from Afghanistan drastically changed the agencies' ability to process and interview

applicants, the court refused to make any meaningful changes to its injunction. The court brushed aside the government's requests to loosen the processing benchmarks that are extremely difficult to comply with, instead leaving in place a 120-day benchmark for completing Chief of Mission processing and a combined 68-day timeline for holding interviews (despite the suspension of operations at the U.S. embassy in Kabul).

This Court should vacate the district court's injunction with instructions to de-certify the class, reverse the unreasonable delay determination, terminate any judicial oversight of the SIV program, and return adjudication of SIV applications to the responsibility of the agencies, subject to the direction of the Executive Branch and their already substantial reporting obligations to Congress. At a minimum, this Court should vacate the injunction and remand with instructions for the district court to exclude applications that have already been refused under Section 1201(g) and to properly take account of the changed circumstances by relaxing the rigid benchmarks it imposed.

## STATEMENT OF JURISDICTION, TIMELINESS, AND VENUE

The district court had jurisdiction under 28 U.S.C. § 1331. The D.C. Circuit has appellate jurisdiction under 28 U.S.C. § 1291 because the district court's June 6, 2025 Order dismissing Count III of Plaintiffs' amended complaint resolved the final remaining cause of action thereby constituting final judgment in this matter. JA212.

4

The appeal of final judgment was timely, because Fed. R. Civ. P. 58(b)(2)(B) states that final judgment is entered if a separate document is required under Rule 58(a), which it is in this case, "when the judgment is entered in the civil docket under Rule 79(a) and the earlier of these events occurs: (A) it is set out in a separate document; or (B) 150 days have run from the entry in the civil docket." 150 days after the June 6, 2025 Memorandum Opinion & Order resolving the final claim in this case (Count III) was November 3, 2025. Accordingly, Defendants' deadline to appeal final judgment was January 2, 2026, and Defendants filed a notice of appeal in the district court on December 30, 2025. JA304.

Separately, after entering a permanent injunction in the Allies' favor as to Counts I and II of the amended complaint, the district court issued an order on November 30, 2022, granting modification of the Approved Adjudication Plan (AAP) and referring the matter to a magistrate judge to oversee development of the RAP. JA167, 169. The magistrate judge recommended a new plan to the District Court in a November 4, 2025 Order. JA172–73. The District Court issued an order adopting the RAP on June 5, 2025. JA 185–86. The Agencies filed a timely notice of appeal on July 30, 2025. JA213.

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court's June 5, 2025 Order is an interlocutory order modifying and/or

5

refusing to modify an injunction. Both appeals were consolidated *sua sponte* on January 5, 2026. *See* Doc. 2152853.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in certifying the class under Fed. R. Civ. P. 23 in [1] finding that the purported class met the requirements under Rule 23(a), and [2] that the Agencies acted or refused to act on grounds applied generally to the purported class such that injunctive relief was appropriate to the class as a whole under Rule 23(b)(2) by failing to consider the numerous, complex, and diverse individual circumstances of applicants that lead to extreme variance in processes, timing benchmarks, and legal footing with respect to SIV adjudications.

2.    Whether the district court erred in ruling that the Agencies owed the Allies a discrete, nondiscretionary duty sufficient to warrant relief under the APA when it found that the 9-month benchmark in the Afghan Allies Protection Act of 2009 and Refugee Crisis in Iraq Act of 2008 was a mandatory timeframe.

3.    Whether the district court erred in ruling, under *Telecoms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (*TRAC*), that the Agencies unreasonably delayed the processing of the Allies' special immigrant visa applications and ordering the Secretary of State and Secretary of Homeland Security to process a visa within nine months from the date of application, regardless of whether the alien is a high-risk applicant requiring further review.

4.    Whether the district court erred in determining that refusal under 8 U.S.C. § 1201(g) is not a final decision and thus improperly required the Department of State to reassess consular decisions.

5.    Whether the district court abused its discretion when it granted modification of injunctive relief that did not meaningfully account for significant changed circumstances impacting the injunctive relief plan, such as, *inter alia*, the withdrawal of U.S. troops from Afghanistan, the massive influx of new applications after the withdrawal, the suspension of U.S. Embassy Kabul's operations, and the consequent diplomatic and logistical hurdles in conducting visa interviews in-person yet outside of Afghanistan.

## PERTINENT STATUTES AND POLICIES

Pertinent statutes and policies are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### I.    STATUTORY FRAMEWORK

#### A. Overview of the Iraqi and Afghan SIV Program

To be admitted to the United States and reside permanently, an alien needs a statutorily provided basis, such as an immigrant visa. *See* 8 U.S.C. § 1181(a)(1). To receive an immigrant visa, the noncitizen must demonstrate that they fall within one of a limited number of immigration categories. *See, e.g.*, *id.* § 1151(a)–(b). A person in a qualifying category may then apply for an immigrant visa, permitting them to

seek entry into the United States as a lawful permanent resident. *Id.* §§ 1101(a)(16), 1201(a)(1)(A), 1204.

The most common qualifying categories include family-sponsored and employment-based noncitizens. At issue in this case is the category of "qualified special immigrants." *Id.* § 1153(b)(4); *see id.* §§ 1151(a)(2), 1101(a)(27). Qualified special immigrants include certain employees of the U.S. government or others who benefited or served the U.S. government abroad. *See, e.g.*, *id.* § 1101(a)(27)(D), (G). In passing the Acts, Congress broadened the special immigrant category to include Iraqi and Afghan nationals who have "provided faithful and valuable service" to the U.S. government in their home countries and who have experienced a "serious threat as a consequence" of their employment. RCIA, Pub. L. No. 110-181, § 1244, 122 Stat. 395 (2008), *codified as amended in* 8 U.S.C. § 1157 note; AAPA, Pub. L. No. 111-8, § 602, 123 Stat. 807 (2009), *codified as amended in* 8 U.S.C. § 1101 note. New applications are no longer being accepted for Iraqi or Afghan SIVs. The deadline to submit a new application for an Iraqi SIV was in 2014 and the deadline for an Afghan SIV was in 2025.

To demonstrate eligibility for an SIV, the noncitizen must complete several steps. The applicant first must submit an application for Chief of Mission (COM) approval to the State Department. AAPA § 602(b)(2)(D); RCIA § 1244(b)(4). The COM is "the principal officer in charge of a diplomatic mission of the United States

or of a United States office abroad which is designated by the Secretary of State as diplomatic in nature." 22 U.S.C. § 3902(3). To secure COM approval, an applicant must establish a number of facts, including his or her "faithful and valuable service to the United States Government" for a specified time period, an ongoing, serious threat as a consequence of their employment, as well as undergo a "background check and appropriate screening." *See* AAPA §§ 602(b)(1)(D), (b)(2)(A), (D); *see also* RCIA § 1244(b)(4), (b)(1).

Congress directed the COM to conduct a risk assessment of the applicant and an independent review of United States government records to confirm employment and "faithful and valuable" service to the United States. AAPA, § 602(b)(2)(D); RCIA § 1244(b)(4)(A).

Since July 2022, Form DS-157, which is generally included in the COM application, may serve as the petition required under the AAPA to proceed as a special immigrant.[1] Prior to July 2022, noncitizens seeking an Afghan SIV were required to file Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, with United States Citizenship and Immigration Services (USCIS).[2] If the noncitizen has obtained COM and petition approval and will seek an immigrant

---

[1] *See COM Review–SIV Petition, Application Review and Decision*, https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov/afghan-faq.html.

[2] *See* https://2021-2025.state.gov/ongoing-efforts-to-support-afghan-special-immigrant-visa-applicants/.

visa outside of the United States, they may then submit an immigrant visa application to the State Department and proceed with consular processing pursuant to the Acts.

### B. Congressional Oversight of the SIV Program

Congress has continually monitored, and sometimes changed, several aspects of the SIV program. *First*, Congress has expressed its preference for expeditious and streamlined treatment of SIV applications, but it has never imposed a mandatory deadline on agency adjudications. In 2013, Congress amended the Acts to provide that the government "shall improve the efficiency" for SIV processing such that "all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, *should* be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa." RCIA § 1242(c)(1); AAPA § 602(b)(4)(A) (2013) (emphasis added). However, Congress stressed that "*nothing*" in that provision "limit[s] the ability of a Secretary . . . to take longer than 9 months to complete those steps . . . in high-risk cases for which satisfaction of national security concerns requires additional time." RCIA § 1242(c)(2); AAPA § 602(b)(4)(B) (emphasis added). In July 2021, Congress again emphasized with an amendment to the AAPA that "all steps, including Chief of Mission approval, under the control of the respective departments incidental to the issuance of [SIVs] . . . *should* be completed not later than 9 months" after the applicant has submitted all

required materials to complete an application for an SIV. Emergency Security Supplemental Appropriations Act, 2021 (ESSAA), Pub. L. No. 117-31, § 401(a)(3), tit. IV, 135 Stat 309 (emphasis added).

*Second*, Congress has repeatedly expanded program eligibility since the program's inception, which has substantially increased the number of applications that the Agencies must review and adjudicate. For example, Congress expanded AAPA qualifying employment in 2014 to include the International Security Assistance Force and again in 2015 to include any successor missions. National Defense Authorization Act, Pub. L. No. 113-291, § 1227 (2014); Pub. L. No. 114-92, § 1216(a)(2) (2015). Congress in 2021 modified certain employment criteria, broadening SIV eligibility. In particular, Congress reduced the period of qualifying employment from two years to one year and removed the previous requirement that those applicants have performed "sensitive and trusted" activities. ESSAA § 401(a).

*Third*, Congress from the outset has monitored the program by requiring the Agencies to submit various reports. These include quarterly reports that describe efficiency improvements as well as processing numbers and average wait times at each application stage. *See* AAPA § 602(b)(12); RCIA § 1248(g). Congress also required a new comprehensive report on the SIV program to be delivered in July 2022. ESSAA § 401(c).

*Fourth*, in 2019, Congress required the State Department to develop and implement a prioritization plan for Afghan SIV applicants. Consolidated Appropriations Act 2019, Pub. L. No. 116-6, § 7076, 113 Stat. 13. The Secretary of State developed a programmatic change in processing applicants under the AAPA. U.S. Dep't of State, *Foreign Affairs Manual*, 9 FAM 502.5-12(B)(b)(9). That plan prioritized Afghan nationals seeking SIVs under the AAPA in order as follows: (1) interpreters and translators; (2) U.S. government direct hire employees; (3) contractors with U.S. government installation badges; (4) implementing partners; and (5) all other applicants. *Id.*

## II. FACTUAL BACKGROUND

### A. Commencement of Litigation

The Allies filed their five-count class complaint in June 2018. Dkt. No. 1. On July 12, 2018, the Allies filed an amended complaint. JA001–30. Among other claims, the Allies sought a declaration that the government has a non-discretionary duty to adjudicate their SIV applications within nine months, and that the government has not fulfilled that duty. JA024. The Allies also alleged unreasonable delay under the Administrative Procedure Act (APA), seeking an order "compelling [the Agencies] to adjudicate their SIV applications." JA025. The Allies also brought other claims that have been dismissed and are not at issue here. *See* JA026–027.

12

The Allies filed a motion for a preliminary injunction, which the district court consolidated with a trial on the merits under FED. R. CIV. P. 65(a)(2). Hr'g Tr. 8:7–13, Dkt. No. 72. On September 20, 2019, the court granted summary judgment to the Allies on Counts I and II. JA095–96. The court applied the *TRAC* factors and declared the delays in processing and adjudicating SIV applications unreasonable. JA083–92. In particular, the court found that SIV applicants, on average, waited two and a half years for a decision on their COM applications, and an additional three years for final adjudication, for a five-year average wait time. *Id*. The court concluded that the delays warranted relief. *Id.*

## B. Class Certification

In June 2018, soon after filing their initial complaint, Plaintiffs sought class certification. Dkt. No. 3. The district court granted certification on February 5, 2020 for:

> all people who have (1) applied for an Afghan or Iraqi SIV pursuant to the Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, 123 Stat. 807 ("AAPA"), or the Refugee Crisis in Iraq Act of 2007, Pub. L. No. 110-181, 122 Stat. 395 ("RCIA"), by submitting an application for Chief of Mission ("COM") approval, and (2) whose applications have been awaiting government action for longer than 9 months.

