**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

## No. 25-5279
(Consolidated with 25-5480)

AFGHAN AND IRAQI ALLIES, UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, On Their Own and On Behalf of Others Similarly Situated,

*Plaintiffs-Appellees,*

*v.*

MARCO RUBIO; JOHN ARMSTRONG; UNITED STATES DEPARTMENT OF STATE; MARKWAYNE MULLIN; JOSEPH EDLOW; CONNIE NOLAN; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:18-cv-01388-TSC, Hon. Tanya S. Chutkan*

## BRIEF FOR PLAINTIFFS-APPELLEES

KIMBERLY GRANO
GHITA SCHWARZ
GUADALUPE AGUIRRE
PEDRO SEPULVEDA, JR.
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
(646) 946-7453
kgrano@refugeerights.org
gschwarz@refugeerights.org
laguirre@refugeerights.org
psepulveda@refugeerights.org

JUSTIN C. SIMEONE
CARLA SUNG AH YOON
FRESHFIELDS US LLP
700 13th Street NW, 10th Floor
Washington, D.C. 20005
(202) 777-4500
justin.simeone@freshfields.com
carla.yoon@freshfields.com

DAVID Y. LIVSHIZ
REBECCA C. KERR
WANG JAE RHEE
NICHOLE CHEN
ELIZABETH LEWIS
GURPREET SINGH
FRESHFIELDS US LLP
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, New York 10007
(212) 227-4000
david.livshiz@freshfields.com
rebecca.kerr@freshfields.com
wangjae.rhee@freshfields.com
nichole.chen@freshfields.com
liz.lewis@freshfields.com
gurpreet.singh@freshfields.com

MIA TSUI
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
(650) 618-9205
mia.tsui@freshfields.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Plaintiffs-Appellees certify as follows:

A.  Parties and Amici: All parties, intervenors, and amici appearing before the district court and before this Court in the present appeal are listed in the Certificate as to Parties, Rulings, and Related Cases included in the Brief for Defendants-Appellants.

B.  Rulings Under Review: References to the rulings at issue appear in the Certificate as to Parties, Rulings, and Related Cases included in the Brief for Defendants-Appellants.

C.  Related Cases: The history of this case before the Court appears in the Certificate as to Parties, Rulings, and Related Cases included in the Brief for Defendants-Appellants. Counsel for Plaintiffs-Appellees are not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

Dated: June 3, 2026

*/s/ Justin C. Simeone*
Justin C. Simeone
Freshfields US LLP
700 13th Street NW, 10th Floor
Washington, D.C. 20005
Telephone: (202) 777-4500
justin.simeone@freshfields.com

*Attorney for Plaintiffs-Appellees and Class Counsel*

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................... iv

GLOSSARY OF ABBREVIATIONS ................................................................... ix

INTRODUCTION ................................................................................................. 1

PERTINENT STATUTES AND REGULATIONS.................................................. 4

COUNTER-STATEMENT OF ISSUES................................................................ 4

COUNTER-STATEMENT OF THE CASE ......................................................... 5

    I.     Congress created the SIV program to protect Afghan and Iraqi allies and directed Defendants to adjudicate applications within nine months. ........................................................................................ 5

    II.    As Defendants defied Congress's timeline, Plaintiffs filed this class action to remedy Defendants' unreasonable delay in deciding their SIV applications. ........................................................ 8

    III.   In Defendants' prior appeal, this Court affirmed that Congress's nine-month timeline provides a rule of reason for SIV processing. .........................................................................................11

    IV.   Defendants sought to eliminate core elements of the adjudication plan, while class members have continued to wait for decisions. ..................................................................................... 12

SUMMARY OF THE ARGUMENT ..................................................................... 14

ARGUMENT ......................................................................................................... 16

    I.     The district court properly certified the class..................................... 16

        A.    The class satisfies the commonality requirement. ................... 18

            i.   All class members present common questions arising from Defendants' systemic failure to process their applications. ....................................................................... 19

           ii.  Defendants never showed the exception for certain "high-risk" cases applied to any subset of the class, and hypothetical differences cannot defeat commonality....................................................................... 21

B.    Defendants do not meaningfully dispute that the class representatives' claims were typical of the class. .................. 24

C.    The district court properly certified the class under Rule 23(b)(2). ...................................................................... 27

II.    The district court did not err in concluding that Defendants' delay in processing Plaintiffs' SIV applications was unreasonable and in setting an adjudication plan.............................. 29

A.    Defendants have a duty to adjudicate SIV applications. ......... 31

B.    The district court did not abuse its discretion in assessing the *TRAC* factors. .................................................................. 34

i.    This Court should review the district court's balancing of the *TRAC* factors for abuse of discretion. ...................... 35

ii.    Factors 1 and 2: This Court already held that the nine-month timeline provides a rule of reason, and the district court properly assessed Plaintiffs' delays against that timeline. .......................................................... 36

iii.    Factors 3 and 5: Defendants do not dispute the magnitude of the interests prejudiced by the delay, including the health and welfare of SIV applicants who are under serious threat. ............................................. 41

iv.    Factor 4: Defendants failed to show that the impact of expediting SIV applications on competing agency priorities outweighed the other factors. ............................. 42

III.    The district court did not abuse its discretion in including all steps in the SIV application process, including administrative processing, within the scope of the injunction. ................................. 44

IV.    The district court did not abuse its discretion in partially denying Defendants' requested modifications to the adjudication plan. ............................................................................ 48

CONCLUSION .................................................................................. 53

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Afghan & Iraqi Allies v. Blinken*,
  103 F.4th 807 (D.C. Cir. 2024)..... 2, 3, 11, 12, 15, 23, 28, 29, 32, 34, 35, 36, 37,
  38, 40, 42, 43, 44, 49

*Al-Tamimi v. Adelson*,
  916 F.3d 1 (D.C. Cir. 2019)...................................................................53

*Am. Anti-Vivisection Soc'y v. USDA*,
  946 F.3d 615 (D.C. Cir. 2020)...............................................................30

*Am. Hosp. Ass'n v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016)....................................................28, 36, 44

*Anglers Conservation Network v. Pritzker*,
  809 F.3d 664 (D.C. Cir. 2016)...............................................................38

*Bahlul v. United States*,
  77 F.4th 918 (D.C. Cir. 2023).................................................................37

*Barrios Garcia v. DHS*,
  25 F.4th 430 (6th Cir. 2022) ..................................................................31

*Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*,
  630 F.3d 217 (D.C. Cir. 2011)................................................................49

*Cobell v. Norton*,
  240 F.3d 1081 (D.C. Cir. 2001).................................................32, 35, 44

*Da Costa v. Immigr. Inv. Program Off.*,
  80 F.4th 330 (D.C. Cir. 2023).......................................30, 32, 33, 40

*Daskalea v. Washington Humane Soc'y*,
275 F.R.D. 346 (D.D.C. 2011)................................................................26

*DL v. District of Columbia*,
  713 F.3d 120 (D.C. Cir. 2013)................................................................21

_____

*Authorities chiefly relied upon are marked with an asterisk.

iv

*DL v. District of Columbia,
  860 F.3d 713 (D.C. Cir. 2017)......................................................19, 20, 21, 26, 27

Doe v. Hampton,
  566 F.2d 265 (D.C. Cir. 1977)..............................................................................38

Ebanks v. Shulkin,
  877 F.3d 1037 (Fed. Cir. 2017) ...........................................................................28

Garcia v. Johanns,
  444 F.3d 625 (D.C. Cir. 2006).............................................................................17

Gen. Tel. Co. of Southwest v. Falcon,
  457 U.S. 147 (1982)..............................................................................................25

Godsey v. Wilkie,
  31 Vet. App. 207 (2019) .......................................................................................21

Gov't of Province of Manitoba v. Zinke,
  849 F.3d 1111 (D.C. Cir. 2017)...........................................................................48

Hartman v. Duffey,
  19 F.3d 1459 (D.C. Cir. 1994).............................................................................17

Hussein v. Beecroft,
  782 F. App'x 437 (6th Cir. 2019) ........................................................................47

In re Am. Rivers & Idaho Rivers United,
  372 F.3d 413 (D.C. Cir. 2004).......................................................................32, 33

In re Barr Lab'ys, Inc.,
  930 F.2d 72 (D.C. Cir. 1991)...............................................................................28

In re Ctr. for Biological Diversity,
  53 F.4th 665 (D.C. Cir. 2022).......................................................................38, 39

In re D.C.,
  792 F.3d 96 (D.C. Cir. 2015).........................................................................18, 19

In re People's Mojahedin Org. of Iran,
  680 F.3d 832 (D.C. Cir. 2012).......................................................................36, 43

*J.D. v. Azar*,
   925 F.3d 1291 (D.C. Cir. 2019)...............................................................19, 25, 26

*Jolly v. Listerman*,
   672 F.2d 935 (D.C. Cir. 1982)...............................................................................38

*Karimova v. Abate*,
   2024 WL 3517852 (D.C. Cir. July 24, 2024)...............................................33, 47

*LaShawn A. v. Barry*,
   87 F.3d 1389 (D.C. Cir. 1996).............................................................................37

*Mashpee Wampanoag Tribal Council v. Norton*,
   336 F.3d 1094 (D.C. Cir. 2003)....................................................................32, 35

*MCI Telecomms. Corp. v. FCC*,
   627 F.2d 322 (D.C. Cir. 1980)..............................................................................50

*Morgan Drexen, Inc. v. CFPB*,
   785 F.3d 684 (D.C. Cir. 2015)..............................................................................17

*Nine Iraqi Allies Under Serious Threat v. Kerry*,
   168 F. Supp. 3d 268 (D.D.C. 2016).........................................................39, 45, 46

*Nio v. DHS*,
   323 F.R.D. 28 (D.D.C. 2017)........................................................................21, 26

*NLRB v. Harris Teeter Supermarkets*,
   215 F.3d 32 (D.C. Cir. 2000)................................................................................52

*Pigford v. Glickman*,
   206 F.3d 1212 (D.C. Cir. 2000)............................................................................23

*Potomac Elec. Power Co. v. ICC*,
   702 F.2d 1026 (D.C. Cir. 1983)....................................................................39, 40

*Pro Football, Inc. v. Harjo*,
   565 F.3d 880 (D.C. Cir. 2009)..............................................................................36

*Pub. Citizen Health Rsch. Grp. v. Auchter*,
   702 F.2d 1150 (D.C. Cir. 1983)....................................................................32, 41

*Pub. Citizen Health Rsch. Grp. v. Brock*,
   823 F.2d 626 (D.C. Cir. 1987)..................................................................50

*Radosti v. Envision EMI, LLC*,
   717 F. Supp. 2d 37 (D.D.C. 2010)..............................................................25

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*,
   2026 WL 1110616 (D.C. Cir. Apr. 24, 2026) ....................................................27

*Schneider v. Kissinger*,
   412 F.3d 190 (D.C. Cir. 2005)..................................................................53

*South Carolina v. United State*s,
   907 F.3d 742 (4th Cir. 2018) ..................................................................35

*\*Telecomms. Rsch. & Action Ctr. v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984)...............................................4, 32, 33, 36, 41, 42

*United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*,
   45 F.4th 426 (D.C. Cir. 2022)..................................................................49

*United States v. Maria*,
   186 F.3d 65 (2d Cir. 1999) ....................................................................38

*United States v. Regenerative Scis., LLC*,
   741 F.3d 1314 (D.C. Cir. 2014)..................................................................44

*Wagner v. Taylor*,
   836 F.2d 578 (D.C. Cir. 1987)..................................................................29

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011).....................................................................18, 19, 27

*Whatley v. D.C.*,
   447 F.3d 814 (D.C. Cir. 2006)....................................................................8