JA132. Defendants moved to de-certify the class in March 2020, which was denied in June 2020. JA155. In October 2024, the district court amended the class definition at the request of the parties to limit it to those "awaiting government action for longer than 9 months on or before November 30, 2022." JA170–71. At the same time, the

district court granted the Parties' Joint Stipulation and Motion to Dismiss Counts IV and V. *Id.*

## C. Order Adopting an Adjudication Plan

The court's September 20, 2019 order required the Agencies to "submit a plan for promptly processing and adjudicating the applications of current class members." JA094. The Allies filed a Motion for Contempt in March 2020, which the district court denied. JA134–36. However, after this ruling, the district court required the parties to jointly submit a proposed adjudication plan. *Id.* Pursuant to this order, on May 21, 2020, the parties proposed a jointly prepared adjudication plan. Dkt. Nos. 106, 111. The court "approve[d] and adopt[ed]" the adjudication plan, JA137, which the parties agreed would be an injunction, Dkt. No. 112. This Approved Adjudication Plan (AAP) established specific time windows for the Agencies to complete the fourteen-step SIV process, although it recognized that some cases may "require additional processing time to reconcile any national security concerns," which would be reported to the court in quarterly status reports. JA139–151. The AAP called for the Agencies to provide progress reports every 90 days, and to explain steps taken to remedy progress shortfalls. *Id.* The Agencies were required to submit data on, *inter alia*, the number of class members who began, ended, and completed the reporting period at each government step. *Id.* The AAP also permitted the Allies to challenge the Agencies' explanations for not meeting the plan's

14

benchmarks, including with meet and confers and the possibility of going to the district court. *Id.*

### D. Proceedings After Entry of the Approved Adjudication Plan

The Agencies submitted quarterly progress reports under the AAP. Dkt. Nos. 120, 133, 137–38. The reports acknowledged failures to certain timing benchmarks, and the Allies identified certain errors for correction. Dkt. Nos. 121, 141, 142, 149. Following passage of the ESSAA, the prolonged interruption in the Agencies' operations due to the COVID-19 pandemic, the Taliban takeover of Afghanistan in August 2021 resulting in a huge upsurge in the number of SIV applications, a security crisis affecting the U.S. Embassy Baghdad, and several administrative reforms spurred by executive orders, the parties pursued settlement discussions and stipulated to stay proceedings and the Agencies' obligations under the AAP as of October 19, 2021. *See* Dkt. Nos. 144, 147.

Once settlement negotiations proved unsuccessful, on May 24, 2022, the Agencies moved under FED. R. CIV. P. 54(b) and 60(b)(5)–(6) for relief from the court's summary judgment on Counts I and II and the AAP, seeking termination or, in the alternative, modification of the AAP. Dkt. No. 163. Specifically, the Agencies explained how global events affected the SIV program. *Id.* As an alternative to termination, the Agencies requested the court modify the AAP to take account of these changed circumstances and accordingly asked for the opportunity to propose

15

a new plan. *Id.* In response to the Agencies' motion for relief, the Allies cross-moved

for clarification and to expand the AAP's scope. Dkt. Nos. 168, 169.

### E. District Court Decision Granting Modification of Plan and Referral to Magistrate Judge

On November 30, 2022, the district court granted and denied in part the

parties' motions. JA169. The district court held that intervening factual

developments since the injunction's implementation in June 2020 warranted

modification. JA160–61. It found that "the government's task of timely adjudicating

Plaintiffs' visa applications has undoubtably become more difficult" in light of the

withdrawal of U.S. troops from Afghanistan and the suspension of operations at U.S.

Embassy Kabul, which led to a "surge[] by 816 percent" of SIV applications, as well

as the government's loss of "its ability to conduct the legally required in-person visa

interviews for Afghan applicants in Afghanistan." JA162–63. Further, it recognized

"arranging for those interviews outside of Afghanistan involve[d] an array of

diplomatic, logistical and other hurdles." *Id.*

Specifically, the district court held "[t]he government may propose modifying

the timing benchmarks to reflect its increased caseload and difficulty scheduling in-

person applicant interviews, . . . as well as the tracking and reporting requirements,

to correspond with the changes in internal processes that it has made in recent years."

JA167. The district court referred the matter to Magistrate Judge Upadhyaya to

oversee limited discovery and the development of a new plan. *Id.*

16

### F. Magistrate Proceedings, Appeal, and Entry of a Proposed Revised Adjudication Plan

The Agencies appealed the November 30, 2022 order and this Court affirmed. The Court evaluated the district court's refusal to terminate the injunction as a partial denial of a Rule 54(b) motion to reconsider a non-final order. *Allies 2024 Appeal*, 103 F.4th at 814. The Court held that the district court had not abused its discretion in deciding to modify rather than terminate the injunction but specifically noted that "if the government concludes that such further accommodations do not go far enough, it may of course appeal the entry of any successor injunction." *Id.* at 819–20.

After this Court's decision, the Agencies supplemented their proposed adjudication plan. Dkt. No. 243. At an October 10, 2024 status conference, Magistrate Judge Upadhyaya largely rejected the Agencies' plan proposals and agreed with the Allies' plan proposal. Dkt. No. 255. The Agencies timely filed objections, to which the Allies objected. Dkt. Nos. 261, 264, 266. On June 5, 2025, the district court ruled on the Agencies' Objections. JA185–86. The court adopted the Revised Adjudication Plan (RAP) on June 5, 2025, which largely accepted Magistrate Judge Upadhyaya's entered plan. *Id.* Defendants timely appealed. JA213.

### G. Final Judgment

On June 6, 2025, the district court disposed of the final count remaining in the case when it granted the Agencies' motion to dismiss count III of the amended

complaint. JA212. The district court did not enter a separate document regarding final judgment. In compliance with the district court order, the Agencies began submitting progress reports required by the RAP every 90 days starting on September 23, 2025. Dkt. No. 290. In December 2025, the Allies filed a Motion to Enforce the district court's June 2025 order. Dkt. No. 293. During the briefing of this motion, the district court clarified that the case had reached final judgment in a minute order. Defendants timely appealed. JA215–16.

## SUMMARY OF THE ARGUMENT

First, the district court abused its discretion in concluding that the Allies met the requirements for certification under Rule 23(a) and (b). The class certification treats all applicants as though on equal legal footing to challenge the Agencies' conduct despite the fact that unreasonable-delay claims will depend on the equities concerning each individual application and despite the Acts' express carveouts treating "high-risk" cases differently. The court's imposition of a mandatory nine-month benchmark when it granted class certification when the Acts explicitly do not is an abuse of discretion.

Second, the district court erred in concluding that the Agencies owed the Allies a discrete, nondiscretionary duty sufficient to warrant relief under the APA. As an initial matter, while the Acts state that the agencies "shall" improve efficiency, they provide only a precatory goal that the process "should" be completed within 9

months. But regardless, the statutes expressly impose no mandatory timeline for the Secretaries' exercise of discretion to take a longer period of time to review high-risk cases with national security concerns. The statutes explicitly provide that "[n]othing" in them interferes with the Secretaries' judgment regarding how long to process "high-risk cases."

Similarly, the district court erred in finding that the Agencies unreasonably delayed SIV applications. Its *TRAC* analysis rests on an erroneous elevation of Congress's nine-month adjudication benchmark to a required timeline and disregard of the Agencies' rule of reason when adjudicating SIV applicants. *See, e.g., Da Costa v. Immigr. Investor Program Office*, 80 F.4th 330, 342 (D.C. Cir. 2023) ("The length of the wait alone is not sufficient to show that [the agency] does not follow a rule of reason in processing EB-5 applications.").

Even if a class-wide injunction could be appropriate, the district court's injunction is also improper in two additional respects. The district court erred in concluding that a refusal under 8 U.S.C. § 1201(g) (sometimes called a "221(g) denial" given its INA citation) is not a final decision, and therefore requiring the Department of State to continue processing such applications. As this Court has previously acknowledged in an unpublished decision, a refusal under Section 1201(g) *is* a final decision. *See Karimova v. Abate*, No. 23-5178, 2024 WL 3517852 (D.C. Cir. July 24, 2024). By issuing that denial under § 1201(g), the consular office

19

has already acted on an application and has no further required action to take. The fact that the agency may exercise its discretion to reconsider its conclusion if it obtains new information does not change that the Department refused the visa because the applicant had not demonstrated eligibility. Thus, once an application is refused under § 1201(g), it should no longer be subject to an unreasonable delay analysis nor a remedy under the RAP.

Finally, the district court abused its discretion by failing to modify the injunction in accordance with significantly changed circumstances to the SIV program, as contemplated by its own November 2022 order. The district court made no meaningful change to the strict benchmarks in its injunction. That is particularly problematic for Chief of Mission approval and for interviewing, which have become extraordinarily difficult following the U.S. withdrawal from Afghanistan and the closure of the embassy in Kabul.  That refusal to modify the injunction to account for workability contravenes the district court's own order granting modification. *See, e.g., Allies 2024 Appeal*, 103 F.4th at 816 ("[W]ith the terms of the successor injunction still undetermined, we cannot decide in advance whether it will sufficiently accommodate the increased difficulties faced by the government.").

## STANDARD OF REVIEW

The certification of a class is reviewed for abuse of discretion. *J.D. v. Azar*, 925 F.3d 1291, 1312 (D.C. Cir. 2019); *D.L. v. District of Columbia*, 860 F.3d 713,

724 (D.C. Cir. 2017). The standard of review for an issue decided on summary judgment *de novo*. *For Sumter Tours, Inc. v. Babbitt*, 202 F.3d 349, 354 (D.C. Cir. 2000). Denials of Rule 54(b) motions to reconsider are reviewed for abuse of discretion. *Allies 2024 Appeal*, 103 F.4th at 814*; see Klayman v. Porter*, 104 F.4th 298, 305 (D.C. Cir. 2024) ("We review the district court's decision to issue or modify an injunction for abuse of discretion").

## ARGUMENT

### I.    The District Court Abused its Discretion When it Certified a Class of Factually Distinct SIV Applicants.

The district court abused its discretion when it certified the Allies class under FED. R. CIV. P. 23(a) and (b). The distinct factual differences between SIV applicants requires a case-by-case adjudication notwithstanding the fact that SIV applicants share the common trait "that they have submitted SIV applications and have been waiting longer than 9 months for final adjudication." JA118–19. Ignoring these differences to conclude that the class met the commonality requirement was error.

On February 5, 2020, the court certified a class of "all people who have (1) applied for an Afghan or Iraqi SIV pursuant to the [Acts], by submitting an application for [Chief of Mission (COM)] approval, and (2) whose applications have been awaiting government action for longer than 9 months." JA132. As the court recognized, under FED. R. CIV. P. 23(a), the proponent of the class action must establish that: "(1) the class is so numerous that joinder of all members is

21

impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." JA115. Further, "[t]he proposed class must also meet one of the three additional requirements set forth in Rule 23(b)." *Id.* "Relevant here is Rule 23(b)(2)'s requirement that 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, such that injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Id.*

The district court's decision fails to appreciate the Acts' provisions for "high risk" cases that may raise national security concerns requiring additional time, nor does it account for the myriad circumstances that may affect the timing and processing of a SIV applicant's application such as their location and ability to travel outside of Afghanistan, their responsiveness to requests from the government, whether administrative processing is needed and what type, and the nature of their qualifying employment and the ability to verify that employment. The district court's decision unsettles the fundamental requirements of class action certification and improperly manufactures a homogeneous group of applicants where the common characteristic is applying for the same immigration benefit. In doing so, the court erred in finding that class members (1) shared questions of law or fact common to the class; and (2) presented claims or defenses typical of the representative parties

22

which are typical of the claims or defenses of the class. *See* FED. R. CIV. P. 23(a)(2)-(3).