*Xie v. Kerry*,
   780 F.3d 405 (D.C. Cir. 2015)..................................................................33

**Statutes**

5 U.S.C. § 555(b) ...........................................................................33, 47

5 U.S.C. § 706.........................................................................4, 8, 24, 30, 31

8 U.S.C. § 1201(g) ................................................................46, 47

*Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, 123 Stat. 807 (2009) (codified as note to 8 U.S.C. § 1101)... 5, 6, 7, 22, 32, 33, 36, 37, 38, 41, 45, 46

Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 7076, 133 Stat. 13 (2019)................................................................7

Emergency Security Supplemental Appropriations Act, 2021, Pub. L. No. 117-31, § 401(a)(3), 135 Stat. 309, 316 (2021)............................................7

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 7034(d)(9), 138 Stat. 460, 789-90 (2024)............................................7

National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113-66, §§ 1218-19, 127 Stat. 910, 914 (2013).......................................7

National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, § 1213, 131 Stat. 1283, 1649 (2017) ......................................7

*Refugee Crisis in Iraq Act of 2007, Pub. L. No. 110-181, 122 Stat. 395 (2008) (codified as note to 8 U.S.C. § 1157)... 5, 6, 7, 14, 22, 32, 33, 36, 37, 38, 41, 45, 46

## Other Authorities

Fed. R. Civ. P. 23 ................................................................18, 24, 27

Fed. R. Civ. P. 54(b) ................................................................51

Fed. R. Civ. P. 60(b) ................................................................51

Fed. R. Civ. P. 72(a)................................................................13, 49

Statement of Rep. Blumenauer, 159 Cong. Rec. 17031 (2013) ................................6

Statement of Sen. Leahy, 159 Cong. Rec. S7100 (daily ed. Oct. 1, 2013)................6

## GLOSSARY OF ABBREVIATIONS

AAPA            Afghan Allies Protection Act of 2009,
                Pub. L. No. 111-8, 123 Stat. 807 (2009),
                (codified as note to 8 U.S.C. § 1101)

*Allies I*      *Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807 (D.C. Cir. 2024)

APA             Administrative Procedure Act,
                5 U.S.C. § 706

Br.             Opening Brief for Defendants-Appellants,
                Doc No. 2171784, May 4, 2026

COM             Chief of Mission

Dkt.            References to docket filings in *Afghan & Iraqi Allies v. Rubio*,
                No. 1:18-cv-01388-TSC (D.D.C. June 12, 2018)

JA              Joint Appendix
                Doc No. 2171785, May 4, 2026

RCIA            Refugee Crisis in Iraq Act of 2007,
                Pub. L. No. 110-181, 122 Stat. 395 (2008),
                (codified as note to 8 U.S.C. § 1157)

SA              Supplemental Appendix
                June 3, 2026

SIV             Special Immigrant Visa

Tr.             Transcript of the Adjudication Plan Hearing Before
                Hon. Moxila A. Upadhyaya, October 10, 2024 (Dkt. No. 255)

*TRAC*          *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir.
                1984)

**INTRODUCTION**

Local interpreters and other essential contractors risked their lives to support the United States' missions in Afghanistan and Iraq over decades of U.S. military intervention. Congress created the Afghan and Iraqi Special Immigrant Visa ("SIV") programs in recognition of the threat posed by the Taliban and other militant groups who sought to punish these workers and their families for their support of the United States. This program was intended to be a critical pathway to safety and permanent residency in the United States. Yet, within a few years, egregious processing delays by Defendants-Appellants ("Defendants")—the State Department and the Department of Homeland Security—had rendered the pathway all but illusory. In response, Congress amended the law to require that Defendants improve the efficiency of the SIV program, providing that all application steps under Defendants' control should be completed within nine months.

It has now been over twelve years since Congress's amendment; eight years since Plaintiffs-Appellees ("Plaintiffs") filed this lawsuit on behalf of a class of SIV applicants still stuck in the process; and nearly seven years since the district court first granted summary judgment to Plaintiffs on their claim that Defendants' delays were unreasonable under the Administrative Procedure Act ("APA") and directed the entry of an adjudication plan to ensure Defendants processed Plaintiffs' SIV applications without further unnecessary delay. Because the class is limited to the

1

longest-delayed SIV applicants—those who applied by February 2022—it also has been at least four years since any class member submitted an application. These applicants are still waiting for Congress's promise to be fulfilled.

After a prior unsuccessful interlocutory appeal to this Court, Defendants now appeal the final judgment and the district court's denial-in-part of their request to modify the adjudication plan. In this latest effort to "terminate any judicial oversight of the SIV program," Defendants-Appellants' Brief ("Br.") 4, Defendants ask this Court to substitute speculation for the actual facts before the district court and to effectively overrule its core holdings in *Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807 (D.C. Cir. 2024) ("*Allies I*"). This Court should decline that invitation for four reasons.

First, the district court did not abuse its discretion in certifying the class. Plaintiffs satisfied the requirements of commonality, typicality, and Rule 23(b)(2), the only certification elements Defendants dispute, by showing class members were subject to systemic delays resulting from Defendants' abject failure to expedite application processing in line with Congress's directive. Defendants never attempted to show that the statute's narrow exception for "distinctively high risk[]" cases, *id.* at 817, applied to any class members, despite now staking their appeal on this issue. Indeed, Defendants do not determine specific cases to be "high-risk" until *after* the adjudication process is over.

2

Second, the district court properly concluded that Defendants had unreasonably delayed Plaintiffs' applications. As this Court already held in *Allies I*, Plaintiffs' unreasonable delay claim does not turn on whether the statute's nine-month timeline is mandatory. *Id.* at 816-17. That timeline nonetheless constitutes the "rule of reason" against which Defendants' extensive delays should be measured, and Defendants' vague allusions to competing priorities do no more to justify their continued delay than in their last appeal.

Third, the district court did not abuse its discretion in including administrative processing—the final stage of mandatory background checks and security screenings—within the scope of the adjudication plan. The SIV statutes require Defendants to complete *all* steps incidental to visa issuance.

Fourth, in modifying the adjudication plan, the district court did not abuse its discretion in denying the proposed modifications that Defendants raise on appeal, which would have eviscerated the purpose of the plan by eliminating any obligation to process class members' applications at certain steps within any timeframe.

Plaintiffs continue to live in fear for their lives while they wait for the United States to fulfill its commitments under the SIV program. The district court's judgment and adjudication plan provide an essential measure of accountability to ensure that Defendants do not let class members' long-delayed cases languish indefinitely. For the reasons below, this Court should affirm.

3

## PERTINENT STATUTES AND REGULATIONS

Section 1248 of the Refugee Crisis in Iraq Act is contained in the Addendum to this brief. All other applicable statutes and policies are contained in the Addendum to the Brief for Defendants-Appellants.

## COUNTER-STATEMENT OF ISSUES

**I.**    Whether the district court abused its discretion in certifying the class, which is limited to individuals whose SIV applications had been awaiting government action for longer than 9 months on or before November 30, 2022, where Plaintiffs showed systemic delays in the SIV application process affecting all class members, and Defendants did not show that any class member was "high-risk" and required additional time or that any delays were attributable to such cases.

**II.**    In granting summary judgment to Plaintiffs and issuing an injunction, whether the district court (1) erred in concluding that Defendants have a duty to adjudicate Afghan and Iraqi SIV applications, or (2) abused its discretion in balancing the factors set out in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*") and determining that Defendants' delay of Plaintiffs' applications was unreasonable so as to warrant relief under APA § 706(1).

**III.**    Whether the district court abused its discretion in including the administrative processing stage within the scope of the injunction, where it is undisputed that administrative processing is required before any Afghan or Iraqi SIV can be issued.

4

**IV.** Whether the district court abused its discretion in denying Defendants' requests to eliminate timing benchmarks for Defendants' processing of class members' applications at two steps of the adjudication plan, where those requests were unsupported by evidence showing they were suitably tailored to changed circumstances.

## COUNTER-STATEMENT OF THE CASE

**I.      Congress created the SIV program to protect Afghan and Iraqi allies and directed Defendants to adjudicate applications within nine months.**

Tens of thousands of Afghan and Iraqi nationals supported U.S. and allied coalition operations in their respective countries at great risk to themselves and their families. *See* SA 35-37 ¶¶ 24-30. They are seen as traitors in the eyes of the Taliban and other insurgents, leading an untold number of allies and their loved ones to be kidnapped, tortured, and killed in retaliation for their assistance to the United States. *See* SA 29, 36 ¶¶ 9, 26-27.

Congress responded by creating the SIV program, a pathway to safety for Afghan and Iraqi nationals facing serious, ongoing threats as a consequence of their service. *See* Refugee Crisis in Iraq Act of 2007, Pub. L. No. 110-181, 122 Stat. 395 (2008) ("RCIA") (codified as note to 8 U.S.C. § 1157); Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, 123 Stat. 807 (2009) ("AAPA") (codified as note to 8 U.S.C. § 1101). From the beginning, however, the program was beset by delays. The

5

statute requires that Defendants confirm the applicant's eligibility, including verifying their employment (through a process known as Chief of Mission ("COM") approval), conduct a risk assessment, and complete background checks. RCIA § 1244(a)-(b); AAPA § 602(b)(1)-(2). But in implementing these requirements, Defendants chose to impose a lengthy 14-step adjudication process. Five years into the Iraqi program and four years into the Afghan program, members of Congress decried that only "a trickle" of authorized visas had been approved. Statement of Rep. Blumenauer, 159 Cong. Rec. 17031 (2013); *see* Statement of Sen. Leahy, 159 Cong. Rec. S7100 (daily ed. Oct. 1, 2013) ("Now, 5 years after the original legislation passed, less than 6,000 of the 25,000 available [Iraqi] visas have been distributed, leaving many well-deserving Iraqi allies in danger and American credibility on the line."). Then-Representative Earl Blumenauer, one of the legislation's original sponsors, lamented that "[t]here is no excuse to fail to make the SIV program work," and condemned the State Department for "drag[ging] its feet on these visas" given the life-and-death consequences. 159 Cong. Rec. 17031.

To address Defendants' lethargic implementation of the SIV program, Congress amended the RCIA and AAPA in 2013 to direct Defendants to improve the program's efficiency such that all application steps under the control of the government "should be completed *not later than 9 months*" from submission of an application, excepting from the timeline only those "high-risk cases for which

6

satisfaction of national security concerns requires additional time." National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113-66, §§ 1218-19, 127 Stat. 910, 914 (2013) (as codified in RCIA and AAPA) (emphasis added); RCIA § 1242(c)(1)-(2); AAPA § 602(b)(4)(A)-(B). Congress simultaneously required Defendants to publish quarterly reports detailing applicant wait times and "the reasons for the failure to process any applications that have been pending for longer than 9 months." RCIA § 1248(f)-(g); AAPA § 602(b)(11)-(12).

Throughout repeated reauthorizations, Congress maintained the nine-month timeline. *See, e.g.*, National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, § 1213, 131 Stat. 1283, 1649 (2017) (authorizing additional Afghan visas and not modifying nine-month provision); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 7034(d)(9), 138 Stat. 460, 789-90 (2024) (same). In 2021, during the United States' withdrawal from Afghanistan, Congress reaffirmed that directive with overwhelming bipartisan support, amending the AAPA to clarify that "all steps, including Chief of Mission approval," fall within the nine-month timeline. Emergency Security Supplemental Appropriations Act, 2021, Pub. L. No. 117-31, § 401(a)(3), 135 Stat. 309, 316 (2021).[1]

---

[1] Defendants note that Congress directed Defendants to "develop[] and implement[] a system to prioritize the processing of" Afghan SIV applicants in an appropriations bill for fiscal year 2019. Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 7076, 133 Stat. 13 (2019); Br. 12. The statute did not direct the prioritization scheme that Defendants adopted and, in any event, the requirement is no longer in

II.    **As Defendants defied Congress's timeline, Plaintiffs filed this class action to remedy Defendants' unreasonable delay in deciding their SIV applications.**

Despite Congress's directive, SIV applicants continued to face delays routinely extending years beyond the statutory timetable. In June 2018, Plaintiffs filed this class action in an effort to remedy this persistent delay. *See* JA 240. As relevant to this appeal, Plaintiffs challenged Defendants' unreasonable delay in processing and adjudicating class members' SIV applications under 5 U.S.C. § 706(1) and sought injunctive and declaratory relief. JA 24-25. In January 2019, the district court denied Defendants' motion to dismiss, rejecting, among other arguments, Defendants' claims that the pace of adjudication is discretionary and that certain steps in the SIV application process should be exempted from the statutory timeline. JA 53.