### A. The district court abused its discretion when it found commonality among SIV applicants.

The district court did not consider the Acts' relevant statutory construction provision when assessing commonality. That provision provides:

> Construction.—Nothing in this section shall be construed to limit the ability of a Secretary referred to in subparagraph (A) [or subparagraph (1) in the RCIA] to take longer than 9 months to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns requires additional time.

AAPA § 602(b)(4); RCIA § 1242(c)(2). Even assuming the statutes mean to impose a mandatory processing goal, the plain meaning of this provision requires construing the Acts in a manner so as *not* to impose the nine-month benchmark on *all* SIV applications. Nevertheless, the district court did precisely that, treating all applicants as though on equal footing to challenge the Agencies' conduct—*e.g.*, the Agencies' failure to adjudicate SIV applications within the nine-month benchmark. JA118 (finding that Plaintiffs' share a common challenge to "the same policy or practice: Defendants' systematic and unaddressed failure to complete processing and adjudication of their SIV applications within nine months."). Consequently, the class as defined necessarily includes individuals who are *not* subject to the nine-month benchmark. *See* JA132; JA170.

The district court relied on the proposition that courts in this jurisdiction routinely certify classes of members with different factual circumstances. *See* JA118; *see also Nio v. U.S. Dep't of Homeland Sec.*, 323 F.R.D. 28 (D.D.C. Oct. 27, 2017); *Bynum v. District of Columbia*, 214 F.R.D. 27, 34 (D.D.C. Mar. 31, 2003). Nevertheless, the facts underlying certification in those cases are inapposite precisely because the statutory construction provisions of the Acts recognize the Secretaries' *plenary* authority to review the facts and circumstances underlying SIV applications and conclude that additional screening is required to satisfy national security concerns. *See* AAPA § 602(b)(4)(A); RCIA § 1242(c)(2).

Moreover, unreasonable delay claims depend on an assessment of multiple equitable factors. *See TRAC*, 750 F.2d at 80 (identifying factors relevant to inquiry regarding the reasonableness of delay). Those equitable factors on their face will vary depending on the circumstances of visa applicants, including, as the statutes expressly recognized, different national security risks that call for different amounts of time to review their applications.

The court compounds its error in finding that "the difference between a high-risk applicant and one that is not . . . is nonetheless insufficient to undermine commonality here given the generality of Plaintiffs' claim, the indeterminate nature of what it means to be high-risk, and the fact that the court's relief allows Defendants flexibility in processing high-risk applications." JA119. To start, the question is not

24

whether plaintiffs can frame their claims at such a high level of "generality" as to make a question literally common. The Supreme Court has cautioned that commonality language in Rule 23 "is easy to misread, since any competently crafted class complaint literally raises common questions." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). The key inquiry is not whether plaintiffs can invent a common question, but rather "the capacity of a classwide proceeding to generate *answers* apt to drive the resolution of the litigation." *Id*. at 350. In *Wal-Mart*, the Supreme Court acknowledged that "'in appropriate cases,' giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory," *Id.* at 355 (citation omitted), where commonality can be satisfied by "'[s]ignificant proof that an employer operated under a general policy of discrimination . . . if the discrimination manifested itself in hiring and promotion practices in the same general fashion,'" *id*. at 353 (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 159 n.15 (1982)).

Moreover, "the indeterminate nature of what it means to be high-risk" cuts *against* certification, not for it. The risk level of an application is indeterminate because it is based on a multitude of variables, and Congress committed that determination of risk level and consideration of national security concerns more generally to the discretion of the Secretaries of State and Homeland Security. AAPA § 602(b)(4); RCIA § 1242(c)(2) ("Nothing . . . shall be construed to limit the *ability*

25

*of a Secretary . . .* to take longer than 9 months . . . . ") (emphasis added). *See* 5 U.S.C. 701(a)(2); *cf. Lincoln v. Vigil*, 508 U.S. 182, 191–92 (1993). That the Secretaries' discretion allows members of the class to be excluded from the very statutory benchmark underlying the claim demonstrates the failure of the class to identify a common claim. Members subject to such a determination simply do not possess the same legal footing to mount their challenge based on unreasonable delay.

Furthermore, "the indeterminate nature of what it means to be high-risk," JA119, is precisely the problem with the class as defined. National security assessments, for purposes of the Acts, are recognized as being under the purview of secretarial authority, and "[n]othing . . . shall be construed to limit" that authority, including the statutory benchmark relied upon by the district court to find a common claim. AAPA § 602(b)(4)(A); RCIA § 1242(c)(2). The district court brushes this issue aside by asserting that "the APA applies to all applicants." JA120. Here, the district court's rigid application of the nine-month benchmark to all class members ignores the clear directive of the plain statutory text—that "nothing," including the previously identified benchmark or statutory mandate to increase efficiency, "shall be construed to limit" the authority of the Secretaries to exceed nine months to satisfy national security concerns. AAPA § 602(b)(4)(A); RCIA § 1242(c)(2). Ignoring the clear language and construction of the statute to find commonality is error.

Similarly, the district court was wrong to rely on its assertion that "the court's relief allows Defendants flexibility in processing high-risk applications." JA119. The district court cannot cure the failure to demonstrate common questions and answers merely by asserting the power to craft different relief for differently situated class members.

This Court's post *Wal-Mart* decision in *D.L. v. District of Columbia*, 713 F.3d 120 (D.C. Cir. 2013), is instructive. That decision concerned a challenge to the District of Columbia Public Schools for alleged violations of, *inter alia*, the Individuals with Disabilities Education Act (IDEA). This Court explained that "the harms alleged to have been suffered by the plaintiffs here involve different policies and practices at different stages of the District's Child Find and FAPE process," finding that "the district court identified no single or uniform policy or practice that bridges all their claims." *Id*. at 127. The Court further explained that "plaintiffs' claims appear to be based on multiple, disparate failures to comply with the [District's] statutory child find obligations rather than a truly systemic policy or practice which affects them all," and noted that alleged harms ranged from those caused by failures associated with the District's "intake and referral process," those caused by failures "to offer adequate and timely education placements to implement individual education plans," and those associated with "the absence of a smooth and effective transition from early intervention programs to preschool programs." *Id*. at

27

128. The Court concluded, "*Wal-Mart* instructs that holding that the District has violated the IDEA as to each class member is not enough to establish Rule 23(a) commonality in the absence of a uniform policy or practice that affects all class members." *Id*. (internal citation omitted). In sum, *Wal-Mart* requires that the determination of a common question "will resolve an issue that is central to the validity of each one of the claims in one stroke." 564 U.S. at 350; *see also Jennings v. Rodriquez*, 583 U.S. 281, 313 (2018) (noting that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class").

Such factual differences exist here. Whether an adjudication is unreasonably delayed for an individual that requires further national security review cannot be determined against the nine-month benchmark contained in the Acts because Congress expressly forbade as much. *See* AAPA § 602(b)(4)(B); RCIA § 1242(c)(2) ("*Nothing* in this section shall be construed to limit the ability of a Secretary ….") (emphasis added). There is no way to parse the district court's class certification without concluding that the court, while giving cursory nod to the construction provision for high-risk cases, determined the underlying claim was resolvable in a single answer for all class members regardless of whether the provision applies. By certifying the class to include high-risk cases, the court acted contrary to the express

language of the construction provision by effectively limiting the Secretaries' ability to identify cases for additional review.

Consequently, resolution of the question regarding whether the Agencies unreasonably delayed SIV adjudications under the AAPA or RCIA does not resolve class members' claims in "one stroke." *Wal-Mart*, 564 U.S. at 350; *see, e.g.*, *Parker v. Bank of Am., N.A.*, 99 F. Supp. 3d 69 (D.D.C. 2015) (Jackson, J.) ("[B]inding precedent in this jurisdiction establishes that a plaintiff must allege that the policy or practice affects all members of the class . . . and that anything less is not faithful to the Supreme Court's interpretation of Rule 23(a)."). Thus, the district court's conclusion that "Plaintiffs challenge a uniform act and allege a uniform harm for which there is a common remedy" is incorrect.

### B. The district court abused its discretion when it found typicality among SIV applicants.

The district court also erred in finding the "claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "The facts and claims of each class member do not have to be identical to support a finding of typicality; rather, typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 52 (D.D.C. 2010) (internal citations and quotations omitted). The typicality requirement is used to ascertain "whether the

29

action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of the absent class members so as to assure that the absentees' interests will be fairly represented." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 27 (D.D.C. 2001) (citations omitted).

Here, the district court determined "that the course of conduct at issue (the application of the Agencies' policies), the injury itself, and the legal theory underlying the claims are the same in all material respects between the named Plaintiffs and the rest of the class." JA124. Once again, the district court minimized the extent to which facts and circumstances between class members distinguished their underlying claims. Notably, this analysis must presuppose the general applicability of the nine-month timing benchmark to all members of the class, including those requiring additional national security review. The district court concluded that, regardless of whether a case is deemed high-risk by the Agencies, the type of claim is typical of all class members. JA123–124. This cannot be the case where, as here, there are at least two groups of Plaintiffs within the certified class: (1) those to whom the nine-month benchmark applies, and (2) those to whom the Secretaries have determined additional review is required to satisfy national security concerns. It does not follow that these groups present the same underlying unreasonable delay challenge when each group requires a different analysis of factors to determine whether a delay in adjudication is, in fact, unreasonable. *See,*

30

*e.g.*, *TRAC*, 750 F.2d at 80 (identifying the factors relevant to determining whether agency delay is unreasonably delayed under the APA); *Daskalea v. Washington Humane Soc.*, 275 F.R.D. 346, 358–59 (D.D.C. 2011) (holding typicality not met when "members of proposed class had suffered a wide range of deprivations, had been provided with different kinds of notice at different points in time, and had claimed distinct injuries . . .").

Notably, Rule 23(a)'s commonality and typicality requirements occasionally merge:

> [b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named Plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*Gen. Tel. Co. of Sw.*, 457 U.S. at 157 n. 13. Just as the district court's overly broad and manifestly erroneous application of the nine-month benchmark pervades its analysis of the Allies' purportedly common claim, so too does it pervade the district court's conclusion that "Plaintiffs' claims are typical of those of the proposed class." JA124. The district court thus erred in finding that class representatives shared "claims or defenses. . . typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3).

### C. The district court abused its discretion when it determined the *Allies* class met the requirements under Rule 23(b)(2)(A).

The district court erred when it granted the Allies class certification under Rule 23(b)(2)(A), JA132, which permits class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted— the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *D.L.,* 715 F. 3d at 125 (citing *Wal-Mart*, 564 U.S. at 360). Rule 23(b)(2) "applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.* Thus, it is not enough for class plaintiffs to "superficially structure[] their case around a claim for class-wide injunctive and declaratory relief . . . if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made . . . ." *Jamie S. v. Milwaukee Pub. Sch.,* 668 F.3d 481, 498–99 (7th Cir. 2012).

Here, the district court erred in finding that "Defendants have unreasonably delayed the adjudication of all putative class members' SIV applications" and, thus, refused to act in a manner "generally applicable to the class." JA129 (internal

32

quotations and citations omitted). This finding is unmoored from the Acts. As previously discussed, the statutory construction provision of the Acts removes high-risk cases from the nine-month benchmark that the district court relied upon—heavily—for a rule of reason applicable to the adjudication period of *all* SIV applications. Consequently, the district court erred in concluding its "injunction does provide relief to each class member, *including those deemed high-risk, since the APA itself prohibits unreasonable delay.*" JA129 (emphasis added); *see, e.g., In re Navy Chaplaincy*, 306 F.R.D. 33, 56 (D.D.C. 2014) ("Plaintiffs have not identified *any* common harms suffered as a policy or practice that affects each class member.") (emphasis in original). As discussed *supra*, the statute expressly prohibits any part of the AAPA or RCIA from being "construed to limit the ability of a Secretary . . . to take longer than 9 months to complete those steps incidental to . . . high-risk cases . . ." AAPA § 602(b)(4); RCIA § 1242(c)(2).