*Summary judgment.* In September 2019, following expedited discovery and provisional class certification, the district court converted Plaintiffs' motion for a preliminary injunction and granted Plaintiffs summary judgment on their unreasonable delay claims under APA § 706(1) after balancing the factors set out in *TRAC*. JA 95-96. The court considered Plaintiffs' undisputed evidence of widespread

---

place. *See Whatley v. D.C.*, 447 F.3d 814, 819 (D.C. Cir. 2006) ("The normal presumption is that appropriations acts do not amend substantive law, and that when they do, the change is only intended for one fiscal year," in the absence of "language [that] clearly indicates that it is intended to be permanent." (internal quotation marks omitted)).

8

delays beyond Congress's nine-month timeline, observing that class members' average wait times exceeded 2.5 years at the COM approval stage, nearly 3 to 4 years for an appeal of COM approval, and 3 years at the later stages in the process. JA 79-80. The district court also credited Plaintiffs' unrebutted evidence of the life-threatening consequences of Defendants' dilatory pace. JA 89.

The court weighed this evidence against Defendants' arguments that their delays were reasonable in light of competing priorities and the statutory timeline's carveout for certain "high-risk" cases that require additional time. JA 87-89. The district court concluded these factors did not outweigh Plaintiffs' showing of unreasonable delay, reasoning that Defendants did not actually "contend that any cases have been … designated" high-risk; that Congress adopted the nine-month timeframe despite recognizing Defendants' concerns about administrative complexity and national security; and that Defendants had not explained how any specific agency activities would be adversely affected by expediting SIV processing. JA 87-91. Rather than compel the adjudication of class member applications within a certain time, the district court directed an adjudication plan that would provide timing benchmarks for Defendants' completion of the remaining steps in class members' cases and allow the court to monitor their progress. JA 94.

***Class certification.*** On February 5, 2020, the district court certified a class of Afghan and Iraqi SIV applicants whose applications had been awaiting government

action for longer than nine months. JA 132. In certifying the class, the district court rejected Defendants' unsupported argument that some unspecified set of class members were differently situated because of the statutory exception for "high-risk" cases that require additional time to satisfy national security concerns. JA 101-02; JA 121. Defendants moved to decertify the class shortly thereafter on grounds not raised in this appeal, and in June 2020 the district court denied Defendants' motion. JA 152-55. Later, in October 2024, upon joint motion of the parties, the district court modified the class definition to be limited to:

> all people who have (1) applied for an Afghan or Iraqi SIV pursuant to the [AAPA or RCIA], by submitting an application for [COM] approval, and (2) whose applications have been awaiting government action for longer than 9 months on or before November 30, 2022.

JA 170-71.

*The adjudication plan.* In June 2020, the district court entered and approved the parties' jointly proposed adjudication plan. *See* JA 137-51. The adjudication plan establishes timing benchmarks at each step of the application process within the agencies' control and requires them to submit quarterly progress reports on those steps. *Id.* The plan allows Defendants to indicate cases that "require additional processing time to reconcile any national security concerns," and it permits Defendants to explain any failure to comply with the timing benchmarks and any actions to be taken to come into compliance. JA 141-42, 144-46; *see* JA 190, 192, 195-98.

After several quarters of Defendants' incomplete compliance with the adjudication plan, the plan was stayed for settlement discussions, which did not result in resolution. *See* JA 258-60; SA 183-94. In 2022, Defendants filed a motion to terminate or modify the injunction, arguing, *inter alia*, that the U.S. withdrawal from Afghanistan in 2021 and the COVID-19 pandemic's impact on embassies in 2020 presented changed circumstances that should relieve them of their obligations under the adjudication plan. *See* Dkt. 163. The district court reevaluated the *TRAC* factors and concluded that class members were still experiencing unreasonable delay. JA 161-66. The court denied Defendants' request to terminate the injunction but permitted Defendants to propose modifications to the adjudication plan, and extended its unreasonable delay ruling and relief to new class members. JA 166-68.

### III.   In Defendants' prior appeal, this Court affirmed that Congress's nine-month timeline provides a rule of reason for SIV processing.

Defendants appealed the district court's denial of their motion to terminate the injunction in 2023. *See Allies I*, No. 23-5025. Defendants argued that the district court, in assessing the *TRAC* factors, wrongly relied upon the nine-month timeline as the "rule of reason" and pointed to national security concerns, resource constraints, and a slew of recent world events to argue that the ongoing delays were no longer unreasonable. *See* Brief for Defendants-Appellants at 23-24, 37-38, 45-46, *Allies I*, No. 23-5025.

11

This Court disagreed. *See Allies I* (affirming the district court's ruling). The Court observed that the statutory nine-month timeline appears to be "something closer to a command," but held that regardless of whether it is mandatory, the district court appropriately considered the timeline to be the "rule of reason" in the *TRAC* analysis. *Id.* at 817. The Court also held that the district court (1) "reasonably address[ed]" Defendants' concerns about national security by noting that these concerns were "apparent when Congress established the [SIV program] and then set the nine-month timeline for processing applications," and (2) "reasonably concluded that the other *TRAC* factors still outweigh the government's generalized appeals to resource constraints." *Id.* at 818-19. This Court also found that the adjudication plan reflected a "flexible, measured approach" to remedying delays while accounting for resource limitations and accommodating cases "requir[ing] additional processing time to reconcile any national security concerns." *Id.* at 812, 819.

### IV. Defendants sought to eliminate core elements of the adjudication plan, while class members have continued to wait for decisions.

Meanwhile, in the district court, Defendants sought to modify the adjudication plan. Because Defendants' motion for relief had not identified what modifications they were requesting, the district court's 2022 order directed Defendants to propose modifications to the plan that retained its "basic elements," including a "methodology for identifying class members" and "timing benchmarks for the government-controlled steps of the SIV adjudication process." JA 167. The court

12

simultaneously authorized Plaintiffs to seek discovery into Defendants' justifications for any changes and referred development of the new adjudication plan to the magistrate judge. JA 167-68.

In February 2023, Defendants submitted their proposed modifications, SA 203-22; *see also* SA 302-12, to which Plaintiffs objected in part, Dkt. 217. Among other changes, Defendants sought to abandon any requirement to identify class members and instead include all SIV applicants in the pipeline, and to eliminate timing benchmarks at the COM approval and visa interview stages. SA 303-04, 308-09. In fall 2024, the magistrate judge ruled from the bench and granted in part and denied in part Defendants' proposed modifications. JA 172-73; SA 316-86 (Oct. 10, 2024 Transcript ("Tr.")). Defendants then objected to the magistrate judge's order under Rule 72(a). Dkt. 261.

In June 2025, the district court granted in part and denied in part Defendants' objections and adopted the Revised Adjudication Plan. JA 175-84. Agreeing with the magistrate judge, the district court declined Defendants' unsupported requests to eliminate timing benchmarks and abandon any effort to identify class members. JA 179-80, 182. The Revised Adjudication Plan, however, did include changes to reflect the closure of the U.S. Embassy in Kabul, account for other processing changes, extend certain timing benchmarks, and double the amount of time Defendants have to file progress reports. *Compare* JA 139-51 *with* JA 187-205; *see* JA 194 (new Step

8 requiring class members to inform the State Department that they can appear in-person at a consular post outside of Afghanistan in order to move forward).

Since the adoption of the modified plan, Plaintiffs have learned that thousands of class members remain waiting. *See, e.g.*, Dkt. 302. This includes Iraqi class members, who were required to apply by September 2014 and have all been waiting for nearly twelve years, and Afghan class members, who comprise the longest-pending applicants in the Afghan SIV pipeline and have all been waiting for at least four years. *See* RCIA § 1244(c)(3)(C)(iii); JA 170.

## SUMMARY OF THE ARGUMENT

This Court should affirm the judgment of the district court and its decision modifying the adjudication plan.

First, the district court did not abuse its discretion in certifying the class, which now includes only applicants who have been waiting at least four years for a decision on their SIV applications. These applicants were all subject to Defendants' systemic delays, all presented the same unreasonable delay claim based on the same factors, and all sought the same relief. Defendants protest that class members are too differently situated because the class could theoretically include "high-risk cases for which satisfaction of national security concerns requires additional time," but they never showed this exception applied to any class members and admitted they do not designate particular cases as "high-risk" until after the adjudication process is over.

Defendants cannot rely on this exception in the abstract, without identifying any relevant differences between class members, in an attempt to foreclose certification for *any* SIV applicants.

Second, the district court did not err in granting summary judgment to Plaintiffs. Defendants' primary arguments—that Plaintiffs' claim fails unless the nine-month timeline is mandatory, and that the timeline does not provide a "rule of reason" against which their delays should be assessed in the *TRAC* analysis—cannot be squared with this Court's decision in *Allies I*, which held that the nine-month timeline serves as a "rule of reason" regardless of whether it is mandatory. *Allies I* at 816-17. In any case, Defendants have a duty to adjudicate SIV applications, and the nine-month timeline provides a "rule of reason" notwithstanding the carveout for "high-risk" cases requiring additional security vetting. As for the district court's evaluation of the *TRAC* factors, this Court should review the district court's equitable balancing for abuse of discretion. Defendants' invocation of generalized national security concerns and competing priorities does not establish that the district court erred under any standard of review, let alone abused its discretion.

Third, Defendants do not show that the scope of the injunction was an abuse of discretion. The adjudication plan appropriately covers the administrative processing step, a post-interview stage that includes security and background checks, because Congress explicitly included *all* steps incidental to SIV issuance in the nine-

15

month timeline. The undisputed facts before the district court show that administrative processing is a step incidental to SIV issuance, as no SIV applicant can receive a visa until Defendants complete it.

Fourth, the district court did not abuse its discretion in granting in part and denying in part Defendants' requested modifications to the adjudication plan. The two proposed modifications that Defendants raise on appeal would have eliminated timing benchmarks altogether at the COM approval and visa interview stages. This would have undermined the central purpose of the adjudication plan by leaving Defendants free to continue delaying class members' applications at those steps. Defendants made no showing that this radical change—which would have left class members in limbo indefinitely—was a suitably tailored response to the increase in COM applications and interview scheduling challenges.

## ARGUMENT

### I.     The district court properly certified the class.

The class here, limited at final judgment to those Afghan and Iraqi SIV applicants "whose applications [had] been awaiting government action for longer than 9 months on or before November 30, 2022," JA 170, presents precisely the type of case that should be certified as a class action. Each class member challenged Defendants' systemic, ongoing practice of unreasonable delays in processing SIV applications and sought the same relief: an adjudication plan that would address all

16

class members' delays without directing particular applicants to jump the line. After fact discovery and multiple rounds of briefing, the district court properly found that the class satisfied each of Rule 23(a)'s requirements and Rule 23(b)(2)'s requirement that Defendants had "acted or refused to act on grounds that apply generally to the class," such that declaratory or injunctive relief was appropriate as to the whole class. JA 132.