The most natural reading of this construction provision prohibits any aspect of the statute from limiting the Secretaries from satisfying national security concerns in cases determined to be high-risk. *Id*. At odds with this provision, the district court found that a single injunctive relief plan would remedy a common injury among all members of the Allies class. JA129. This court's conclusion erroneously overemphasized the "similarity arising from the defendants' conduct" rather than "dissimilarity that has the capacity to undercut the indivisible character of an

33

appropriate remedy." Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L. Rev. 97, 132 (2009); *see, e.g.*, *Wal-Mart Stores, Inc.*, 564 U.S. at 360 ("[Rule 23(b)(2)] does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment.") (emphasis in original). By concluding that the Agencies' conduct—taking longer than nine months to adjudicate SIV applications—can be remedied by a single injunction, the district court necessarily (and erroneously) concluded that all class members are entitled to the same relief: *i.e.*, prompt adjudication of their SIV applications. *See* JA129. Put another way, if class members were required to bring individual suits, a court would need to determine if the construction provision applied to their case before getting to the question of relief. The district court erred by failing to appropriately consider the clear instructions set forth by Congress on how to construe the provisions of the Acts: "*Nothing* in this section shall be construed to limit the ability of a Secretary ….". AAPA § 602(b)(4)(A); RCIA § 1242(c)(2) (emphasis added).

The fact that some members of the class cannot be said to have had their applications unreasonably delayed on the same basis as others distinguishes this case from other district court cases in the D.C. Circuit. For example, in *Crowe v. Fed. Bureau of Prisons*, No. 24-CV-3582 (APM), 2025 WL 1635392, at *20 (D.D.C. June 9, 2025), the district court held that an individualized inquiry under *TRAC* was

34

unnecessary for each class member because "Plaintiffs challenge a regulation 'generally applicable to the class.'" But here, the carveouts in the Acts by their very nature makes it so that an injunction could not be generally applicable to all individuals claiming unreasonable delay in the SIV process.

## II. The District Court Erred in Finding Unreasonable Delay Under the APA.

Title 5 of the U.S. Code, Section 706(1) of the APA states that a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonable delayed." To state a claim for unreasonable delay, Plaintiffs must first allege that the agency "failed to take a discrete agency action that it is required to take," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004), and, second, that the delay was unreasonable, *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 621 (D.C. Cir. 2020). Here, Congress created no mandatory duty to process high-risk applications within a particular timeline, so the district court erred in imposing a mandatory duty to expedite for all cases.

### A. The Agencies Do Not Owe the Allies a Discrete, Nondiscretionary Duty.

A legal duty owed must be "ministerial or nondiscretionary" and must amount to a "specific, unequivocal command." *Norton*, 542 U.S. at 63–64. Courts "have long recognized that the term [agency action] is not so all-encompassing as to authorize…judicial review over everything done by an administrative

35

agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (internal citations omitted); *see Fund for Animals, Inc., v. U.S. Bureau of Land Mgmt*, 460 F.3d 13, 21 (D.C. Cir. 2006) ("The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives. . . is not contemplated by the APA."). This Court has previously declined to hold that section 555(b) of the APA by itself creates a "specific, unequivocal command" just because it requires agencies to "proceed to conclude a matter presented to it." *Karimova*, 2024 WL 3517852, *4. Just like section 555(b) did not "place upon consular officers a 'crystal-clear legal duty' after they have adjudicated a visa application to then forgo any potentially beneficial follow-on administrative processing," so too should this Court hold that the Acts do not place a specific, unequivocal command to adjudicate *all* SIVs within nine months.

As an initial matter, the statutes do not clearly impose any mandatory timeline. The core of those provisions includes a directive that the agencies "shall improve the efficiency" with the goal of speeding SIV processing. AAPA § 602(b)(4)(A); RCIA § 1242(c)(1). But unsurprisingly in light of the complex and varied circumstances surrounding visa adjudications, Congress did not impose a rigid timeline, instead only stating a precatory goal that the process "should" be completed within 9 months. *Id.* That different choice of word—"should" rather than "shall"—

36

demonstrates that Congress did not intend to impose a rigid timeline in this context. *See, e.g.*, *Anglers Conservation Network v. Pritzker*, 809 F. 3d 664, 666 (D.C. Cir. 2016) (when a "statutory provision uses both 'shall' and 'may,' it is a fair inference that the writers intended the ordinary distinction"); *Jolly v. Listerman*, 672 F.2d 935, 945 (D.C. Cir. 1982) ("The use of the word 'should' . . . detracts significantly from any claim that this guideline is more than merely precatory."); *United States v. Maria*, 186 F.3d 65, 71 (2d Cir. 1999) ("'[S]hould' implies, suggests, and recommends, but does not require."). Thus, while a panel of this Court previously stated in dicta that "contextual clues suggest something closer to a command," *see Allies 2024 Appeal*, 103 F.4th at 817, that command is limited to improving efficiency, *not* to following any particular timeline or expediting every case.

In any event, even if a 9-month goal could be read as more than precatory, the statutes expressly state that the 9-month target does *not* apply to high-risk cases involving national security concerns. In particular, they state that "[n]othing in this section shall be construed to limit the ability of a Secretary * * * to take longer than 9 months * * * in high-risk cases for which satisfaction of national security concerns requires additional time." AAPA § 602(b)(4)(B), RCIA § 1242(c)(2). That language demonstrates that Congress did not intend to limit the Secretaries' discretion regarding national security concerns. And as noted, the determination of which cases are "high-risk" and require further processing regarding national security concerns

is wholly committed to the Agencies' discretion. The district court therefore erred in imposing a mandatory duty to expedite for *all* cases.

### B. The Agencies Did Not Unreasonably Delay SIV Adjudications.

Even if a nondiscretionary duty existed to process within any particular timeline, the district court was wrong to find unreasonable delay by applying a 9-month metric to all cases, regardless of whether the applicant is high risk and requires further review. JA84–92. The district court explicitly considered nine months to be the "rule of reason" supplied by Congress, JA84–88, and held there was no evidence of any competing obligations that could justify the delay in processing applications. JA90–92. That error infected the court's entire unreasonable-delay analysis in deciding to impose an injunction. This Court previously left open whether that analysis was sound and focused narrowly on whether the district court abused its discretion in declining to terminate its injunction. *See Allies 2024 Appeal*, 103 F.4th at 815–20. It should now address that question and reverse.

> *i. The district court erred in its "rule of reason analysis" by overemphasizing the nine-month benchmark*

*TRAC* factor one looks to a "rule of reason" governing the time agencies take to make decisions. 750 F.2d at 80 (quoting *Potomac Elec. Power Co. v. ICC*, 702 F.2d 1026, 1034 (D.C. Cir. 1983)). In assessing whether an agency follows a rule of reason, the court evaluates the length of the delay in light of "the complexity of the

task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). *TRAC* factor two assesses whether "Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed" 750 F.2d at 80. The second *TRAC* consideration thus "gives content to the first." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999). The first and second *TRAC* factors are typically considered together and ask whether the agency's timeline conforms to a "rule of reason," which is a flexible assessment of the context of the agency's action. *Mashpee,* 336 F.3d at 1102.

Here, the district court adopted a one-size-fits-all metric of nine months from the submission of an application for COM approval for all applicants. JA099 ("[T]his court used the 9-month timetable to evaluate the reasonableness of the delay experienced by applicants."). The district court determined that because Congress provided a nine-month benchmark, nine months was the applicable "rule of reason" for all government-controlled steps of all applications. JA84–88. That decision contravenes the statute. Congress stated that "[n]othing in this section shall be construed to limit the ability of a Secretary to take longer than 9 months in high-risk cases for which satisfaction of national security concerns requires additional time." AAPA § 602(b)(4)(B), RCIA § 1242(c)(2). That means that Congress understood—

39

indeed, expected—that processing would routinely require longer than 9 months in cases involving national security concerns.

Moreover, the district court relied mostly on the view that the delay here must have been unreasonable because of its length.  JA84–88.  But as the district court itself acknowledged, delay alone does not show that the time elapsed is *unreasonable*. *See id.* The rule of reason is *flexible*, accommodating changes in agency policy or practice, new information that may become relevant, and the possibility that one adjudication may impact another. *See In re Pub. Emps. for Env't. Resp.*, 957 F.3d 267, 273 (D.C. Cir. 2020). In *Da Costa,* this Court recognized that "the length of the wait alone is not sufficient" to show that an agency did not follow a rule of reason. *Da Costa*, 80 F 4th. at 343. It rejected the notion that "four-and-one half years to process an immigration petition is per se unreasonable." *Id.* at 342 (cleaned up). Instead, the court looked at practical challenges experienced by the agency, such as expending agency resources, waiting on Congressional action, and the global pandemic. *Id.* at 341–43. This Court should apply similar logic to the SIV program when evaluating the rule of reason, instead of solely focusing on the nine-month benchmark in the Acts.

This Court emphasizes a totality-of-the-circumstances approach to *TRAC* because the mere presence of a statutory timetable (Factor 2) does not supplant the overarching rule of reason (Factor 1). *See Cutler v. Hayes*, 818 F. 2d 879, 898 (D.C.

40

Cir. 1987) (absent bad faith, courts should "consider the agency's explanation, such as necessity, insufficient resources, or the complexity of the task confronting the agency"). This is because, as Congress has consistently and recently recognized, the nine-month benchmark in the Acts, while an important marker for the Agencies' adjudication efforts, might be unattainable despite the Agencies' best efforts. Thus, where "Congress deemed it unwise to impose a rigid timetable on [an agency]; [courts] are not free to ignore that judgment and rewrite the statute to include a specific timetable." *See In re Am. Fed'n of Gov't Emps.*, 837 F.2d 503, 506 (D.C. Cir. 1988).

A strict timetable approach is especially inappropriate where, as here, the Agencies administer a complex, multistep process that requires review of extensive submissions and involves national security considerations. *See Wang v. Blinken*, 3 F.4th 479, 483 (D.C. Cir. 2021) ("[W]e require clearer legislative direction than just the relocation of unaltered statutory text before adopting a reading of the statute that effects the type of sweeping and monumental change in immigration policy that the Plaintiffs' reading of the statute would cause."); *see In re Barr Labs.*, 930 F.2d 72, 75 (D.C. Cir. 1991) (an agency's failure to meet a statutory deadline "does not, alone, justify judicial intervention"). Further, courts should recognize the broad authority Congress and the Agencies have in immigration matters. *See Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) (Congress has "plenary power to make rules for the

41

admission of aliens and to exclude those who possess those characteristics which Congress has forbidden"); *Skalka v. Kelly*, 246 F. Supp. 3d 147, 153–54 (D.D.C. 2017) ("Congress has given the agencies wide discretion in the area of immigration processing."). "Few interests can be more compelling than a nation's need to ensure its own security," *Wayte v. United States*, 470 U.S. 598, 611–12 (1985), and consular officers' visa determinations are "matters touching on national security," *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999).

While the Acts show that Congress wanted the Agencies to process SIV applications expeditiously, it also required thorough vetting of those applications— which takes considerable time. At multiple stages of the SIV process, the Agencies must intensively screen and investigate the backgrounds of each applicant. At the COM approval stage, Congress requires a "risk assessment" of the applicant and an "independent review of records" maintained by the hiring organization to ensure that the applicant was, in fact, employed by or on behalf of the U.S. government as represented. *See* RCIA § 1244(b)(4)(A), AAPA § 602(b)(2)(D)(i)(a). At the visa petition stage, Congress requires the applicant to clear a "background check and appropriate screening." *See* 8 U.S.C. § 1153(f); RCIA § 1244(a)(4); AAPA § 602(b)(1)(D). At the visa application stage, Congress requires the applicant to submit police, prison, and military records, and requires the State Department to liaise with other agencies on security issues and to refuse a visa if the applicant is

inadmissible. 8 U.S.C. §§ 1105(a), 1202(b), (e), 1204; RCIA § 1244(a)(2); AAPA § 602(b)(1)(B). All throughout, the Acts afford the Agencies time to ensure that national security concerns are vetted. RCIA § 1242(c)(2); AAPA § 602(b)(4)(B). The Agencies also faced the additional hurdle that unlike unreasonable delay claims involving a *single* agency, *see, e.g.*, *Barr Labs.*, 930 F.2d at 74, the Acts require coordination among at least three departments: State, Defense, and Homeland Security, *see, e.g.*, RCIA §§ 1242(c)(1), 1244(a), (c)(1), (e); AAPA §§ 602(b)(1), (4)(A), (6), (11)–(13).