Because "the district court is uniquely well situated to rule on class certification matters," this Court "review[s] a certification ruling conservatively only to ensure against abuse of discretion or erroneous application of legal criteria, and will affirm the district court even if [the Court] would have ruled differently in the first instance." *Garcia v. Johanns*, 444 F.3d 625, 631 (D.C. Cir. 2006) (internal quotation marks omitted). For similar reasons, this Court will not evaluate new facts that were not at issue before the district court. *See Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684, 690 n.2 (D.C. Cir. 2015) (supplementing appellate record with new evidence "would undermine the district court's factfinding role"). The Court considers "whether the class as currently certified can be upheld on appeal." *Hartman v. Duffey*, 19 F.3d 1459, 1474 n.5 (D.C. Cir. 1994).

Defendants do not dispute that the district court relied on the correct legal standard under Rule 23, and they do not cite any facts in the record that the district court overlooked in applying those standards. Instead, Defendants challenge the

17

district court's Rule 23(a) findings on commonality and typicality and its Rule 23(b)(2) findings largely based on the hypothetical differences of a purported "high-risk" category of applicants. But the statutory carveout does not render the district court's conclusion an abuse of discretion. The district court properly concluded that all class members raised common questions susceptible to common proof, and that the exception for certain "high-risk" cases was inapposite. Defendants never showed that this exception applied to any subset of the class or caused the delays experienced by class members; in fact, it is undisputed that they do not designate pending applicants as "high-risk." Likewise, the named plaintiffs' claims were typical of the class in that they were harmed by the same, program-wide delays as everyone else, and Defendants do not argue otherwise. Lastly, certification as a Rule 23(b)(2) class was proper because Plaintiffs claimed—and ultimately established—that Defendants' pervasive delays were unreasonable on grounds generally applicable to the class, and that those delays could be addressed by a single adjudication plan. This Court should therefore affirm.

### A.    The class satisfies the commonality requirement.

Rule 23(a) requires there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court has clarified that "even a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (brackets and internal quotation marks omitted); *accord In re D.C.*, 792 F.3d 96, 100 (D.C.

Cir. 2015). Even the existence of "myriad factual differences" between class members is insufficient to defeat commonality when class members raise "common questions [that] are 'apt to drive the resolution of the litigation.'" *J.D. v. Azar*, 925 F.3d 1291, 1321-22 (D.C. Cir. 2019) (quoting *Wal-Mart*, 564 U.S. at 350).

That is precisely the case here. Every class member has been subject to Defendants' system-wide practice of unreasonable delay, resulting in "common harms" that are "subject to common proof"—evidence going to the *TRAC* factors that is applicable to every class member. *DL v. District of Columbia*, 860 F.3d 713, 724 (D.C. Cir. 2017) ("*DL II*"). Defendants assert that the class "necessarily" includes individuals whose cases were "high-risk" and required additional time to satisfy national security concerns, Br. 23, but they did not even attempt to show that exception applied to any class members. In any event, even hypothetical "high-risk" class members would present common questions. Therefore, the district court did not abuse its discretion in finding the commonality requirement satisfied.

### i. All class members present common questions arising from Defendants' systemic failure to process their applications.

The district court recognized that Plaintiffs' claims presented multiple common questions. *See* JA 118-19. The central question underlying Plaintiffs' claims—the extent of Defendants' systemic failure to complete processing and adjudication of their SIV applications and whether this constituted unreasonable delay—is common to the class. JA 118. Plaintiffs also raised common questions of

19

law, "including whether Defendants are required to adjudicate SIV applications, whether Defendants must adjudicate SIV applications within 9 months, and whether Defendants' failure to adjudicate SIV applications merits relief." JA 118.

Each of these questions is "susceptible to common proof." *DL II*, 860 F.3d at 724. In addition to the purely legal questions, on which class members' individual circumstances have no bearing, the district court's baseline finding of unreasonable delay rested on common factual predicates. Since Congress's imposition of the nine-month timeline, Defendants consistently failed to process applications in a timely manner.[2] For example, 98% of applicants who completed an interview had already been waiting over nine months *excluding* the time they spent waiting for COM approval, and Iraqi class members had waited an average of over five years for an initial COM decision.[3] JA 113-14 (citing SA 167-69, 180-82). Facts common to the entire class—including Congress's intent to expedite SIV processing, the inherent risks facing SIV applicants that Congress designed the SIV program to address, as well as Defendants' reliance on the general nature of the application process and broad competing priorities to justify their delays—showed that the delay was unreasonable under the *TRAC* factors. *See infra* at 36-44. That class members were

---

[2] In Defendants' reports to Congress (which dramatically undercount delays because, among other things, they exclude pending cases, JA 80-82), the reported processing times for Afghans nearly doubled between 2017 and 2018, from 410 to 712 days. *Compare* SA 82 *with* SA 103.

[3] And of course, all class members have now been waiting for at least four years.

not waiting for identical amounts of time or did not face precisely the same threats did not make these issues incapable of resolution on a class-wide basis. *See* JA 119; *cf. Nio v. DHS*, 323 F.R.D. 28, 32 (D.D.C. 2017) (factual differences did not impact overarching questions going to unreasonable delay claim); *Godsey v. Wilkie*, 31 Vet. App. 207, 221-22, 228-29 (2019) (commonality established where petitioners challenged delays as per se unreasonable). The district court did not abuse its discretion in finding commonality based on these common issues.

Defendants' reliance on the D.C. Circuit's decision in *DL v. District of Columbia*, 713 F.3d 120 (D.C. Cir. 2013), is misplaced. There, commonality failed because the class challenged four distinct policies and practices in the school district's provision of special education which harmed different groups of students, *id.* at 127-28, a defect that was cured by creating subclasses of students challenging each policy or practice, *DL II*, 860 F.3d at 724. Plaintiffs here all challenge the same conduct—Defendants' ongoing failure to process their SIV applications—that gives rise to questions capable of class-wide resolution.

> ii.    **Defendants never showed the exception for certain "high-risk" cases applied to any subset of the class, and hypothetical differences cannot defeat commonality.**

Defendants focus their arguments on the purported existence of a distinct group of "high-risk" class members who may require additional time to satisfy national security concerns. Br. 30; *see also* Br. 26 (claiming there are class

21

"[m]embers subject to such a determination"). But Defendants made no showing before the district court that any class member's case had been designated "high-risk" and required additional processing time. *See* JA 119. Indeed, in practice Defendants presume *all* applicants to be potentially "high-risk" until the final decision to grant or deny an SIV; only "[o]nce … the process has concluded" do Defendants "determine[] that … the application is not high risk." SA 161, 207:15-22. This post-hoc determination logically cannot dictate how applications are processed. That Defendants do not even distinguish between "high-risk" and other cases when processing applications underscores the general applicability of Defendants' systemic delay to the class.[4]

Even if Defendants had shown that some subset of the class had "high-risk" cases, as the district court observed, the exception permits additional time only in those cases "for which satisfaction of national security concerns *requires additional time*." JA 120 (emphasis in original) (citing RCIA § 1242(c)(2); AAPA § 602(b)(4)(B)). The mere existence of such cases would not "establish, without more, that additional time [was] needed" or that this in fact contributed to Defendants' across-the-board delays. JA 121.

---

[4] The only "high-risk" case Defendants identified at all was Plaintiff John Doe-Alpha. But his case was deemed "high-risk" only *after* the adjudication process concluded (when Defendants determined him to be ineligible) and the delay was complete, Dkt. 59-1 at 3, and Defendants did "not indicate[] that his high-risk status had anything to do with the delay." JA 121.

22

Moreover, Defendants have never explained what they understand the exception to cover; it cannot be that any case undergoing a security check is excepted from the timeline, because security checks are required for all applicants. Instead, Defendants argue in the abstract that some subset of the class with no defining principle is differently situated. That kind of speculation is insufficient to "mak[e] a clear showing that an abuse of discretion has occurred." *Pigford v. Glickman*, 206 F.3d 1212, 1217 (D.C. Cir. 2000) (internal quotation marks omitted). This is particularly so given that it is Defendants who would determine both whether a case qualifies as "high-risk" and when national security concerns require additional time, *see* Br. 25-26, and they would need to distinguish such cases to conclude they are not subject to the nine-month timeline.

Ultimately, Defendants seek to have an exception swallow the rule. But as this Court concluded, the exception is a "carveout" for cases presenting "*distinctively high risks*" that require additional time to complete, and does not subsume Defendants' general obligations under the AAPA and RCIA. *Allies I* at 817 (emphasis added). To insist on the existence of factual differences between class members without identifying any, Defendants rely on the district court's description of the "indeterminate nature" of the "high-risk" label. Br. 25-26. But the label is "indeterminate" precisely because Defendants do not actually apply it to pending cases. *See supra* at 21-22; *see also* JA 120 (noting Defendants' argument that they

23

do not have to designate anyone as high-risk). Permitting an undefined, discretionary label—that Defendants have not applied to any class member—to defeat certification would allow Defendants to unilaterally avoid class-wide relief.

Even if Defendants had shown that a subset of class members had "high-risk" cases for which additional time was required, they would still raise common questions. Such applicants would still have been unreasonably delayed, particularly given the four-plus year delay that all class members have now experienced.[5] *See* JA 120; *infra* at 31-32 (statutory timeframe not required to establish unreasonable delay under APA § 706(1)). At minimum, whether Defendants have a duty to adjudicate SIV applications (regardless of timeline), Defendants' justifications for their program-wide delays, and the harms to SIV applicants underpinning the RCIA and AAPA would be common to every class member regardless of "high risk" status. These are sufficient to establish commonality, and differences would, at most, require subclassing. *See infra* at 29 n.7.

### B.    Defendants do not meaningfully dispute that the class representatives' claims were typical of the class.

Rule 23(a) also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

---

[5] Defendants argue that nothing in the AAPA and RCIA prevents the Secretary from taking longer than 9 months in cases covered by the exception. *See* Br. 26. But even if Defendants can take longer than nine months, they cannot take infinite time to process applications.

Typicality is satisfied where "the claims or defenses of the representatives and the members of the class stem from … a unitary course of conduct, or if they are based on the same legal or remedial theory." *J.D.*, 925 F.3d at 1322 (internal quotation marks omitted). Additionally, because commonality and typicality both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical," the "two inquiries tend to merge." *Id.* (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).

Defendants acknowledge that "typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff," Br. 29 (quoting *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 52 (D.D.C. 2010)), yet make no effort to explain how the representative plaintiffs' claims fail to satisfy this standard. Defendants do not mention any named plaintiff, let alone identify any respect in which their claims diverge from those of the class. *See* Br. 29-31. The named plaintiffs' claims are typical of the class: each submitted an SIV application, experienced delay exceeding the nine-month statutory timeline, and sought the same relief of prompt adjudication through a court-supervised adjudication plan.

For example, John Doe-Echo, an Iraqi national who served as a translator for U.S. forces, applied in 2013 and waited nearly five years for adjudication, during which time militants murdered his father and he was forced to live in hiding. JA 111-12. Jane Doe-Bravo, an Afghan national who served a U.S. government-funded

development organization, applied in 2015 and endured nearly three years of delay, receiving death threats throughout and relocating repeatedly with her young children. JA 109-10. These plaintiffs are not outliers; they are representatives.

Defendants do not explain what arguments they have against these or other named plaintiffs that did not apply with equal force to others in the class.[6] Instead, they repackage the same "high-risk" argument from their commonality challenge "in a new guise." *DL II*, 860 F.3d at 725. This argument fails for the same reasons. *Supra* at 21-24; *see Nio*, 323 F.R.D. at 32-33 (rejecting defendants' arguments that "factual variations" among class members defeat either commonality or typicality). *Daskalea v. Washington Humane Society*, on which Defendants rely, found typicality lacking because class members had "suffered a wide range of deprivations," 275 F.R.D. 346, 358 (D.D.C. 2011), unlike the named plaintiffs here, who were harmed the same way as the rest of the class by Defendants' systemic processing failures. The district court did not abuse its discretion in finding the typicality requirement satisfied.