Further, as recently as July 2021, Congress amended the AAPA to explicitly include the COM approval phase in the nine-month period. ESSAA § 401(a)(3). But as it had done before, Congress provided only that the Agencies "should" complete processing under the specific terms, and again left in place the provision stating that the agencies may take longer than that whenever they identify high risk cases raising national security concerns. *Id.* ("[A]ll steps [under government control] should be completed not later than 9 months . . . .").

> ii. *The district court erred in its analysis of the remaining TRAC factors.*

43

*TRAC* factors 3, 4, and 5 also weigh in favor of the Agencies. [3] "[*TRAC* factor 3] looks to whether human health and welfare are at stake…and [*TRAC* factor 5] assesses the nature and extent of the interests prejudiced by delay." *Ctr. for Sci. in the Pub. Int. v. U.S. Food & Drug Admin.*, 74 F. Supp. 3d 295, 304 (D.D.C. 2014) (internal quotation marks omitted). *TRAC* factor 4 considers "the effect of expediting delayed action on agency activities of a higher or competing priority." 750 F. 2d at 80. The district court's improper use of the 9-month benchmark for all cases ultimately infected its analysis of the remaining factors.

This Court has emphasized that in cases alleging unreasonable agency delay, agencies should have a primary role in determining how to direct their scarce and finite resources. *See Barr Labs.*, 930 F.2d at 76 ("The agency is in a unique—and authoritative—position to…allocate its resources in the optimal way."). Even when an agency fails to meet a statutory deadline for action, courts hesitate to reset agency priorities. *See, e.g., Action on Smoking & Health v. Dep't of Labor*, 100 F.3d 991, 994–95 (D.C. Cir. 1996); *EMR Network v. FCC*, 391 F.3d 269, 273 (D.C. Cir. 2004). But the injunction inherently interferes with, for only one example, the Agencies' discretion to resolve national security concerns and complete the process outside the nine-month deadline the court imposed. Congress mandated that the Agencies

---

[3] The sixth factor is not at issue and, consequently, was not addressed by the district court here. *See* JA084 ("The court will address each factor—excluding the sixth factor, which is not necessary—in turn.").

conduct "a background check and appropriate screening" on an SIV applicant, among other measures. RCIA § 1244(a)(4); AAPA § 602(b)(1)(D). In this way, Congress required "respect for the autonomy and comparative institutional advantage of the executive branch." *Barr Labs.*, 930 F.2d at 74; *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.").

Courts have recognized that even a delay "stem[ming] from a lack of resources" is "'a problem for the political branches to work out.'" *Mashpee*, 336 F.3d at 1101 (quoting *Barr Labs.*, 930 F.2d at 75)*; see also Grand Canyon Air Tour Coal.*, 154 F.3d at 476 ("[W]e are acutely aware of the limits of our institutional competence in the highly technical area at issue in this case."). Ultimately, if "an order compelling agency action will serve only to delay other important [agency] matters, then the delay in question may be considered reasonable." *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 40 (D.D.C. 2000). While the Agencies recognize the dangerous conditions many SIV applicants face in Afghanistan and Iraq and are making strenuous efforts to approve meritorious SIV applications, the Agencies are best positioned to manage the SIV program in the best interests of both SIV applicants and the public interest.

Absent proper consideration of the Secretaries' discretion over which cases require additional time to resolve for national security concerns, the district court

45

cannot be said to have properly balanced the factors under *TRAC* as applied to every member of the class. Accordingly, the district court's conclusion that Defendants unreasonably delayed the adjudication of class members' SIV applications should be vacated.

### III. The District Court Erred in Determining That a Refusal Under 8 U.S.C. § 1201(G) Does Not Discharge the Duty Owed Under the Acts.

Even if an injunction were appropriate, the district court was wrong to apply the injunction to visa applications that the State Department has already refused for "administrative processing" under 8 U.S.C. § 1201(g). A refusal under 8 U.S.C. § 1201(g) is a *final* decision under the Acts and 22 C.F.R. § 42.81(a) thus not subject to the injunctive relief ordered by the district court. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). It means that the applicant has failed to demonstrate eligibility, and therefore the Department has refused the application. Under the statute and applicable regulations, the Department of State must either approve or refuse a visa application. *See* 22 C.F.R. § 42.81(a) (stating "[w]hen a visa application has been properly completed and executed before a consular officer in accordance with the provisions of INA," the consular officer must either issue or refuse the visa under INA 212(a) or INA 221(g) or other applicable law."). Although the Department may choose, in its discretion, to reconsider a refusal under Section 1201(g) if it obtains more information, it has no duty to do so.

This Court previously recognized that Section 1201(g) refusals are final decisions in *Karimova*, 2024 WL 3517852, *4. There, this Court concluded in an unpublished decision that dismissal of the plaintiff-appellant's APA claim below was proper "because Karimova ha[d] not identified any law 'plainly prescrib[ing]' that the consular officer does not put an officially refused visa application in administrative processing." *Id*. at *3 (citing and quoting *I.C.C. v. New York, N.H. & H.R. Co.*, 287 U.S. 178, 204 (1932)). In so holding, this Court found that the appellant's "'matter' ha[d] already been 'conclude[d]'" where "[a] consular officer reviewed her application, interviewed her, and ruled that no visa would be granted." *Id*. at *4 (quoting with alteration 5 U.S.C. § 555(b)). As noted by this Court, appellant "received the 'refused' decision that the law expressly authorizes as one of the allowed actions on a visa application." *Id*. (citing 22 C.F.R. § 42.81; 8 U.S.C. § 1201(g)). Additionally, the Sixth Circuit has held that an individual was not entitled to mandamus relief after multiple 1201(g) refusals because "defendants fully discharged their duties under the law." *Hussein v. Beecroft*, 782 F. App'x 437, 442 (6th Cir. 2019).

Here, the district court erroneously concluded that a refusal for administrative processing under 8 U.S.C. § 1201(g) "is not a final adjudication but a mandatory intermediate step" and that "[a]pplicants who languish in that step for unreasonable periods of time suffer . . . an injury in fact: 'the failure to receive final decisions . .

47

. within a reasonable period.'" JA049 (quoting *Nine Iraqi Allies v. Kerry*, 168 F. Supp. 268, 282 (D.D.C. Mar. 7, 2016)*; see also* JA049 (in denying the Agencies' Motion to Dismiss, the district court incorrectly concluded that "administrative processing is not a final adjudication but a mandatory intermediate step"). But as *Karimova* correctly explained, mandamus and APA relief are limited to "required agency action" and, by issuing a section 1201(g) refusal, the consular officer has already acted on an application—e.g., there is no further required action to take. *Karimova*, 2024 WL 3517852 at *5.

Thus, the mere fact that a consular officer *may* reconsider a refusal does not render the refusal a non-final, temporary, or interim agency position. *See id.* A refusal under § 1201(g) marks the culmination of a consular officer's decision making process and should not be included in an injunctive relief plan that ends at the final determination of a visa. No provision in the AAPA or RCIA precludes a consular officer from refusing a case under section 1201(g) or reviewing a previously refused case in an exercise of discretion. *See Karimova*, 2024 WL 3517852 at *3. Accordingly, the district court erred in concluding that such refusals did not constitute a final agency action, and at a minimum, the injunction cannot extend to applications that a consular officer has already refused.

## IV. The District Court Abused Its Discretion by Failing to Modify the Injunction in Accordance with Significant Changed Circumstances to the SIV Program.

In addition, the district court abused its discretion when it failed to meaningfully modify the 2020 AAP based on the significant changes in circumstances since the September 2019 order, instead leaving in place rigid benchmarks that are extraordinarily difficult to meet.

Given the lacking case law for Rule 54(b) denial of the modification of an injunction, Rule 60(b) cases are instructive here when "changed factual conditions" would make compliance "more onerous" or "unworkable because of unforeseen obstacles." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 385 (1992). Akin to Rule 54(b) appellate review, a denial of a Rule 60(b)(5) motion is also reviewed for abuse of discretion. *Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 366 (D.C. Cir. 2017). In *Horne v. Flores*, 557 U.S. 433 (2009), the Supreme Court held that "[t]he party seeking relief bears the burden of establishing that changed circumstances warrant relief, … but once a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction…in light of such changes.'" 557 U.S. at 447 (quoting *Agostini v. Felton*, 521 U.S. 203, 215 (1997); *see also Gov't of Province of Manitoba v. Zinke*, 849 F.3d 1111 (D.C. Cir. 2017).

Here, the district court had granted modification of the AAP "[i]n light of the court's renewed unreasonable delay analysis and Defendants' technical alternations to the SIV visa adjudication process." JA166. The district court agreed that "intervening factual developments warrant modification of the court's judgment and

49

the 2020 Plan." JA160–61. Despite that finding, the district court adopted very few changes between the 2020 AAP and the 2025 RAP. No significant timing benchmarks were changed. Tracking and reporting requirements also barely differ from the AAP and RAP: Defendants have only ten additional days to lodge progress reports. Mandatory explanation and proposed remedies in the event of government failure to meet the timing benchmarks are also minimally changed.

The RAP only differs from the AAP by (1) updating the class member parameters (proposed by Plaintiffs), (2) adding the business days or calendar days label to most benchmarks, (3) removing reference to the COM Committee as it no longer exists (agreed to by Plaintiffs), (4) slightly lengthening the timeline that NVC has to send the instruction packet at Step 7, (5) adding Step 8 for Afghan SIV applicants (agreed to by Plaintiffs), (6) providing Defendants ten additional days to lodge quarterly progress reports after the end of the reporting period (agreed to by Plaintiffs), (7) adding a footnote recognizing USCIS's diminished role in the SIV process, (9) requiring a meet and confer before enforcement motions, and (9) clarifying the term "administrative processing," although not in the way Defendants proposed. *Compare* JA139–151 *to* JA187–205. All other changes between the plans are not substantive, such as formatting or slight wording changes. *Id.* Many of the significant intervening developments put forth by Defendants related to circumstances that have made it difficult to meet certain performance standards set

50

out in the AAP. Nonetheless, while the court recognized the existence of those developments, it ignored them in largely retaining the same performance standards between the AAP and RAP.

The district court's failure to make any change regarding benchmarks for interviews or Chief of Mission review is particularly stark. Not only has the withdrawal led to an 8-fold increase in applications, but the consequent closure of the embassy in Kabul has made it extremely difficult to assess the applications vis-à-vis the statutory requirements and interview the applicants. In light of those difficulties, Defendants' revised plan proposed adjudicating 4,500 COM applications and/or appeals per quarter. Dkt. No. 207. Defendants explained that the 120-day timeline is not workable because, at the end of 2020, there were 8,795 pre-COM cases and 4,531 COM applications awaiting review, whereas by the end of 2022, there were 76,778 pre-COM cases and 62,919 COM applications. *See* Dkt. No. 261 at 4–5, Brooks Dep. 85:17–85:19, Ex. E; McGeary 30(b)(6) Dep. 348:11–348:18, Ex. H (explaining the "unprecedented interest in the Afghan SIV program and thus the huge influx of COM applications."). However, the district court refused to make any change, continuing to impose the same 120-day benchmark. To maintain the same benchmark as the AAP fundamentally conflicts with Defendants' need to carefully review COM applications, verify the authenticity of documents, conduct fraud review, and verify qualifying employment, all of which are required

to ensure the integrity of the COM application process. *See id.* at 5–6, Schubert Dep. 43:18-48:17, Ex. K (describing the steps involved in the COM application review process).