---

[6] Defendants made no showing that John Doe-Alpha's belated designation as "high-risk" was connected to the years-long delay he experienced, and therefore the carveout is irrelevant to his claim. *See* JA 120. In any case, this would not affect the typicality of the remaining named plaintiffs. *Cf. J.D.*, 925 F.3d at 1320 (government's objection to only one of two class representatives would not justify overturning class certification).

### C.    The district court properly certified the class under Rule 23(b)(2).

The district court likewise did not abuse its discretion in certifying the class under Rule 23(b)(2) because Defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). As the Supreme Court has explained, the "key" to Rule 23(b)(2) certification is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360. "Rule 23(b)(2) 'exists so that parties and courts … can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief.'" *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 2026 WL 1110616, at *21 (D.C. Cir. Apr. 24, 2026) (quoting *DL II*, 860 F.3d at 726). The district court did not err in certifying the class on the basis that Defendants unreasonably delayed the adjudication of *all* class members' SIV applications, and a plan for prompt adjudication of all class members' pending applications would provide relief for the entire class.

First, Plaintiffs' claims arose from Defendants' overarching practice of delay that "appl[ied] generally to the class." Fed. R. Civ. P. 23(b)(2). Program-wide delays prompted Congress's adoption of the nine-month timeline and in the years that

27

followed, they continued to grow. *See supra* at 5-6, 20 n.2. As Plaintiffs' evidence showed, the delays affecting class members were not confined to individual cases but rather were endemic to Defendants' SIV processing as a whole. *See supra* at 20. By the time of final judgment in 2025, the class was limited to those experiencing the longest delays. *See* JA 170. Circumstances applicable class-wide, including the risks facing class members by virtue of the nature of the SIV program itself and the generalized, system-wide justifications Defendants raised for their delay, confirmed such delays were unreasonable under the *TRAC* factors. *See infra* at 36-44.

Second, the district court correctly held that the flexible remedy of an adjudication plan was appropriate for the class as a whole. Agency-wide delays are "best addressed" by class-wide relief, which ensures delayed applications move through the process on an expedited timeline without resulting in "line-jumping." *Ebanks v. Shulkin*, 877 F.3d 1037, 1040 (Fed. Cir. 2017); *see also Allies I* at 819; *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 192 (D.C. Cir. 2016) (plaintiffs could only challenge delays as a whole rather than individually to avoid "solving their delay problem at the expense of others similarly situated"); *cf. In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991) (judicial order putting an individual "at the head of the queue simply moves all others back one space and produces no net gain").

Defendants again attempt to impugn the district court's analysis on the basis that some applications were purportedly determined "high-risk." *See* Br. 32-35.

28

Their third iteration of this argument is no more persuasive than before. As Defendants did not even contend at summary judgment "that any cases have been … designated" as being high-risk and requiring additional time to satisfy national security concerns, JA 89, the district court correctly concluded that it could assess the delay against the nine-month timeline for all class members, *see infra* at 39. Nor did the district court err in finding that a single adjudication plan—a "flexible, measured approach" to relief—was warranted for all class members. *Allies I* at 819; JA 129. Even if Defendants later deem a class member "high-risk," that would not retroactively render their prior delay reasonable or eliminate their entitlement to prompt adjudication. *See Allies I* at 816. And as Defendants recognize, the adjudication plan accounts for cases that "require additional processing time to reconcile any national security concerns." Br. 14-15; JA 190, 192, 195-98.[7]

Thus, the district court did not abuse its discretion in certifying the class.

**II.    The district court did not err in concluding that Defendants' delay in processing Plaintiffs' SIV applications was unreasonable and in setting an adjudication plan.**

None of Defendants' arguments disturb the district court's conclusion that they unreasonably delayed adjudicating the SIV applications of class members, all

---

[7] As Plaintiffs previously argued, *see* Dkt. 31 at 13 n.9, to the extent the Court decides that the "high-risk" exception poses a problem for certification, the solution is to certify a subclass, not to decertify. *See Wagner v. Taylor*, 836 F.2d 578, 589-90 (D.C. Cir. 1987).

of whom have now been waiting years for a decision.[8] Under the two-step inquiry for an unreasonable delay claim under APA § 706(1), a court first considers whether the plaintiff has identified a required action that the agency has failed to take, regardless of whether Congress specified a deadline. *See Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 620-21 (D.C. Cir. 2020); *Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 340 (D.C. Cir. 2023). If so, the court next considers whether the agency's delay in taking that action is unreasonable, taking into account any statutory timetable (or lack thereof) and other factors bearing on the reasonableness of the government's delay in the multifactor *TRAC* analysis. *See Am. Anti-Vivisection Soc'y.*, 946 F.3d at 621. The district court did not err on either point.

First, Defendants have a statutory obligation to process SIV applications. The district court's threshold conclusion that Plaintiffs had identified a required agency action, regardless of whether a mandatory timeline applied, was therefore correct. Second, the district court correctly concluded that Defendants' systemic disregard of the statutory timeframe, coupled with the magnitude of the delays and the life-threatening circumstances facing class members, weighed in favor of finding unreasonable delay under the *TRAC* factors and warranted the adjudication plan. In arguing that the nine-month timeline should be effectively disregarded, Defendants

---

[8] *See supra* at 14. The district court reaffirmed its unreasonable delay decision in November 2022, extending it to applicants who had joined the class since its 2019 decision. Defendants do not appeal that decision. *See* Br. 6-7.

ask this Court to overturn the holdings of *Allies I* and to elevate the narrow exception for "high-risk" cases requiring additional time—which Defendants never showed applied to anyone in the class—into a blanket justification for delay across the entire program. These arguments fail.

### A.     Defendants have a duty to adjudicate SIV applications.

Attempting to short-circuit the analysis required by the APA, Defendants argue that Plaintiffs' unreasonable delay claim fails because, they assert, the agencies do not have a duty "to adjudicate *all* SIVs within nine months" and "the statutes do not clearly impose any mandatory timeline." Br. 36. Their argument rests on a false premise. A plaintiff claiming unreasonable delay must show only that agency action is required, not that Congress has specified a mandatory timeframe for that action. Here, the district court correctly concluded that Defendants have a duty to adjudicate SIV applications.[9]

"The violation of a statutory deadline is not required to succeed on a § 706(1) claim." *Barrios Garcia v. DHS*, 25 F.4th 430, 454 (6th Cir. 2022). This Court's prior holding that the nine-month timeline does not need to be mandatory for the delay to be unreasonable is fatal to Defendants' argument to the contrary. *See infra* at 36-37

---

[9] Defendants erroneously state that the district court "found the 9-month benchmark … was a mandatory timeframe." Br. 6. It did not. Rather, it concluded that Defendants had a duty to fully adjudicate Plaintiffs' SIV applications whether or not the timeframe is mandatory. JA 45-51.

(citing *Allies I* at 817); *see also Da Costa*, 80 F.4th at 344. In any event, decades of precedent, including *TRAC* itself, confirm that Plaintiffs need only establish a required agency action, not a required processing speed. *TRAC*, 750 F.2d at 80 (finding agency's delay in resolving ratemaking disputes unreasonable without identifying a statutory deadline); *Pub. Citizen Health Rsch. Grp. v. Auchter*, 702 F.2d 1150, 1153-54 (D.C. Cir. 1983) (finding unreasonable delay and ordering expedited agency action despite absence of statutory deadline); *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (same); *Cobell v. Norton*, 240 F.3d 1081, 1096-97 (D.C. Cir. 2001) (same); *Mashpee Wampanoag Tribal Council v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003) (plaintiff need not identify "'a mandatory, nondiscretionary duty to begin to consider the [plaintiff's] petition' by a time certain").

Here, as the district court held, Defendants have an obligation to adjudicate SIV applications. *See* JA 45-49. Defendants do not argue otherwise. *See* Br. 35-38 (arguing only that they have no duty to adjudicate SIV applications within nine months or otherwise expedite them). In any case, the district court's conclusion was correct. Congress intended for the agencies to *complete* "all steps … incidental to the issuance of such visas," regardless of whether the nine-month timeline itself is viewed as mandatory or aspirational, and built in extensive oversight to ensure applications were completed. AAPA § 602(b)(4)(A), (b)(11); RCIA § 1242(c)(1),

(f)(2); *cf. Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015) (INA provision regarding order of consideration of visa petitions confirmed mandatory duty to adjudicate application). Even the statutes' exception for high-risk cases, which allows Defendants to take longer than nine months, does not suggest they could opt out of adjudicating them altogether. AAPA § 602(b)(4)(B); RCIA § 1242(c)(1).

Other sources of law confirm the agencies' duty to act on SIV applications at specific steps of the application process. *See* JA 45-51; AAPA § 602(b)(2)(D)(i); RCIA § 1244(b)(4)(A) (mandating assessment of COM approval); AAPA § 602(b)(2)(D)(ii); RCIA § 1244(b)(4)(B)(i)(A)(II) (guaranteeing right to COM appeal). And the APA directs that the SIV processing required by the AAPA and RCIA be completed within a reasonable time.[10] *See TRAC*, 750 F.2d at 80 (5 U.S.C. § 555(b) "mandate[s] that agencies decide matters in a reasonable time"); *Am. Rivers*, 372 F.3d at 418 (similar). Accordingly, the district court correctly held that Defendants have a duty to complete processing of class members' SIV applications.

---

[10] Defendants' reliance on the unpublished decision in *Karimova v. Abate*, 2024 WL 3517852 (D.C. Cir. July 24, 2024), is unavailing. Br. 36. The plaintiff there relied solely on the APA as the source of the purported duty, and the panel distinguished cases where a specific provision of the INA gave rise to the duty to act, as is the case here. *Karimova*, 2024 WL 3517852, at *3, *6 (citing *Da Costa*, 80 F.4th at 340; *Xie*, 780 F.3d at 405); *see also infra* at 47.

### B.     The district court did not abuse its discretion in assessing the *TRAC* factors.

Upon correctly concluding that Defendants have a duty to process SIV applications, the district court did not err in finding that Defendants' systemic delays of class members' applications were unreasonable. As a threshold matter, a district court's balancing of the *TRAC* factors should be reviewed for abuse of discretion. *Cf. Allies I* at 814. Regardless of the applicable standard, the district court's careful balancing of (1) the delay against the "rule of reason," as reflected in the statutory timeframe (*TRAC* factors 1 and 2); (2) the harm to human health and welfare and the interests prejudiced by delay (factors 3 and 5); and (3) the effect of expediting processing on other agency priorities (factor 4) withstands scrutiny.

This Court's holding in *Allies I* is fatal to Defendants' arguments. In *Allies I*, this Court squarely rejected the notion that the nine-month timeline does not constitute a "rule of reason" against which Defendants' delays should be assessed, notwithstanding the narrow exception in the statute for certain "high-risk cases." *Contra* Br. 38. But even apart from *Allies I*, the consistent languishing of cases far past the Congressional timetable weighed in favor of finding the delay unreasonable in 2019, and class members have now been waiting years longer. Defendants do not seriously dispute that Plaintiffs, who face enormous risk of retaliation at the hands of the Taliban and other groups for their service to the United States, established that the threat to human health and welfare and interests prejudiced by the delay

34

supported the district court's findings. Finally, Defendants do not show that their conclusory assertion of competing priorities outweighed these other factors.