As to interviews, the AAP required Defendants to notify an SIV applicant of an interview date within 10 days of determining that the case was ready to proceed to an interview, and the interview date had to be the next available interview within 60 calendar days of the notice, unless the applicant requested a different interview location or interview time or there were reasonable circumstances for the delay as explained in the quarterly progress reports. JA139–151. Following the withdrawal from Afghanistan and its drastic impact on SIV applications, the government asked the district court not to impose any time period in which an interview must be completed, but to instead require only notification of an interview date within 60 days. *See* Dkt. 271, at 5. Defendants explained that, along with the influx in SIV cases since the AAP was instituted, the backlog of all immigrant visa cases (not just SIV cases) awaiting interview scheduling also dramatically increased. Dkt. No. 261 at 8 (citing *Yazdanpanahderav v. U.S. Dep't of State*, No. 1:23-CV-3688 (ACR), 2024 WL 3010874 (D.D.C. June 14, 2024)). The backlog of visa cases deemed ready for an interview but awaiting availability at a U.S. Embassy overseas increased by approximately 440% from 78,000 cases in January 2020 to 421,136 cases in May 2022. Dkt. No. 261 at 9, Vermillion Dec. ¶ 3, Ex. D. Defendants' requested

52

modification reflected this scarcity of resources. *Id.* at 9. The district court nonetheless continued to require the State Department to notify an applicant of an interview date within 8 days and hold the interview within 60 days of the notification. The lack of any modification limits consular managers' ability to consider, for example, local conditions, staffing, and the bilateral relationship with the host country. *See id*, McGeary 30(b)(6) Dep. 453:24-455:5, Ex. H.

The district court's failure to make any meaningful change thus resulted in an injunction that is not "suitably tailored to the changed circumstances." *See* JA160 (citing *Rufo*, 502 U.S. at 393). Courts must "closely tailor injunctions to the harm that they address." *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 972 (D.C. Cir. 1990); *see Gulf Oil Corp. v. Brock*, 778 F.2d 834, 843–44 (D.C. Cir. 1985) ("Clearly, the District Court's order falls far short of the requirement that an injunction must be narrowly tailored to remedy the harm shown."). The purpose of the injunctive relief plan is to "aid Plaintiffs in their quest for an adjudication without unduly intruding into Defendants' province." JA093. However, an injunction tailored to circumstances which are now changed is not and cannot be reasonably tailored to present circumstances, nor does it abide by the original purpose of the injunction set out in 2019. And the district court failed to take account of what is "workable," as equity demands. *See North Carolina v. Covington*, 581 U.S. 486, 488 (2017*); cf. American Hosp. Ass'n v. Price*, 867 F.3d 160, 166 (D.C. Cir. 2017)

53

("[I]t was an error of law, and therefore an abuse of discretion, to…order the Secretary to render that performance without first finding that lawful compliance was indeed possible."). This Court should reverse the district court's order of June 5, 2025 adopting the RAP, and remand to the district court to enter an injunction in line with its November 2022 order.

## CONCLUSION

For the foregoing reasons, the Court should:

- Vacate the injunction;

- Issue an order to de-certify the class;

- Reverse the district court's order finding that Defendants-Appellants unreasonably delayed SIV adjudications; and

- Reverse the district court's order of June 5, 2025 adopting the Revised Adjudication Plan.

- In the alternative, remand with instructions to the district court to enter a new Adjudication Plan that contains modifications consistent with the district court's November 2022 order.

***

54

Dated: May 4, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANTHONY P. NICASTRO
Acting Director
Office of Immigration Litigation

RUTH ANN MUELLER
DAVID J. BYERLEY
Senior Litigation Counsel

JOSHUA A. CLEM
LARISSA K. JOHNSON
Trial Attorneys

*/s/ Jaime A. Scott*
JAIME A. SCOTT
D.C. Cir. Bar No. 66335
Trial Attorney
U.S. Department of Justice,
Civil Division
Office of Immigration Litigation
P.O. Box. 868, Washington, DC
20044
Telephone: (202) 305-3620
Email: Jaime.A.Scott@usdoj.gov

*Attorneys for Defendants-Appellants*

# ADDENDUM

## <u>ADDENDUM TABLE OF CONTENTS</u>

Afghan Allies Protection Act, Pub. L. No. 111-8, 123 Stat. 807 (2009), *codified as amended in* 8 U.S.C. § 1101 note .....................................................................A3–17

Refugee Crisis in Iraq Act, Pub. L. No. 110-181, 122 Stat. 395 (2008), *codified as amended in* 8 U.S.C. § 1157 note .....................................................................A18–27

**Afghan Allies Protection Act, Pub. L. No. 111-8, 123 Stat. 807 (2009),** *codified as amended in* **8 U.S.C. § 1101 note**

Sec. 601.   Short title.

This Act [Pub. L. 111-8, Div. F, Title VI, § 601 et seq., March 11, 2009, 123 Stat. 807, which enacted this note] may be cited as the 'Afghan Allies Protection Act of 2009'.

Sec. 602.   Protection for Afghan allies.

(a) Appropriate committees of Congress defined.—In this section, the term 'appropriate committees of Congress' means—

    (1) the Committee on Armed Services, the Committee on Foreign Relations, and the Committee on the Judiciary of the Senate; and

    (2) the Committee on Armed Services, the Committee on Foreign Affairs, and the Committee on the Judiciary of the House of Representatives.

(b) Special immigrant status for certain Afghans.—

    (1) In general.—Subject to paragraph (3), the Secretary of Homeland Security, or, notwithstanding any other provision of law, the Secretary of State in consultation with the Secretary of Homeland Security, may provide an alien described in subparagraph (A), (B), or (C) of paragraph (2) with the status of a special immigrant under section 101(a)(27) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(27)), if the alien—

        (A) or an agent acting on behalf of the alien, submits a petition for classification under section 203(b)(4) of such Act (8 U.S.C. 1153(b)(4));

        (B) is otherwise eligible to receive an immigrant visa;

        (C) is otherwise admissible to the United States for permanent residence (excluding the grounds for inadmissibility specified in section 212(a)(4) of such Act (8 U.S.C. 1182(a)(4)); and

        (D) clears a background check and appropriate screening, as determined by the Secretary of Homeland Security.

A3

(2) Aliens described.—

    (A) Principal aliens.—An alien is described in this subparagraph if the alien—

        (i) is a citizen or national of Afghanistan;

        (ii) was or is employed in Afghanistan on or after October 7, 2001, for not less than 1 year—

            (I) by, or on behalf of, the United States Government; or

            (II) by the International Security Assistance Force (or any successor name for such Force) in a capacity that required the alien—

                (aa) while traveling off-base with United States military personnel stationed at the International Security Assistance Force (or any successor name for such Force), to serve as an interpreter or translator for such United States military personnel; or

                (bb) to perform activities for the United States military personnel stationed at International Security Assistance Force (or any successor name for such Force);

        (iii) provided faithful and valuable service to an entity or organization described in clause (ii), which is documented in a positive recommendation or evaluation, subject to subparagraph (D), from the employee's senior supervisor or the person currently occupying that position, or a more senior person, if the employee's senior supervisor has left the employer or has left Afghanistan; and

        (iv) has experienced or is experiencing an ongoing serious threat as a consequence of the alien's employment described in clause (ii).

A4

(B) Spouse or child.—An alien is described in this subparagraph if the alien—

    (i) is the spouse or child of a principal alien described in subparagraph (A); and

    (ii) is accompanying or following to join the principal alien in the United States.

(C) Surviving spouse or child.—

    (I) In general [sic; probably should read '(i) In general'].—An alien is described in this subparagraph if the alien—

    (I) was the spouse or child of a principal alien described in subparagraph (A) who had submitted an application to the Chief of Mission pursuant to this section or section 1059 of the National Defense Authorization Act for Fiscal Year 2006 (Public Law 109-163; 8 U.S.C. 1101 note) which included the alien as an accompanying spouse or child; and

    (II) due to the death of the principal alien—

        (aa) such petition was revoked or terminated (or otherwise rendered null); and

        (bb) such petition would have been approved if the principal alien had survived.

    (II) Employment requirements [sic; probably should read '(ii) Employment requirements'].—An application by a surviving spouse or child of a principal alien shall be subject to employment requirements set forth in subparagraph (A) as of the date of the principal alien's filing of an application for the first time, or if no application has been filed, the employment requirements as of the date of the principal alien's death.

A5

(D) Approval by Chief of Mission required.—

  (i) In general.—Except as provided under clause (ii), a recommendation or evaluation required under subparagraph (A)(iii) shall be accompanied by approval from the appropriate Chief of Mission, or the designee of the appropriate Chief of Mission, who shall conduct a risk assessment of the alien and an independent review of records maintained by the United States Government or hiring organization or entity to confirm employment and faithful and valuable service to the United States Government prior to approval of a petition under this section.

  (ii) Review process for denial by Chief of Mission.—

    (I) In general.—An applicant who has been denied Chief of Mission approval shall—

      (aa) receive a written decision that provides, to the maximum extent feasible, information describing the basis for the denial, including the facts and inferences underlying the individual determination; and

      (bb) be provided not more than one written appeal per denial or revocation—

        (AA) that shall be submitted not more than 120 days after the date that the applicant receives such decision in writing or thereafter at the discretion of the Secretary of State; and

        (BB) that may request reopening of such decision and provide additional information, clarify existing information, or explain any unfavorable information.

A6

> (II) Afghan Special Immigrant Visa Coordinator.— The Secretary of State shall designate, in the Embassy of the United States in Kabul, Afghanistan, an Afghan Special Immigrant Visa Coordinator responsible for overseeing the efficiency and integrity of the processing of special immigrant visas under this section, who shall be given—
>
>> (aa) sufficiently high security clearance to review information supporting Chief of Mission denials if an appeal of a denial is filed;
>>
>> (bb) responsibility for ensuring that an applicant described in subclause (I) receives the information described in subclause (I)(aa); and
>>
>> (cc) responsibility for ensuring that every applicant is provided a reasonable opportunity to provide additional information, clarify existing information, or explain any unfavorable information pursuant to [sub]clause (I)(bb).

(E) Evidence of serious threat.—A credible sworn statement depicting dangerous country conditions, together with official evidence of such country conditions from the United States Government, should be considered as a factor in determination of whether the alien has experienced or is experiencing an ongoing serious threat as a consequence of the alien's employment by the United States Government for purposes of subparagraph (A)(iv).

(F) Representation.—An alien applying for admission to the United States pursuant to this title may be represented during the application process, including at relevant interviews and examinations, by an attorney or other accredited representative.   Such representation shall not be at the expense of the United States Government.

A7

(3) Numerical limitations.—

    (A) In general.—Except as provided in subparagraph (C), the total number of principal aliens who may be provided special immigrant status under this section may not exceed 1,500 per year for each of the fiscal years 2009, 2010, 2011, 2012, and 2013.

    (B) Exclusion from numerical limitations.—Aliens provided special immigrant status under this subsection shall not be counted against any numerical limitation under sections 201(d), 202(a), or 203(b)(4) of the Immigration and Nationality Act ( 8 U.S.C. 1151(d), 1152(a), and 1153(b)(4)).

    (C) Carry forward.—

        (i) Fiscal years 2009 through 2013.—If the numerical limitation specified in subparagraph (A) is not reached during a given fiscal year, with respect to fiscal year 2009, 2010, 2011, 2012, or 2013, the numerical limitation specified in such subparagraph for the following fiscal year shall be increased by a number equal to the difference between—

            (I) the numerical limitation specified in subparagraph (A) for the given fiscal year; and

            (II) the number of principal aliens provided special immigrant status under this section during the given fiscal year.

        (ii) Fiscal year 2014.—If the numerical limitation determined under clause (i) is not reached in fiscal year 2013, the total number of principal aliens who may be provided special immigrant status under this subsection for fiscal year 2014 shall be equal to the difference between—

            (I) the numerical limitation determined under clause (i) for fiscal year 2013; and

            (II) the number of principal aliens provided such status under this section during fiscal year 2013.

A8

(D) Additional fiscal year.—For fiscal year 2014, the total number of principal aliens who may be provided special immigrant status under this section may not exceed 3,000, except that any unused balance of the total number of principal aliens who may be provided special immigrant status in fiscal year 2014 may be carried forward and provided through the end of fiscal year 2015, notwithstanding the provisions of paragraph (C), except that the one year period during which an alien must have been employed in accordance with subsection (b)(2)(A)(ii) shall be the period from October 7, 2001 through December 31, 2014, and except that the principal alien seeking special immigrant status under this subparagraph shall apply to the Chief of Mission in accordance with subsection (b)(2)(D) no later than September 30, 2014.