### i. This Court should review the district court's balancing of the *TRAC* factors for abuse of discretion.

Though Defendants' arguments fail under any standard of review, the Court should review the district court's balancing of the *TRAC* factors for abuse of discretion, not *de novo* as Defendants contend. Appellate review of a district court's balancing of the *TRAC* factors and decision to issue an injunction is deferential. *See Allies I* at 814. Even though Defendants appeal summary judgment, abuse-of-discretion review is appropriate here because Defendants do not identify any genuine disputes of material fact, but instead disagree with the *weight* in the *TRAC* analysis that the district court gave to the undisputed facts before it. *See* Br. 38-46.

This Court has recognized that the unreasonable delay "determination turns on 'consideration of the particular facts and circumstances' regarding the specific agency action at issue," *Allies I* at 814 (quoting *Mashpee*, 336 F.3d at 1100), and that "Section 706 of the APA leaves in the courts the discretion to decide whether agency delay is unreasonable," *Cobell*, 240 F.3d at 1096 (internal quotation marks omitted). "Put simply, there is no way for a reviewing court to determine that an agency has 'unreasonably' delayed taking action without engaging in some discretionary analysis." *South Carolina v. United State*s, 907 F.3d 742, 760 (4th Cir. 2018). The Court should therefore apply an abuse-of-discretion standard in reviewing the

35

district court's balancing of the *TRAC* factors and decision to issue injunctive relief. *Cf. Am. Hosp.*, 812 F.3d at 191 (on appeal of summary judgment in mandamus context, evaluation of *TRAC* factors reviewed for abuse of discretion); *Pro Football, Inc. v. Harjo*, 565 F.3d 880, 883 (D.C. Cir. 2009) (applying abuse of discretion to equitable determination where material facts were undisputed).

### ii. Factors 1 and 2: This Court already held that the nine-month timeline provides a rule of reason, and the district court properly assessed Plaintiffs' delays against that timeline.

The first two and most important *TRAC* factors ask whether the time taken by the agency follows a "rule of reason," which may be found in a "timetable or other indication … in the enabling statute," against which the court can determine whether the delay is unreasonable. *TRAC*, 750 F.2d at 80; *see In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 836 (D.C. Cir. 2012). In *Allies I*, this Court concluded that the nine-month timeframe provides the applicable rule of reason, observing that "Congress mandated that the Secretaries 'shall improve the efficiency' for processing visa applications under the RCIA and AAPA, so that all steps within their control 'should be completed not later than 9 months after' a qualifying [noncitizen] applies for a visa." *Allies I* at 816 (quoting AAPA § 602(b)(4)(A); RCIA § 1242(c)(1)). Indeed, the Court recognized that "contextual clues suggest something closer to a command":

36

> Congress linked the nine-month benchmark that the Secretaries "should" meet to a command that they "shall" improve efficiency for processing visa applications. Also, if the nine-month timeline were solely aspirational, there would have been little reason to carve out "high-risk cases for which satisfaction of national security concerns requires additional time." RCIA § 1242(c)(2); AAPA § 602(b)(4)(B). The carveout suggests that a nine-month timeline *is* appropriate *unless* a case presents distinctively high risks to the national security.

*Id.* at 817 (emphasis in original). Thus, even if the nine-month timeline is not mandatory, it is a rule of reason that "should play an important role in assessing the reasonableness of the government's pace of adjudication." *Id.*

Defendants' contrary arguments are foreclosed by *Allies I*. There, this Court decided the precise issue Defendants attempt to relitigate here: as a matter of statutory interpretation, the nine-month timeline in the RCIA and AAPA is an applicable rule of reason. *See* Br. 39-41. This holding is binding on subsequent panels under the law-of-the-circuit doctrine. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1393-95 (D.C. Cir. 1996). And the law-of-the-case doctrine holds that courts should "be 'loathe' to reconsider issues already decided 'in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice.'" *Id.* at 1393; *accord Bahlul v. United States*, 77 F.4th 918, 925 (D.C. Cir. 2023). Defendants have not identified any extraordinary circumstances here.

In any case, the district court appropriately assessed Defendants' delays against the nine-month timeline under the first two *TRAC* factors. For one, as this

37

Court suggested, Congress intended the nine-month timeline as a requirement *except* in certain high-risk cases. *Allies I* at 817. Defendants argue that the use of the word "should" means the timetable cannot be mandatory, but the mere fact that a provision uses the word "should" does not mean Congress intended it to be precatory. *See id.*; *Doe v. Hampton*, 566 F.2d 265, 281-82 (D.C. Cir. 1977) (use of the word "should" instead of "shall" is not determinative of whether provision is mandatory, especially when accompanied by "strong expressions of congressional … policy").[11]

But whether mandatory or not, the timeline "should play an important role in assessing the reasonableness of the government's pace of adjudication." *Allies I* at 817. That the SIV process contains many steps and touches on national security considerations does not undermine Congress's direction to process cases expeditiously. *Contra* Br. 41-42. Congress specifically provided that *all* steps of the process under control of the different agencies, including background checks, should be completed within nine months, AAPA § 602(b)(4)(A), RCIA § 1242(c)(1), and "the construction of the statute makes clear that Congress was patently aware of the

---

[11] The cases Defendants rely upon, Br. 36-37, do not suggest that provisions using the word "should" can never be mandatory, but rather emphasize the need to read the term in context. *See Jolly v. Listerman*, 672 F.2d 935, 945 (D.C. Cir. 1982) ("should" may not be binding when used in a "guideline"); *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016) (provision using "may" was precatory given contrasting provision using "shall," but "matters are not always so clear cut"); *United States v. Maria*, 186 F.3d 65, 70 (2d Cir. 1999) (finding relevant that agency used "shall" for certain provisions and "should" for others).

38

national security implications when it set the 9-month time limit," JA 86; *cf. In re Ctr. for Biological Diversity*, 53 F.4th 665, 671 (D.C. Cir. 2022) (finding agency's argument about complexity of the process and competing obligations did not hold sway when Congress provided a timeline). Despite Defendants' quarterly reports repeatedly relaying these concerns, Congress has maintained that timeframe through subsequent program reauthorizations, which shows Congress wanted Defendants to abide by it, not continue flouting it. JA 87; *see supra* at 7.

Moreover, the district court rightly considered the nine-month timeframe to be the applicable rule of reason for *all* class members' applications. *Contra* Br. 39. The high-risk exception did not change the analysis because "Defendants [did] not contend that any cases have been … designated" as high-risk, JA 89, and did not link their systemic delays to a need to reconcile national security concerns. *See* JA 89-90; *see also* JA 120-21; *supra* at 22 (citing SA 161, 207:15-22). Rather, Defendants made the sweeping argument that Congress gave them "'unequivocal direction' to take 'whatever time is required to resolve national security concerns'" in *all* cases and that "any delay, which is a result of these complex background checks and screening, is reasonable," which the district court correctly rejected. JA 86-87 (quoting Dkt. 70); *see Nine Iraqi Allies Under Serious Threat v. Kerry*, 168 F. Supp. 3d 268, 294 (D.D.C. 2016) ("Obviously, Congress would not have adopted this rule-and-exception structure if it expected the exception to apply in every case."); *cf.*

39

*Potomac Elec. Power Co. v. ICC*, 702 F.2d 1026, 1031 (D.C. Cir. 1983) (observing that statutory deadline for agency decision could be extended, "but there is no evidence that the Commission took the [actions] necessary to utilize the escape valve provided by" subsection allowing extension).

Defendants also contend the district court failed to embrace a totality-of-the-circumstances approach in identifying the rule of reason, but do not indicate any rule of reason that *does* govern their processing speed, other than simply asserting the authority to take as long as they deem fit to process applications.[12] Br. 40-41. Defendants' reliance on *Da Costa*, Br. 40, is therefore misplaced. Not only did the statute there have only an aspirational "sense of Congress" provision, unlike here, but USCIS substantiated an actual rule of reason underlying its lengthy processing times. *See Da Costa*, 80 F.4th at 342-43 (observing that USCIS employed a publicly announced, rational queuing system); *cf. infra* at 49 (applications are not processed first-in, first-out). In contrast, Defendants offered class members no expectation as to when their long-pending applications would be processed; indeed, thousands of class members are still waiting years later. *See* JA 88; *supra* at 14.

---

[12] Defendants rehash their argument from their prior appeal concerning judicial review of immigration-related cases. Br. 41-42. But as they do not assert any "categorical limits on [the Court's] review," the Court is "left to consider whether the district court permissibly balanced the various competing interests" in applying the *TRAC* factors. *Allies I* at 818 n.4.

Upon finding that the nine-month timeframe was the rule of reason, the district court correctly concluded that the disparity between this timeline and the delays experienced by class members—an average of over 2.5 years for COM approval, nearly 3 to 4 years for an appeal of a denial of COM approval, and 3 years for later steps—weighed in favor of finding unreasonable delay. *See* JA 79-80, 84.

### iii.     Factors 3 and 5: Defendants do not dispute the magnitude of the interests prejudiced by the delay, including the health and welfare of SIV applicants who are under serious threat.

The third and fifth *TRAC* factors required the district court to assess the "human health and welfare" and the "nature and extent of the interests prejudiced by delay." *TRAC*, 750 F.2d at 80. Agency delays that otherwise may be reasonable "are less tolerable when human lives are at stake," particularly where "the very purpose of the governing Act is to protect those lives." *Pub. Citizen*, 702 F.2d at 1157-58. The SIV program, of course, was created specifically to protect Afghan and Iraqi individuals who "ha[ve] experienced or [are] experiencing an ongoing serious threat as a consequence of [their] employment" on behalf of the U.S. government. RCIA § 1244(b)(1)(D); AAPA § 602(b)(2)(A)(iv).

Defendants assert, in passing and without analysis or support, that these factors weigh in favor of the agencies. Br. 44. They barely acknowledge the undisputed evidence the district court identified showing that "the delays (1) place Plaintiffs' lives in danger, (2) cause Plaintiffs to live with the stress and anxiety of

41

trying to protect themselves and their families from danger, (3) prevent Plaintiffs from adequately planning for the future, and (4) harm national interests, because delays undermine other countries' trust in this country's commitments." JA 89 (citing SA 1-49). Named plaintiffs' experiences starkly illustrate the human consequences of Defendants' delays. In retaliation for their work or perceived association with the United States, the Taliban and other militants sent them death threats, attacked or murdered their relatives, and forced them and their families into hiding. *See, e.g.*, JA 109-11. Defendants provide no reason to disturb the district court's conclusion that *TRAC* factors 3 and 5 weigh in favor of Plaintiffs.

### iv.    Factor 4: Defendants failed to show that the impact of expediting SIV applications on competing agency priorities outweighed the other factors.

The fourth factor considers "the effect of expediting delayed action on agency activities of a higher or competing priority." *TRAC*, 750 F.2d at 80. Given the virtually nonexistent showing that Defendants made before the district court and reiterated here, the district court did not err in finding this factor was, at best, neutral.

Defendants complain that the district court disregarded the agencies' competing priorities, alluding generally to limited resources and national security. Br. 44-45. But this Court already concluded that the district court "reasonably address[ed] the government's underlying concerns" in "not[ing] that the existence of foreign-policy and national-security concerns was apparent when Congress

established the special-immigrant visa programs for Iraqi and Afghan allies and then set the nine-month timeline for processing applications." *See Allies I* at 818 (citing JA 91 n.12); *cf. People's Mojahedin Org. of Iran*, 680 F.3d at 837 (noting that Congress "undoubtedly knew the enormous demands placed upon the Secretary [of State]" when setting deadline for decision on foreign terrorist organization designation).