(E) Special rule for end of calendar year 2014.—

(i) In general.—During the period beginning on the date of the enactment of this subparagraph [Aug. 8, 2014] and ending on December 31, 2014, an additional 1,000 principal aliens may be provided special immigrant status under this section. For purposes of status provided under this subparagraph—

(I) the period during which an alien must have been employed in accordance with paragraph (2)(A)(ii) must terminate on or before December 31, 2014;

(II) the principal alien seeking special immigrant status under this subparagraph shall apply to the Chief of Mission in accordance with paragraph (2)(D) not later than December 31, 2014; and

(III) the authority to provide such status shall terminate on December 31, 2014.

(ii) Construction.—Clause (i) shall not be construed to affect the authority, numerical limitations, or terms for provision of status, under subparagraph (D).

A9

(F) Fiscal years 2015 through 2023.—In addition to any unused balance under subparagraph (D), for the period beginning on the date of the enactment of this subparagraph [Dec. 19, 2014] until such time that available special immigrant visas under subparagraphs (D) and (E) and this subparagraph are exhausted, the total number of principal aliens who may be provided special immigrant status under this section shall not exceed 38,500. For purposes of status provided under this subparagraph—

    (i) the period during which an alien must have been employed in accordance with paragraph (2)(A)(ii) must terminate on or before December 31, 2024;; [sic]

    (ii) the principal alien seeking special immigrant status under this subparagraph shall apply to the Chief of Mission in accordance with paragraph (2)(D) not later than December 31, 2024;; [sic] and

    (iii) the authority to issue visas shall commence on the date of the enactment of this subparagraph [Dec. 19, 2014] and shall terminate on the date such visas are exhausted.

(4) Application process.—

    (A) In general.—Not later than 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2014 [Dec. 26, 2013], the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall improve the efficiency by which applications for special immigrant visas under paragraph (1), are processed so that all steps, including Chief of Mission approval, under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa.

    (B) Construction.—Nothing in this section shall be construed to limit the ability of a Secretary referred to in subparagraph (A)

A10

to take longer than 9 months to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns requires additional time.

(C) Prohibition on fees.—The Secretary of Homeland Security or the Secretary of State may not charge an alien described in subparagraph (A), (B), or (C) of paragraph (2) any fee in connection with an application for, or issuance of, a special immigrant visa under this section.

(5) Assistance with passport issuance.—The Secretary of State shall make a reasonable effort to ensure that an alien described in subparagraph (A), (B), or (C) of paragraph (2) who is issued a special immigrant visa pursuant to this subsection is provided with the appropriate series Afghan passport necessary to enter the United States.

(6) Protection of aliens.—The Secretary of State, in consultation with the heads of other appropriate Federal agencies, shall make a reasonable effort to provide an alien described in subparagraph (A), (B), or (C) of paragraph (2) who is seeking special immigrant status under this subsection protection or to immediately remove such alien from Afghanistan, if possible, if the Secretary determines, after consultation, that such alien is in imminent danger.

(7) Other eligibility for immigrant status.—No alien shall be denied the opportunity to apply for admission under this subsection solely because such alien qualifies as an immediate relative or is eligible for any other immigrant classification.

(8) Resettlement support.—A citizen or national of Afghanistan who is granted special immigrant status described in section 101(a)(27) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(27)) shall be eligible for resettlement assistance, entitlement programs, and other benefits available to refugees admitted under section 207 of such Act (8 U.S.C. 1157) to the same extent, and for the same periods of time, as such refugees.

(9) Adjustment of status.—Notwithstanding paragraph (2), (7), or (8) of subsection (c) of section 245 of the Immigration and Nationality Act (8 U.S.C. 1255), the Secretary of Homeland Security may adjust the

A11

status of an alien described in subparagraph (A), (B), or (C) of paragraph (2) of this subsection or in section 1244(b) of the Refugee Crisis in Iraq Act of 2007 (Public Law 110-181 ; 122 Stat. 397) [ Pub.L. 110-181, Div. A, Title XII, § 1244(b), Jan. 28, 2008, 122 Stat. 397, which is set out in a note under 8 U.S.C.A. § 1157] to that of an alien lawfully admitted for permanent residence under subsection (a) of such section 245 [ 8 U.S.C.A. § 1255(a)] if the alien—

    (A) was paroled or admitted as a nonimmigrant into the United States; and

    (B) is otherwise eligible for special immigrant status under—

        (i)

            (I) this subsection; or

            (II) such section 1244(b) [section 1244(b) of Pub.L. 110-181, Div. A, Title XII, Jan. 28, 2008, 122 Stat. 397, which is set out in a note under 8 U.S.C.A. § 1157]; and

        (ii) the Immigration and Nationality Act ( 8 U.S.C. 1101 et seq. ) [Act June 27, 1952, c. 477, 66 Stat. 163, as amended, which is principally classified to this chapter].

(10) Annual report on use of special immigrant status.—

    (A) Requirement.—Not later than 120 days after the date of the enactment of this Act [March 11, 2009], and annually thereafter, the Secretary of Homeland Security shall submit to the appropriate committees of Congress a report on the number of citizens or nationals of Afghanistan or Iraq who have applied for status as special immigrants under this subsection or section 1244 of the Refugee Crisis in Iraq Act of 2007 (Public Law 110-181; 122 Stat. 396) [Pub. L. 110-181, Div. A, Title XII, § 1244, Jan. 28, 2008, 122 Stat. 396, which is set out in a note under 8 U.S.C.A. § 1157].

    (B) Content.—Each report required by subparagraph (A) submitted in a fiscal year shall include the following information for the previous fiscal year:

A12

      (i) The number of citizens or nationals of Afghanistan or Iraq who submitted an application for status as a special immigrant pursuant to this section or section 1244 of the Refugee Crisis in Iraq Act of 2007 (Public Law 110-181; 122 Stat. 396) [Pub.L. 110-181, Div. A, Title XII, §1244, Jan. 28, 2008, 122 Stat. 396, which is set out in a note under 8 U.S.C.A. § 1157 ], disaggregated—

          (I) by the number of principal aliens applying for such status; and

          (II) by the number of spouses and children of principal aliens applying for such status.

      (ii) The number of applications referred to in clause (i) that—

          (I) were approved; or

          (II) were denied, including a description of the basis for each denial.

(11) Report on improvements.—

    (A) Requirement for report.—Not later than 120 days after the date of the enactment of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 [Aug. 13, 2018], the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall submit to the appropriate committees of Congress a report, with a classified annex, if necessary.

    (B) Contents.—The report required by subparagraph (A) shall describe the implementation of improvements to the processing of applications for special immigrant visas under this subsection, including information relating to—

      (i) Enhancing existing systems for conducting background and security checks of persons applying for special immigrant status, which shall—

          (I) support immigration security; and

A13

(II) provide for the orderly processing of such applications without significant delay;

(ii) the financial, security, and personnel considerations and resources necessary to carry out this section;

(iii) the number of aliens who have applied for special immigrant visas under this subsection during each month of the preceding fiscal year;

(iv) the reasons for the failure to process any applications that have been pending for longer than 9 months;

(v) The total number of applications that are pending due to the failure—

(I) to receive approval from the Chief of Mission;

(II) of U.S. Citizenship and Immigration Services to complete the adjudication of the Form I-360;

(III) to conduct a visa interview; or

(IV) to issue the visa to an eligible alien;

(vi) the average wait times for an applicant at each of the stages described in clause (v);

(vii) the number of denials or rejections at each of the stages described in clause (v); and

(viii) the reasons for denials by the Chief of Mission based on the categories already made available to denied special immigrant visa applicants in the denial letter sent to them by the Chief of Mission.

(12) Public quarterly reports.—Not later than 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2014 [Dec. 26, 2013], and every 3 months thereafter, the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall publish a report on the website of the Department of State that describes the efficiency improvements made in the process by which applications for special

A14

immigrant visas under this subsection are processed, including information described in clauses (iii) through (viii) of paragraph (11)(B).

(13) Report.—Not later than December 31, 2016, and annually thereafter through January 31, 2024, the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall submit a report to the appropriate committees of Congress containing the following information:

(A) The occupations of aliens who—

(i) were provided special immigrant status under subclause (I) or (II)(bb) of paragraph (2)(A)(ii); and

(ii) were considered principal aliens for such purpose.

(B) The number of appeals submitted under paragraph (2)(D)(ii)(I)(bb) from application denials by the Chief of Mission and the number of those applications that were approved pursuant to the appeal.

(C) The number of applications denied by the Chief of Mission on the basis of derogatory information that were appealed and the number of those applications that were approved pursuant to the appeal.

(D) The number of applications denied by the Chief of Mission on the basis that the applicant did not establish faithful and valuable service to the United States Government that were appealed and the number of those applications that were approved pursuant to the appeal.

(E) The number of applications denied by the Chief of Mission for failure to establish the one-year period of employment required that were appealed and the number of those applications that were approved pursuant to the appeal.

(F) The number of applications denied by the Chief of Mission for failure to establish employment by or on behalf of the United States Government that were appealed and the number

A15

of those applications that were approved pursuant to the appeal.

(G) The number of special immigrant status approvals revoked by the Chief of Mission and the reason for each revocation.

(H) The number of special immigrant status approvals revoked by the Chief of Mission that were appealed and the number of those revocations that were overturned pursuant to the appeal.

(14) Reports informing the conclusion of the Afghan Special Immigrant VISA Program.—Not later than June 1, 2016, and every six months thereafter, the Secretary of Defense, in conjunction with the Secretary of State, shall submit to the Committee on Armed Services and the Committee on the Judiciary of the Senate and the Committee on Armed Services and the Committee on the Judiciary of the House of Representatives a report that contains—

(A) a description of the United States force presence in Afghanistan during the previous 6 months;

(B) a description of the projected United States force presence in Afghanistan;

(C) the number of citizens or nationals of Afghanistan who were employed by or on behalf of the entities described in paragraph (2)(A)(ii) during the previous 6 months; and

(D) the projected number of such citizens or nationals who will be employed by or on behalf of such entities.

(15) Sense of Congress.—It is the sense of Congress that the necessity of providing special immigrant status under this subsection should be assessed at regular intervals by the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives, taking into account the scope of the current and planned presence of United States troops in Afghanistan, the current and prospective numbers of citizens and nationals of Afghanistan employed by or on behalf of the entities described in paragraph (2)(A)(ii), and the security climate in Afghanistan. [(16) Redesignated (15)]

A16

(c) Rule of construction.—Nothing in this section may be construed to affect the authority of the Secretary of Homeland Security under section 1059 of the National Defense Authorization Act for Fiscal Year 2006 (Public Law 109-163; 8 U.S.C. 1101 note). [(d)  Redesignated (c)]

A17

**Refugee Crisis in Iraq Act, Pub. L. No. 110-181, 122 Stat. 395 (2008), *codified as amended in* 8 U.S.C. § 1157 note**

Sec. 1241.    Short title.

This subtitle [this note] may be cited as the 'Refugee Crisis in Iraq Act of 2007'.

Sec. 1242.    Processing mechanisms.

(a) In general.—The Secretary of State, in consultation with the Secretary of Homeland Security, shall establish or use existing refugee processing mechanisms in Iraq and in countries, where appropriate, in the region in which—

(1) aliens described in section 1243 [of this note] may apply and interview for admission to the United States as refugees; and

(2) aliens described in section 1244(b) [of this note] may apply and interview for admission to United States as special immigrants.

(b) Suspension.—If such is determined necessary, the Secretary of State, in consultation with the Secretary of Homeland Security, may suspend in-country processing under subsection (a) for a period not to exceed 90 days. Such suspension may be extended by the Secretary of State upon notification to the Committee on the Judiciary of the House of Representatives, the Committee on Foreign Affairs of the House of Representatives, the Committee on the Judiciary of the Senate, and the Committee on Foreign Relations of the Senate. The Secretary of State shall submit to such committees a report outlining the basis of any such suspension and any extensions thereof.