Defendants again do not "explain[] with precision the personnel or resource tradeoffs that it faces, or why those constraints justify" reversing the district court's finding of unreasonable delay, *Allies I* at 819, nor did they present any such evidence to the district court, JA 91 ("In its written submissions, Defendants did not proffer any specific agency activities that would be adversely affected"). Even for the sole example offered on appeal—the need to reconcile national security concerns during background checks—they do not show how expediting application processing would affect their ability to do so. Br. 44-45. This is particularly true given the "light touch" the district court employed in the relief it ordered, which did not "interfere[] with … the Agencies' discretion to resolve national security concerns and complete the process outside the nine-month deadline" as Defendants claim. Br. 44; *Allies I* at 819. The plan accommodates cases that they determine "require additional processing time to reconcile any national security concerns," and permits

43

Defendants to explain failures to comply with the timing benchmarks. *Id.* at 812, 819; JA 190, 192, 195-97.

Even if this factor were entitled to some weight, a general reference to resource limitations "can go only so far—agency resources always are limited, and [this Court] ha[s] never suggested that the possibility of their shifting is always enough to make any *TRAC* relief inappropriate." *Allies I* at 819; *see also Cobell*, 240 F.3d at 1097; *Am. Hosp.*, 812 F.3d at 191. Here, class members have been waiting from four years to over a decade for a decision on their SIV applications; Defendants have not shown that resource constraints justify indefinite delay.

Accordingly, the district court did not abuse its discretion in concluding that the *TRAC* factors, taken together, showed unreasonable delay and ordering an adjudication plan.[13]

### III. The district court did not abuse its discretion in including all steps in the SIV application process, including administrative processing, within the scope of the injunction.

Defendants also dispute the scope of the district court's injunction. Br. 46-48. The Court reviews "the district court's entry of a permanent injunction for abuse of discretion and its factual findings for clear error." *United States v. Regenerative Scis.,*

---

[13] Defendants repeatedly insist that the district court ordered them to meet the nine-month timeline or imposed "a rigid timetable," Br. 6, 41, 44, but this is untrue. The relief extended only to individuals whose cases were *already* pending beyond nine months and, as this Court found, provided Defendants significant flexibility. *See Allies I* at 819.

44

*LLC*, 741 F.3d 1314, 1318 (D.C. Cir. 2014). Because it is undisputed that administrative processing is a mandatory step incidental to the issuance of Afghan and Iraqi SIVs, inclusion of that step in the adjudication plan was neither an abuse of discretion nor based on clearly erroneous factual findings.

Defendants have an obligation to complete "all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks," and thus the adjudication plan properly included all such steps. *See supra* at 32-33; AAPA § 602(b)(4)(A); RCIA § 1242(c)(1). The "abundance of evidence" before the district court confirmed that administrative processing, a step that encompasses background checks and security screenings, is a mandatory part of the application process "incidental to the issuance" of SIVs. JA 48, 108; *see also Nine Iraqi Allies*, 168 F. Supp. 3d at 284-88. Defendants concede this point in practice; in reports to Congress regarding their compliance with the nine-month timeline, Defendants include administrative processing as one of the application steps and stated that a visa issues only "[u]pon completion of administrative processing."[14] JA 48 (citing SA 54). On their website, Defendants

---

[14] Congress required Defendants to report on, *inter alia*, "the reasons for the failure to process any applications that have been pending for longer than 9 months" as well as the total number of, and the average wait time for, "applications that are pending due to the failure … (I) to receive approval from the Chief of Mission; (II) of U.S. Citizenship and Immigration Services to complete the adjudication of the Form I-360; (III) to conduct a visa interview; or (IV) to issue the visa to an eligible alien." AAPA § 602(b)(11)(B); RCIA § 1248(f)(2). If Congress intended for applications in

45

represented that "[a]ll SIV applicants require additional *administrative processing* after the interview." *Id.* (citing SA 140). Applicants whose cases were placed in administrative processing were handed forms stating that their application is refused pending administrative processing, and Plaintiffs were told directly that their applications were still being processed. JA 48-49. "These facts establish that administrative processing is not a final adjudication but a mandatory intermediate step." JA 49; *see also Nine Iraqi Allies*, 168 F. Supp. 3d at 284 ("'[A]dministrative processing' is not an opportunity for reconsideration of a decision but is a prerequisite to reaching the decision itself—a crucial distinction.").

The district court's factual findings based on this evidence were not clearly erroneous. Defendants do not dispute that no SIV can be issued without administrative processing. *See* Br. 47-48; *see also* SA 160, 163:5-9 (agreeing that "all SIV applicants who ultimately receive [SIVs] receive a [1201(g)] denial at the time of their interview"). As Congress was concerned with delays inhibiting visa *issuance*, AAPA § 602(b)(4)(A); RCIA § 1242(c)(1), it is not conceivable that Congress intended only for Defendants to provide eligible applicants with an inevitable denial within nine months and have the discretion to never complete the final step required to issue an SIV. Congress understandably sought to address delays

---

administrative processing to be excluded from the nine-month timeline that the reporting monitors, it makes little sense that it would require reporting on applicant wait times for that period (i.e., the time between the interview and visa issuance).

46

at all prerequisite steps, including at the administrative processing stage, which can take months or years. *See supra* at 5-7; JA 43-44.

Defendants' reliance on the unpublished *Karimova* decision to argue that they have no obligation to process applications in administrative processing is misplaced.[15] *See* Br. 34-36. In *Karimova*, the plaintiff relied solely on section 555(b) of the APA as the purported source of the consular officer's duty to adjudicate her application. *Karimova v. Abate*, 2024 WL 3517852, at *3 (D.C. Cir. July 24, 2024). The statutory and factual context is distinguishable. The AAPA and RCIA themselves contain specific language including all steps incidental to the issuance of SIVs, including background checks, in the nine-month timeframe. *Karimova* also accepted the factual premise that the section 1201(g) refusal in that context was a final decision on her application, *see id.* at *4, but here it is undisputed that consular officers *must* place applicants in administrative processing before issuing an Afghan or Iraqi SIV. For an SIV applicant, a section 1201(g) refusal for administrative processing is not an adverse decision but rather the best-case scenario, because it is the only way an applicant can proceed to visa issuance. Therefore, the district court's inclusion of the administrative processing stage in the adjudication plan was proper.

---

[15] The unpublished Sixth Circuit case cited by Defendants is also irrelevant, as the embassy had returned the plaintiff's visa petition to USCIS after denying her visa applications for failing to prove she was married to her spouse. *Hussein v. Beecroft*, 782 F. App'x 437, 442 (6th Cir. 2019).

### IV.     The district court did not abuse its discretion in partially denying Defendants' requested modifications to the adjudication plan.

The substance of Defendants' challenge to the Revised Adjudication Plan is limited to the district court's denial of their request to eliminate timing benchmarks at the COM approval and visa interview stages. *See* Br. 51-53. The district court did not abuse its discretion in rejecting these proposed modifications, which would relieve Defendants of any obligation to move forward class members at two significant steps of the process, and which Defendants failed to show were suitably tailored to the increase in pending COM and visa applications they experienced after 2020. The Court should affirm the modified plan.

Aside from their argument regarding the inclusion of class members in administrative processing, *see supra* at 44-47, Defendants do not appeal the contours of the original jointly proposed adjudication plan. Thus, in evaluating Defendants' challenge, the Court must take the original plan "as a given," and "consider only whether the district court reasonably responded to the changes." *Allies I* at 815. A party moving to modify an injunction not only "'bears the burden of establishing that a significant change in circumstances warrants [its] revision,'" but also that the requested modification is "suitably tailored" to the change in circumstances. *Gov't of Province of Manitoba v. Zinke*, 849 F.3d 1111, 1117, 1121 (D.C. Cir. 2017) (evaluating Rule 60(b) decision); *see* Br. 49 (noting Rule 60(b) is instructive to Rule 54(b) context). This Court reverses a refusal to modify an injunction only for abuse

48

of discretion. *See Allies I* at 814 (citing *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 225-26 (D.C. Cir. 2011)); *United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 F.4th 426, 432 (D.C. Cir. 2022). Here, Defendants must contend with a doubly deferential standard of review, as the district court was required to reverse the magistrate judge's order only if clearly erroneous or contrary to law. JA 178, 186; Dkt. 261 (objecting under Fed. R. Civ. P. 72(a)).

Defendants object to the district court's refusal to eliminate the timing benchmarks for Afghan class members at two steps. *See* Br. 51-53. At the COM approval stage, Defendants requested that the 120-day benchmark be changed to a throughput standard, whereby they would process 4,500 Afghan SIV COM applications or appeals total—not just class members—per quarter. JA 179; SA 303-04, 308. As Defendants do not process COM applications first-in, first-out, a throughput standard could result in class members being stuck indefinitely at this step while more recent applicants bypass them. *See* SA 358, Tr. 43:9-14; SA 361, Tr. 46:7-22 (a class member would have "no indication of when they would receive an adjudication" of COM approval); SA 249-50, 162:9-163:4 (State Department spends only one day per week processing the longest-pending COM applications, and only started doing that in 2022). Additionally, 4,500 is even less than the number Defendants were processing per quarter at the time. *See* Dkt. 261 at 6 n.7 (9,925 cases processed in quarter prior to most recent congressional report). At the visa

49

interview stage, Defendants proposed making the benchmark for scheduling applicants for interviews contingent on interview capacity and eliminating the benchmark for when interviews will occur. *See* SA 377-78, Tr. 62:18-63:8. Because the State Department controls how much interview capacity to make available to class members, this proposal would have eliminated any benchmark at the interview step.

Jettisoning the core feature of the plan from two critical steps is not a suitably tailored modification. *See* JA 179-80; SA 361-62, Tr. 46:7-47:20; SA 377-78, 62:18-63:8. The purpose of the adjudication plan is to ensure that Defendants process class members' unreasonably delayed SIV applications promptly. *See* JA 93; *see also Pub. Citizen Health Rsch. Grp. v. Brock*, 823 F.2d 626, 629 (D.C. Cir. 1987) (ordering agency to abide by a schedule and submit progress reports); *MCI Telecomms. Corp. v. FCC*, 627 F.2d 322, 345 (D.C. Cir. 1980) (directing agency to submit schedule). Without timing benchmarks at the COM approval and visa interview steps, where class members experience significant delays, *see* JA 79-80, Defendants would have no obligation to process class members at those steps within any timeframe at all, and the district court and Plaintiffs would have no means of monitoring Defendants' progress. JA 179-80. Class members could therefore languish indefinitely at these steps without recourse, eviscerating the purpose of the adjudication plan. *Id.*

Defendants also failed to show the modifications were suitably tailored to the changed circumstances they identified. As support, they relied solely on the increase in total COM applications and worldwide visa applications and asked the court to presume that the elimination of the timeframes at those steps was warranted.[16] *See* Br. 51-52. The district court did not clearly err in declining to make a factual leap that Defendants themselves did not substantiate. For one, Defendants provided no information about the number of pending class members.[17] Because their obligations are limited to class members—not every Afghan SIV applicant in the pipeline—the district court was not required to infer that processing an unknown number of class members at these steps within the existing timelines was unworkable. *Contra* Br. 51-52. Nor did Defendants support their asserted limitations on their ability to increase processing capacity or estimate how long it would take to process class members'

---

[16] When submitting these proposed modifications, Defendants provided no explanation or supporting evidence, even though they knew that the factual "justifications the government advances for its proposed modifications" would be at issue. JA 167-68 (authorizing Plaintiffs to seek discovery into this question); *see* SA 203-22; *see also* SA 315 (in denying as moot Plaintiffs' motion to strike previously submitted declarations, noting that "Defendants have not submitted the challenged Declarations in support of their modifications to the proposed adjudication plan"). In objecting to the magistrate judge's order, Defendants raised the statistics they cite here regarding the total increases in COM applications and immigrant visa applications, yet still did not justify the specific changes they requested. *See* Dkt. 261 at 9.