(c) Improved application process.—

(1) In general.—Not later than 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2014 [Dec. 26, 2013], the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall improve the efficiency by which applications for special immigrant visas under section 1244(a) [of this note], are processed so that all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks,

A18

should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa.

(2) Construction.—Nothing in this section shall be construed to limit the ability of a Secretary referred to in paragraph (1) to take longer than 9 months to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns requires additional time.

(d) Representation.—An alien applying for admission to the United States pursuant to this subtitle [this note] may be represented during the application process, including at relevant interviews and examinations, by an attorney or other accredited representative. Such representation shall not be at the expense of the United States Government.

Sec. 1243.    United States refugee program processing priorities.

(a) In general.—Refugees of special humanitarian concern eligible for Priority 2 processing under the refugee resettlement priority system who may apply directly to the United States Admission Program shall include—

(1) Iraqis who were or are employed by the United States Government, in Iraq;

(2) Iraqis who establish to the satisfaction of the Secretary of State that they are or were employed in Iraq by—

(A) a media or nongovernmental organization headquartered in the United States; or

(B) an organization or entity closely associated with the United States mission in Iraq that has received United States Government funding through an official and documented contract, award, grant, or cooperative agreement; and

(3) spouses, children, and parents whether or not accompanying or following to join, and sons, daughters, and siblings of aliens described in paragraph (1), paragraph (2), or section 1244(b)(1) [of this note]; and

A19

(4) Iraqis who are members of a religious or minority community, have been identified by the Secretary of State, or the designee of the Secretary, as a persecuted group, and have close family members (as described in section 201(b)(2)(A)(i) or 203(a) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i) and 1153(a))) in the United States.

(b) Identification of other persecuted groups.—The Secretary of State, or the designee of the Secretary, is authorized to identify other Priority 2 groups of Iraqis, including vulnerable populations.

(c) Ineligible organizations and entities.—Organizations and entities described in subsection (a)(2) shall not include any that appear on the Department of the Treasury's list of Specially Designated Nationals or any entity specifically excluded by the Secretary of Homeland Security, after consultation with the Secretary of State and the heads of relevant elements of the intelligence community (as defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4)) [now 50 U.S.C.A. § 3003(4)]).

(d) Applicability of other requirements.—Aliens under this section who qualify for Priority 2 processing under the refugee resettlement priority system shall satisfy the requirements of section 207 of the Immigration and Nationality Act ( 8 U.S.C. 1157 ) [this section] for admission to the United States.

(e) Numerical limitations.—In determining the number of Iraqi refugees who should be resettled in the United States under paragraphs (2), (3), and (4) of subsection (a) and subsection (b) of section 207 of the Immigration and Nationality Act (8 U.S.C. 1157), the President shall consult with the heads of nongovernmental organizations that have a presence in Iraq or experience in assessing the problems faced by Iraqi refugees.

(f) Eligibility for admission as refugee.—No alien shall be denied the opportunity to apply for admission under this section solely because such alien qualifies as an immediate relative or is eligible for any other immigrant classification.

Sec. 1244.   Special immigrant status for certain Iraqis.

(a) In general.—Subject to subsection (c), the Secretary of Homeland Security, or, notwithstanding any other provision of law, the Secretary of State in consultation with the Secretary of Homeland Security, may provide an alien

described in subsection (b) with the status of a special immigrant under section 101(a)(27) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(27) ), if the alien—

(1) or an agent acting on behalf of the alien, submits a petition for classification under section 203(b)(4) of such Act (8 U.S.C. 1153(b)(4));

(2) is otherwise eligible to receive an immigrant visa;

(3) is otherwise admissible to the United States for permanent residence (excluding the grounds for inadmissibility specified in section 212(a)(4) of such Act (8 U.S.C. 1182(a)(4))); and

(4) cleared a background check and appropriate screening, as determined by the Secretary of Homeland Security.

(b) Aliens described.—

(1) Principal aliens.—An alien is described in this subsection if the alien—

(A) is a citizen or national of Iraq;

(B) was or is employed by or on behalf of the United States Government in Iraq, on or after March 20, 2003, for not less than one year;

(C) provided faithful and valuable service to the United States Government, which is documented in a positive recommendation or evaluation, subject to paragraph (4), from the employee's senior supervisor or the person currently occupying that position, or a more senior person, if the employee's senior supervisor has left the employer or has left Iraq; and

(D) has experienced or is experiencing an ongoing serious threat as a consequence of the alien's employment by the United States Government.

(2) Spouses and children.—An alien is described in this subsection if the alien—

A21

(A) is the spouse or child of a principal alien described in paragraph (1); and

(B) is accompanying or following to join the principal alien in the United States.

(3) Treatment of surviving spouse or child.—

(A) In general.—An alien is described in this subsection if the alien—

(i) was the spouse or child of a principal alien described in paragraph (1) who submitted an application to the Chief of Mission pursuant to this section or section 1059 of the National Defense Authorization Act for Fiscal Year 2006 (Public Law 109-163 ; 8 U.S.C. 1101 note), which included the alien as an accompanying spouse or child; and

(ii) due to the death of the principal alien—

(I) such petition was revoked or terminated (or otherwise rendered null); and

(II) such petition would have been approved if the principal alien had survived.

(B) Employment requirements.—An application by a surviving spouse or child of a principal alien shall be subject to employment requirements set forth in paragraph (1) as of the date of the principal alien's filing of an application for the first time, or if the principal alien did not file an application, the employment requirements as of the date of the principal alien's death.

(4) Approval by Chief of Mission required.—

(A) In general.—Except as provided under subparagraph (B), a recommendation or evaluation required under paragraph (1)(C) shall be accompanied by approval from the Chief of Mission, or the designee of the Chief of Mission, who shall conduct a risk assessment of the alien and an independent

A22

review of records maintained by the United States Government or hiring organization or entity to confirm employment and faithful and valuable service to the United States Government prior to approval of a petition under this section.

(B) Review process for denial by Chief of Mission.—

(i) In general.—An applicant who has been denied Chief of Mission approval required by subparagraph (A) shall—

(I) receive a written decision that provides, to the maximum extent feasible, information describing the basis for the denial, including the facts and inferences underlying the individual determination; and

(II) be provided not more than one written appeal—

(aa)that shall be submitted not more than 120 days after the date that the applicant receives such decision in writing; and

(bb) that may request reopening of such decision and provide additional information, clarify existing information, or explain any unfavorable information.

(ii)Iraqi Special Immigrant Visa Coordinator.—The Secretary of State shall designate, in the Embassy of the United States in Baghdad, Iraq, an Iraqi Special Immigrant Visa Coordinator responsible for overseeing the efficiency and integrity of the processing of special immigrant visas under this section, who shall be given—

(I) sufficiently high security clearance to review information supporting Chief of Mission denials if an appeal of a denial is filed;

(II) responsibility for ensuring that an applicant described in clause (i) receives the information described in clause (i)(I); and

A23

(III) responsibility for ensuring that every applicant is provided a reasonable opportunity to provide additional information, clarify existing information, or explain any unfavorable information pursuant to clause (i)(II).

(5) Evidence of serious threat.—A credible sworn statement depicting dangerous country conditions, together with official evidence of such country conditions from the United States Government, should be considered as a factor in determination of whether the alien has experienced or is experiencing an ongoing serious threat as a consequence of the alien's employment by the United States Government for purposes of paragraph (1)(D).

(c) Numerical limitations.—

(1) In general.—The total number of principal aliens who may be provided special immigrant status under this section may not exceed 5,000 per year for fiscal years 2008 through 2012.

(2) Exclusion from numerical limitations.—Aliens provided special immigrant status under this section shall not be counted against any numerical limitation under sections 201(d), 202(a), or 203(b)(4) of the Immigration and Nationality Act (8 U.S.C. 1151(d), 1152(a), and 1153(b)(4)).

(3) Carry forward.—

(A) Fiscal years 2008 through 2011.—If the numerical limitation specified in paragraph (1) is not reached during a given fiscal year referred to in such paragraph (with respect to fiscal years 2008 through 2011), the numerical limitation specified in such paragraph for the following fiscal year shall be increased by a number equal to the difference between—

(i) the numerical limitation specified in paragraph (1) for the given fiscal year; and

(ii) the number of principal aliens provided special immigrant status under this section during the given fiscal year.

A24

(B) Fiscal years 2012 and 2013.—If the numerical limitation specified in paragraph (1) is not reached in fiscal year 2012, the total number of principal aliens who may be provided special immigrant status under this section for fiscal year 2013 shall be equal to the difference between—

  (i) the numerical limitation specified in paragraph (1) for fiscal year 2012; and

  (ii) the number of principal aliens provided such status under this section during fiscal year 2012.

(C) Limitation on number of visas.—

  (i) In general.—The total number of principal aliens who may be provided special immigrant status under this section after January 1, 2014, shall be not more than 2500.

  (ii) Employment period.—The 1-year period during which the principal alien is required to have been employed by or on behalf of the United States Government in Iraq under subsection (b)(1)(B) shall begin on or after March 20, 2003, and end on or before September 30, 2013.

  (iii) Application deadline.—The principal alien seeking special immigrant status under this subparagraph shall apply to the Chief of Mission in accordance with subsection (b)(4) not later than September 30, 2014.

(d) Visa and passport issuance and fees.—Neither the Secretary of State nor the Secretary of Homeland Security may charge an alien described in subsection (b) any fee in connection with an application for, or issuance of, a special immigrant visa. The Secretary of State shall make a reasonable effort to ensure that aliens described in this section who are issued special immigrant visas are provided with the appropriate series Iraqi passport necessary to enter the United States.

(e) Protection of aliens.—The Secretary of State, in consultation with the heads of other relevant Federal agencies, shall make a reasonable effort to provide an alien described in this section who is applying for a special immigrant visa with protection or the immediate removal from Iraq, if possible, of such

A25

alien if the Secretary determines after consultation that such alien is in imminent danger.

(f) Eligibility for admission under other classification.—No alien shall be denied the opportunity to apply for admission under this section solely because such alien qualifies as an immediate relative or is eligible for any other immigrant classification.

(g) Resettlement support.—Iraqi aliens granted special immigrant status described in section 101(a)(27) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(27)) shall be eligible for resettlement assistance, entitlement programs, and other benefits available to refugees admitted under section 207 of such Act (8 U.S.C. 1157) [this section] to the same extent, and for the same periods of time, as such refugees.

(h) Rule of construction.—Nothing in this section may be construed to affect the authority of the Secretary of Homeland Security under section 1059 of the National Defense Authorization Act for Fiscal Year 2006 [8 U.S.C.A. § 1101 note].

Sec. 1245.    Senior Coordinator for Iraqi Refugees and Internally Displaced Persons.

(a) Designation in Iraq.—The Secretary of State shall designate in the embassy of the United States in Baghdad, Iraq, a Senior Coordinator for Iraqi Refugees and Internally Displaced Persons (referred to in this section as the 'Senior Coordinator').

(b) Responsibilities.—The Senior Coordinator shall be responsible for the oversight of processing for the resettlement in the United States of refugees of special humanitarian concern, special immigrant visa programs in Iraq, and the development and implementation of other appropriate policies and programs concerning Iraqi refugees and internally displaced persons.   The Senior Coordinator shall have the authority to refer persons to the United States refugee resettlement program.

(c) Designation of additional Senior Coordinators.—The Secretary of State shall designate in the embassies of the United States in Cairo, Egypt, Amman, Jordan, Damascus, Syria, and Beirut, Lebanon, a Senior Coordinator to oversee resettlement in the United States of refugees of special humanitarian concern in those countries to ensure their applications to the United States

A26

refugee resettlement program are processed in an orderly manner and without delay.

A27

# CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limitation requirement in FRAP 32(g). The length of this document is 12,860 words.

# CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2026, I electronically filed the foregoing with the Clerk of the Circuit Court by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system. I further certify that I will cause eight paper copies of this brief to be filed with the Court within two business days.

Respectfully submitted,

*/s/ Jaime A. Scott*
Jaime A. Scott
Trial Attorney