[17] At the time of the decision, Defendants' most recent progress report stated that of the Afghan class members covered by the original plan, 824 were still pending COM approval, 756 were awaiting interview scheduling, and 98 were awaiting interview as of November 30, 2022. SA 196, 198.

applications even with their existing capacity.[18] And they certainly offered no justification for eliminating the timing benchmarks altogether, rather than proposing alternative timelines. *See* SA 275-76, 56:12-57:7 (no change in State Department's ability to track and report processing times); *cf. NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 35 (D.C. Cir. 2000) (no basis to modify injunction where defendant did "no more than complain about harms inherent in all injunctive restraints"). The district court therefore did not abuse its discretion in rejecting changes that Defendants made no effort to show were suitably tailored.

Finally, contrary to Defendants' argument, Br. 49-50, the district court appropriately adapted the plan to address "intervening factual developments" as contemplated by its November 2022 order. This included limiting Defendants' obligation to schedule interviews to the subset of class members who are able to leave Afghanistan. *See supra* at 13-14. The November 2022 order did not give Defendants carte blanche to make whatever changes they saw fit; indeed, it specifically required the plan to retain "timing benchmarks." JA 167. To the extent Defendants allude to other purported errors in the district court's decision, those arguments are forfeited because they do not explain why they were an abuse of

---

[18] Defendants appear to suggest that the closure of Embassy Kabul affected the COM approval process in addition to the visa interview stage. Br. 51. But the Afghan SIV Unit in the United States, not the embassy, handles the COM process. *See* Dkt. 302 at 14.

discretion. *See* Br. 50; *see also* Br. 54 (requesting, without elaboration, that the Court remand to "the district court to enter an injunction in line with its November 2022 order"). "Mentioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)).

## CONCLUSION

This Court should affirm the judgment of the district court and the district court's denial-in-part of Defendants' request to modify the adjudication plan.

Dated: June 3, 2026                          Respectfully submitted,

                                             Kimberly Grano
                                             Guadalupe Aguirre
                                             Pedro Sepulveda
                                             INTERNATIONAL REFUGEE
                                             ASSISTANCE PROJECT
                                             One Battery Park Plaza, 33rd Floor
                                             New York, NY 10004
                                             Telephone: (646) 946-7453
                                             kgrano@refugeerights.org
                                             laguirre@refugeerights.org
                                             psepulveda@refugeerights.org

                                             David Y. Livshiz
                                             Rebecca C. Kerr
                                             Freshfields US LLP

53

3 World Trade Center
175 Greenwich Street, 51st Floor
New York, NY 10007
Telephone: (212) 227-4000
david.livshiz@freshfields.com
rebecca.kerr@freshfields.com

*/s/ Justin C. Simeone*
Justin C. Simeone
Carla Sung Ah Yoon
Freshfields US LLP
700 13th Street NW, 10th Floor
Washington, D.C. 20005
Telephone: (202) 777-4500
justin.simeone@freshfields.com
carla.yoon@freshfields.com

*Attorneys for Plaintiffs-Appellees and
Class Counsel*

## CERTIFICATE OF COMPLIANCE

I certify the following:

This brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B)(i) and Circuit Rule 32(a)(7)(B)(i). It contains 12,963 words, excluding the accompanying documents authorized by Fed. R. App. P. 32(f) and Circuit Rule 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Times New Roman 14-point font.

Dated: June 3, 2026

*/s/ Justin C. Simeone*
Justin C. Simeone
Freshfields US LLP
700 13th Street NW, 10th Floor
Washington, D.C. 20005
Telephone: (202) 777-4500
justin.simeone@freshfields.com

*Attorney for Plaintiffs-Appellees and Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2026, I electronically filed the foregoing with the Clerk of the Circuit Court by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system. I further certify that I will cause eight paper copies of this brief to be filed with the Court within two business days.

Dated: June 3, 2026

*/s/ Justin C. Simeone*
Justin C. Simeone
Freshfields US LLP
700 13th Street NW, 10th Floor
Washington, D.C. 20005
Telephone: (202) 777-4500
justin.simeone@freshfields.com

*Attorney for Plaintiffs-Appellees and Class Counsel*

# ADDENDUM

## <u>ADDENDUM TABLE OF CONTENTS</u>

Refugee Crisis in Iraq Act, Pub. L. No. 110-181, § 1248, 122 Stat. 395 (2008)
(codified as note to 8 U.S.C. § 1157)..............................................................ADD3-8

ADD2

**Refugee Crisis in Iraq Act, Pub. L. No. 110-181, § 1248, 122 Stat. 395 (2008) (codified as note to 8 U.S.C. § 1157)**

Sec. 1248.   Reports.

(a) Secretary of Homeland Security.—Not later than 120 days after the date of the enactment of this Act [Jan. 28, 2008], the Secretary of Homeland Security shall submit to the Committee on the Judiciary of the House of Representatives, the Committee on Foreign Affairs of the House of Representatives, the Committee on the Judiciary of the Senate, and the Committee on Foreign Relations of the Senate a report containing plans to expedite the processing of Iraqi refugees for resettlement, including information relating to—

    (1) expediting the processing of Iraqi refugees for resettlement, including through temporary expansion of the Refugee Corps of United States Citizenship and Immigration Services;

    (2) increasing the number of personnel of the Department of Homeland Security devoted to refugee processing in Iraq, Jordan, Egypt, Syria, Turkey, and Lebanon;

    (3) enhancing existing systems for conducting background and security checks of persons applying for special immigrant status and of persons considered Priority 2 refugees of special humanitarian concern under the refugee resettlement priority system, which enhancements shall support immigration security and provide for the orderly processing of such applications without delay; and

    (4) the projections of the Secretary, per country and per month, for the number of refugee interviews that will be conducted in fiscal year 2008 and fiscal year 2009.

(b) President.—Not later than 120 days after the date of the enactment of this Act [Jan. 28, 2008], and annually thereafter through 2013, the President shall submit to Congress an unclassified report, with a classified annex if necessary, which includes—

    (1) an assessment of the financial, security, and personnel considerations and resources necessary to carry out the provisions of this subtitle;

    (2) the number of aliens described in section 1243(a)(1);

ADD3

(3) the number of such aliens who have applied for special immigrant visas;

(4) the date of such applications; and

(5) in the case of applications pending for longer than six months, the reasons that such visas have not been expeditiously processed.

(c) Report on Iraqi Citizens and Nationals Employed by the United States Government or Federal Contractors in Iraq.—

(1) In general.—Not later than 120 days after the date of the enactment of this Act [Jan. 28, 2008], the Secretary of Defense, the Secretary of State, the Administrator of the United States Agency for International Development, the Secretary of the Treasury, and the Secretary of Homeland Security shall—

(A) review internal records and databases of their respective agencies for information that can be used to verify employment of Iraqi nationals by the United States Government; and

(B) request from each prime contractor or grantee that has performed work in Iraq since March 20, 2003, under a contract, grant, or cooperative agreement with their respective agencies that is valued in excess of $100,000 information that can be used to verify the employment of Iraqi nationals by such contractor or grantee.

(2) Information required.—To the extent data is available, the information referred to in paragraph (1) shall include the name and dates of employment of, biometric data for, and other data that can be used to verify the employment of each Iraqi citizen or national who has performed work in Iraq since March 20, 2003, under a contract, grant, or cooperative agreement with an executive agency.

(3) Executive agency defined.—In this subsection, the term 'executive agency' has the meaning given the term in section 4(1) of the Office of Federal Procurement Policy Act ([former] 41 U.S.C. 403(1)) [now 41 U.S.C. 133].

(d) Report on Establishment of Database.—Not later than 120 days after the date of the enactment of this Act [Jan. 28, 2008], the Secretary of Defense, in consultation with the Secretary of State, the Administrator of the United States Agency for International Development, the Secretary of the Treasury, and the Secretary of Homeland Security, shall submit to Congress a report examining the options for establishing a unified, classified database of information related to contracts, grants, or cooperative agreements entered into by executive agencies for the performance of work in Iraq since March 20, 2003, including the information described and collected under subsection (c), to be used by relevant Federal departments and agencies to adjudicate refugee, asylum, special immigrant visa, and other immigration claims and applications.

(e) Noncompliance Report.—Not later than 180 days after the date of the enactment of this Act [Jan. 28, 2008], the President shall submit a report to Congress that describes—

   (1) the inability or unwillingness of any contractor or grantee to provide the information requested under subsection (c)(1)(B); and

   (2) the reasons for failing to provide such information.

(f) Report on Improvements.—

   (1) In general.—Not later than 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2014 [Dec. 26, 2013], the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall submit a report, with a classified annex, if necessary, to—

      (A) the Committee on the Judiciary, the Committee on Foreign Relations, and the Committee on Armed Services of the Senate; and

      (B) the Committee on the Judiciary, the Committee on Foreign Affairs, and the Committee on Armed Services of the House of Representatives.

   (2) Contents.—The report submitted under paragraph (1) shall describe the implementation of improvements to the processing of applications for special immigrant visas under section 1244(a), including information relating to—

ADD5

(A) enhancing existing systems for conducting background and security checks of persons applying for special immigrant status, which shall—

    (i) support immigration security; and

    (ii) provide for the orderly processing of such applications without significant delay;

(B) the financial, security, and personnel considerations and resources necessary to carry out this subtitle;

(C) the number of aliens who have applied for special immigrant visas under section 1244 during each month of the preceding fiscal year;

(D) the reasons for the failure to process any applications that have been pending for longer than 9 months;

(E) the total number of applications that are pending due to the failure—

    (i) to receive approval from the Chief of Mission;

    (ii) of U.S. Citizenship and Immigration Services to complete the adjudication of the Form I–360;

    (iii) to conduct a visa interview; or

    (iv) to issue the visa to an eligible alien;

(F) the average wait times for an applicant at each of the stages described in subparagraph (E);

(G) the number of denials or rejections at each of the stages described in subparagraph (E); and

(H) the reasons for denials by the Chief of Mission based on the categories already made available to denied special immigrant visa applicants in the denial letter sent to them by the Chief of Mission.

ADD6

(g) Public Quarterly Reports.—Not later than 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2014 [Dec. 26, 2013], and every 3 months thereafter, the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall publish a report on the website of the Department of State that describes the efficiency improvements made in the process by which applications for special immigrant visas under section 1244(a) are processed, including information described in subparagraphs (C) through (H) of subsection (f)(2).

(h) Senior Coordinating Officials.—

    (1) Requirement to designate.—The Secretary of Homeland Security, the Secretary of State, and the Secretary of Defense shall each designate a senior coordinating official, with sufficient expertise, authority, and resources, to carry out the duties described in paragraph (2), with regard to the issuance of special immigrant visas under this subtitle and the Afghan Allies Protection Act of 2009 [title VI of div. F of Pub. L. 111–8] (8 U.S.C. 1101 note).

    (2) Duties.—Each senior coordinating official designated under paragraph (1) shall—

        (A) develop proposals to improve the efficiency and effectiveness of the process for issuing special immigrant visas under this subtitle and the Afghan Allies Protection Act of 2009;

        (B) coordinate and monitor the implementation of such proposals;

        (C) include such proposals in the report required by subsection (f) and in each quarterly report required by subsection (g); and

        (D) implement appropriate actions as authorized by law to carry out the improvements described in the report required by subsection (f).

    (3) Submission to congress.—Not later than 30 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2014 [Dec. 26, 2013], the Secretary of Homeland Security, the Secretary of State, and the Secretary of Defense shall each submit to

the committees set out in subparagraphs (A) and (B) of subsection (f)(1) the name and title of the senior coordinating official designated under paragraph (1) by each such Secretary, along with a description of the relevant expertise, authority, and resources of such official.