**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

## No. 25-5279
(Consolidated with 25-5480)

AFGHAN AND IRAQI ALLIES, UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, On Their Own and On Behalf of Others Similarly Situated,

*Plaintiffs-Appellees,*

*v.*

MARCO RUBIO; JOHN ARMSTRONG; UNITED STATES DEPARTMENT OF STATE; MARKWAYNE MULLIN; JOSEPH EDLOW; CONNIE NOLAN; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:18-cv-01388-TSC, Hon. Tanya S. Chutkan*

# SUPPLEMENTAL APPENDIX

KIMBERLY GRANO
GHITA SCHWARZ
GUADALUPE AGUIRRE
PEDRO SEPULVEDA, JR.
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
(646) 946-7453
kgrano@refugeerights.org
gschwarz@refugeerights.org
laguirre@refugeerights.org
psepulveda@refugeerights.org

JUSTIN C. SIMEONE
CARLA SUNG AH YOON
FRESHFIELDS US LLP
700 13th Street NW, 10th Floor
Washington, D.C. 20005
(202) 777-4500
justin.simeone@freshfields.com
carla.yoon@freshfields.com

DAVID Y. LIVSHIZ
REBECCA C. KERR
WANG JAE RHEE
NICHOLE CHEN
ELIZABETH LEWIS
GURPREET SINGH
FRESHFIELDS US LLP
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, New York 10007
(212) 227-4000
david.livshiz@freshfields.com
rebecca.kerr@freshfields.com
wangjae.rhee@freshfields.com
nichole.chen@freshfields.com
liz.lewis@freshfields.com
gurpreet.singh@freshfields.com

MIA TSUI
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
(650) 618-9205
mia.tsui@freshfields.com

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

Declaration of John Doe-Alpha (Dkt. No. 3-5) ..................................................... 1-6

Declaration of Jane Doe-Bravo (Dkt. No. 3-6)................................................. 7-11

Declaration of John Doe-Charlie (Dkt. No. 3-7) ........................................... 12-17

Declaration of Jane Doe-Delta (Dkt. No. 3-8) ............................................... 18-22

Declaration of John Doe-Echo (Dkt. No. 3-9) ................................................ 23-26

Declaration of Col. Steven Miska in Support of Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 34-2) ............................................................................... 27-41

Declaration of Stephen Poellot in Support of Plaintiffs' Motion for a Preliminary Injunction and Opposition to Motion to Dismiss (Dkt. No. 34-5) ................... 42-49

Joint Reports to Congress on the Status of the Afghan Special Immigrant Visa Program, January 2016 to April 2018 (Dkt. No. 34-6) .................................. 50-120

Travel.State.Gov, *Special Immigrant Visas for Afghans—Who Were Employed by/on Behalf of the U.S. Government* (Dkt. No. 34-8) ................................. 121-148

Rule 30(b)(6) Deposition of the Department of State, by and through its Designated Representative, Lareina Ockerman (Dkt. No. 68-7) .................. 149-161

Declaration of Laura Onken in Support of Plaintiffs' Supplement in Further Support of Their Motion for a Preliminary Injunction (Dkt. No. 68-12) ..... 162-182

Defendants' Notice of Lodging Progress Report, July 12, 2021 (Dkt. No. 138) ...................................................................................... 183-194

Defendants' Progress Report and Supplemental Report, January 3, 2023 (Dkt. No. 193-1) ...................................................................................... 195-202

Defendants' Notice of Lodging New Proposed Adjudication Plan, February 2, 2023 (Dkt. No. 207) .................................................................................. 203-205

Defendants' Proposed Revised Adjudication Plan, February 2, 2023 (Dkt. No. 207-1) ................................................................................................... 206-222

Deposition of Melissa A. Schubert (Dkt. No. 217-6) ................................... 223-255

Rule 30(b)(6) Deposition of the Department of State, by and through its Designated Representative, Melissa A. Schubert (Dkt. No. 217-14) ........... 256-301

Defendants' Modified Proposed Revised Adjudication Plan, August 26, 2024 (Dkt. No. 243-1) ....................................................................................... 302-312

Opinion and Order Denying Motion to Strike (Dkt. No. 252) ..................... 313-315

Transcript of the Adjudication Plan Hearing Before Hon. Moxila A. Upadhyaya, October 10, 2024 (Dkt. No. 255) ................................................................. 316-386

# Ex. E

SA 001

## **Declaration of John Doe-Alpha**

I, ▮▮▮▮▮▮▮▮▮ upon my personal knowledge, hereby declare as follows:

1. I am a national of, and currently reside in, Afghanistan.

2. My family and I face ongoing serious threats because of my service to the United States.

3. I have been working for international development projects funded by the United States government for several years. From approximately December 2011 to March 2014, when the project ended successfully, I worked on the management team for a U.S. government contractor's project to empower local governments to provide effective revenue oversight. In May 2015, I began working for a different U.S. government contractor on a project to improve the sustainability of local governments. I am now a senior director for the project.

4. My SIV application is within the control of the United States government. I am currently awaiting administrative processing of my SIV application.

5. I submitted my application for COM approval on September 25, 2013, which was granted approximately four months later, on January 27, 2014. I submitted my form I-360 (Petition for Special Immigrant) on March 8, 2014, and it was approved on or about March 13, 2014. After receiving that approval, I submitted the DS-260 (Application for Immigrant Visa) and supporting documentation on June 2, 2014.

6. I then waited for my interview to be scheduled for over 10 months. In April 2015, I was notified that my interview had been scheduled for June 11, 2015. My case has been in administrative processing since I attended the interview nearly three years ago.

7. The Taliban controls my home village, and they have their own intelligence systems to identify people who work for the Afghan government and other donor agencies, especially U.S. agencies. After people in my home village learned I was working for an American program, my family began to receive threats from people identifying themselves as being with the Taliban.

8.      Sometime in 2012, several months after I began working for a U.S. government contractor, members of the Taliban visited my relatives and informed them that the head of the Taliban in our region had ordered me to leave my job immediately and appear before their court to defend myself.  I later learned that many others who worked with the U.S. government had been given the same directive.

9.      Although I was concerned that the Taliban would harm my family if I did not comply with their demands, I wanted to continue to serve my country and the development organization that was trying to help us, so I remained at my job and was promoted to a management position.  I had relocated to a nearby city for work but was unable to return home to see my wife and daughter, who was then a baby, in case the Taliban learned about my return.

10.     Fearing harm and wishing to be together again, my wife and daughter joined me in the city, leaving the rest of our families behind. We were not able to see our families for the next two years, and we have only seen them a few times since. It is too risky for us to return home because I still work with the U.S. government, and it would be easy for the Taliban to identify us.

11.     Since I left home, the Taliban commanders have continued to harass and threaten my family in an effort to get me to come back to our village.  They even put my parents under house arrest for a month.  After they accepted that I would not return to the village, they ordered my parents to move out of the village.  The Taliban commanders eventually let my parents stay but told my family that they will target me if I return and will hold my family responsible if they help me hide.

12.     The fear of being identified by the Taliban has taken a toll on my family.  We don't risk attending family functions because of the harm that could come to us or my family remaining in our home village if the Taliban found me again.

13.     I have been waiting for a decision on my SIV application for over four years, and every day that I continue to wait is another day that my family and I must hide or risk being found by the Taliban.  In the past few years, they have increased their territorial hold and the security situation has gotten much worse.

14.   My brother was able to move to the United States through the SIV program approximately two years ago. My family misses him a lot, but I am also relieved and happy that he was able to move to safety.

15.   I am proud of the work that I have done for my country and the United States, but the uncertainty of knowing whether my SIV application will be granted makes me unsure about my family's future. I would like to pursue higher education but I cannot until I know whether I will be able to leave my country for the safety of the United States. Until my application is decided, I cannot know whether I should find new work or think about alternative ways to leave the country to secure my family's safety. Even though I am lucky to have a good job, I want my wife and daughter to live a life where we are not surrounded by bombs exploding and constant violence, and where we are free to be with our family members during happy and sad times.

16.   I fear that my participation in the lawsuit using my real name would subject my family and me to more threats and violence in Afghanistan. As I have described above, people do not understand that the work I do is in service of our country, and the Taliban has been quick to perceive me as a spy and traitor. I work at a level at my company where it is easy to identify me. As of now, the Taliban has told my parents that they believe I am working with the Americans somewhere, but I am not sure if they have complete details about my job or whereabouts. If my name and employment history were made public, that information would spread quickly and confirm the Taliban's suspicions about me. That would be very dangerous to me and is why I feel that I must proceed under a pseudonym to ensure the safety of my wife, my young daughter, and myself.

17.   I am willing to serve as a class representative on behalf of those who are similarly situated to me and have been waiting longer than nine months for a decision on their SIV applications.

18.   I know that if the class is certified, I will be representing more than just myself in this case. I will be representing the interests of other SIV applicants who are threatened because of their service to the United States and are harmed by the

SA 004

delays in processing their SIV applications.  I understand what being a class representative means.

19.  I want to help everyone in my situation because I understand the pain and frustration they feel due to the unfair delays in processing SIV applications.  I feel privileged to represent their interests, and I would be very happy if even one other person benefitted from my participation in this lawsuit.  I am willing to be actively involved in this lawsuit as a class representative and to work with my attorneys to help all of the class members.

[*Remainder of page intentionally left blank*]

SA 005

SA 006

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Afghanistan on May 8, 2018.



# Ex. F

SA 007

**<u>Declaration of Jane Doe-Bravo</u>**

I, ▮▮▮▮▮▮▮▮▮▮ upon my personal knowledge, hereby declare as follows:

1. I am a national of, and currently reside in, Afghanistan.

2. My family and I face ongoing serious threats because of my service to the United States.

3. I have been working in international development for a U.S. government contractor since 2013. I began as a Grants Specialist, and I was promoted to Grants and Subcontracts Manager in 2015 based on my exemplary performance.

4. The start of my work with the United States marked a new phase in my life. Since then, I have received many insults, threats and warnings from the Taliban and other groups. They call me an American spy, and say that one day they will send my husband and me to hell. I am very scared. I have three children and I fear for their safety.

5. The Taliban has targeted me for being a woman working for an American company. They threaten to kill me because I paved the way for other women to start working with the Americans, who they call infidels. The Taliban has murdered women for being educated and working out of the home.

6. My SIV application is within the control of the United States government. I am currently awaiting Chief of Mission ("COM") approval.

7. I submitted my application for COM approval on October 15, 2015, and it was denied on January 9, 2016. The denial stated that I did not have the required length of employment, despite the fact that I had already worked with the U.S. government for more than two years at the time I submitted my application and had included documentation establishing my employment. The government has failed to decide my appeal from that denial for over two years – I submitted the appeal on February 4, 2016. After I obtained pro bono legal representation, my lawyers emailed a supplemental submission to COM on May 25, 2017, intended to clarify any misunderstanding regarding the length of my employment.

8.   Many people I worked with applied to the SIV program at the same time as me. They are now in the United States, and I am still waiting for a decision because of the U.S. government's mistake and delay in deciding my appeal.

9.   In this time, the threats to my life have worsened.  In 2016, I received a phone call from a man who identified himself as a member of the Taliban Mujahedeen. He said he knew all about me including who I worked for and what I did.  His knowledge about my background made me extremely fearful.  He demanded that I quit my job and stay at home.  He said he would kill me if I did not agree to his demands.

10.   Two days later, as I was leaving my apartment, the building's cleaning man handed me a letter that he said he had been asked to deliver to me.  The letter said that my family and I would be killed.  At my husband's urging, I reported the call and my receipt of the letter to the Afghan Ministry of Interior Affairs.

11.   In October 2016, I received another phone call from the same Taliban member, who again threatened to kill my family and me.

12.   Fearful of further threats, I changed my phone number and have since changed my phone number multiple times.  In November 2016, my husband and I moved our family to a new address.  We live in hiding and keep our new address a secret.  Other than my parents and my husband's parents, none of our family and friends know where we live, because we cannot trust anyone.  My children are escorted to school each day and immediately return to our apartment at the end of each school day.

13.   My husband, our three children, and I cannot live in hiding forever.  We live in a very stressful situation, in fear of being killed.  When I walk in the street, I reflexively look behind me because I have a feeling that somebody is following me.  I am scared of these threats because killing those who have assisted the United States and their family members is highly prized among the Taliban.

14.   Every day that I have to wait for a decision on my SIV application is another day that my family and I are in danger of being murdered by the Taliban and other groups.

SA 009

15. The uncertainty of not knowing whether my SIV application will be granted makes me feel hopeless, and makes it extremely difficult to plan for the future. I wait every hour of every day for something bad to happen. I cannot buy a home here because I do not know if my family will survive until tomorrow. We are just alive—we are not living.

16. I fear that my participation in the lawsuit using my real name would subject my family and me to more threats and violence in Afghanistan. I have had to move and change my phone number many times because the Taliban knows my identity and many details about me, and I have kept my most recent address secret. If my identity became public, it would be easier to identify and target my family, including my newborn baby and seven- and seventeen-year-old children, and me where we are hiding.

17. For these reasons, I feel that my personal security and that of my family necessitates that I be allowed to proceed under a pseudonym.

18. I am willing to serve as a class representative on behalf of those who are similarly situated to me and have been waiting longer than nine months for a decision on their SIV applications.

19. I know that if the class is certified I will be representing more than just myself in this case. I will be representing the interests of other SIV applicants who are threatened because of their service to the United States and are harmed by the delays in processing their SIV applications. I understand what being a class representative means. I want to help everyone in my situation because we are all suffering due to the unfair delays in processing SIV applications. I know how important a decision on my SIV application is for me, and I am sure that there are people in even worse security situations for whom a decision is even more important. I want to take this opportunity to help all of them. I am willing to be actively involved in this lawsuit as a class representative and to work with my attorneys to help all of the class members.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Afghanistan on May 14, 2018.



# Ex. G

**<u>Declaration of John Doe-Charlie</u>**

I, ██████████ upon my personal knowledge, hereby declare as follows:

1.  I am a national of, and currently reside in, Afghanistan.

2.  My family and I face ongoing serious threats because of my service to the United States.

3.  I served as an interpreter and translator for two U.S. contractors in Afghanistan from April 2009 to March 2013.  In this role, I acted as a liaison between the United States military and Afghan personnel.

4.  In 2010, while I was at work one day, my father received a phone call at home from a man who identified himself as a Taliban commander.  The person who called asked my father whether I worked for the Americans.  He said that if they found out that I was working for the Americans, they would kill me.  My father begged me to quit my job, but I had no choice but to continue working.  It is very difficult to find stable work in my area, and I needed to provide for my family.

5.  In 2013, the Taliban came looking to kill me because of my work on behalf of the United States. They contacted a local shopkeeper to ask about my whereabouts and indicated that they knew I was working for the United States. Three men found my brother outside of his home and attacked him.  When my brother was taken to the hospital, he had been beaten and stabbed three times: twice in the stomach, and once in the leg.  Thankfully, my brother was able to recover.  A Taliban commander later contacted the shopkeeper to tell him that Taliban soldiers had found and attacked me—the attackers believed that my brother was actually me.

6.  After the attack, my family and I had to be much more careful.  I moved away from my family's district and into my grandfather's home.  However, this has not stopped the Taliban from looking for me.  Now, the Taliban asks shopkeepers in my family's neighborhood about my whereabouts. Also, in 2014, the Taliban killed one of my neighbors, another former interpreter for the

U.S. forces.  They are still looking for me, and if they find me, I am sure that they will kill me.

7. My family and I cannot leave our homes after sundown because the Taliban is especially active at night.  I cannot go to many parts of my city, including my family's neighborhood, because of the Taliban's presence.  I have not returned home since the attack on my brother.  I do not think I can ever return home.

8. The threats that my family and I face because of my work on behalf of the United States have changed our lives drastically.  I fear for our lives if I have to stay in Afghanistan.  I want to live my life free of threat and have the opportunity to provide for those I love.  I want my wife and son to have a comfortable, secure life.

9. My SIV application is within the control of the United States government. I am currently waiting for a decision on my Chief of Mission ("COM") appeal.

10. I submitted my COM application on April 18, 2016 and received a denial over eight months later on December 30, 2016.  My COM application was denied because the letter verifying my employment did not include the contract number between my employer and the U.S. government.

11. I reached out to my employers and obtained contract numbers, which I submitted with my appeal on April 3, 2017, within the 120-day period that the law provides for appeals of COM denials.

12. I have been in the SIV application process for more than two years, including over one year of waiting for a decision on my COM appeal.

13. Every day that I have to wait for a decision on my SIV application is another day that my family and I face danger from the Taliban.  Attacks and threats continue, and I do not believe the Afghan police can protect me because of the Taliban's influence. The Taliban have increased their attacks across the country, and they will become even more active in the summertime. More importantly, after attacks on military and police stations, the Taliban can now access the government's biometric systems and identify people affiliated with the Afghan police or army, including interpreters who worked with the U.S. military.

14. My family and I are even more frightened because of the increase in attacks and the Taliban's ability to access information about my work for the United States. Another group, Daesh, is also looking for people who worked with the U.S. military, and they are even more violent than the Taliban. I believe one day the Taliban or another group will find me and kill me.

15. The uncertainty of not knowing whether my SIV application will be granted has affected my family and me very badly. I want to come to the United States so that my family can have a safe and comfortable life. We are not safe here in Afghanistan, and there is no opportunity for education. In particular, I am worried that my son may be attacked by the Taliban or another group because of my work with the U.S. government.

16. I fear that my participation in the lawsuit using my real name would subject my family, including my approximately 2-year-old son, and me to even more serious threats in Afghanistan. The Taliban does not know where I currently live with my grandfather, wife, and son. Members of the Taliban are actively seeking to harm my family and me, and making my identity public would make it easier for Taliban members to identify us.

17. For this reason, I feel that I must use a pseudonym to protect the safety of my family and me.

18. I am willing to serve as a class representative on behalf of those who are similarly situated to me and have been waiting longer than nine months for a decision on their SIV applications.

19. I know that if the class is certified I will be representing more than just myself in this case. I will be representing other SIV applicants who are threatened because of their support for the United States and are harmed by the delays in processing their SIV applications. I understand what being a class representative means. I know other SIV applicants whose lives are also in danger and who have been waiting for a long time for their applications to be approved. I want to help everyone in my situation because we are all suffering due to the unfair delays in processing SIV applications. I am willing to be

actively involved in this lawsuit as a class representative and to work with my attorneys to help all of the class members.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Afghanistan on April 2 8, 2018.



{00009116}

## Declaration of Translation

I, Sohail Shariq, affirm, under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct:

1.      I am fluent in both English and Dari and competent to translate from English into Dari and *vice versa*.

2.      I translated the within Declaration of John Doe Charlie, from English to Dari, accurately and completely to the best of my abilities, for John Doe Charlie, and he informed me that he understood its contents in signing the agreement.

_____
Sohail Shariq

Executed on May 30, 2018
Alexandria, Virginia

SA 017

# Ex. H

SA 018

**Declaration of Jane Doe-Delta**

I, ████████ upon my personal knowledge, hereby declare as follows:

1.     I am a national and resident of Afghanistan.

2.     My family and I face ongoing serious threats because of my service to the United States.

3.     I work for a contractor of the United States military.  As part of its U.S. contracts, my employer deploys communications infrastructure at government offices throughout Afghanistan.

4.     I have been an administrative assistant with my employer since August 2013.  I provide administrative support, work with computer systems, and administer contracts.

5.     My role is public-facing and involves direct contact with Afghan government ministries.  My position requires me to travel frequently to various provinces, including active conflict zones, with my supervisors and colleagues.  During these visits, many people have seen me with U.S. citizens and military and government personnel.  As a result, many people know that I work on behalf of the United States military.

6.     My family and I have faced threats because of my work on behalf of the United States, and we feel unsafe in Afghanistan as a result.  Since I began working for the U.S. military contractor, on several occasions, people I believe to be members of the Taliban have threatened, harassed, and followed me, as well as my father, brother, sister, and other family members.

7.     These threats are exacerbated because I am a woman.  In Afghanistan, many consider it shameful for women to work.  To the Taliban, it is even more shameful that I work on behalf of the U.S.  When I go out, strangers in the street often call me a prostitute because I am widely perceived to be close to the U.S. military, and they say that I am a "broker" providing Afghan women to the U.S. military for sex.

8.     In 2016, several months before I applied for an SIV, while on my way to my office, a masked man approached me with a gun in his hand and identified

SA 019

himself as a Taliban member.  He called me a prostitute and told me that he knew I worked with the United States military.  This man said that the Taliban would kill my family and me if I did not quit my job.

9. Another morning, later in 2016, I found people waiting outside my house.  They threatened me, saying that I should quit my job.  They told me they know where I live, who my family is, the times I come and go from my house, and what my car looks like.  Around the same time, those people also threatened my father, saying they would kill him if I did not quit my job.

10. Because of these threats to my life and my family, I do not feel safe in Afghanistan.  It is extremely difficult for me to focus on my work as I worry about my safety and that of my family.  The SIV program represents a potentially life-saving opportunity for me and my family.

11. My SIV application is within the control of the United States government.  I am currently awaiting Chief of Mission ("COM") approval.

12. The government has now had my application for COM approval since December 23, 2016, when I submitted the application.  On May 23, 2017, I received an email from the National Visa Center ("NVC") requesting additional details, including my primary e-mail address and my American supervisor's passport number.  I emailed NVC answers to its questions one week later, on May 30, 2017.  On July 17, 2017, I received an email from NVC confirming receipt of all documentation, but I am still waiting for a decision on my application.

13. I have already been waiting for a decision on my COM application for over 16 months.  I find it unfair that the U.S. government is taking so long to make a decision on my application.  It makes me feel like the United States does not care about the immense danger I face here in Afghanistan because of my service to the United States.  Also, my brother moved to the United States in July 2017, and I want to be reunited with him.

14. Every day that I have to wait for a decision on my SIV application is another day that the Taliban may follow through on its promise to kill me or my family.  It is not safe for me to work or study here in Afghanistan, but I have to take the

risk of traveling to work every day because I have no other way to support myself.  Instead, I just wait for the day that the Taliban comes for me.

15. I do not want anyone here to know I am participating in this lawsuit.  I fear that my participation in the lawsuit using my real name would subject my family and me to more threats in Afghanistan, particularly if my name is picked up by the media.  If my identity were made public, along with my history of service to the United States, it would be easy for members of the Taliban to find, target, and possibly kill my family and me.

16. For these reasons, I feel that my personal security and that of my family necessitates that I be allowed to proceed under a pseudonym.

17. I am willing to serve as a class representative on behalf of those who are similarly situated to me and have been waiting longer than nine months for a decision on their SIV applications.

18. I know that if the class is certified I will be representing more than just myself in this case.  I will be representing other SIV applicants who are threatened because of their support for the United States and are harmed by the delays in processing their SIV applications.  I understand what being a class representative means.  I know other SIV applicants whose lives are also in danger and who have been waiting for a long time for their applications to be approved.  I want to help everyone in my situation because we are all suffering due to the unfair delays in processing SIV applications. I am willing to be actively involved in this lawsuit as a class representative and to work with my attorneys to help all of the class members.

SA 021

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Afghanistan on April 15, 2018.



{00009115}

# Ex. I

SA 023

USCA Case #25-5279   Document #2176641   Filed: 06/03/2026   Page 28 of 390

**<u>Declaration of John Doe-Echo</u>**

I, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ upon my personal knowledge, hereby declare as follows:

1. I am a national of, and currently reside in, Iraq.

2. My family and I face ongoing serious threats as a result of my service to the United States.

3. I worked as a translator for a U.S. military contractor from April 2006 to August 2008. My job was to translate between the U.S. forces and Iraqi civilians. As part of my job, I also spent eight months training the Iraqi police.

4. After learning that I worked for the Americans, members of a local militant group kidnapped my father in 2007. They threatened to kill my father unless I paid a ransom. I paid the ransom to save my father's life, but they killed him anyway.

5. In addition, on a later occasion, members of the same militant group shot at my family's home while everyone was home. Fortunately, no one was hurt, but the threats to my family show that they were not safe because of my service to the United States. Neither me nor my family members had been attacked prior to my work for the U.S. government.

6. The murder of my father forced me to go into hiding to protect my safety. First, I went to my grandfather's house, and then I went to Jordan. I returned to Iraq after three years because I ran out of money and could not support myself without work authorization. When I returned to Iraq, I moved to a different neighborhood away from my family. I have not returned and will not return to my old neighborhood for fear that someone who knows of my work for the United States will identify me.

7. My SIV application is within the control of the United States government. I am currently awaiting administrative processing of my application.

8. I have already been in the SIV application process for nearly five years.

9. The government initially took over fifteen months to decide my application for Chief of Mission ("COM") approval.  I submitted the application in July 2013, and it was denied on November 21, 2014.

10.     I filed an appeal of that denial within the 120-day period set by law, on March 20, 2015, and COM approval was granted less than a month later, on April 13, 2015. After receiving COM approval, I submitted an I-360 (Petition for Special Immigrant) eight days later, on April 21, 2015. It was not approved until nearly six months later, on October 14, 2015.

11.     The government has now had my DS-260 (Application for Immigrant Visa) since November 2015. I was interviewed by the U.S. Embassy in Baghdad on February 3, 2016, but I have not heard any information about my application since then other than that it is in administrative processing.

12.     Every day that I have to wait for a decision on my SIV application is another day that my family and I are in danger of threats and retaliation based on my service to the United States. Knowing that my father was killed because of my work leaves me terrified that members of my family or I will meet the same fate.

13.     The uncertainty of not knowing whether my SIV application will be granted has had a very big impact on my life. I have been pursuing this opportunity since 2009 in order to start a new and safe life for both me and my family. I was happy to help both the United States military and the Iraqi people with my work, and I still have a lot of hope that I can have a fresh start in America.

14.     I have tried very hard to keep my identity and location a secret from people in Iraq who oppose the United States' work here. For that reason, I do not want anyone here to know I am participating in this lawsuit. I fear that my participation in the lawsuit using my real name and home address, especially if that information is communicated worldwide by the media, would subject my family and me to more threats and harm in Iraq. If my personal information is publicized, I would be forced to relocate again or risk getting attacked and killed for my service to the United States.

15.     I am willing to serve as a class representative on behalf of those who are similarly situated to me and have been waiting longer than nine months for a decision on their SIV applications.

SA 025

16. I know that if the class is certified I will be representing more than just myself in this case. I will be representing other SIV applicants who are threatened because of their support for the United States and are harmed by the delays in processing their SIV applications. I have spoken with the lawyers who represent me about what being a class representative means. I know other SIV applicants whose lives are also in danger because they served the U.S. military. I want to help everyone in my situation because the unfair delays in processing SIV applications are hurting all of us. I am willing to be actively involved in this lawsuit as a class representative and am willing to help the lawyers however I can.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Iraq on April 27, 2018.



{00009104}

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AFGHAN AND IRAQI ALLIES UNDER SERIOUS
THREAT BECAUSE OF THEIR FAITHFUL
SERVICE TO THE UNITED STATES, ON THEIR
OWN AND ON BEHALF OF OTHERS SIMILARLY
SITUATED,

               Plaintiffs,

        – against –

MICHAEL R. POMPEO, et al.,

               Defendants.

Case No. 18-cv-01388-TSC

## DECLARATION OF STEVEN MISKA
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Steven Miska, Col. (Retired) U.S. Army, hereby declare the following:

1. I am a Retired Colonel from the U.S. Army with over 25 years of military experience as an active duty Army officer. During my time in the military, I have served in a number of roles, including as Infantry Task Force Commander during wartime in Iraq and, from June 2011 to June 2012, as the Director for Iraq on the National Security Council at the White House. I am currently a national security consultant and researcher focusing on developing policies that government agencies can implement to protect U.S. "soft networks"—the local interpreters and other civilians who provide a variety of critical services to the U.S. armed forces and other government agencies operating in conflict zones ("Contractors").

SA 027

USCA Case #25-5279 Document #2176641 Filed: 06/03/2026 Page 32 of 390

**SUMMARY OF OPINIONS**

2. I submit this declaration in support of the Plaintiffs' Motion for a Preliminary Injunction. I have been asked to provide my opinions on the nature and extent of the interests prejudiced by the delay in the processing of Special Immigrant Visas ("SIV") for Afghans and Iraqi Contractors.

3. While my opinions and the bases for these opinions are set out at length below, my opinion, in summary, is that the delay in the processing of SIVs for Afghan and Iraqi Contractors prejudices the welfare of the Contractors as well as U.S. national security interests and the welfare of U.S. service members and other government workers.

4. The SIV processing delay prejudices the Contractors because in both Afghanistan and Iraq the Contractors face the risk of death, torture, and other physical harm on a daily basis because of their affiliation with the United States. Thus, every day that the SIV application is delayed is another day that the Contractors and their families remain at risk of severe harm.

5. The SIV processing delay also prejudices U.S. national security interests and the welfare of U.S. service members and other government workers. When the U.S. government delays the SIV application process despite the imminent dangers to the people who faithfully worked with the United States, it undermines the current Contractors' reliance and trust in the U.S. government and the willingness and the ability of local nationals to vigorously support U.S. efforts in Iraq and Afghanistan, as well as in other conflict zones. This puts at risk the U.S. service members and other government workers on the ground who rely on the Contractors to navigate the language, culture, and networks in the conflict zones.

6. The SIV processing delay also sends a message that the United States will not protect those who work side-by-side with Americans and contribute valuable skills to U.S.

SA 028

efforts. It thus undercuts the U.S. government's relationship with the host country's military, the credibility of the diplomats in the Middle East, and domestic law enforcement investigations into counterterrorism. It further undermines the morale of American veterans, including former service members and other government workers who deployed in Iraq and Afghanistan, who see that their own government is not offering assistance to those who worked side-by-side with them and who used their skills as locals to protect them from harm.

### EXPERIENCE AND QUALIFICATIONS

7. Over the course of the past ten years, I have gained significant knowledge and familiarity with the topic of threats facing Contractors and policy options for insulating them from those threats. My qualifications on this topic are described below, and a true and correct copy of my full Curriculum Vitae is attached as Exhibit A to this Declaration and incorporated by reference.

8. I graduated from West Point in 1990 and served as an active duty Army officer for over 25 years thereafter. In 1996, I was selected as a MacArthur Leadership Award Winner for the entire Army—an award given to only twelve officers.

9. Between 2003 and 2010, I served in Iraq over the course of three deployments spanning forty total months at growing levels of responsibility, first as a Battalion Operations Officer, then as a Deputy Brigade Commander and Task Force Commander, and then as a Task Force Commander. During this time, I worked closely with several dozen Iraqi Contractors who assisted my unit in accomplishing our objectives, often at grave risk to themselves. I know from first-hand experience during this period that we were not the only unit to receive such assistance. To the contrary, Contractors formed a critical part of our efforts in Iraq. But, during this period, I also saw the murder, torture, and intimidation that the Contractors faced from insurgents,

3

militia, and other nefarious actors.  For example, during one of my deployments to Iraq, one of my interpreters, Akeel "Jack" Hassan, who had been threatened previously, was killed when he went home to comfort his wife who had just given birth to stillborn twins.  Two weeks later, Nedal Mahpser Nife, a store owner who had been serving the U.S. base for four years, was killed.  These experiences drove home how lethal the situation is for the Contractors and the risks that they were taking to assist U.S. efforts.

10.     During and in between deployments, service members in my brigade and I assisted dozens of Iraqi Contractors, all of whom were interpreters whose language skills and local knowledge had been critical in our work, in navigating the SIV process.  The process was bureaucratic and by the end of 2007, three dozen cases of Contractors who had worked with my brigade were pending in the pipeline.  Aware of the threat that they faced, many of these Contractors were in hiding, using pseudonyms in their work, and living the life of fear.  The brigade helped push applications through the Chief of Mission approval process, where we could.  When the U.S. Embassy in Iraq shut down, we helped the Contractors reach their interviews in Jordan.  Many of the Contractors eventually reached safety in the United States, and six of them enlisted in the U.S. military and continued to contribute their skills to U.S. efforts.

11.     After my third deployment concluded, I enrolled in the College of International Security Affairs at the National Defense University in Washington, D.C. as a Counter-Terrorism Fellow.  In that capacity, I wrote a graduate thesis on policy recommendations for protecting the Contractors and coined the concept of "protecting soft networks."  Soft networks are local people like the Contractors who support U.S. work overseas.  They are critical to the U.S. mission because they have the language skills, cultural familiarity, and local networks and knowledge

USCA Case #25-5279   Document #2176641   Filed: 06/03/2026   Page 35 of 390

necessary to navigate the terrain.  Local national contractors become the cultural eyes, ears and mouthpieces for U.S. leaders abroad.  When the Founding Fathers were fighting the British in the Revolution, part of why they won was by effectively targeting the British soft networks.  American patriots effectively employed a strategy of targeting soft networks that led to the defeat of the greatest world power at the time.  Modern U.S. adversaries employ this same strategy and target Contractors because they understand their value to the U.S. effort.  By ruthlessly targeting local nationals who support U.S. efforts, adversaries culturally blind U.S. service members, diplomats and other government workers.  As a result, the United States must proactively adopt policies, like the SIV programs for Afghanistan and Iraq, that insulate soft networks in order to continue to engage their support.

12.     From 2011 to 2012, after completing the graduate program with honors, I served as the Director for Iraq on the National Security Council at the White House.  I had responsibility for the security portfolio of the Iraq conflict, including assessing threat levels and apprising senior leaders at our highest level of government about threat groups and actors in the region.  I received daily briefings for the CIA and received dozens of reports daily on evolving threats and conditions on the ground.  As a result, I could confidently combine my forty months of experience on the ground in Iraq with diplomatic cables, intelligence reports, and military reporting to educate leaders on conditions on the ground in Iraq.

13.     From 2012 to 2015, I served as the Lieutenant General Robert Eichelberger Army Chair at the Marine Corps University in Quantico, Virginia.  In that role, I continued researching and developing policy options to protect Contractors in conflict zones.  I also taught the senior service level (master's level) students at the Marine Corps War College on national security

SA 031

matters.   In this capacity I not only taught senior military students, but also FBI agents, intelligence community professionals, and international students.

14.   Since 2016, I have been the CEO of Servant, Leader, and Citizen Consulting, Inc., an organization that I founded to consult on complex national security and terrorism challenges. The organization partners with academic institutions and Nongovernmental Organizations (NGOs) to advance national security research and policy.

15.   Since 2016, I have also been the Principal Investigator at the Project to Strategically Protect Soft Networks, which harvests best practices from nontraditional areas like the media, NGOs, and domestic law enforcement to infuse creativity into the government policy development process to strategically protect U.S. soft networks.   In this capacity, I have fostered relationships across domains to facilitate policy development by national security professionals about protecting assets in military and foreign service contexts.

16.   In my current role as a consultant and researcher, I routinely advise members of the military, the intelligence community, and other stakeholders on how best to protect Contractors in Afghanistan and Iraq.   Veterans, members of the military, and former Contractors who have safely made it to the U.S. routinely seek me out for advice on what to do with cases of Contractors who are in harm's way.   I also advise members of Congress and their staff on legislation relating to protecting Contractors in conflict zones in addition to other vulnerable people like victims of human trafficking.

17.   I am currently on the advisory committees of No One Left Behind and the International Refugee Assistance Project, two organizations that help Afghan and Iraqi

SA 032

Contractors resettle in the United States through the SIV and other programs.[1]  I am also a member of the Pacific Council, a foreign affairs organization that brings together leaders from different industries to share ideas, keep up on foreign affairs, and effect change on issues that are important at home and abroad.  I further serve on the advisory board of the i5 Freedom Network, a nonprofit founded to raise awareness about human trafficking in the hospitality industry.

18.     I routinely lecture, publish articles, and respond to media requests on the topic of protecting Contractors in Afghanistan and Iraq, in addition to other conflict zones.  This fall, I will be presenting on this topic at the annual summit of the International Stability Operations Association, a non-profit that convenes government and defense contractors.  I will also present on a panel discussion at the Pacific Council specifically designed on the subject of protecting soft networks, in addition to lecturing at the University of San Diego on the topic.  My curriculum vitae lists a representative sample of my presentations and interviews, as well as all published writings authored in the previous ten years.

19.     I have testified as an expert at trial in one case in the previous four years.  The case was a matter in Immigration Court in 2015 on behalf of an Iraqi national seeking deferral of removal under the Convention Against Torture ("CAT").  The individual's father had worked as an interpreter for the U.S. forces in Iraq and had disappeared, and the family had received death threats because of the father's work.  I testified about the harms faced by Iraqi individuals who work and cooperate with U.S. forces and about country conditions in Iraq.  The Immigration Court recognized me as an expert, with no objection from the Department of Homeland Security, and credited my testimony regarding conditions in Iraq and harms faced by Iraqi individuals with

---

[1]     Notwithstanding my service on IRAP's advisory committee, I have no fiduciary obligations to IRAP and have never received payment for the advice that I give to IRAP.  I will also not receive payment from IRAP or any other entity for the opinions that I provide in, or for my work in relation to, this case, which I am doing on a *pro bono* basis.

American affiliations.  The Immigration Court granted the application for deferral of removal under the CAT.

## BASES OF OPINIONS

20.    In preparing this declaration, I reviewed the Amended Class Action Complaint dated July 12, 2018, the Joint Reports referenced in the Complaint, and the Declarations of Plaintiffs John Doe-Alpha, Jane Doe-Bravo, John Doe-Charlie, Jane Doe-Delta, and John Doe-Echo.

21.    I base my opinions in this Declaration on my experiences detailed above, including extensive academic and policy research into the risks faced by Contractors in war zones, and in particular in Iraq and Afghanistan, and how best to protect Contractors; regular contact with stakeholders on the topic of protection of Contractors, including national security officials, foreign policy professionals, government contractors, veterans, and host-country officials; and firsthand knowledge of the importance of the Contractors to U.S. efforts overseas and the dangers facing the Contractors in conflict areas.

22.    I also base my opinions in this Declaration on my knowledge of country conditions in Iraq and Afghanistan.  I have deep knowledge of country conditions in Iraq because of my three deployments in that country and service as the Director for Iraq on the National Security Council at the White House.  In addition, I maintain current knowledge of country conditions in both Iraq and Afghanistan, in addition to many other areas of the world, through the regular review of foreign policy publications, meetings with government officials and think tank researchers with knowledge of Iraq and Afghanistan, and contact with former colleagues from the government who are currently in Iraq, Syria and Afghanistan.

## OPINIONS

**A.    Delay in Processing of SIVs Severely Prejudices the Welfare of the Contractors, Who Face Ongoing Serious Threat to Their Safety Because of Their Service to the United States.**

23.    My opinion is that delay in processing of SIVs for Afghans and Iraqis severely prejudices the welfare of the Plaintiffs—Contractors who are facing ongoing serious threats to their safety because of their service to the United States.  The SIV legislation itself recognizes the serious threat to safety for the Contractors who are in Iraq and Afghanistan.

24.    Based on my academic research and experience in the field, I have concluded that it is logical for adversaries of the United States to employ strategies of targeting Contractors who collaborate with Americans.  Contractors are vital to U.S. efforts abroad because of their familiarity with the local language, culture, and networks.  The enemy recognizes this.  The enemy also recognizes that Contractors are soft targets because they and their families most often live among the local population and are less protected than U.S. service members and government employees.  Most U.S. government officials reside in hardened bases and diplomatic compounds that offer relative safety in dangerous environments.  This is not the case for most Contractors who commute to and from those bases, thereby exposing their persons and families to the threat of intimidation, abuse and potential death.  Those Contractors lucky enough to reside on a military base must still commute home periodically to provide for their families.  In cash-based societies like Iraq and Afghanistan, the Contractors don't have the luxury of wiring the salary they earn through their work to their family.  They must physically deliver that money, exposing themselves and their loved ones to the threat of violence from U.S. adversaries.

25.    Furthermore, current country conditions in Iraq and Afghanistan, documented in many foreign policy publications and confirmed by my contacts on the ground, affirm that the

9

U.S. adversaries in those countries have indeed been and are currently targeting the Contractors for death, torture, and other serious physical harm.

26.     Iraq today remains unstable and extremely dangerous for the Contractors, as is evident from various publications reporting on Iraq and from news from my contacts on the ground.  ISIS has demonstrated a capacity for ruthlessness, beheading Americans and torturing and killing those with known relationships to the United States.  The threats to the Contractors come not just from ISIS, however, but also from Shia militias, former Sunni insurgents, and even members of government forces seeking retaliation.  These groups categorize local Iraqis who side with U.S. diplomats and military units as "traitors."  As a result, Iraqi Contractors find themselves and their families targeted for death by various groups throughout Iraq.  The Iraqi government is weak, and its military and police forces remain highly susceptible to corruption and nefarious influences, which means that the government is unable to protect the Contractors from harm.  In short, Iraq as a whole presents survival challenges to the Contractors who are identified as affiliated with the United States.

27.     The threats to the Contractors in Afghanistan are similar in degree to the threats to the Contractors in Iraq, as confirmed by my contacts on the ground in Afghanistan and as documented in various publications.  Taliban and other terrorist organizations routinely cite the Contractors as priority targets, employ techniques to intimidate, torture, and kill them, and will post videos of these acts.  In addition, locals routinely refer to the Contractors as "traitors."  The local police and other agencies are not able to protect the Contractors because they have many priorities and face daunting challenges.

28.     As the drawdown in Afghanistan continues, the threat will only increase for the Contractors, especially for Contractors who are currently working for the U.S. government.

Many Contractors live and work on bases to preclude the risk of traveling back and forth to their homes, along which the routes can be hazardous. As the bases dwindle in numbers, the Contractors will be laid off and have to seek refuge elsewhere.

29.     In summary, the stigma of working for western forces in countries like Afghanistan and Iraq creates extreme risks for local nationals and their families. Many Contractors have to live under false pretenses, even with their family members, to prevent kin from inadvertently giving away information to nefarious actors. Many Contractors are in hiding, and, given the current country conditions, there is no guarantee of safety for the Contractors while they remain in their countries.

30.     Given these extreme risks, the SIV process is critical for protecting the Contractors and their family members from imminent, serious physical harm, including the risk of death. Every day matters when facing these extreme risks, and when the SIV processing is delayed it severely prejudices the Contractors and their families by prolonging the time that they live at risk of this severe harm.

**B.     Delay in Processing of SIVs Severely Prejudices U.S. National Security Interests and the Welfare of U.S. Service Members and Other Government Workers.**

31.     My opinion is also that delay in processing of SIVs challenged in this case severely prejudices tangible U.S. national security interests and the welfare of U.S. service members and other government workers. This opinion is based on firsthand experience commanding U.S. service members on the ground in combat and working with Contractors, experience in overseeing U.S. national security policy in a conflict zone, academic research into policy options for protecting Contractors and other assets domestically and internationally, and numerous policy discussions over the past ten years with military, diplomatic, and law enforcement professionals.

SA 037

32.     There is widespread consensus among military, diplomatic, and law enforcement professionals supporting this opinion: as just one recent example, the Pentagon is sounding the alarm about the sharp drop in refugee admission to the United States of Iraqi Contractors precisely because delays or drop in saving the Contractors from danger undermines the Pentagon's mission.[2]

33.     There are several ways in which delay in SIV processing causes severe prejudice to U.S. interests. _First_, based on my firsthand experience, policy research, and contact with Contractors and colleagues who are currently serving in the field, it is clear that delay undermines the Contractors' reliance and trust in the U.S. government and the willingness and the ability of local nationals to vigorously support U.S. efforts in Iraq and Afghanistan, as well as in other conflict zones.  Relationships between the currently serving Contractors and the U.S. troops and other government workers are undermined when the Contractors see that the U.S. government is not doing enough to help other Contractors who have worked with the Americans and who are now in danger.  U.S. troops and other government workers on the ground are put at a risk of serious physical harm when they cannot develop a full and trusting relationship with the Contractors, who protect their lives by navigating the language, culture, and networks of the conflict zone.

34.     _Second_, delay undermines the U.S. government's relationship with the host country's military.  It sends a message to the leaders of the host countries that the United States does not stand by those who work with them and that it might not stand with the host country's

---

[2] Yaganeh Torbati, _Exclusive: Pentagon Raises Alarm About Sharp Drop in Iraqi Refugees Coming to U.S._, Aug. 20, 2018, Reuters, https://www.reuters.com/article/us-usa-immigration-refugees-iraq-exclusi/exclusive-pentagon-raises-alarm-about-sharp-drop-in-iraqi-refugees-coming-to-u-s-idUSKCN1L51N9. A true and correct copy of this article is attached as Exhibit B to this Declaration.

leadership when the going gets tough.  I base this opinion on my contacts with U.S. and foreign military leaders through the course of my career.

35.     *Third*, delay undermines the credibility of the diplomats in the Middle East.  It sends a message to the diplomats' counterparts and other nations that the United States will not follow through on what we said we would do—here, that we would promptly issue SIVs to qualified Contractors to protect them from harm.  I base this opinion on my contacts with foreign policy professionals and diplomats through the course of my career.

36.     *Fourth*, delay undermines U.S. domestic and international law enforcement investigations into counterterrorism issues because potential witnesses and other assets see how the United States treats those who cooperate with and support the country.  The potential assets will not trust an FBI investigator or others working for the U.S. government if they perceive the United States as failing to assist those who cooperate with their efforts.  I base this on my contacts with domestic law enforcement professionals, including the FBI, and research into the intersection between domestic law enforcement and national security best practices.

37.     *Fifth*, based on first-hand experience of working in the field and of advising younger men and women in the military who reach out to me for advice on how they can assist their Contractors with the SIV process, I know that delay undermines the morale of American veterans, including former service members and other government workers who deployed in Iraq and Afghanistan.  Combat veterans understand the importance of living up to the ethos of leaving no team members behind—an ethos instilled during military training.  But when their own government provides no options to help people who worked hand-in-hand with them and who are now sending distress signals from Afghanistan and Iraq, it violates this central ethos and leaves the veterans ashamed of their country.  This demoralization has lasting impact as veterans

speak to young people who are considering a career in the military.  Delay in the processing of SIVs thus not only lets down the Contractors but also the men and women in the U.S. military.

38.     The SIV program has been an important tool in protecting the U.S. mission overseas and insulating critical partners in conflict zones, albeit one too limited in scope and too slow-moving to address the number of former interpreters and other local nationals at risk due to their U.S. affiliation.  Given that the SIV is currently one of the only policy tools that military and diplomatic practitioners have at their disposal for protecting the Contractors, the United States should be making maximum use of congressionally authorized SIV allocations and ensuring that processing of the SIVs is not delayed.

USCA Case #25-5279      Document #2176641         Filed: 06/03/2026      Page 45 of 390

I, Steven Miska, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  September 6, 2018
      San Clemente, CA

           COL. (RET.) STEVEN MISKA

SA 041

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

AFGHAN AND IRAQI ALLIES UNDER SERIOUS
THREAT BECAUSE OF THEIR FAITHFUL
SERVICE TO THE UNITED STATES, ON THEIR
OWN AND ON BEHALF OF OTHERS SIMILARLY
SITUATED,

Plaintiffs,

– against –

MICHAEL R. POMPEO, et al.,

Defendants.

Case No. 18-cv-01388-TSC

---

**DECLARATION OF STEPHEN POELLOT IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
AND OPPOSITION TO MOTION TO DISMISS**

I, Stephen Poellot, under penalty of perjury, hereby declare as follows:

1.      I am an attorney admitted to practice in New York and the Legal Director of the

International Refugee Assistance Project ("IRAP"), co-counsel to Plaintiffs in the above-

captioned action.  This declaration is submitted in support of Plaintiffs' Motion for a Preliminary

Injunction and Opposition to Motion to Dismiss.  I also submitted a substantively similar

declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended

Complaint in *Nine Iraqi Allies Nine Iraqi Allies Under Serious Threat Because of Their Faithful

Serv. to the United States v. Kerry*, 168 F. Supp. 3d 268 (D.D.C. 2016), in which IRAP was also

co-counsel.

1

SA 042

**EXPERIENCE AND BACKGROUND**

2.      I have been the Legal Director at IRAP since 2012.  As the Legal Director I manage IRAP's Legal Department, which provides free direct services representation, including to Iraqi applicants for Special Immigrant Visas ("SIVs") under the Refugee Crisis in Iraq Act, 8 U.S.C. § 1157 note at § 1241-59 ("Iraqi SIVs"), and Afghan applicants for SIVs under the Afghan Allies Protection Act, 8 U.S.C. § 1101 note at § 601-02 ("Afghan SIVs").  Since IRAP was founded, we have provided legal assistance to hundreds of Iraqi and Afghan SIV applicants in cooperation with pro bono lawyers at more than 75 law firms and in-house legal departments, as well as with more than 1000 law students in 29 law school chapters across the country.

3.      My work as IRAP's Legal Director has afforded me extensive first-hand experience of the SIV program and of its administration by the Departments of State ("DOS") and Homeland Security ("DHS").  I have personally provided advice to hundreds of Iraqi and Afghan SIV applicants at all stages of the SIV process and supervised over one hundred pro bono legal teams representing SIV applicants in cooperation with IRAP.  In the course of this work I have routinely interacted with officials from DOS involved in SIV processing.  I also routinely communicate with DOS and DHS regarding individual cases.

4.      As a result of this work I am deeply familiar with every step of the SIV process, from the submission of the application for Chief of Mission ("COM") Approval to issuance or rejection of an SIV.  I have trained hundreds of law students and attorneys on how to represent SIV applicants and am an author of a comprehensive legal manual on refugee and visa overseas processing, which has a section on SIV processing.  I am currently a Visiting Clinical Lecturer in Law at the Yale Law School, where I teach a course on overseas refugee and visa processing, including the SIV process.

2

SA 043

**THE SIV PROCESS FROM COM APPROVAL TO ADMINISTRATIVE PROCESSING IS ACCURATELY AND FAIRLY REFLECTED IN THE JOINT REPORTS.**

5.      Under the RCIA and the AAPA, DHS and DOS are required to issue public joint reports on the Iraqi and Afghan SIV programs (together, "Joint Reports").  Attached as **Exhibit A** is a compilation of true and correct copies of the quarterly Joint Reports on the Status of the Afghan Special Immigrant Visa Program, issued between January 2016 and April 2018, downloaded on September 6, 2018 at approximately 12:15pm from https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html#quarterly.  Attached as **Exhibit B** is a compilation of true and correct copies of the quarterly Joint Reports on the Status of the Iraqi Special Immigrant Visa Program, issued between January 2016 and April 2018, downloaded on September 6, 2018 at approximately 12:15pm from https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visas-iraqis-employed-us-gov.html#quarterly.

6.      I routinely review and rely on the Joint Reports for my work.  Defendants' description in the Joint Reports of the sequence of processing step from COM application (step 1) to administrative processing (step 13) is fully consistent with my experience in hundreds of cases.[1]

7.      In summary, the SIV application process begins with an applicant's submission of a request for COM Approval. At this step, an applicant submits the COM application package with proof of their work on behalf of the U.S. government, including a letter from the employer, a letter of recommendation from a U.S. citizen supervisor, a statement of threats related to employment, and other required documentation.  DOS's National Visa Center first reviews the

---

[1] In my experience, however, step 14 is not fully applicant-controlled as the Joint Reports represent.

3

<span style="color:red">SA 044</span>

package and, if satisfied, forwards the COM application package to the appropriate U.S. Embassy's COM. DOS then verifies that those documents are true and accurate by reaching out to the employers and supervisors. If the COM application is denied, the applicant has the right to submit an appeal.

8.      The SIV application process proceeds sequentially, with the applicant being able to move to the next step in the process only when the step that they are at is complete.

9.      Visa issuance occurs only after the completion of "administrative processing." As the State Department states on its website, "All SIV cases require additional administrative processing after the interview." Attached as **Exhibit C** is a true and correct copy of the website, entitled "Special Immigrant Visas for Afghans - Who Were Employed by/on Behalf of the U.S. Government," published by the United States Department of State, which I last accessed on September 6, 2018 at 5:46 pm at https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html.

10.     At the conclusion of the interview that the SIV applicant attends with a consular officer at a U.S. Embassy or a Consulate, the SIV applicant is routinely handed a form that indicates that their application is "refused" pending "administrative processing" and/or pending submission of additional documents requested by DOS. Afghan SIV applicants attending interviews at the U.S. Embassy in Kabul usually receive a yellow card titled "Immigrant Visa Refusal / Collection Card," a true and correct example of which is attached as **Exhibit D**. Iraqi SIV applicants attending interviews at the U.S. Embassy in Baghdad usually receive a one-page white document marked with DOS's insignia, a true and correct example of which is attached as **Exhibit E**.

4

USCA Case #25-5279     Document #2176641          Filed: 06/03/2026     Page 50 of 390

11.    In my experience, these "refusals" are not treated as and are not intended to be final adjudications of an SIV application.  Rather, as the Joint Reports confirm, administrative processing is an expected and anticipated part of the SIV process.  I am not aware of any SIV applicant who was granted a visa after the interview without undergoing administrative processing, nor am I aware of any SIV applicant who has not gone through administrative processing after the interview.

12.    Upon completion of administrative processing, SIV applicants are notified if their visa has been issued or refused.  In fact, Afghan applicants in Afghanistan are instructed to present the very same yellow "Immigrant Visa Refusal / Collection Card" in order to re-enter the Embassy in Kabul to pick up their visas.

13.    Until at least September 24, 2015, the website of the U.S. Embassy in Baghdad confirmed that applicants who have completed their visa interview can check the status of their SIV application online and will see one of three status indicators appear: (1) Administrative Processing; (2) Issued; or (3) Refused.  "Administrative processing" and "Refused" are thus different statuses.  Although this website was taken down at some point after I included the website as an exhibit to a declaration filed in *Nine Iraqi Allies*, it remains the case to this day that SIV applicants can check their status online and the status indicators for Administrative Processing and Visa Refused are different status.  A true and correct copy of the website as it appeared as of September 24, 2015, downloaded from http://iraq.usembassy.gov/administrative-processing.html on September 24, 2015, is attached as **Exhibit F** to this Declaration.

5

SA 046

**DELAYS IN THE SIV PROCESS PREJUDICES APPLICANTS' ABILITY TO GATHER SUPPORTIVE EVIDENCE AND RESULTS IN UNFAIR DENIALS OF SIV APPLICATIONS.**

14.     As a result of my experience with assisting SIV applicants, I have first-hand knowledge of how delays in the SIV process prejudice the SIV applicants in gathering employment evidence supportive of their applications. I have seen many clients and potential clients face difficulties in supporting their applications or be unfairly denied an SIV because of government delays in SIV processing.

15.     Government delays in SIV processing prejudice the evidence-gathering process for the SIV in several ways.

16.     *First*, I have seen government delays in verifying employment at the COM Approval step unfairly result in COM denial because the company that the SIV applicant worked for becomes defunct or merges with other companies during that delay.  This makes it either difficult or impossible to verify employment when records of employment and government contracts were misplaced or destroyed in the process.  These company closures and mergers have happened frequently in recent years, especially as companies have exited Iraq and Afghanistan. One example of such a company is International Management Services ("IMS"), Inc., which used to have a contract with the U.S. government to employ Afghan interpreters.  IMS closed its offices in Afghanistan in 2012 and burned all of its records relating to employment of Afghan interpreters.

17.     *Second*, I have seen government delays in following up on supervisor letters of recommendation at the COM Approval step unfairly result in COM denial because supervisors fall out of touch or change their contact information during that delay.  This happens frequently because supervisors who are in the U.S. military often lose access to their military email account

6

SA 047

once they complete their service and are discharged.  When the U.S. government eventually emails that supervisor on the military email account that was in the COM application and the email goes unanswered, the government will deny COM Approval citing inability to confirm that their letters of recommendation are authentic.

18.     *Third*, government delays in issuing a denial on the COM Application almost always prejudice the COM Appeal.  I have seen denials of COM Applications based on evidence relating to employment that DOS deemed to be missing from the file that would have been far easier to obtain if the applicant had been advised earlier of the missing evidence.  In addition, prevailing in the COM Appeal process often requires securing the support of the applicant's former supervisor, employer, or both.  In the majority of COM Appeal cases, IRAP spends a significant amount of time and resources to locate supervisors or employers.  This process is more difficult the longer the COM Application was pending with the government because the supervisors often have returned to the United States and do not have a public presence that facilitates locating them, or because the companies often change personnel, merge, close, or destroy records during that time.

19.     *Fourth*, government delays in overall processing prejudice applicants for whom DHS and/or DOS request additional evidence relating to employment later in the process.  I have seen cases where applicants who have reached interview or administrative processing stages must produce evidence relating to their employment that is difficult or impossible to obtain because so much time has passed since they first submitted a COM Application.

SA 048

SA 049

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and

correct.

Executed on:   September 7, 2018
               New York, New York

Stephen Poellot

SA 049

# Ex. A

SA 050

# Afghan SIV Joint Report: January 2016

SA 051

**Joint Department of State/Department of Homeland Security Report:
Status of the Afghan Special Immigrant Visa Program**

**Introduction**

The Department of State (State), the Department of Homeland Security (DHS), and all other U.S. government departments and agencies involved in the U.S. Special Immigrant Visa (SIV) program have the highest respect for the men and women who take enormous risks in helping our military and civilian personnel. We are committed to helping those who have helped us. The U.S. government has devoted substantial resources to reducing the amount of time required to complete the SIV process authorized under section 602(b) of the Afghan Allies Protection Act of 2009, as amended, and these efforts have resulted in a record number of visa issuances. As we continue to strive for process improvements, we also continue to ensure thorough screening for national security concerns. As of September 30, 2015, we have issued 2,301 SIVs to Afghan principal applicants and 4,411 SIVs to their family members in FY 2015. SIV issuance numbers through the fourth quarter of FY 2015 are available on travel.state.gov.

On December 19, 2014, President Obama signed the National Defense Authorization Act (NDAA) for FY 2015, which provides 4,000 additional SIVs for Afghan principal applicants. On November 25, 2015, President Obama signed the NDAA for FY 2016, which, in addition to other changes, provides an additional 3,000 SIVs, for a total of 7,000 since December 19, 2014. Overall, as of December 7, 2015, State has issued 3,029 of these 7,000 SIVs to Afghan principal applicants who were employed by or on behalf of the U.S. government in Afghanistan, or by the International Security Assistance Force (ISAF).

**Average Wait Times for Each Step of the SIV Application Process**

All steps in the SIV application process are outlined below and include the current average processing time for all involved U.S. government entities. This statistic captures total U.S. government processing time, beginning with the applicant's initial submission of documents to State's National Visa Center (NVC) and ending with the date of visa issuance at Embassy Kabul. It does not capture those steps in the SIV process that are solely dependent on the applicant's initiative and are outside the control of the U.S. government. SIV applications move through 14 steps, in the following four stages: Chief of Mission (COM) Application Process; Form I-360 Adjudication; Visa Interview; and Visa Issuance.

| Special Immigrant Visa (SIV) Processing Steps[1] | | | |
|---|---|---|---|
| Stage | Step | Description | Current average processing times for Afghan cases applying in Kabul (business days) |
| Chief of Mission (COM) application process | 1 | Applicant submits COM application package to State's NVC. | Applicant-controlled |
| | 2 | NVC reviews documents for completeness. | 13 |
| | 3 | NVC sends completed COM package to U.S. Embassy Kabul. | 1 |
| | 4 | U.S. Embassy Kabul reviews COM application and makes a decision to approve or deny. | 43 (if all required documents are present) |
| | 5 | Embassy Kabul advises NVC if COM application is approved. If approved, NVC immediately sends approval letter to applicant.  (If any documents reveal that applicant does not qualify for the program, the COM application is denied.) | 5 |
| Form I-360 adjudication process | 6 | Applicant self-petitions to DHS U.S. Citizenship and Immigration Services (USCIS) using form I-360. | Applicant-controlled |
| | 7 | USCIS adjudicates petition and sends to NVC if approved.[2] | 15 |
| Visa interview process, including pre- and post-interview[3] | 8 | NVC sends instruction packet to applicant requesting standard immigrant visa documentation. | 10 |
| | 9 | Applicant submits required documentation to NVC. | Applicant-controlled |
| | 10 | NVC reviews documents for completeness. | 17 |
| | 11 | NVC schedules applicant for next available interview at U.S. Embassy Kabul. | 60 |
| | 12 | Applicant is interviewed by consular officer on the scheduled appointment date. Administrative processing is initiated following the interview. | 5 |

SA 053

| | | | |
|---|---|---|---|
| | 13 | The applicant's case undergoes administrative processing.[4] | 147 |
| Visa issuance to eligible applicants | 14 | Upon completion of administrative processing, applicant is instructed to obtain a medical exam. The visa is issued if applicant is eligible. In some cases, the passport will have expired and the applicant is required to renew the passport. | Applicant-controlled |
| | | **Total U.S. government processing time[5]** | **293** |

[1]Processing steps are for SQ SIVs.

[2]Based on NVC data.

[3]The majority of applicants receive SIV status by going through the process explained in this chart. Applicants who obtain SIV status in the United States apply for adjustment of status from USCIS.

[4]Line 13 totals include data for principal applicant cases issued from October 1, 2014, through September 30, 2015. Average processing time for cases that remain pending cannot be calculated until they are completed.

[5]U.S. government processing times do not factor in applicant-controlled steps. Overall processing times are greater than U.S. government processing times.

## Applications Pending Longer Than Nine Months

Even if an applicant has acted promptly in each of the applicant-controlled steps that precede step 13 of the SIV application process, applications may be pending longer than nine months for completion of administrative processing (step 13 of the SIV application process). Although step 13 is lengthy, process enhancements have resulted in improved efficiency.

## Applications Pending at Each Stage of the SIV Application Process

As of November 20, 2015, approximately 10,300 Afghan principal applicants are at some step in the SIV application process. The following provides details on the numbers of Afghan applicants pending at specific steps in the process:

- Step 1 – 3,366 principal applicants have COM applications pending at the NVC where the applicant has taken action within the past 120 days. These applicants have submitted some, but not all, of the documents required to apply for COM approval. COM applications with all required documents

are sent to Embassy Kabul within one business day.  COM applications must be submitted by December 31, 2016.

- Step 7 – 922 principal applicants have Form I-360 petitions pending with USCIS.

- Step 11 – 196 principal applicants and 510 family members currently are scheduled for visa interviews.  Interviews are scheduled approximately 60 days in advance.  Applicants utilize this time to gather any remaining documents required for their interviews and prepare for travel to the U.S. embassy or consulate.  Eighty-eight principal applicants and 342 family members are waiting to be scheduled for visa interviews.  Most Afghan applicants will be interviewed at Embassy Kabul, as they reside in Afghanistan.  Applicants who reside outside of Afghanistan will be interviewed at the U.S. embassy or consulate that adjudicates immigrant visa applications for their countries of residence.

- Step 13 – applications for 1,444 principal applicants and 435 family members are undergoing administrative processing.

**Number of SIV Applicants in Fourth Quarter of FY 2015**

The following chart shows the number of Afghan applicants who applied for SIVs in the fourth quarter of FY 2015 under section 602(b) of the Afghan Allies Protection Act of 2009, subsequent to receiving COM approval:

| Month | Principal Applicants | Family Members | **Total** |
|---|---|---|---|
| July | 445 | 1,039 | **1,484** |
| August | 615 | 1,390 | **2,005** |
| September | 227 | 525 | **752** |
| **Total** | **1,287** | **2,954** | **4,241** |

**Applications Denied or Pending at Each Stage of the SIV Application Process**

At the end of the fourth quarter of FY 2015 on September 30, 2015, approximately 11,300 Afghan principal applicants were denied or pending at some

point in the SIV application process.  The following provides details on the number of Afghan applicants in some part of the application process:

- 553 Afghan principal applicants did not qualify to receive COM approval or had their approval revoked during the fourth quarter of FY 2015.  Applicants whose COM applications are denied are able to appeal their denials; approximately 50 percent of these appeal cases are subsequently approved.

- 12 principal applicants had their Form I-360 petitions denied by USCIS during the fourth quarter of FY 2015.

- As of September 30, 2015, 151 principal applicants and 346 family members had scheduled visa interviews.  Thirty-nine principal applicants and 132 family members were waiting to be scheduled for visa interviews.

- As of September 30, 2015, applications for 2,272 principal applicants and 488 family members were undergoing administrative processing.

**Reasons for COM Denial**

As reflected in denial letters sent by the COM at Embassy Kabul, denial of a COM application generally occurs for one or more of the following four reasons:

- *Failure to establish employment by or on behalf of the U.S. government, or failure to establish qualifying employment by ISAF.*  For Afghans employed by or on behalf of the U.S. government, State considers the employment requirement satisfied for an alien hired under a direct-hire appointment, or through an agency's personal services agreement (PSA) or personal services contract (PSC) authority.  State also has considered Afghan nationals hired by and paid through a U.S. government contractor or subcontractor to meet the broader criteria for employment "by or on behalf of" the U.S. government.  State has not considered the requirement under 602(b) to be "employed by or on behalf of the United States government" satisfied in other situations, such as individuals for an entity funded by a grant or cooperative agreement with the U.S. government, or self-employed businesspersons who operate under a license with the U.S. government.  Afghans employed by ISAF must have served in a capacity that required service as an interpreter or translator for U.S. military personnel while traveling off-base with U.S. military personnel stationed at ISAF or the

performance of sensitive and trusted activities for U.S. military personnel stationed at ISAF.

- *Failure to establish at least one year of employment by or on behalf of the U.S. government, or by ISAF, during the period specified in section 602(b) of the Afghan Allies Protection Act of 2009, as amended.*

- *Failure to establish providing of faithful and valuable service to the U.S. government.* Applications denied for this reason generally have involved cases lacking the requisite positive recommendation or evaluation. In some instances where faithful and valuable service was not confirmed, employment by or on behalf of the U.S. government had been terminated for cause.

- *Derogatory information associated with the applicant that is incompatible with the requirements of the SIV program.* This reason for denial generally relates to information that the applicant engaged in an unlawful, unethical, criminal, or terrorism-related activity.

# Afghan SIV Joint Report: April 2016

**Joint Department of State/Department of Homeland Security Report:
Status of the Afghan Special Immigrant Visa Program**

## Introduction

The Department of State (State), the Department of Homeland Security (DHS), and all other U.S. government departments and agencies involved in the U.S. Special Immigrant Visa (SIV) program have the highest respect for the men and women who take enormous risks to help our military and civilian personnel. We are committed to helping those who have helped us.  The U.S. government has devoted substantial resources to reducing the amount of time required to complete the SIV process authorized under section 602(b) of the Afghan Allies Protection Act of 2009, as amended, and these efforts have resulted in a record number of visa issuances.  Since the beginning of Fiscal Year (FY) 2014, we have issued visas to 7,213 of our Afghan colleagues, and an additional 13,313 visas to their immediate family members – more than 20,000 visas in the last two and half years.  As we continue to strive for process improvements, we also continue to ensure thorough screening for national security concerns.  SIV issuance numbers through the first quarter of FY 2016 are available on travel.state.gov.  As of December 31, 2015, we have issued 1,367 SIVs to Afghan principal applicants and 2,942 SIVs to their family members in FY 2016.

On December 19, 2014, President Obama signed the National Defense Authorization Act (NDAA) for FY 2015 (Pub. L. No. 113-291), which provides 4,000 additional SIVs for Afghan principal applicants.  On November 25, 2015, President Obama signed the NDAA for FY 2016 (Pub. L. No. 114-92), which, in addition to other changes, provides an additional 3,000 SIVs, for a total of 7,000 since December 19, 2014.  Overall, as of February 21, 2016, State has issued 3,200 out of the 7,000 SIVs to Afghan principal applicants who were employed by, or on behalf of, the U.S. government in Afghanistan, or by the International Security Assistance Force (ISAF) or a successor mission to ISAF.

## Average Wait Times for Each Step of the SIV Application Process

All steps in the SIV application process are outlined below and include the current average processing time for all involved U.S. government entities.  This statistic captures total U.S. government processing time, beginning with the applicant's initial submission of documents to State's National Visa Center (NVC) and ending with the date of visa issuance at Embassy Kabul.  It does not capture those steps in the SIV process that are solely dependent on the applicant's initiative

and are outside the control of the U.S. government.  SIV applications move through 14 steps, in the following four stages:  Chief of Mission (COM) Application Process; Form I-360 Adjudication; Visa Interview; and Visa Issuance.

| Special Immigrant Visa (SIV) Processing Steps[1] | | | |
|---|---|---|---|
| Stage | Step | Description | Current average processing times for Afghan cases applying in Kabul (business days) |
| Chief of Mission (COM) application process | 1 | Applicant submits COM application package to State's NVC. | Applicant-controlled |
| | 2 | NVC reviews documents for completeness. | 13 |
| | 3 | NVC sends completed COM package to U.S. Embassy Kabul. | 1 |
| | 4 | U.S. Embassy Kabul reviews COM application and makes a decision to approve or deny. | 14 (if all required documents are present) |
| | 5 | Embassy Kabul advises NVC if COM application is approved. If approved, NVC immediately sends approval letter to applicant.  (If any documents reveal that applicant does not qualify for the program, the COM application is denied.) | 5 |
| Form I-360 adjudication process | 6 | Applicant self-petitions to DHS U.S. Citizenship and Immigration Services (USCIS) using form I-360. | Applicant-controlled |
| | 7 | USCIS adjudicates petition and sends to NVC if approved.[2] | 15 |
| Visa interview process, including pre- and post-interview[3] | 8 | NVC sends instruction packet to applicant requesting standard immigrant visa documentation. | 10 |
| | 9 | Applicant submits required documentation to NVC. | Applicant-controlled |
| | 10 | NVC reviews documents for completeness. | 17 |
| | 11 | NVC schedules applicant for next available interview at U.S. Embassy Kabul. | 60 |

SA 060

USCA Case #25-5279   Document #2176641   Filed: 06/03/2026   Page 65 of 390

| | | | |
|---|---|---|---|
| | 12 | Applicant is interviewed by consular officer on the scheduled appointment date. Administrative processing is initiated following the interview. | 5 |
| | 13 | The applicant's case undergoes administrative processing.[4] | 130 |
| Visa issuance to eligible applicants | 14 | Upon completion of administrative processing, applicant is instructed to obtain a medical exam.  The visa is issued if applicant is eligible.  In some cases, the passport will have expired and the applicant is required to renew the passport. | Applicant-controlled |
| | | **Total U.S. government processing time[5]** | **270** |

[1]Processing steps are for SQ SIVs.

[2]Based on NVC data.

[3]The majority of applicants receive SIV status by going through the process explained in this chart.  Applicants who obtain SIV status in the United States apply for adjustment of status from USCIS.

[4]Line 13 totals include data for principal applicant cases issued from January 1, 2015, through December 31, 2015.  Average processing time for cases that remain pending cannot be calculated until they are completed.

[5]U.S. government processing times do not factor in applicant-controlled steps.  Overall processing times are greater than U.S. government processing times.

## Applications Pending Longer Than Nine Months

Even if an applicant has acted promptly in each of the applicant-controlled steps that precede step 13 of the SIV application process, applications may be pending longer than nine months for completion of administrative processing (step 13 of the SIV application process).  Although step 13—administrative processing—is lengthy, process enhancements have resulted in improved efficiency.

## Applications Pending at Each Stage of the SIV Application Process

As of February 21, 2016, the following numbers of Afghan applicants are pending in one of the application stages:

- Step 1 – 4,264 principal applicants have COM applications pending at the NVC, where the applicant has taken action within the past 120 days.  These

applicants have submitted some, but not all, of the documents required to apply for COM approval. COM applications with all required documents are sent to Embassy Kabul within one business day, and then are processed within 14 days in Kabul. COM applications must be submitted by December 31, 2016.

- Step 7 – 3,195 principal applicants have Form I-360 petitions pending with USCIS.

- Step 11 – 292 principal applicants and 677 family members are scheduled for visa interviews. Interviews are scheduled approximately 60 days in advance. Applicants utilize this time to gather any remaining documents required for their interviews and prepare for travel to the U.S. embassy or consulate. 152 principal applicants and 499 family members are waiting to be scheduled for visa interviews. Most Afghan applicants will be interviewed at Embassy Kabul, as they reside in Afghanistan. Applicants who reside outside of Afghanistan will be interviewed at the U.S. embassy or consulate that adjudicates immigrant visa applications for their countries of residence.

- Step 13 – applications for 1,950 principal applicants and 874 family members are undergoing administrative processing.

**Number of SIV Applicants in First Quarter of FY 2016**

The following chart shows the number of Afghan applicants who applied for SIVs in the first quarter of FY 2016 under section 602(b) of the Afghan Allies Protection Act of 2009, subsequent to receiving COM approval:

| Month | Principal Applicants | Family Members | Total |
|---|---|---|---|
| October | 161 | 421 | **582** |
| November | 154 | 449 | **603** |
| December | 270 | 677 | **947** |
| **Total** | **585** | **1,547** | **2,132** |

**Applications Denied or Pending at Each Stage of the SIV Application Process**

At the end of the first quarter of FY 2016 on December 31, 2015, the following numbers of applications were denied or pending at one of the application stages:

- 1,092 Afghan principal applicants did not qualify to receive COM approval or had the approval revoked during the first quarter of FY 2016.  Applicants whose COM applications are denied are able to appeal the decision; approximately 50 percent of these appeal cases subsequently are approved.

- Seven principal applicants had their Form I-360 petitions denied by USCIS during the first quarter of FY 2016.

- As of December 31, 2015, 170 principal applicants and 389 family members had scheduled visa interviews.  114 principal applicants and 350 family members were waiting to be scheduled for visa interviews.

- As of December 31, 2015, applications for 1,651 principal applicants and 574 family members were undergoing administrative processing.

**Reasons for COM Denial**

As reflected in denial letters sent by the COM at Embassy Kabul, denial of a COM application generally occurs for one or more of the following four reasons:

- *Failure to establish employment by or on behalf of the U.S. government, or failure to establish qualifying employment by ISAF or a successor mission.* For Afghans employed by or on behalf of the U.S. government, State considers the employment requirement satisfied for an alien hired under a direct-hire appointment, or through an agency's personal services agreement (PSA) or personal services contract (PSC) authority.  State also has considered Afghan nationals hired by and paid through a U.S. government contractor, subcontractor, or Employee Association to meet the broader criteria for employment "by or on behalf of" the U.S. government.  State has not considered the requirement under 602(b) to be "employed by or on behalf of the United States government" satisfied in other situations, such as individuals for an entity funded by a grant or cooperative agreement with the U.S. government, or self-employed businesspersons who operate under a

license with the U.S. government.  Afghans employed by ISAF, or a successor mission, must have served in a capacity that required service as an interpreter or translator for U.S. military personnel while traveling off-base with U.S. military personnel stationed at ISAF, or a successor mission, or the performance of sensitive and trusted activities for U.S. military personnel stationed at ISAF, or a successor mission.

- *Failure to establish the required length of employment by or on behalf of the U.S. government, or by ISAF or a successor mission, during the period specified in section 602(b) of the Afghan Allies Protection Act of 2009, as amended.*  Applicants who submitted applications for COM approval on or before September 30, 2015, must demonstrate one year of qualifying service.  Applicants who submitted or submit applications for COM approval on or after October 1, 2015, must demonstrate two years of qualifying service.

- *Failure to establish providing faithful and valuable service to the U.S. government.*  Applications denied for this reason generally have involved cases lacking the requisite positive recommendation or evaluation.  In some instances where faithful and valuable service was not confirmed, employment by or on behalf of the U.S. government had been terminated for cause.

- *Derogatory information associated with the applicant that is incompatible with the requirements of the SIV program.*  This reason for denial generally relates to information that the applicant engaged in an unlawful, unethical, criminal, or terrorism-related activity.

SA 065

# Afghan SIV Joint Report: July 2016

USCA Case #25-5279      Document #2176641         Filed: 06/03/2026      Page 70 of 390

**Joint Department of State/Department of Homeland Security Report:
Status of the Afghan Special Immigrant Visa Program**

## Introduction

The Department of State (State), the Department of Homeland Security (DHS), and all other U.S. government departments and agencies involved in the U.S. Special Immigrant Visa (SIV) program have the highest respect for the men and women who take enormous risks to help our military and civilian personnel. We are committed to helping those who have helped us.  The U.S. government has devoted substantial resources to reducing the amount of time required to complete the SIV process authorized under section 602(b) of the Afghan Allies Protection Act of 2009, as amended, and these efforts have resulted in a record number of visa issuances.  Since the beginning of Fiscal Year (FY) 2014, we have issued visas to 8,077 of our Afghan colleagues, and an additional 15,392 visas to their immediate family members – more than 23,000 visas in almost three years.  As we continue to strive for process improvements, we also continue to ensure thorough screening for national security concerns.  SIV issuance numbers through the second quarter of FY 2016 are available on travel.state.gov.  As of March 31, 2016, we issued 1,600 SIVs to Afghan principal applicants and 3,584 SIVs to their family members in FY 2016.

On December 19, 2014, President Obama signed the National Defense Authorization Act (NDAA) for FY 2015 (Pub. L. No. 113-291), which provides 4,000 additional SIVs for Afghan principal applicants.  On November 25, 2015, President Obama signed the NDAA for FY 2016 (Pub. L. No. 114-92), which, in addition to other changes, provides an additional 3,000 SIVs, for a total of 7,000 since December 19, 2014.  Overall, as of June 5, 2016, State issued 3,712 out of the 7,000 SIVs to Afghan principal applicants who were employed by, or on behalf of, the U.S. government in Afghanistan, or by the International Security Assistance Force (ISAF) or a successor mission to ISAF.

## Average Wait Times for Each Step of the SIV Application Process

All steps in the SIV application process are outlined below and include the current average processing time for all involved U.S. government entities.  This statistic captures total U.S. government processing time in days, beginning with the applicant's initial submission of documents to State's National Visa Center (NVC) and ending with the date of visa issuance at Embassy Kabul.  (This statistic was reported in business days in prior reports.)  It does not capture those steps in the

SIV process that depend solely on the applicant's initiative and are outside the control of the U.S. government.  SIV applications move through 14 steps, in the following four stages:  Chief of Mission (COM) Application Process; Form I-360 Adjudication; Visa Interview; and Visa Issuance.

| Special Immigrant Visa (SIV) Processing Steps[1] | | | |
|---|---|---|---|
| Stage | Step | Description | Current average processing times in days for Afghan cases applying in Kabul |
| Chief of Mission (COM) application process | 1 | Applicant submits COM application package to State's NVC. | Applicant-controlled |
| | 2 | NVC reviews documents for completeness. | 17 |
| | 3 | NVC sends completed COM package to U.S. Embassy Kabul. | 1 |
| | 4 | U.S. Embassy Kabul reviews COM application and makes a decision to approve or deny. | 47 (if all required documents are present) |
| | 5 | Embassy Kabul advises NVC if COM application is approved. If approved, NVC immediately sends approval letter to applicant.  (If any documents reveal that applicant does not qualify for the program, the COM application is denied.) | 5 |
| Form I-360 adjudication process | 6 | Applicant self-petitions to DHS U.S. Citizenship and Immigration Services (USCIS) using form I-360. | Applicant-controlled |
| | 7 | USCIS adjudicates petition and sends to NVC if approved.[2] | 19 |
| Visa interview process, including pre- and post-interview[3] | 8 | NVC sends instruction packet to applicant requesting standard immigrant visa documentation. | 12 |
| | 9 | Applicant submits required documentation to NVC. | Applicant-controlled |
| | 10 | NVC reviews documents for completeness. | 23 |
| | 11 | NVC schedules applicant for next available interview at U.S. Embassy Kabul. | 60 |

SA 067

| | | | |
|---|---|---|---|
| | 12 | Applicant is interviewed by consular officer on the scheduled appointment date. Administrative processing is initiated following the interview. | 5 |
| | 13 | The applicant's case undergoes administrative processing.[4] | 185 |
| Visa issuance to eligible applicants | 14 | Upon completion of administrative processing, applicant is instructed to obtain a medical exam.  The visa is issued if applicant is eligible.  In some cases, the passport will have expired and the applicant is required to renew the passport. | Applicant-controlled |
| | | **Total U.S. government processing time[5]** | **374** |

[1]Processing steps are for SQ SIVs.

[2]Based on NVC data.

[3]The majority of applicants receive SIV status by going through the process explained in this chart.  Applicants who obtain SIV status in the United States apply for adjustment of status from USCIS.

[4]Line 13 totals include data for principal applicant cases issued from April 1, 2015, through March 31, 2016.  Average processing time for cases that remain pending cannot be calculated until they are completed.

[5]U.S. government processing times do not factor in applicant-controlled steps. Overall processing times are greater than U.S. government processing times.

## Applications Pending Longer Than Nine Months

Even if an applicant has acted promptly in each of the applicant-controlled steps that precede step 13 of the SIV application process, applications may be pending longer than nine months for completion of administrative processing (step 13 of the SIV application process).  Although step 13 is lengthy, process enhancements have resulted in improved efficiency.

## Applications Pending at Each Stage of the SIV Application Process

As of May 29, 2016, the following numbers of Afghan applicants are pending in one of the application stages:

- Step 1 – 3,740 principal applicants have COM applications pending at NVC, where the applicant has taken action within the past 120 days.  These applicants have submitted some, but not all, of the documents required to

apply for COM approval.  COM applications with all required documents are sent to Embassy Kabul within one day, and then are processed within 47 days in Kabul.  COM applications must be submitted by December 31, 2016.

- Step 7 – 1,856 principal applicants have Form I-360 petitions pending with USCIS.

- Step 11 – 156 principal applicants and 408 family members are scheduled for visa interviews.  Interviews are scheduled approximately 60 days in advance.  Applicants use this time to gather any remaining documents required for their interviews and prepare for travel to the U.S. embassy or consulate.  There are 316 principal applicants and 1,107 family members waiting to be scheduled for visa interviews.  Most Afghan applicants will be interviewed at Embassy Kabul, as they reside in Afghanistan.  Applicants who reside outside of Afghanistan will be interviewed at the U.S. embassy or consulate that adjudicates immigrant visa applications for their countries of residence.

- Step 13 – Applications for 1,759 principal applicants and 558 family members are undergoing administrative processing.

**Number of SIV Applicants in Second Quarter of FY 2016**

The following chart shows the number of Afghan applicants who applied for SIVs in the second quarter of FY 2016 under section 602(b) of the Afghan Allies Protection Act of 2009, subsequent to receiving COM approval:

| Month | Principal Applicants | Family Members | Total |
|---|---|---|---|
| January | 298 | 771 | **1,069** |
| February | 383 | 975 | **1,358** |
| March | 245 | 617 | **862** |
| **Total** | **926** | **2,363** | **3,289** |

**Applications Denied or Pending at Each Stage of the SIV Application Process**

At the end of the second quarter of FY 2016 on March 31, 2016, the following numbers of applications were denied or pending at one of the application stages:

- 2,925 Afghan principal applicants were deemed unqualified to receive COM approval or had the approval revoked during the second quarter of FY 2016. Applicants whose COM applications are denied or revoked are able to appeal the decision.  1,501 Afghans submitted appeals during the second quarter of FY 2016, and 54 percent of the cases adjudicated as of June 3, 2016 were approved.

- Eight principal applicants had their Form I-360 petitions denied by USCIS during the second quarter of FY 2016.

- As of March 31, 2016, 199 principal applicants and 496 family members had scheduled visa interviews.  186 principal applicants and 621 family members were waiting to be scheduled for visa interviews.

- As of March 31, 2016, applications for 1,762 principal applicants and 743 family members were undergoing administrative processing.

**Reasons for COM Denial**

As reflected in denial letters sent by the COM at Embassy Kabul, denial of a COM application generally occurs for one or more of the following four reasons:

- *Failure to establish employment by or on behalf of the U.S. government, or failure to establish qualifying employment by ISAF or a successor mission.* For Afghans employed by or on behalf of the U.S. government, State considers the employment requirement satisfied for an alien hired under a direct-hire appointment, or through an agency's personal services agreement (PSA) or personal services contract (PSC) authority.  State also has considered Afghan nationals hired by and paid through a U.S. government contractor, subcontractor, or Employee Association to meet the broader criteria for employment "by or on behalf of" the U.S. government.  State has not considered the requirement under 602(b) to be "employed by or on behalf of the United States government" satisfied in other situations, such as individuals for an entity funded by a grant or cooperative agreement with the U.S. government, or self-employed businesspersons who operate under a license with the U.S. government.  Afghans employed by ISAF, or a successor mission, must have served in a capacity that required service as an interpreter or translator for U.S. military personnel while traveling off-base

with U.S. military personnel stationed at ISAF, or a successor mission, or the performance of sensitive and trusted activities for U.S. military personnel stationed at ISAF, or a successor mission.

- *Failure to establish the required length of employment by or on behalf of the U.S. government, or by ISAF or a successor mission, during the period specified in section 602(b) of the Afghan Allies Protection Act of 2009, as amended.* Applicants who submitted applications for COM approval on or before September 30, 2015, must demonstrate one year of qualifying service. Applicants who submitted or submit applications for COM approval on or after October 1, 2015, must demonstrate two years of qualifying service.

- *Failure to establish providing faithful and valuable service to the U.S. government.* Applications denied for this reason generally have involved cases lacking the requisite positive recommendation or evaluation. In some instances where faithful and valuable service was not confirmed, employment by or on behalf of the U.S. government had been terminated for cause.

- *Derogatory information associated with the applicant that is incompatible with the requirements of the SIV program.* This reason for denial generally relates to information that the applicant engaged in an unlawful, unethical, criminal, or terrorism-related activity.

# Afghan SIV Joint Report: October 2016

SA 072

**Joint Department of State/Department of Homeland Security Report:
Status of the Afghan Special Immigrant Visa Program**

## Introduction

The Department of State (State), the Department of Homeland Security (DHS), and all other U.S. government departments and agencies involved in the U.S. Special Immigrant Visa (SIV) program have the highest respect for the men and women who take enormous risks to support our military and civilian personnel.  We are committed to helping those who have helped us.  The U.S. government has devoted substantial resources to reducing the amount of time required to complete the SIV process authorized under section 602(b) of the Afghan Allies Protection Act of 2009, as amended, and these efforts have resulted in a record number of visa issuances.  From the beginning of Fiscal Year (FY) 2014 to June 30, 2016, we issued visas to 8,069 of our Afghan colleagues, and an additional 15,367 visas to their immediate family members – more than 23,000 visas in less than three years.  As we continue to strive for process improvements, we also continue to ensure thorough screening for national security concerns.  SIV issuance numbers through the third quarter of FY 2016 are available on travel.state.gov.  As of June 30, 2016, we issued 2,327 SIVs to Afghan principal applicants and 5,290 SIVs to their family members in FY 2016.

On December 19, 2014, President Obama signed the National Defense Authorization Act (NDAA) for FY 2015 (Pub. L. No. 113-291), which provides 4,000 additional SIVs for Afghan principal applicants.  On November 25, 2015, President Obama signed the NDAA for FY 2016 (Pub. L. No. 114-92), which, in addition to other changes, provides an additional 3,000 SIVs, for a total of 7,000 SIV numbers allocated since December 19, 2014.  Overall, as of June 30, 2016, State issued 3,966 out of the 7,000 SIVs to Afghan principal applicants who were employed by, or on behalf of, the U.S. government in Afghanistan, or by the International Security Assistance Force (ISAF) or a successor mission to ISAF.

## Average Wait Times for Each Step of the SIV Application Process

All steps in the SIV application process are outlined below and include the current average processing time for all involved U.S. government entities.  This statistic captures total U.S. government processing time in calendar days, beginning with the applicant's initial submission of documents to State's National Visa Center (NVC) and ending with the date of visa issuance at a U.S. Embassy or Consulate.  It does not capture those steps in the SIV process that depend solely on

the applicant's initiative and are outside the control of the U.S. government.  SIV applications move through 14 steps, in the following four stages:  Chief of Mission (COM) Application Process; Form I-360 Adjudication; Visa Interview; and Visa Issuance.

| Special Immigrant Visa (SIV) Processing Steps[1] | | | |
|---|---|---|---|
| Stage | Step | Description | Average processing times in calendar days |
| Chief of Mission (COM) application process | 1 | Applicant submits COM application package to State's NVC. | Applicant-controlled |
| | 2 | NVC reviews documents for completeness. | 4 |
| | 3 | NVC sends completed COM package to U.S. Embassy Kabul. | 1 |
| | 4 | U.S. Embassy Kabul reviews COM application and makes a decision to approve or deny. | 75 (if all required documents are present) |
| | 5 | Embassy Kabul advises NVC if COM application is approved. If approved, NVC immediately sends approval letter to applicant.  (If any documents reveal that applicant does not qualify for the program, the COM application is denied.) | 5 |
| Form I-360 adjudication process | 6 | Applicant self-petitions to DHS U.S. Citizenship and Immigration Services (USCIS) using form I-360. | Applicant-controlled |
| | 7 | USCIS adjudicates petition and sends to NVC if approved.[2] | 60 |
| Visa interview process, including pre- and post-interview[3] | 8 | NVC sends instruction packet to applicant requesting standard immigrant visa documentation. | 12 |
| | 9 | Applicant submits required documentation to NVC. | Applicant-controlled |
| | 10 | NVC reviews documents for completeness. | 23 |
| | 11 | NVC schedules applicant for next available interview at U.S. Embassy Kabul. | 60 |

| | | | |
|---|---|---|---|
| | 12 | Applicant is interviewed by consular officer on the scheduled appointment date. Administrative processing is initiated following the interview. | 5 |
| | 13 | The applicant's case undergoes administrative processing.[4] | 189 |
| Visa issuance to eligible applicants | 14 | Upon completion of administrative processing, applicant is instructed to obtain a medical exam.  The visa is issued if applicant is eligible.  In some cases, the passport will have expired and the applicant is required to renew the passport. | Applicant-controlled |
| | | **Total U.S. government processing time in calendar days[5]** | **434** |

[1]Processing steps are for SIVs authorized under section 602(b) of the Afghan Allies Protection Act of 2009, as amended.  This applies to Afghan nationals in the SQ classification.

[2]For I-360 petitions filed with USCIS between April 1 and June 30, 2016.

[3]The majority of applicants receive SIV status by going through the process explained in this chart.  Applicants who obtain SIV status in the United States apply for adjustment of status from USCIS.

[4]Line 13 totals include data for principal applicant cases issued from July 1, 2015, through June 30, 2016.  Average processing time for cases that remain pending cannot be calculated until they are completed.

[5] The statistics in this chart were formerly reported in business days in reports published April 2014 – April 2016.  U.S. government processing times do not factor in applicant-controlled steps.  Overall processing times are greater than U.S. government processing times.

## Applications Pending Longer Than Nine Months

Even if an applicant has acted promptly in each of the applicant-controlled steps that precede step 13 of the SIV application process, applications may be pending longer than nine months for completion of administrative processing (step 13 of the SIV application process).  Although step 13 is lengthy it is essential to the integrity of the SIV program.  Even so, process enhancements have resulted in improved efficiency.

## Applications Pending at Each Stage of the SIV Application Process

As of June 30, 2016, the following numbers of Afghan applicants are pending in one of the application stages:

- Step 1 – 3,712 principal applicants have COM applications pending at NVC, where the applicant has taken action within the past 120 days. These applicants have submitted some, but not all, of the documents required to apply for COM approval.

- Step 7 – 732 principal applicants have Form I-360 petitions pending with USCIS.

- Step 11 – 1,099 principal applicants and 2,807 family members are scheduled for visa interviews. Interviews are scheduled approximately 30-60 days in advance. Applicants use this time to gather any remaining documents required for their interviews and prepare for travel to the U.S. embassy or consulate. There are 777 principal applicants and 2,791 family members waiting to be scheduled for visa interviews. Most Afghan applicants will be interviewed at Embassy Kabul, as they reside in Afghanistan. Applicants who reside outside of Afghanistan will be interviewed at the U.S. embassy or consulate that adjudicates immigrant visa applications for their country of residence.

- Step 13 – Applications for 1,891 principal applicants and 521 family members are undergoing administrative processing.

**Number of SIV Applicants in Third Quarter of FY 2016**

The following chart shows the number of Afghan applicants who applied for SIVs in the third quarter of FY 2016 under section 602(b) of the Afghan Allies Protection Act of 2009, subsequent to receiving COM approval:

| Month | Principal Applicants | Family Members | Total |
|---|---|---|---|
| April | 391 | 999 | **1,390** |
| May | 330 | 771 | **1,101** |
| June | 368 | 818 | **1,186** |
| **Total** | **1,089** | **2,588** | **3,677** |

**Applications Denied or Pending at Each Stage of the SIV Application Process**

At the end of the third quarter of FY 2016 on June 30, 2016, the following numbers of applications were denied or pending at one of the application stages:

- 816 Afghan principal applicants were deemed unqualified to receive COM approval or had the approval revoked during the third quarter of FY 2016. Applicants whose COM applications are denied or revoked are able to appeal the decision.  845 Afghans submitted appeals during the third quarter of FY 2016, and 46 percent of the appeals adjudicated as of August 30, 2016 were approved after the applicant submitted additional information.

- One Form I-360 petition filed by an Afghan principal applicant between April 1 and June 30, 2016 was denied by USCIS.

- As of June 30, 2016, 1,099 principal applicants and 2,807 family members had scheduled visa interviews.  777 principal applicants and 2,791 family members were waiting to be scheduled for visa interviews.

- As of June 30, 2016, applications for 1,891 principal applicants and 521 family members were undergoing administrative processing.

**Reasons for COM Denial**

As reflected in denial letters sent by the COM at Embassy Kabul, denial of a COM application generally occurs for one or more of the following four reasons:

- *Failure to establish employment by or on behalf of the U.S. government, or failure to establish qualifying employment by ISAF or a successor mission.* For Afghans employed by or on behalf of the U.S. government, State considers the employment requirement satisfied for an alien hired under a direct-hire appointment, or through an agency's personal services agreement (PSA) or personal services contract (PSC) authority.  State also has considered Afghan nationals hired by and paid through a U.S. government contractor, subcontractor, or Employee Association to meet the broader criteria for employment "by or on behalf of" the U.S. government.  State has not considered the requirement under 602(b) to be "employed by or on behalf of the United States government" satisfied in other situations, such as individuals employed by an entity funded by a grant or cooperative agreement with the U.S. government, or self-employed businesspersons who operate under a license with the U.S. government.  Afghans employed by

USCA Case #25-5279   Document #2176641   Filed: 06/03/2026   Page 82 of 390

ISAF, or a successor mission, must have served in a capacity that required service as an interpreter or translator for U.S. military personnel while traveling off-base with U.S. military personnel stationed at ISAF, or a successor mission, or the performance of sensitive and trusted activities for U.S. military personnel stationed at ISAF, or a successor mission.

- *Failure to establish the required length of employment by or on behalf of the U.S. government, or by ISAF or a successor mission, during the period specified in section 602(b) of the Afghan Allies Protection Act of 2009, as amended.* Applicants who submitted applications for COM approval on or before September 30, 2015, must demonstrate one year of qualifying service. Applicants who submitted or submit applications for COM approval on or after October 1, 2015, must demonstrate two years of qualifying service.

- *Failure to establish providing faithful and valuable service to the U.S. government.* Applications denied for this reason generally have involved cases lacking the requisite positive recommendation or evaluation. In some instances where faithful and valuable service was not confirmed, employment by or on behalf of the U.S. government had been terminated for cause.

- *Derogatory information associated with the applicant that is incompatible with the requirements of the SIV program.* This reason for denial generally relates to information that the applicant engaged in an unlawful, unethical, criminal, or terrorism-related activity.

# Afghan SIV Joint Report: January 2017

SA 079

**Joint Department of State/Department of Homeland Security Report:**
**Status of the Afghan Special Immigrant Visa Program**

**Introduction**

The Department of State (State), the Department of Homeland Security (DHS), and all other U.S. government departments and agencies involved in the U.S. Special Immigrant Visa (SIV) program have the highest respect for the men and women who take enormous risks to support our military and civilian personnel.  We are committed to helping those who have helped us.  The U.S. government has devoted substantial resources to reducing the amount of time required to complete the SIV process authorized under section 602(b) of the Afghan Allies Protection Act of 2009, as amended, and these efforts have resulted in a record number of visa issuances.  We issued 12,086 SIVs to Afghans in FY 2016, including 3,626 principal applicants – more than any other year in the program's history.  As we continue to strive for process improvements, we also continue to ensure thorough screening for national security concerns.  SIV issuance numbers through the fourth quarter of FY 2016 are available on travel.state.gov.

On December 19, 2014, President Obama signed the National Defense Authorization Act (NDAA) for FY 2015 (Pub. L. No. 113-291), which provides 4,000 additional SIVs for Afghan principal applicants.  On November 25, 2015, President Obama signed the NDAA for FY 2016 (Pub. L. No. 114-92), which, in addition to other changes, provides an additional 3,000 SIVs, for a total of 7,000 SIV numbers allocated since December 19, 2014.  Overall, as of September 30, 2016, State issued 5,350 out of the 7,000 SIVs to Afghan principal applicants who were employed by, or on behalf of, the U.S. government in Afghanistan, or by the International Security Assistance Force (ISAF) or a successor mission to ISAF.

**Average Wait Times for Each Step of the SIV Application Process**

All steps in the SIV application process are outlined below and include the current average processing time for all involved U.S. government entities.  This statistic captures total U.S. government processing time in calendar days, beginning with the applicant's initial submission of documents to State's National Visa Center (NVC) and ending with the date of visa issuance at a U.S. Embassy or Consulate.  It does not capture those steps in the SIV process that depend solely on the applicant's initiative and are outside the control of the U.S. government.  SIV applications move through 14 steps, in the following four stages:  the Chief of Mission (COM) application process; Form I-360 petition adjudication by the

Department of Homeland Security; visa interview and security screening; and final visa adjudication (issuance or denial).

| Special Immigrant Visa (SIV) Processing Steps[1] | | | |
|---|---|---|---|
| Stage | Step | Description | Average processing times in calendar days |
| Chief of Mission (COM) application process | 1 | Applicant submits COM application package to State's NVC. | Applicant-controlled |
| | 2 | NVC reviews documents for completeness. | 4 |
| | 3 | NVC sends completed COM package to U.S. Embassy Kabul. | 1 |
| | 4 | U.S. Embassy Kabul reviews COM application and makes a decision to approve or deny. | 53(if all required documents are present) |
| | 5 | Embassy Kabul advises NVC if COM application is approved. If approved, NVC immediately sends approval letter to applicant.  (If any documents reveal that applicant does not qualify for the program, the COM application is denied.) | 5 |
| Form I-360 adjudication process | 6 | Applicant self-petitions to DHS U.S. Citizenship and Immigration Services (USCIS) using form I-360. | Applicant-controlled |
| | 7 | USCIS adjudicates petition and sends to NVC if approved.[2] | 63 |
| Visa interview process, including pre- and post-interview[3] | 8 | NVC sends instruction packet to applicant requesting standard immigrant visa documentation. | 12 |
| | 9 | Applicant submits required documentation to NVC. | Applicant-controlled |
| | 10 | NVC reviews documents for completeness. | 23 |
| | 11 | NVC schedules applicant for next available interview at U.S. Embassy Kabul. | 60 |

SA 081

| | | | |
|---|---|---|---|
| | 12 | Applicant is interviewed by consular officer on the scheduled appointment date. Administrative processing is initiated following the interview. | |
| | 13 | The applicant's case undergoes administrative processing.[4] | 5 / 184 |
| Visa issuance to eligible applicants | 14 | Upon completion of administrative processing, applicant is instructed to obtain a medical exam.  The visa is issued if applicant is eligible.  In some cases, the passport will have expired and the applicant is required to renew the passport. | Applicant-controlled |
| | | **Total U.S. government processing time in calendar days**[5] | **410** |

[1]Processing steps are for SIVs authorized under section 602(b) of the Afghan Allies Protection Act of 2009, as amended.  This applies to Afghan nationals in the SQ classification.

[2]For I-360 petitions filed with USCIS between July 1 and September 30, 2016.

[3]The majority of applicants receive SIV status by going through the process explained in this chart.  Applicants who obtain SIV status in the United States apply for adjustment of status from USCIS.

[4]Line 13 totals include data for SIV applicants who completed administrative processing from October 1, 2015, through September 30, 2016.  Average processing time for cases that remain pending cannot be calculated until they are completed.

[5] The statistics in this chart were formerly reported in business days in reports published April 2014 – April 2016.  U.S. government processing times do not factor in applicant-controlled steps.  Overall processing times are greater than U.S. government processing times.

## Applications Pending Longer Than Nine Months

Even if an applicant has acted promptly in each of the applicant-controlled steps that precede step 13 of the SIV application process, applications may be pending longer than nine months for completion of administrative processing (step 13 of the SIV application process).  Although step 13 is lengthy it is essential to the integrity of the SIV program, and process enhancements have resulted in improved efficiency.

SA 082

**Applications Pending at Each Stage of the SIV Application Process**

As of September 30, 2016, the following numbers of Afghan applicants were pending in one of the application stages:

- Step 1 – 3,768 principal applicants had COM applications pending at NVC, where the applicant had taken action within the past 120 days.  These applicants had submitted some, but not all, of the documents required to apply for COM approval.

- Step 7 – 196 principal applicants had Form I-360 petitions pending with USCIS.

- Step 11 – 724 principal applicants and 1,707 family members were scheduled for visa interviews.  Interviews are scheduled approximately 30-60 days in advance.  Applicants use this time to gather any remaining documents required for their interviews and prepare for travel to the U.S. embassy or consulate.  There were 1,844 principal applicants and 7,299 family members waiting to be scheduled for visa interviews as of September 30, 2016.  Most Afghan applicants will be interviewed at Embassy Kabul, as they reside in Afghanistan.  Applicants who reside outside of Afghanistan will be interviewed at the U.S. embassy or consulate that adjudicates immigrant visa applications for their country of residence.

- Step 13 – Applications for 2,045 principal applicants and 342 family members were undergoing administrative processing.

**Number of SIV Applicants in Fourth Quarter of FY 2016**

The following chart shows the number of Afghan applicants who applied for SIVs in the fourth quarter of FY 2016 under section 602(b) of the Afghan Allies Protection Act of 2009, subsequent to receiving COM approval:

| Month | Principal Applicants | Family Members | **Total** |
|---|---|---|---|
| July | 314 | 800 | **1,114** |
| August | 534 | 1,470 | **1,951** |
| September | 569 | 1,672 | **2,241** |
| **Total** | **1,417** | **3,889** | **5,306** |

**Applications Denied or Pending at Each Stage of the SIV Application Process**

At the end of the fourth quarter of FY 2016 on September 30, 2016, the following numbers of applications were denied or pending at one of the application stages:

- 793 Afghan principal applicants were deemed unqualified to receive COM approval or had the approval revoked during the fourth quarter of FY 2016. Applicants whose COM applications are denied or revoked are able to appeal the decision. 397 Afghans submitted appeals during the fourth quarter of FY 2016. Of those appeals adjudicated as of December 14, 2016, 42 percent were approved after the applicant submitted additional information.

- One Form I-360 petition filed by an Afghan principal applicant between July 1 and September 30, 2016 was denied by USCIS.

- As of September 30, 2016, 724 principal applicants and 1,707 family members had scheduled visa interviews. 1,844 principal applicants and 7,299 family members were waiting to be scheduled for visa interviews.

- As of September 30, 2016, applications for 2,045 principal applicants and 342 family members were undergoing administrative processing.

**Reasons for COM Denial**

As reflected in denial letters sent by the COM at Embassy Kabul, denial of a COM application generally occurs for one or more of the following four reasons:

- *Failure to establish employment by or on behalf of the U.S. government, or failure to establish qualifying employment by ISAF or a successor mission.* For Afghans employed by or on behalf of the U.S. government, State considers the employment requirement satisfied for an alien hired under a direct-hire appointment, or through an agency's personal services agreement (PSA) or personal services contract (PSC) authority. State also has considered Afghan nationals hired by and paid through a U.S. government contractor, subcontractor, or Employee Association to meet the broader criteria for employment "by or on behalf of" the U.S. government. State has

SA 084

not considered the requirement under 602(b) to be "employed by or on behalf of the United States government" satisfied in other situations, such as individuals employed by an entity funded by a grant or cooperative agreement with the U.S. government, or self-employed businesspersons who operate under a license with the U.S. government.  Afghans employed by ISAF, or a successor mission, must have served in a capacity that required service as an interpreter or translator for U.S. military personnel while traveling off-base with U.S. military personnel stationed at ISAF, or a successor mission, or the performance of sensitive and trusted activities for U.S. military personnel stationed at ISAF, or a successor mission.

- *Failure to establish the required length of employment by or on behalf of the U.S. government, or by ISAF or a successor mission, during the period specified in section 602(b) of the Afghan Allies Protection Act of 2009, as amended.*  Applicants who submitted applications for COM approval on or before September 30, 2015, must demonstrate one year of qualifying service.  Applicants who submitted or submit applications for COM approval on or after October 1, 2015, must demonstrate two years of qualifying service.

- *Failure to establish providing faithful and valuable service to the U.S. government.*  Applications denied for this reason generally have involved cases lacking the requisite positive recommendation or evaluation.  In some instances where faithful and valuable service was not confirmed, employment by or on behalf of the U.S. government had been terminated for cause.

- *Derogatory information associated with the applicant that is incompatible with the requirements of the SIV program.*  This reason for denial generally relates to information that the applicant engaged in an unlawful, unethical, criminal, or terrorism-related activity.

# Afghan SIV Joint Report: April 2017

SA 086

**Joint Department of State/Department of Homeland Security Report:
Status of the Afghan Special Immigrant Visa Program**

**Introduction**

The Department of State (State), the Department of Homeland Security (DHS), and all other U.S. government departments and agencies involved in the U.S. Special Immigrant Visa (SIV) program have the highest respect for the men and women who take enormous risks to support our military and civilian personnel.  We are committed to helping those who have helped us.  The U.S. government has devoted substantial resources to reducing the amount of time required to complete the SIV process authorized under section 602(b) of the Afghan Allies Protection Act of 2009, as amended, and these efforts have resulted in a record number of visa issuances.  We issued 12,086 SIVs to Afghans in FY 2016, including 3,626 principal applicants – more than any other year in the program's history.  As we continue to strive for process improvements, we also continue to ensure thorough screening for national security concerns.  SIV issuance numbers through the first quarter of FY 2017 are available on travel.state.gov.

On December 23, 2016, President Obama signed the National Defense Authorization Act for FY 2017  (Public Law 114-328), which provides an additional 1,500 SIV numbers for Afghan principal applicants, for a total of 8,500 SIV numbers allocated since December 19, 2014.  As of December 31, 2016, State has issued 6,233 out of the 8,500 SIVs to Afghan principal applicants who were employed by, or on behalf of, the U.S. government in Afghanistan, or by the International Security Assistance Force (ISAF) or a successor mission to ISAF.

**Average Wait Times for Each Step of the SIV Application Process**

All steps in the SIV application process are outlined below and include the current average processing time for all involved U.S. government entities.  This statistic captures total U.S. government processing time in calendar days, beginning with the applicant's initial submission of documents to State's National Visa Center (NVC) and ending with the date of visa issuance at a U.S. embassy or consulate.  It does not capture those steps in the SIV process that depend solely on the applicant's initiative and are outside the control of the U.S. government.  SIV applications move through 14 steps, in the following four stages:  the Chief of Mission (COM) application process; Form I-360 petition adjudication by DHS; visa interview and security screening; and final visa adjudication (issuance or denial).

| Special Immigrant Visa (SIV) Processing Steps[1] | | | |
|---|---|---|---|
| **Stage** | **Step** | **Description** | **Average processing times in calendar days** |
| COM application process | 1 | Applicant submits COM application package to State's NVC. | Applicant-controlled |

| | | | |
|---|---|---|---|
| | 2 | NVC reviews documents for completeness. | 4 |
| | 3 | NVC sends completed COM package to U.S. Embassy Kabul. | 1 |
| | 4 | U.S. Embassy Kabul reviews COM application and makes a decision to approve or deny. | 53 (if all required documents are present) |
| | 5 | Embassy Kabul advises NVC if COM application is approved.  If approved, NVC immediately sends approval letter to applicant.  (If any documents reveal that applicant does not qualify for the program, the COM application is denied.) | 5 |
| Form I-360 adjudication process | 6 | Applicant self-petitions to DHS U.S. Citizenship and Immigration Services (USCIS) using form I-360. | Applicant-controlled |
| | 7 | USCIS adjudicates petition and sends to NVC if approved.[2] | 127 |
| Visa interview process, including pre- and post-interview[3] | 8 | NVC sends instruction packet to applicant requesting standard immigrant visa documentation. | 12 |
| | 9 | Applicant submits required documentation to NVC. | Applicant-controlled |
| | 10 | NVC reviews documents for completeness. | 23 |
| | 11 | NVC schedules applicant for next available interview at U.S. Embassy Kabul. | 60 |
| | 12 | Applicant is interviewed by consular officer on the scheduled appointment date.  Administrative processing is initiated following the interview. | 5 |

SA 088

- 3 -

| | | | |
|---|---|---|---|
| | 13 | The applicant's case undergoes administrative processing.[4] | 190 |
| Visa issuance to eligible applicants | 14 | Upon completion of administrative processing, applicant is instructed to obtain a medical exam. The visa is issued if applicant is eligible.  In some cases, the passport will have expired and the applicant is required to renew the passport. | Applicant-controlled |
| | | **Total U.S. government processing time in calendar days[5]** | **480** |

[1]Processing steps are for SIVs authorized under section 602(b) of the Afghan Allies Protection Act of 2009, as amended.  This applies to Afghan nationals in the SQ classification.

[2]For I-360 petitions filed with USCIS between October 1 and December 31, 2016.

[3]The majority of applicants receive SIV status by going through the process explained in this chart.  Applicants who obtain SIV status in the United States apply for adjustment of status from USCIS.

[4]Line 13 totals include data for SIV applicants who completed administrative processing between October 1 and December 31, 2016.  Average processing time for cases that remain pending cannot be calculated until they are completed.

[5] The statistics in this chart were formerly reported in business days in reports published April 2014 – April 2016.  U.S. government processing times do not factor in applicant-controlled steps.  Overall processing times are greater than U.S. government processing times.

**Applications Pending Longer Than Nine Months**

Even if an applicant acted promptly in each of the applicant-controlled steps that precede step 13 of the SIV application process, applications may pend longer than nine months for completion of administrative processing (step 13 of the SIV application process).  Although step 13 is lengthy, it is essential to the integrity of the SIV program, and process enhancements have resulted in improved efficiency.

**Applications Pending at Each Stage of the SIV Application Process**

As of December 31, 2016, the following numbers of Afghan applicants were pending in one of the application stages:

SA 089

- 4 -

- Step 1 – 4,500 principal applicants had COM applications pending at NVC, where the applicant took action within the past 120 days. These applicants submitted some, but not all, of the documents required to apply for COM approval.

- Step 7 – 91 principal applicants had Form I-360 petitions pending with USCIS.

- Step 11 – 154 principal applicants and 465 family members were scheduled for visa interviews. Interviews are scheduled approximately 30-60 days in advance. Applicants use this time to gather any remaining documents required for their interviews and prepare for travel to the U.S. embassy or consulate. There were 1,840 principal applicants and 7,479 family members waiting to be scheduled for visa interviews as of December 31, 2016. Most Afghan applicants will be interviewed at U.S. Embassy Kabul, as they reside in Afghanistan. Applicants who reside outside of Afghanistan will be interviewed at the U.S. embassy or consulate that adjudicates immigrant visa applications for their country of residence.

- Step 13 – Applications for 2,977 principal applicants and 263 family members were undergoing administrative processing.

**Number of SIV Applicants in First Quarter of FY 2017**

The following chart shows the number of Afghan applicants who applied for SIVs in the first quarter of FY 2017 under section 602(b) of the Afghan Allies Protection Act of 2009, subsequent to receiving COM approval:

| Month | Principal Applicants | Family Members | **Total** |
|---|---|---|---|
| October | 665 | 1,667 | **2,332** |
| November | 782 | 2,236 | **3,018** |
| December | 209 | 553 | **762** |
| **Total** | **1,656** | **4,456** | **6,112** |

**Applications Denied or Pending at Each Stage of the SIV Application Process**

At the end of the first quarter of FY 2017 on December 31, 2016, the following numbers of applications were denied or pending at one of the application stages:

- 920 Afghan principal applicants were deemed unqualified to receive COM approval or had the approval revoked during the first quarter of FY 2017. Applicants whose COM applications are denied or revoked are able to appeal the decision. 430 Afghans submitted appeals during the first quarter of FY 2017. Of those appeals adjudicated as of February 17, 2017, 66 percent were approved after the applicant submitted additional information.

- 5 -

- 10 Form I-360 petitions filed by Afghan principal applicants between October 1 and December 31, 2016 were denied by USCIS.

- 154 principal applicants and 465 family members had scheduled visa interviews. 1,840 principal applicants and 7,479 family members were waiting to be scheduled for visa interviews.

- Applications for 2,977 principal applicants and 263 family members were undergoing administrative processing.

**Reasons for COM Denial**

As reflected in denial letters sent by the COM at U.S. Embassy Kabul, denial of a COM application generally occurs for one or more of the following four reasons:

- *Failure to establish employment by or on behalf of the U.S. government, or failure to establish qualifying employment by ISAF or a successor mission.* For Afghans employed by or on behalf of the U.S. government, State considers the employment requirement satisfied for an alien hired under a direct-hire appointment, or through an agency's personal services agreement (PSA) or personal services contract (PSC) authority. State also has considered Afghan nationals hired by and paid through a U.S. government contractor, subcontractor, or employee association to meet the broader criteria for employment "by or on behalf of" the U.S. government. State has not considered the requirement under 602(b) to be "employed by or on behalf of the United States government" satisfied in other situations, such as individuals employed by an entity funded by a grant or cooperative agreement with the U.S. government, or self-employed businesspersons who operate under a license with the U.S. government. Afghans employed by ISAF, or a successor mission, must have served in a capacity that required service as an interpreter or translator for U.S. military personnel while traveling off-base with U.S. military personnel stationed at ISAF, or a successor mission, or the performance of sensitive and trusted activities for U.S. military personnel stationed at ISAF, or a successor mission.

- *Failure to establish the required length of employment by or on behalf of the U.S. government, or by ISAF or a successor mission, during the period specified in section 602(b) of the Afghan Allies Protection Act of 2009, as amended.* Applicants who submitted applications for COM approval on or before September 30, 2015, must demonstrate one year of qualifying service. Applicants who submitted or submit applications for COM approval on or after October 1, 2015, must demonstrate two years of qualifying service.

- *Failure to establish providing faithful and valuable service to the U.S. government.* Applications denied for this reason generally have involved cases lacking the requisite positive recommendation or evaluation. In some instances where faithful and valuable service was not confirmed, employment by or on behalf of the U.S. government had been terminated for cause.

SA 091

Case 1:18-cv-01388-TSC   Document 34-6   Filed 09/07/18   Page 43 of 71
USCA Case #25-5279      Document #2176641      Filed: 06/03/2026   Page 96 of 390

- 6 -

- *Derogatory information associated with the applicant that is incompatible with the requirements of the SIV program.*  This reason for denial generally relates to information that the applicant engaged in an unlawful, unethical, criminal, or terrorism-related activity.

SA 093

# Afghan SIV Joint Report: July 2017

UNCLASSIFIED

**Joint Department of State/Department of Homeland Security Report:**
**Status of the Afghan Special Immigrant Visa Program**

**Introduction**

The Department of State, the Department of Homeland Security (DHS), and other U.S. government departments and agencies involved in the U.S. Special Immigrant Visa (SIV) program are committed to helping the men and women who have taken enormous risks to support our military and civilian personnel.  Congress, under section 602(b) of the Afghan Allies Protection Act of 2009, as amended, requires this quarterly report to review statistical data on nationals of Afghanistan or Iraq who have applied for status as special immigrants.

We issued 12,086 SIVs to Afghans in FY 2016, including 3,626 principal applicants.  As we continue to strive for process improvements, we also continue to ensure thorough screening for national security concerns.  SIV issuance numbers through the second quarter of FY 2017 are available on travel.state.gov.

On December 23, 2016, President Obama signed the National Defense Authorization Act (NDAA) for FY 2017  (Public Law 114-328), which provided an additional 1,500 SIV numbers for Afghan principal applicants, for a total of 8,500 SIV numbers allocated since December 19, 2014.  As of March 31, 2017, State has issued 7,391 out of the 8,500 SIVs to Afghan principal applicants who were employed by, or on behalf of, the U.S. government in Afghanistan, or by the International Security Assistance Force (ISAF) or a successor mission to ISAF.

**Average Wait Times for Each Step of the SIV Application Process**

All steps in the SIV application process are outlined below and include the current average processing time for all involved U.S. government entities.  This statistic captures total U.S. government processing time in calendar days, beginning with the applicant's initial submission of documents to State's National Visa Center (NVC) and ending with the date of visa issuance at a U.S. Embassy or Consulate.  It does not capture those steps in the SIV process that depend solely on the applicant's initiative and are outside the control of the U.S. government.  SIV applications move through 14 steps, in the following four stages:  the Chief of Mission (COM) application process; Form I-360 petition adjudication by the Department of Homeland Security; visa interview and security screening; and final visa adjudication (issuance or denial).

| Special Immigrant Visa (SIV) Processing Steps[1] | | | |
|---|---|---|---|
| **Stage** | **Step** | **Description** | **Average processing times in calendar days** |
| Chief of Mission (COM) application | 1 | Applicant submits COM application package to State's NVC. | Applicant-controlled |

UNCLASSIFIED

- 2 −

| | | | |
|---|---|---|---|
| process | 2 | NVC reviews documents for completeness. | 3 |
| | 3 | NVC sends completed COM package to U.S. Embassy Kabul. | 1 |
| | 4 | U.S. Embassy Kabul reviews COM application and makes a decision to approve or deny. | 210 (if all required documents are present) |
| | 5 | Embassy Kabul advises NVC if COM application is approved. If approved, NVC immediately sends approval letter to applicant.  (If any documents reveal that applicant does not qualify for the program, the COM application is denied.) | 5 |
| Form I-360 adjudication process | 6 | Applicant self-petitions to DHS U.S. Citizenship and Immigration Services (USCIS) using form I-360. | Applicant-controlled |
| | 7 | USCIS adjudicates petition and sends to NVC if approved.[2] | 52 |
| Visa interview process, including pre- and post-interview[3] | 8 | NVC sends instruction packet to applicant requesting standard immigrant visa documentation. | 18 |
| | 9 | Applicant submits required documentation to NVC. | Applicant-controlled |
| | 10 | NVC reviews documents for completeness. | 10 |
| | 11 | NVC schedules applicant for next available interview at | 282 |

UNCLASSIFIED

SA 095

UNCLASSIFIED

- 3 –

| | | | |
|---|---|---|---|
| | | U.S. Embassy Kabul. | |
| | 12 | Applicant is interviewed by consular officer on the scheduled appointment date.  Administrative processing is initiated following the interview. | 2 |
| | 13 | The applicant's case undergoes administrative processing.[4] | 153 |
| Visa issuance to eligible applicants | 14 | Upon completion of administrative processing, applicant is instructed to obtain a medical exam.  The visa is issued if applicant is eligible.  In some cases, the passport will have expired and the applicant is required to renew the passport. | Applicant-controlled |
| | | **Total U.S. government processing time in calendar days[5]** | **736** |

[1]Processing steps are for SIVs authorized under section 602(b) of the Afghan Allies Protection Act of 2009, as amended.  This applies to Afghan nationals in the SQ classification.

[2]For I-360 petitions filed with USCIS between January 1 and March 31, 2017.

[3]The majority of applicants receive SIV status by going through the process explained in this chart.  Applicants who obtain SIV status in the United States apply for adjustment of status from USCIS.

[4]Line 13 totals include data for SIV applicants who completed administrative processing between January 1 and March 31, 2017.  Average processing time for cases that remain pending cannot be calculated until they are completed.

[5] The statistics in this chart were formerly reported in business days in reports published April 2014 – April 2016.  U.S. government processing times do not factor in applicant-controlled steps.  Overall processing times

UNCLASSIFIED

SA 096

UNCLASSIFIED

- 4 –

> are greater than U.S. government processing times.

**Applications Pending Longer Than Nine Months**

Even if an applicant has acted promptly in each of the applicant-controlled steps that precede step 13 of the SIV application process, applications may be pending longer than nine months for completion of administrative processing (step 13 of the SIV application process).  Although step 13 is lengthy, it is essential to the integrity of the SIV program, and process enhancements have resulted in improved efficiency.  Further, the unusually long delay at step 11 of the SIV application process reflects the fact that visa interviews were temporarily suspended during the reporting period due to limited visa numbers remaining for Afghan special immigrant visa applicants.

**Applications Pending at Each Stage of the SIV Application Process**

As of March 31, 2017, the following numbers of Afghan applicants were pending in one of the application stages:

- Step 1 – 3,841 principal applicants had COM applications pending at NVC, for which the applicant had taken action within the past 120 days.  These applicants had submitted some, but not all, of the documents required to apply for COM approval.

- Step 7 – 538 principal applicants had Form I-360 petitions pending with USCIS.

- Step 11 – 2,703 principal applicants and 8,241 family members were pending scheduling for visa interviews.  Due to limited numbers remaining for Afghan special immigrant visa applicants, visa interviews were temporarily suspended during the reporting period.  Interviews are normally scheduled approximately 30-60 days in advance.  Applicants use this time to gather any remaining documents required for their interviews and prepare for travel to the U.S. embassy or consulate.  Most Afghan applicants will be interviewed at Embassy Kabul, as they reside in Afghanistan.  Applicants who reside outside of Afghanistan will be interviewed at the U.S. embassy or consulate that adjudicates immigrant visa applications for their country of residence.

- Step 13 – Applications for 1,574 principal applicants and 203 family members were undergoing administrative processing.

**Number of SIV Applicants in Second Quarter of FY 2017**

The following chart shows the number of Afghan applicants who applied for SIVs at a visa interview in the second quarter of FY 2017 under section 602(b) of the Afghan Allies Protection Act of 2009, subsequent to receiving COM approval.  Visa interviews were temporarily suspended during the reporting period due to limited numbers remaining for Afghan special immigrant visa applicants, and thus no applications were possible during the months of February or March.

UNCLASSIFIED

UNCLASSIFIED
- 5 –

| Month | Principal Applicants | Family Members | Total |
|---|---|---|---|
| January | 600 | 2468 | **3068** |
| February | 0 | 0 | **0** |
| March | 0 | 0 | **0** |
| **Total** | 600 | **2468** | **3068** |

**Applications Denied or Pending at Each Stage of the SIV Application Process**

At the end of the second quarter of FY 2017 the following numbers of applications were denied or pending at one of the application stages:

- 756 Afghan principal applicants were deemed unqualified to receive COM approval or had the approval revoked during the second quarter of FY 2017. Applicants whose COM applications are denied or revoked are able to appeal the decision. 591 Afghans submitted appeals during the second quarter of FY 2017. Of those appeals adjudicated as of May 26, 2017, 50 percent were approved after the applicant submitted additional information.

- 612 Form I-360 petitions filed by Afghan principal applicants between January 1 and March 31, 2017. Fourteen were denied by USCIS.

- 2,703 principal applicants and 8,241 family members were pending scheduling for visa interviews.

- Applications for 1,574 principal applicants and 203 family members were undergoing administrative processing.

**Reasons for COM Denial**

As reflected in denial letters sent by the COM at Embassy Kabul, denial of a COM application generally occurs for one or more of the following four reasons:

- *Failure to establish employment by or on behalf of the U.S. government, or failure to establish qualifying employment by ISAF or a successor mission.* For Afghans employed by or on behalf of the U.S. government, State considers the employment requirement satisfied for an alien hired under a direct-hire appointment, or through an agency's personal services agreement (PSA) or personal services contract (PSC) authority. State also has considered Afghan nationals hired by and paid through a U.S. government contractor, subcontractor, or Employee Association to meet the broader criteria for employment "by or on behalf of" the U.S. government. State has not considered the

UNCLASSIFIED

USCA Case #25-5279      Document #2176641      Filed: 06/03/2026      Page 103 of 390

UNCLASSIFIED

- 6 –

requirement under 602(b) to be "employed by or on behalf of the United States government" satisfied in other situations, such as individuals employed by an entity funded by a grant or cooperative agreement with the U.S. government, or self-employed businesspersons who operate under a license with the U.S. government.  Afghans employed by ISAF, or a successor mission, must have served in a capacity that required service as an interpreter or translator for U.S. military personnel while traveling off-base with U.S. military personnel stationed at ISAF, or a successor mission, or the performance of sensitive and trusted activities for U.S. military personnel stationed at ISAF, or a successor mission.

- *Failure to establish the required length of employment by or on behalf of the U.S. government, or by ISAF or a successor mission, during the period specified in section 602(b) of the Afghan Allies Protection Act of 2009, as amended.*  Applicants who submitted applications for COM approval on or before September 30, 2015, must demonstrate one year of qualifying service.  Applicants who submitted or submit applications for COM approval on or after October 1, 2015, must demonstrate two years of qualifying service.

- *Failure to establish providing faithful and valuable service to the U.S. government.* Applications denied for this reason generally have involved cases lacking the requisite positive recommendation or evaluation.  In some instances where faithful and valuable service was not confirmed, employment by or on behalf of the U.S. government had been terminated for cause.

- *Derogatory information associated with the applicant that is incompatible with the requirements of the SIV program.*  This reason for denial generally relates to information that the applicant engaged in an unlawful, unethical, criminal, or terrorism-related activity.

UNCLASSIFIED

SA 099

# Afghan SIV Joint Report: October 2017

SA 100

<u>UNCLASSIFIED</u>

**Joint Department of State/Department of Homeland Security Report:
Status of the Afghan Special Immigrant Visa Program**

**Introduction**

The Department of State (State), the Department of Homeland Security (DHS), and other U.S. government departments and agencies involved in the U.S. Special Immigrant Visa (SIV) program are committed to helping the men and women who have taken enormous risks to support our military and civilian personnel.  Congress, under section 602(b) of the Afghan Allies Protection Act of 2009, as amended, requires this quarterly report to review statistical data on nationals of Afghanistan who have applied for status as special immigrants.

State issued 16,170 SIVs to Afghans in Fiscal Year (FY) 2017, including 4,120 principal applicants.  As we continue to strive for process improvements, we also continue to ensure thorough screening for national security concerns.  SIV issuance numbers through the fourth quarter of FY 2017 are available on travel.state.gov.

On May 5, 2017, President Trump signed the Consolidated Appropriations Act for FY 2017, Section 7083 of Public Law 115-31, which provided an additional 2,500 SIV numbers for Afghan principal applicants, for a total of 11,000 SIV numbers allocated since December 19, 2014.  As of September 30, 2017, State has issued 9,475 out of the 11,000 SIVs to Afghan principal applicants who were employed by, or on behalf of, the U.S. government in Afghanistan, or by the International Security Assistance Force (ISAF) or a successor mission to ISAF.

**Average Wait Times for Each Step of the SIV Application Process**

All steps in the SIV application process are outlined below and include the current average processing time for all involved U.S. government entities.  This statistic captures total U.S. government processing time in calendar days, beginning with the applicant's initial submission of documents to State's National Visa Center (NVC) and ending with the date of visa issuance at a U.S. embassy or consulate.  It does not capture those steps in the SIV process that depend solely on the applicant's initiative and are outside the control of the U.S. government. SIV applications move through 14 steps, in the following four stages:  the Chief of Mission (COM) application process; Form I-360 petition adjudication by the Department of Homeland Security; visa interview and security screening; and final visa adjudication (issuance or denial).

<u>UNCLASSIFIED</u>

SA 101

UNCLASSIFIED

- 2 -

| Special Immigrant Visa (SIV) Processing Steps[1] | | | |
|---|---|---|---|
| Stage | Step | Description | Average processing times in calendar days |
| Chief of Mission (COM) application process | 1 | Applicant submits COM application package to State's NVC. | Applicant-controlled |
| | 2 | NVC reviews documents for completeness. | 30 |
| | 3 | NVC sends completed COM package to U.S. Embassy Kabul. | 1 |
| | 4 | U.S. Embassy Kabul reviews COM application and makes a decision to approve or deny. | 149 (if all required documents are present) |
| | 5 | U.S. Embassy Kabul advises NVC if COM application is approved. If approved, NVC immediately sends approval letter to applicant.  (If any documents reveal that applicant does not qualify for the program, COM application is denied.) | 5 |
| Form I-360 adjudication process | 6 | Applicant self-petitions to DHS U.S. Citizenship and Immigration Services (USCIS) using form I-360. | Applicant-controlled |
| | 7 | USCIS adjudicates petition and sends to NVC if approved.[2] | 22 |
| Visa interview process, | 8 | NVC sends instruction packet to applicant requesting standard | 18 |

UNCLASSIFIED

SA 102

| | | | |
|---|---|---|---|
| including pre- and post-interview[3] | | immigrant visa documentation. | |
| | 9 | Applicant submits required documentation to NVC. | Applicant-controlled |
| | 10 | NVC reviews documents for completeness. | 9 |
| | 11 | NVC schedules applicant for next available interview at U.S. Embassy Kabul. | 263 |
| | 12 | Applicant is interviewed by consular officer on the scheduled appointment date.  Administrative processing is initiated following the interview. | 3 |
| | 13 | Applicant's case undergoes administrative processing.[4] | 212 |
| Visa issuance to eligible applicants | 14 | Upon completion of administrative processing, applicant is instructed to obtain a medical exam.  The visa is issued if applicant is eligible.  In some cases, the passport will have expired, and applicant is required to renew the passport. | Applicant-controlled |
| | | **Total U.S. government processing time in calendar days[5]** | **712** |
| [1]Processing steps are for SIVs authorized under section 602(b) of the Afghan Allies Protection Act of 2009, as amended.  This applies to Afghan nationals in the SQ classification. | | | |
| [2]For I-360 petitions filed with USCIS between July 1 and September 30, 2017. | | | |

UNCLASSIFIED
- 4 -

> [3] The majority of applicants receive SIV status by going through the process explained in this chart.  Applicants who obtain SIV status in the United States apply for adjustment of status from USCIS.
>
> [4] Line 13 totals include data for SIV applicants who completed administrative processing between July 1 and September 30, 2017.  Average processing time for cases that remain pending cannot be calculated until they are completed.
>
> [5] The statistics in this chart were formerly reported in business days in reports published April 2014 – April 2016.  U.S. government processing times do not factor in applicant-controlled steps.  Overall processing times are greater than U.S. government processing times.

**Applications Pending Longer Than Nine Months**

Even if an applicant has acted promptly in each of the applicant-controlled steps that precede step 13 of the SIV application process, applications may be pending longer than nine months for scheduling visa interviews and administrative processing (Step 13).

Administrative processing is essential to the integrity of the SIV program, and process enhancements have resulted in improved efficiency.  In addition, visa interviews were temporarily suspended during the fiscal year due to the unavailability of visa numbers for Afghan special immigrant visa applicants, thus resulting in longer interview wait times (Step 12).

**Applications Pending at Each Stage of the SIV Application Process**

As of September 30, 2017, the following numbers of Afghan applicants were pending in one of the application stages:

- Step 1 – 6,151 principal applicants had COM applications pending at NVC, for which the applicant had taken action within the past 120 days.  These applicants had submitted some, but not all, of the documents required to apply for COM approval.

- Step 7 – 82 principal applicants had Form I-360 petitions pending with USCIS.

- Step 11 – 2,511 principal applicants and 8,780 family members were pending scheduling for visa interviews.  Interviews are normally scheduled approximately 30-60 days in advance when visa numbers are available.  Applicants use this time to gather any remaining documents required for their interviews and prepare for travel to the U.S. embassy or consulate.  Most Afghan applicants will be interviewed at U.S. Embassy Kabul, as they reside in Afghanistan.  Applicants who reside outside of Afghanistan will be interviewed at the U.S. embassy or consulate that adjudicates immigrant visa applications for their country of residence.

- Step 13 – Applications for 571 principal applicants and 75 family members were undergoing administrative processing.

- 5 -

**Number of SIV Applicants in Fourth Quarter of FY 2017**

The following chart shows the number of Afghan applicants who applied for SIVs at a visa interview in the fourth quarter of FY 2017 under section 602(b) of the Afghan Allies Protection Act of 2009, subsequent to receiving COM approval.

| Month | Principal Applicants | Family Members | Total |
|---|---|---|---|
| July | 354 | 1182 | **1536** |
| Aug | 505 | 1547 | **2052** |
| September | 399 | 1263 | **1662** |
| **Total** | **1258** | **3992** | **5250** |

**Applications Denied or Pending at Each Stage of the SIV Application Process**

At the end of the fourth quarter of FY 2017 the following numbers of applications were denied or pending at one of the application stages:

- 1,181 Afghan principal applicants were deemed unqualified to receive COM approval or had the approval revoked during the fourth quarter of FY 2017. Applicants whose COM applications are denied or revoked are able to appeal the decision. 483 Afghans submitted appeals during the fourth quarter of FY 2017. 28 percent of appeals adjudicated between July 1 and September 30, 2017 were approved after submitting additional evidence.

- 447 Form I-360 petitions were filed by Afghan principal applicants between July 1 and September 30, 2017. 25 were denied by USCIS.

- 2,511 principal applicants and 8,780 family members were pending scheduling for visa interviews.

- Applications for 571 principal applicants and 75 family members were undergoing administrative processing.

**Reasons for COM Denial**

As reflected in denial letters sent by the COM at U.S. Embassy Kabul, denial of a COM application generally occurs for one or more of the following five reasons:

SA 105

- *Failure to establish employment by or on behalf of the U.S. government, or failure to establish qualifying employment by ISAF or a successor mission.*  For Afghans employed by or on behalf of the U.S. government, State considers the employment requirement satisfied for an alien hired under a direct-hire appointment, or through an agency's personal services agreement (PSA) or personal services contract (PSC) authority.  State also has considered Afghan nationals hired by and paid through a U.S. government contractor, subcontractor, or Employee Association to meet the broader criteria for employment "by or on behalf of" the U.S. government.  State has not considered the requirement under section 602(b) to be "employed by or on behalf of the United States government" satisfied in other situations, such as individuals employed by an entity funded by a grant or cooperative agreement with the U.S. government, or self-employed businesspersons who operate under a license with the U.S. government.  For Afghans employed by ISAF, or a successor mission, section 1227 of the FY 2015 NDAA states that qualifying applicants must be employed "by the International Security Assistance Force," interpreted to include direct hires by ISAF or ISAF member nations. While section 1216 of the FY 2016 NDAA expanded qualification for the SIV program to certain Afghans employed by successor missions to ISAF, the language did not include contractors and subcontractors.

- *Insufficient documentation.*  Applications are denied for this reason if the applicant fails to provide a required document, or if there is a deficiency in a document provided by the applicant.

- *Failure to establish the required length of employment by or on behalf of the U.S. government or by ISAF or a successor mission during the period specified in section 602(b) of the Afghan Allies Protection Act of 2009, as amended.*  Applicants who submitted applications for COM approval on or before September 30, 2015, must demonstrate one year of qualifying service.  Applicants who submitted or submit applications for COM approval on or after October 1, 2015, must demonstrate two years of qualifying service.

- *Failure to establish providing faithful and valuable service to the U.S. government.*  Applications denied for this reason generally have involved cases lacking the requisite positive recommendation or evaluation.  In some instances where faithful and valuable service was not confirmed, employment by or on behalf of the U.S. government had been terminated for cause.

- *Derogatory information associated with the applicant that is incompatible with the requirements of the SIV program.*  This reason for denial generally relates to information that the applicant engaged in an unlawful, unethical, criminal, or terrorism-related activity.

SA 106

# Afghan SIV Joint Report: January 2018

UNCLASSIFIED

**Joint Department of State/Department of Homeland Security Report:
Status of the Afghan Special Immigrant Visa Program**

**Introduction**

The Department of State, the Department of Homeland Security (DHS), and other U.S. government departments and agencies involved in the U.S. Special Immigrant Visa (SIV) program are committed to helping the men and women who have taken enormous risks to support our military and civilian personnel.  Congress, under section 602(b) of the Afghan Allies Protection Act of 2009, as amended, requires this quarterly report to review statistical data on nationals of Afghanistan who have applied for status as special immigrants.

The Department issued 16,170 SIVs to Afghans in FY 2017, including 4,120 principal applicants.  As we continue to strive for process improvements, we also continue to ensure thorough screening for national security concerns.  SIV issuance numbers through the first quarter of FY 2018 are available on travel.state.gov.

On December 12, 2017, the President signed the National Defense Authorization Act for FY 2018 which provided an additional 3,500 SIV numbers for Afghan principal applicants.  As of December 31, 2017, State has issued  10,450 out of the 14,500 SIVs to Afghan principal applicants who were employed by, or on behalf of, the U.S. government in Afghanistan, or by the International Security Assistance Force (ISAF) or a successor mission to ISAF.

**Average Wait Times for Each Step of the SIV Application Process**

All steps in the SIV application process are outlined below and include the current average processing time for all involved U.S. government entities.  This statistic captures total U.S. government processing time in calendar days, beginning with the applicant's initial submission of documents to State's National Visa Center (NVC) and ending with the date of visa issuance at a U.S. embassy or consulate.  It does not capture those steps in the SIV process that depend solely on the applicant's initiative and are outside the control of the U.S. government.  SIV applications move through 14 steps, in the following four stages:  the Chief of Mission (COM) application process; Form I-360 petition adjudication by the Department of Homeland Security; visa interview and security screening; and final visa adjudication (issuance or denial).

UNCLASSIFIED

- 2 -

| Special Immigrant Visa (SIV) Processing Steps[1] | | | |
|---|---|---|---|
| **Stage** | **Step** | **Description** | **Average processing times in calendar days** |
| Chief of Mission (COM) application process | 1 | Applicant submits COM application package to State's NVC. | Applicant-controlled |
| | 2 | NVC reviews documents for completeness. | 38 |
| | 3 | NVC sends completed COM package to U.S. Embassy Kabul. | 1 |
| | 4 | U.S. Embassy Kabul reviews COM application and makes a decision to approve or deny. | 234 (if all required documents are present) |
| | 5 | Embassy Kabul advises NVC if COM application is approved. If approved, NVC immediately sends approval letter to applicant.  (If any documents reveal that applicant does not qualify for the program, the COM application is denied.) | 5 |
| Form I-360 adjudication process | 6 | Applicant self-petitions to DHS U.S. Citizenship and Immigration Services (USCIS) using form I-360. | Applicant-controlled |
| | 7 | USCIS adjudicates petition and sends to NVC if approved.[2] | 16 |
| Visa interview process, | 8 | NVC sends instruction packet to applicant requesting standard | 19 |

SA 109

| including pre- and post-interview[3] | | immigrant visa documentation. | |
|---|---|---|---|
| | 9 | Applicant submits required documentation to NVC. | Applicant-controlled |
| | 10 | NVC reviews documents for completeness. | 10 |
| | 11 | NVC schedules applicant for next available interview at U.S. Embassy Kabul. | 280 |
| | 12 | Applicant is interviewed by consular officer on the scheduled appointment date.  Administrative processing is initiated following the interview. | 2 |
| | 13 | The applicant's case undergoes administrative processing.[4] | 95 |
| Visa issuance to eligible applicants | 14 | Upon completion of administrative processing, applicant is instructed to obtain a medical exam.  The visa is issued if applicant is eligible.  In some cases, the passport will have expired and the applicant is required to renew the passport. | Applicant-controlled |
| | | **Total U.S. government processing time in calendar days[5]** | **700** |
| [1]Processing steps are for SIVs authorized under section 602(b) of the Afghan Allies Protection Act of 2009, as amended.  This applies to Afghan nationals in the SQ classification. | | | |
| [2]For I-360 petitions filed with USCIS between October 1 and December 31, 2017. | | | |

UNCLASSIFIED
- 4 -

> [3]The majority of applicants receive SIV status by going through the process explained in this chart.  Applicants who obtain SIV status in the United States apply for adjustment of status from USCIS.
>
> [4]Line 13 totals include data for SIV applicants who completed administrative processing between October 1 and December 31, 2017.  Average processing time for cases that remain pending cannot be calculated until they are completed.
>
> [5] The statistics in this chart were formerly reported in business days in reports published April 2014 – April 2016.  U.S. government processing times do not factor in applicant-controlled steps.  Overall processing times are greater than U.S. government processing times.

**Applications Pending Longer Than Nine Months**

Even if an applicant has acted promptly in each of the applicant-controlled steps that precede step 13 of the SIV application process, applications may be pending longer than nine months for completion of administrative processing (Step 13).  Administrative processing is essential to the integrity of the SIV program, and process enhancements have resulted in improved efficiency.

**Applications Pending at Each Stage of the SIV Application Process**

As of December 31, 2017, the following numbers of Afghan applicants were pending in one of the application stages:

- Step 1 – 6,609 principal applicants had COM applications pending at NVC, for which the applicant had taken action within the past 120 days.  These applicants had submitted some, but not all, of the documents required to apply for COM approval.

- Step 7 – 42 principal applicants had Form I-360 petitions pending with USCIS.

- Step 11 – 2,829 principal applicants and 11,435 family members were pending scheduling for visa interviews.  Interviews are normally scheduled approximately 30-60 days in advance.  Applicants use this time to gather any remaining documents required for their interviews and prepare for travel to the U.S. embassy or consulate.  Most Afghan applicants will be interviewed at Embassy Kabul, as they reside in Afghanistan.  Applicants who reside outside of Afghanistan will be interviewed at the U.S. embassy or consulate that adjudicates immigrant visa applications for their country of residence.

- Step 13 – Applications for  approximately 505 principal applicants and 87 family members were undergoing administrative processing.

**Number of SIV Applicants in First Quarter of FY 2018**

The following chart shows the number of Afghan applicants who applied for SIVs at a visa interview in the first quarter of FY 2018 under section 602(b) of the Afghan Allies Protection Act of 2009, subsequent to receiving COM approval.

UNCLASSIFIED

| Month | Principal Applicants | Family Members | **Total** |
|---|---|---|---|
| October | 231 | 789 | **1020** |
| November | 167 | 486 | **653** |
| December | 84 | 312 | **396** |
| **Total** | **482** | **1587** | **2069** |

**Applications Denied or Pending at Each Stage of the SIV Application Process**

At the end of the first quarter of FY 2018 the following numbers of applications were denied or pending at one of the application stages:

- 13 Afghan principal applicants were deemed unqualified to receive COM approval or had the approval revoked during the first quarter of FY 2018.  Applicants whose COM applications are denied or revoked are able to appeal the decision.  352 Afghans submitted appeals during the first quarter of FY 2018.  Of those appeals adjudicated as of December 31, 2017, 50 percent were approved after the applicant submitted additional information.

- 124 Form I-360 petitions were filed by Afghan principal applicants between October 1 and December 31, 2017.  Thirteen were denied by USCIS.

-  2,829 principal applicants and 11,435 family members were pending scheduling for visa interviews.

- Applications for 505 principal applicants and 87 family members were undergoing administrative processing.

**Reasons for COM Denial**

As reflected in denial letters sent by the COM at Embassy Kabul, denial of a COM application generally occurs for one or more of the following reasons:

- *Failure to establish employment by or on behalf of the U.S. government, or failure to establish qualifying employment by ISAF or a successor mission.*  For Afghans employed by or on behalf of the U.S. government, State considers the employment requirement satisfied for an alien hired under a direct-hire appointment, or through an agency's personal services agreement (PSA) or personal services contract (PSC) authority.  State also has considered Afghan nationals hired by and paid through a U.S. government contractor, subcontractor, or Employee Association to meet the broader criteria for

employment "by or on behalf of" the U.S. government.  State has not considered the requirement under section 602(b) to be "employed by or on behalf of the United States government" satisfied in other situations, such as individuals employed by an entity funded by a grant or cooperative agreement with the U.S. government, or self-employed businesspersons who operate under a license with the U.S. government.  For Afghans employed by ISAF, or a successor mission, section 1227 of the FY 2015 NDAA states that qualifying applicants must be employed "by the International Security Assistance Force," interpreted to include direct hires by ISAF or ISAF member nations.  While section 1216 of the FY 2016 NDAA expanded qualification for the SIV program to certain Afghans employed by successor missions to ISAF, the language did not include contractors and subcontractors .

- *Insufficient documentation.*  Applications are denied for this reason if the applicant fails to provide a required document, or if there is a deficiency in a document provided by the applicant.

- *Failure to establish the required length of employment by or on behalf of the U.S. government, or by ISAF or a successor mission, during the period specified in section 602(b) of the Afghan Allies Protection Act of 2009, as amended.*  Applicants who submitted applications for COM approval on or before September 30, 2015, must demonstrate one year of qualifying service.  Applicants who submitted or submit applications for COM approval on or after October 1, 2015, must demonstrate two years of qualifying service.

- *Failure to establish providing faithful and valuable service to the U.S. government.*  Applications denied for this reason generally have involved cases lacking the requisite positive recommendation or evaluation.  In some instances where faithful and valuable service was not confirmed, employment by or on behalf of the U.S. government had been terminated for cause.

- *Derogatory information associated with the applicant that is incompatible with the requirements of the SIV program.*  This reason for denial generally relates to information that the applicant engaged in an unlawful, unethical, criminal, or terrorism-related activity.

USCA Case #25-5279      Document #2176641         Filed: 06/03/2026      Page 118 of 390

# Afghan SIV Joint Report: April 2018

**Joint Department of State/Department of Homeland Security Report:
Status of the Afghan Special Immigrant Visa Program**

**Introduction**

The Department of State (State), the Department of Homeland Security (DHS), and other U.S. government departments and agencies involved in the U.S. Special Immigrant Visa (SIV) program are committed to helping the men and women who have taken enormous risks to support our military and civilian personnel.  Congress, under section 602(b) of the Afghan Allies Protection Act of 2009, as amended, requires this quarterly report to review statistical data on nationals of Afghanistan who have applied for status as special immigrants.

State issued 16,170 SIVs to Afghans in FY 2017, including 4,120 principal applicants.  As we continue to strive for process improvements, we also continue to ensure thorough screening for national security concerns.  SIV issuance numbers through the second quarter of FY 2018 are available on travel.state.gov.

On December 12, 2017, the President signed the National Defense Authorization Act for FY 2018 that provided an additional 3,500 SIV numbers for Afghan principal applicants for FY2018.  As of March 31, 2018, the Department has issued 10,613 out of the 14,500 SIVs to Afghan principal applicants who are employed by, or on behalf of, the U.S. government in Afghanistan, or by the International Security Assistance Force (ISAF) or a successor mission to ISAF.

**Average Wait Times for Each Step of the SIV Application Process**

All steps in the SIV application process are outlined below and include the current average processing time for all involved U.S. government entities.  This statistic captures total U.S. government processing time in calendar days, beginning with the applicant's initial submission of documents to the Department of State's National Visa Center (NVC) and ending with the date of visa issuance at a U.S. embassy or consulate.[1]  It does not capture those steps in the SIV process that depend solely on the applicant's initiative and are outside the control of the U.S. government.  SIV applications move through 14 steps, in the following four stages:  the Chief of Mission (COM) application process; Form I-360 petition adjudication by DHS; visa interview and security screening; and final visa adjudication (issuance or denial).

---

[1] The Department of State's National Visa Center (NVC) should not be confused with the National Vetting Center, also known as NVC, established under the National Security Presidential Memorandum 9.

UNCLASSIFIED

-2-

| Special Immigrant Visa (SIV) Processing Steps[1] | | | |
|---|---|---|---|
| **Stage** | **Step** | **Description** | **Average processing times in calendar days** |
| Chief of Mission (COM) application process | 1 | Applicant submits COM application package to State's NVC. | Applicant-controlled |
| | 2 | NVC reviews documents for completeness. | 46 |
| | 3 | NVC sends completed package to the COM Committee at the U.S. Embassy Kabul. | 1 |
| | 4 | The COM Committee reviews the application and makes a decision to approve or deny. | 189 (if all required documents are present) |
| | 5 | The COM Committee advises NVC if the application is approved. If approved, NVC immediately sends approval letter to applicant. (If any documents reveal that applicant does not qualify for the program, the COM application is denied.) | 5 |
| Form I-360 adjudication process | 6 | Applicant self-petitions to DHS U.S. Citizenship and Immigration Services (USCIS) using form I-360. | Applicant-controlled |
| | 7 | USCIS adjudicates petition and sends to NVC if approved.[2] | 15 |
| Visa interview process, | 8 | NVC sends instruction packet to applicant requesting standard | 16 |

UNCLASSIFIED

SA 116

-3-

| | | | |
|---|---|---|---|
| including pre- and post-interview[3] | | immigrant visa documentation. | |
| | 9 | Applicant submits required documentation to NVC. | Applicant-controlled |
| | 10 | NVC reviews documents for completeness. | 6 |
| | 11 | NVC schedules applicant for next available interview at the U.S. embassy's consular section. | 272 |
| | 12 | Applicant is interviewed by consular officer on the scheduled appointment date.  Administrative processing is initiated following the interview. | 2 |
| | 13 | The applicant's case undergoes administrative processing.[4] | 171 |
| Visa issuance to eligible applicants | 14 | Upon completion of administrative processing, applicant is instructed to obtain a medical exam.  The visa is issued if applicant is eligible.  In some cases, the passport will have expired and the applicant is required to renew the passport. | Applicant-controlled |
| | | **Total U.S. government processing time in calendar days**[5] | **700** |

[1]Processing steps are for SIVs authorized under section 602(b) of the Afghan Allies Protection Act of 2009, as amended.  This applies to Afghan nationals in the SQ classification.

[2]For I-360 petitions filed with USCIS between January 1 and March 31,

SA 117

UNCLASSIFIED
-4-

| |
|---|
| 2018. |
| [3]The majority of applicants receive SIV status by going through the process explained in this chart.  Applicants who obtain SIV status in the United States apply for adjustment of status from USCIS. |
| [4]Line 13 totals include data for SIV applicants who completed administrative processing between January 1 and March 31, 2018.  Average processing time for cases that remain pending cannot be calculated until they are completed. |
| [5] The statistics in this chart were formerly reported in business days in reports published April 2014 – April 2016.  U.S. government processing times do not factor in applicant-controlled steps.  Overall processing times are greater than U.S. government processing times. |

**Applications Pending Longer Than Nine Months**

Even if an applicant has acted promptly in each of the applicant-controlled steps that precede Step 13 of the SIV application process, applications may be pending longer than nine months for completion of administrative processing (Step 13).  Administrative processing is essential to the integrity of the SIV program, and process enhancements have resulted in improved efficiency.

**Applications Pending at Each Stage of the SIV Application Process**

As of March 31, 2018, the following numbers of Afghan applicants were pending in one of the application stages:

- Step 1 –7,647 principal applicants had COM applications pending at NVC, for which the applicant had taken action within the past 120 days.  These applicants had submitted some, but not all, of the documents required to apply for COM approval.

- Step 7 – 103 principal applicants had Form I-360 petitions pending with USCIS.

- Step 11 –2,504 principal applicants and 10,072 derivative family members were pending scheduling for visa interviews.  Interviews are normally scheduled approximately 30-60 days in advance.  Applicants use this time to gather any remaining documents required for their interviews and prepare for travel to the U.S. embassy or consulate.  Most Afghan applicants will be interviewed at Embassy Kabul, as they reside in Afghanistan. Applicants who reside outside of Afghanistan will be interviewed at the U.S. embassy or consulate that adjudicates immigrant visa applications for their country of residence.

- Step 13 – Applications for approximately 842 principal applicants and 133 family derivative members were undergoing administrative processing.

**Number of SIV Applicants in Second Quarter of FY 2018**

UNCLASSIFIED
-5-

The following chart shows the number of Afghan applicants who applied for SIVs at a visa interview in the second quarter of FY 2018 under section 602(b) of the Afghan Allies Protection Act of 2009, subsequent to receiving COM approval.

| Month | Principal Applicants | Derivative Family Members | Total |
|-------|---------------------|---------------------------|-------|
| January | 120 | 425 | **545** |
| February | 261 | 849 | **1110** |
| March | 163 | 588 | **751** |
| **Total** | **544** | **1862** | **2406** |

**Applications Denied or Pending at Each Stage of the SIV Application Process**

At the end of the second quarter of FY 2018, the following numbers of applications were denied or pending at one of the application stages:

- 802 Afghan principal applicants were deemed unqualified to receive COM approval or had the approval revoked during the second quarter of FY 2018. Applicants whose COM applications are denied or revoked are able to appeal the decision. 155 Afghans submitted appeals during the second quarter of FY 2018. Of those appeals adjudicated as of March 31, 2018, 58 percent were approved after the applicant submitted additional information.

- 315 Form I-360 petitions were filed by Afghan principal applicants between January 1 and March 31, 2018. USCIS denied petitions for seven of them.

- 2,504 principal applicants and 10,072 derivative family members were pending scheduling for visa interviews.

- Applications for 842 principal applicants and 133 derivative family members were undergoing administrative processing.

**Reasons for COM Denial**

As reflected in denial letters sent by the COM at U.S. Embassy Kabul, denial of a COM application generally occurs for one or more of the following reasons:

- *Failure to establish employment by or on behalf of the U.S. government, or failure to establish qualifying employment by ISAF or a successor mission.* For Afghans employed by or on behalf of the U.S. government, State considers the employment requirement

UNCLASSIFIED
SA 119

satisfied for an alien hired under a direct-hire appointment, or through an agency's personal services agreement (PSA) or personal services contract (PSC) authority.  State also has considered Afghan nationals hired by and paid through a U.S. government contractor, subcontractor, or Employee Association to meet the broader criteria for employment "by or on behalf of" the U.S. government.  State has not considered the requirement under section 602(b) to be "employed by or on behalf of the United States government" satisfied in other situations, such as individuals employed by an entity funded by a grant or cooperative agreement with the U.S. government, or self-employed businesspersons who operate under a license with the U.S. government.  For Afghans employed by ISAF, or a successor mission, Section 1227 of the FY 2015 NDAA states that qualifying applicants must be employed "by the International Security Assistance Force," interpreted to include direct hires by ISAF or ISAF member nations.  While Section 1216 of the FY 2016 NDAA expanded qualification for the SIV program to certain Afghans employed by successor missions to ISAF, the language did not include contractors and subcontractors.

- *Insufficient documentation.*  Applications are denied for this reason if the applicant fails to provide a required document, or if there is a deficiency in a document provided by the applicant.

- *Failure to establish the required length of employment by or on behalf of the U.S. government, or by ISAF or a successor mission, during the period specified in section 602(b) of the Afghan Allies Protection Act of 2009, as amended.*  Applicants who submitted applications for COM approval on or before September 30, 2015, must demonstrate one year of qualifying service.  Applicants who submitted or submit applications for COM approval on or after October 1, 2015, must demonstrate two years of qualifying service.

- *Failure to establish providing faithful and valuable service to the U.S. government.*  Applications denied for this reason generally have involved cases lacking the requisite positive recommendation or evaluation.  In some instances where faithful and valuable service was not confirmed, employment by or on behalf of the U.S. government had been terminated for cause.

- *Derogatory information associated with the applicant that is incompatible with the requirements of the SIV program.*  This reason for denial generally relates to information that the applicant engaged in an unlawful, unethical, criminal, or terrorism-related activity

# Ex. C

Case 1:18-cv-01388-TSC   Document 34-6   Filed 09/07/18   Page 2 of 28
USCA Case #25-5279        Document #2176641        Filed: 06/03/2026        Page 126 of 390

Home | Travel Advisories | Newsroom | About Us | Contact Us | Careers |

Find U.S. Embassies & Consulates

## Travel.State.Gov
U.S. DEPARTMENT OF STATE — BUREAU OF CONSULAR AFFAIRS

Search

U.S. Passports | International Travel | U.S. Visas | Intercountry Adoption | International Parental Child Abduction | U.S. Visas

Tourism & Visit | Business | Employment | Study & Exchange | Immigrate | Other Visa Categories | U.S. Visa: Reciprocity and Civil Documents by Country

Travel.State.Gov > U.S. Visas > Immigrate

**Family Immigration**

◆ **The Immigrant Visa Process**

◆ **Diversity Visa Program - Entry**

**Employment-Based Immigrant Visas**

# Special Immigrant Visas for Afghans - Who Were Employed by/on Behalf of the U.S. Government

## Afghan SIV Program Update

The National Defense Authorization Act for FY2018 as signed by President Trump on December 12, 2017 allocated 3,500 additional visas for Afghan principal applicants, for a total of 14,500 visas allocated since December 19, 2014.  The Department of State's authority to issue Special Immigrant Visas (SIVs) to Afghan nationals under section 602(b) of the Afghan Allies Protection Act of 2009, as amended, will continue until all visa numbers allocated under the Act are issued.

### Important Notice: Termination of Registration ⊖

Immigration and Nationality Act (INA) section 203(g) provides that the Secretary of State shall terminate the registration (petition) of any alien who fails to apply for an immigrant visa within one year of notice of visa availability. The petition may be reinstated if, within two years of notice of visa availability, the alien establishes that the failure to apply was for reasons beyond the alien's control. Therefore if you do not respond to notices from the NVC within one year you risk termination of your petition under this section of law and would lose the benefits of that petition, such as your priority date.

Overview

STEP 1 – Apply for Chief of Mission Approval

STEP 2 – File a Petition with USCIS

STEP 3 – Prepare for Your Visa Application

STEP 4 – The Visa Interview

STEP 5 – Arrival in the United States

Contact Information

**More Information**

A-Z Index
DOD Supervisory Locator
Vaccinations
Denials
Lost/Stolen Travel Documents
Border Security/Safety
Fraud Warning

**Who's Involved**

U.S. Citizens and Immigration Services (USCIS) ⧉
National Visa Center



FAQ'S DS-260



A GUIDE FOR NEW IMMIGRANTS

SA 122

USCA Case #25-5279          Document #2176641          Filed: 06/03/2026          Page 127 of 390

Quarterly Reports on Status of Afghan Program

References – U.S. Laws

**Note: You should NOT make any travel arrangements, sell property, or give up employment until and unless you are issued a U.S. visa.**

**Overview**

ALL **+/–**

### What is this program?

⊖

A special immigrant is a person who qualifies for lawful permanent residence under one of several programs.  Section 602(b) of the Afghan Allies Protection Act of 2009, as amended, is a special immigrant program which authorizes the issuance of Special Immigrant Visas (SIVs) to Afghan nationals who meet certain requirements and who were employed in Afghanistan:

- by or on behalf of the U.S. government in Afghanistan, or
- by the International Security Assistance Force (ISAF), or a successor mission, in a capacity that required the applicant to serve as an interpreter or translator for U.S. military personnel while traveling off-base with U.S. military personnel stationed at ISAF or to perform sensitive and trusted activities for U.S. military personnel stationed at ISAF.

The SIV program requires applicants to have been employed for a minimum of two years, between October 7, 2001 and December 31, 2020. Applicants must also have experienced or be experiencing an ongoing serious threat as a consequence of their employment. For more information about the relevant U.S. laws, see References - U.S. Laws.

In addition to the information on this website, U.S. Citizenship and Immigration Services (USCIS) has posted on its website a fact sheet and information on Form I-360 petitions for this program.

This program is completely distinct from another program authorizing SIVs for certain Iraqi and Afghan translators/interpreters who worked directly with the United States Armed Forces or under COM authority, although some translators and interpreters may qualify under both programs. For information on that program, see Special Immigrant Visas for Iraqi and Afghan Translators/Interpreters.

### What is meant by fiscal year?

⊖

The fiscal year begins on October 1 and ends September 30.

SA 123

USCA Case #25-5279　　Document #2176641　　　Filed: 06/03/2026　　Page 128 of 390

## What is meant by successor mission?

The International Security Assistance Force (ISAF) mission ended on December 31, 2014, and the NATO-led Resolute Support Mission (RSM) began on January 1, 2015. Section 1227 of the National Defense Authorization Act (NDAA) for FY 2015 expanded the SIV program to certain Afghans who had been employed by ISAF, but did not provide for SIVs for Afghans employed by successor missions. Section 1216 of the NDAA for FY 2016 expands qualification to now include Afghans employed by ISAF successor missions. Certain Afghans employed by RSM, as well as any future successor missions to ISAF, may now qualify for the Afghan SIV program.  Applicants who were employed by ISAF, RSM, or a successor mission, or a combination of these entities, must meet all of the SIV program requirements explained in Step 1.

## How many Special Immigrant Visas can be issued under this program?

The National Defense Authorization Act (NDAA) for FY 2018 authorized the issuance of 14,500 visas since December 19, 2014.  The program will end when all visas have been issued. SIVs issued to a principal applicant's spouse and children do not count toward the numerical limit.

## Who can apply for this program?

You may apply for this program if you meet all of the following requirements:

- You must be a national of Afghanistan;
- You must have been employed in Afghanistan for a period of at least two years between October 7, 2001 and December 31, 2020:
    - by, or on behalf of, the U.S. government; in a capacity that required you to serve as an interpreter or translator for personnel of the Department of State or USAID; to serve as an interpreter or translator for U.S. military personnel; or to perform sensitive and trusted activities for the U.S. government; or
    - by the International Security Assistance Force (ISAF), or a successor mission, in a capacity that required you to serve as an interpreter or translator for U.S. military personnel while traveling off-base with U.S. military personnel stationed at ISAF, or a successor mission, or to perform sensitive and trusted activities for U.S. military personnel stationed at ISAF, or a successor mission;
- You must have provided faithful and valuable service to the U.S. government, or ISAF, or a successor mission, as applicable, which is documented in a letter of recommendation; and
- You must have experienced or be experiencing an ongoing serious threat as a consequence of such employment.

You must apply no later than December 31, 2020. Specific requirements for each step of the process are detailed below.

SA 124

Case 1:18-cv-01388-TSC   Document 34-6   Filed 09/07/18   Page 5 of 28

USCA Case #25-5279     Document #2176641     Filed: 06/03/2026     Page 129 of 390

## What about my family? Can my family members immigrate with me?

Your spouse, as well as unmarried children younger than age 21, may be granted SIVs, and may travel with you or may follow to join you after you have been admitted to the United States.

[Back to Overview](#)

[Back to Top](#)

### STEP 1 - Apply for Chief of Mission Approval

Click here to view detailed Applicant Guidelines for Chief of Mission Approval in English (PDF - 246 KB)

SA 125

ALL **+**/**—**

## What documents are required for Chief of Mission (COM) approval?   **⊖**

Follow the detailed Applicant Guidelines for Chief of Mission Approval ⬚.

The following documents are required from applicants who were **employed by or on behalf of the U.S. government:**

- Verification of at least two years of employment by or on behalf of the U.S. government in Afghanistan:  a letter from your employer's Human Resources (HR) department confirming that you were employed by, or on behalf of, the U.S. government in Afghanistan between October 7, 2001 and December 31, 2020 for at least two years.
- Letter of Recommendation from your direct, U.S. citizen supervisor.
- Statement of threats you received as a consequence of your employment with the U.S. government.
- A completed ⬚ Form DS-157, Supplemental Nonimmigrant Visa Application ⬚ (PDF - 278 KB).
- Evidence of Afghan nationality: A scanned copy of your passport or *taskera* (with English translation). (At the time of the visa interview, applicants must provide new Afghan machine-readable e-passports.)
- Your biographic data, and a scanned copy of your employee badge (if available).

The following documents are required from applicants who were **employed by the International Security Assistance Force (ISAF), or a successor mission:**

- Verification of at least two years of employment with ISAF, or a successor mission:  a letter from the Human Resources (HR) department confirming that you were employed by ISAF, or a successor mission, for a period of two years or more between October 7, 2001 and December 31, 2020. If you were directly hired by ISAF, or a successor mission, this letter must be from ISAF Headquarters HR, or regardless of where you were stationed in Afghanistan.  If you were hired by an ISAF member nation, this letter must come from the department or agency that hired you.
- Letter of Recommendation from a member of the U.S. military who personally worked with you.
- Statement of threats you received as a consequence of your employment with the U.S. government.
- A completed Form DS-157, Supplemental Nonimmigrant Visa Application ⬚ (PDF - 278 KB).
- Evidence of Afghan nationality: A scanned copy of your passport or *taskera* (with English translation). (At the time of the visa interview, applicants must provide new Afghan machine-readable e-passports.)
- Your biographic data, and a scanned copy of your employee badge (if available).

SA 126

9/6/2018                    Case 1:18-cv-01388-TSC   Document 34-6   Filed 09/07/18   Page 7 of 28
Special Immigrant Visas for Afghans - Who Were Employed by/on Behalf of the U.S. Government

USCA Case #25-5279        Document #2176641            Filed: 06/03/2026        Page 131 of 390

### The National Defense Authorization Act for FY 2016 increased the required length of service to two years for Afghans submitting new applications after September 30, 2015. What required length of service must I demonstrate?

Applicants who submit applications for Chief of Mission (COM) approval on or after October 1, 2015 must demonstrate two years of qualifying service. You are considered to have submitted an application for Chief of Mission (COM) approval if you sent an email to the National Visa Center indicating you are seeking COM approval and providing, at a minimum, your name, date of birth, evidence of Afghan nationality, and email address. Applicants who submitted applications on or before September 30, 2015 must demonstrate one year of qualifying service.

A complete application for COM approval requires all of the information and documents listed in the above Q/A and in the Applicant Guidelines for Chief of Mission Approval (PDF - 291 KB), but an expression of interest, along with name, date of birth, evidence of Afghan nationality, and email address, is sufficient for determination of the date on which COM approval was sought.

### What is required in the HR letter from my employer?

The HR letter should confirm that you were employed by, or on behalf of, the U.S. government, or by ISAF or a successor mission, for at least two years and must include the details outlined in the Applicant Guidelines for Chief of Mission Approval (PDF - 291 KB).

Afghans employed by an organization under a U.S. grant or cooperative agreement are not eligible for the SIV program; if you are unsure of whether this is the case, please inquire with your HR department before you apply for Chief of Mission approval. Afghans who were employed by contractors or subcontractors to work at ISAF, or a successor mission, do not qualify for the SIV program.

### Who may submit the letter of recommendation?

If you were employed by or on behalf of the U.S. government: The letter of recommendation should normally be from the U.S. citizen who directly supervises you, or supervises the company for which you are employed and must include the details outlined the Applicant Guidelines for Chief of Mission Approval.

If you were employed by ISAF, or a successor mission: The letter of recommendation should be from a member of the U.S. military who personally worked with you and must include the details outlined in the Applicant Guidelines for Chief of Mission Approval.

SA 127

Case 1:18-cv-01388-TSC   Document 34-6   Filed 09/07/18   Page 8 of 28

USCA Case #25-5279    Document #2176641     Filed: 06/03/2026     Page 132 of 390

### What if I am unable to locate or need assistance contacting my former U.S. military or Department of Defense supervisor?

If your previous supervisor was U.S. military or an employee of the U.S. Department of Defense and you are having trouble locating him or her, the Supervisor Locator can possibly help. Learn more.

### What if it is not possible for me, as a contract employee employed on behalf of the U.S. government, to obtain this recommendation from a U.S. citizen supervisor?

You should provide a letter of recommendation signed by your non-U.S. citizen supervisor and co-signed by the U.S. citizen who is responsible for the contract. The letter must include the details outlined in the  Applicant Guidelines for Chief of Mission Approval.

Afghans who were employed by contractors or subcontractors to work at ISAF, or a successor mission, do not qualify for the SIV program.

### Why do applicants who were employed by contractors or subcontractors on behalf of the U.S. government qualify for the SIV program, but applicants who were employed by contractors or subcontractors on behalf of ISAF, or a successor mission, do not?

Section 1227 of the National Defense Authorization Act (NDAA) for FY 2015, which expanded the program to include certain Afghans who were employed by the International Security Assistance Force (ISAF) and section 1216 of the NDAA for FY 2016, which expands the program to include Afghans who were employed by successor missions to ISAF, do not include contractors or subcontractors with ISAF, or successor missions. Section 1227 of the FY 2015 NDAA states only that qualifying applicants must be employed "by the International Security Assistance Force," interpreted to include direct hires by ISAF or ISAF member nations. While section 1216 of the FY 2016 NDAA expanded qualification for the SIV program to certain Afghans employed by successor missions to ISAF, the language did not include contractors and subcontractors.

SA 128

### I began working for ISAF and I now work for Resolute Support Mission (RSM) following the transition from ISAF to RSM. Will I qualify for the program?

You may qualify if you have a total of at least two years of employment between October 7, 2001 and December 31, 2016 with ISAF, or a successor mission, in a capacity that required you to serve as an interpreter or translator for U.S. military personnel while traveling off-base with U.S. military personnel stationed at ISAF, or a successor mission, or to perform sensitive and trusted activities for U.S. military personnel stationed at ISAF, or a successor mission.

### Is there a template or format for the letter of recommendation?

There is no required format, but the letter must include the details outlined in the Applicant Guidelines for Chief of Mission Approval. Generic form letters from supervisors are not helpful to your application. All letters of recommendation should be proofread closely.  Letters of recommendation with significant spelling and grammar errors may delay processing.

### How do I demonstrate an "ongoing serious threat"?

You must write, sign, and date a brief statement describing the threat you face as a result of your employment with or on behalf of the U.S. government in Afghanistan. *Although statements provided by other parties may be included, you must also provide your own statement. Please provide as many details as possible.*

Section 1219 of Public Law 113-66 provides that a credible sworn statement depicting dangerous country conditions, together with official evidence of such country conditions from the U.S government, should be considered as a factor in a determination of whether an applicant has experienced or is experiencing an ongoing serious threat as a consequence of employment by the U.S. government.

### If I have a record of disciplinary actions that have been taken against me, will I be automatically disqualified from receiving a visa under this program?

The Chief of Mission, or his/her designee, will assess the gravity of the reasons for the disciplinary action and whether your record as a whole, notwithstanding the disciplinary actions, is one of faithful service. It will generally be more difficult for you to demonstrate faithful service if the record reflects that disciplinary action has been taken against you.

SA 129

USCA Case #25-5279      Document #2176641      Filed: 06/03/2026      Page 134 of 390

### How do I submit my documents for Chief of Mission approval?

Send all required documents by email to the National Visa Center (NVC) at: AfghanSIVapplication@state.gov.

You will need an email address to facilitate communication with the NVC, both to submit documents and receive instructions.

### By what date may I apply for Chief of Mission approval?

You must submit an application including, at a minimum, name, date of birth, evidence of Afghan nationality, and an email address, to the National Visa Center no later than December 31, 2020. However, only complete Chief of Mission applications containing all required documents and information will be forwarded to U.S. Embassy Kabul for a decision by the Chief of Mission designee. Applicants who meet the December 31, 2020 deadline may provide additional required information or documentation following that date.

### What happens after I submit my documents?

The NVC will collect and review your documents. Once the NVC deems the application packet complete, it is forwarded to the U.S. Embassy in Kabul, where the Chief of Mission (COM) SIV approval designee and staff will review your case. If approved, a Chief of Mission Approval letter will be sent to you via email with instructions on how to send your application and a Form I-360 petition to the USCIS Nebraska Service Center. See Step 2 below.

### Who is the Chief of Mission (COM)?

The Chief of Mission (COM) is the principal officer in charge of a diplomatic mission and is appointed by the President. For more information, visit the website of the U.S. Embassy in Kabul.

SA 130

Case 1:18-cv-01388-TSC   Document 34-8   Filed 09/07/18   Page 11 of 28

USCA Case #25-5279     Document #2176641     Filed: 06/03/2026     Page 135 of 390

## What happens if my Chief of Mission application is denied?

Applicants whose Chief of Mission (COM) applications are denied will receive a letter of denial by email which will provide an explanation of the basis for denial. You may file one appeal of a COM denial, and it must be filed within 120 days of receiving the denial letter by email. Your appeal should request that your denied COM application be reopened and should provide additional information pertinent to your application, clarify existing information in your original application, or explain any unfavorable information that was contained in the letter of denial.

## If I have already been scheduled for an interview or have been interviewed as a refugee, but am also eligible for a Special Immigrant Visa, which application should I pursue?

You determine which route you choose to pursue. Both processes take several months to complete. Registration and application for either program is not a guarantee of eventual admission to the United States. You may pursue both applications simultaneously. The refugee and SIV programs differ in process and eligibility. Please consult the Bureau of Population, Refugees and Migration website for more information about accessing the U.S. Refugee Admissions Program.

You may apply for both the refugee and SIV programs at the same time. At the time of your interview with a U.S. government official for either refugee or SIV status, you should ask that your case in the other status be closed. You may be asked to submit a written request to close your other case.

## What if I have questions about the Chief of Mission Letter?

If you have questions about your Chief of Mission letter, please contact the National Visa Center at AfghanSIVapplication@state.gov.

Back to Step 1

Back to Top

**STEP 2 - File a Petition with USCIS**

SA 131

ALL ➕/➖

## Who files the petition? What documents are required with the petition? ➖

You must submit the following package of documents directly to the USCIS Nebraska Service Center:

- A completed Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant⧉. [NOTE: To be properly filed, the Form I-360 must include your original signature.]
- A copy of your passport or *taskera* showing that you are a national of Afghanistan, along with a certified English translation, if the document is not in English. (At the time of the visa interview, applicants must provide new Afghan machine-readable e-passports.)
- A copy of the letter of recommendation that you sent to NVC when you applied for Chief of Mission (COM) Approval.
- A copy of your COM approval, which should note that the COM or his/her designee:
    - Has determined that you have been employed by, or on behalf of, the U.S. government or by ISAF, or a successor mission, on or after October 7, 2001, and prior to December 31, 2020, for a period of not less than two years;
    - Has conducted an independent review of records maintained by the U.S. government or hiring organization or entity to confirm employment and determined that you have provided faithful and valuable service to the U.S. government; and
    - Has determined that you have experienced or are experiencing an ongoing serious threat as a consequence of your employment by the U.S. government.

- If you are in the United States when you file the petition, a copy of the front and back of your paper Form I-94, Arrival/Departure Record.

## Where do I find the forms? ➖

Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant⧉ is available on the USCIS Forms webpage⧉.

SA 132

9/6/2018                Special Immigrant Visas for Afghans – Who Were Employed by/on Behalf of the U.S. Government

Case 1:18-cv-01388-TSC   Document 34-8   Filed 09/07/18   Page 13 of 28
USCA Case #25-5279      Document #2176641        Filed: 06/03/2026      Page 137 of 390

## How do I file the petition?

There are no filing or biometric fees associated with this petition, you may scan and email your petition with the required documents (preferably in pdf format) to the following email address:

NSCI360SIVAPP@uscis.dhs.gov

**Please note if you submit your I-360 by email, that you must bring the same original, signed Form I-360 that was submitted to NSC with you to the consular interview.**

Or you may send the original I-360 and required documents by either regular mail or overnight delivery, to the appropriate address below.

**Regular Mail:**
USCIS/ Nebraska Service Center (NSC)
P.O. Box 87485
Lincoln, NE 68501-7485

**Overnight Deliveries:**
USCIS/ Nebraska Service Center (NSC)
850 "S" Street
Lincoln, NE 68508

## What return email or mailing address should I use on the Form I-360 petition?

If you scan and email your Form I-360 petition, include the email address you want USCIS to use to send your electronic receipt (Form I-797). If no email address is submitted with the form, the receipt notice will be sent electronically to the email address from which the petition was submitted.

USCIS cannot send mail outside the United States except to an APO address. If you have access to an APO address, USCIS will use this address. If you do not have access to an APO address, but you have family, friends, or an attorney with an address in the United States, you may list their address (with their permission). In Part 1, line 3, the family member's, friend's, or attorney's name must be listed in the C/O (in care of) section; otherwise the post office will not deliver the mail. You should also list your email address as this is the best way for USCIS to reach you.

If you don't have an APO address or an address in the United States, you should list your email address.

## Where will my petition be adjudicated? Who makes the decision?

All petitions for this program are adjudicated at USCIS Nebraska Service Center. If approved, USCIS will forward your petition to NVC, which will then contact you by email to begin collecting the necessary documentation to support your visa application. NVC also will schedule your visa interview at a U.S. embassy or consulate overseas.

SA 133

Case 1:18-cv-01388-TSC Document 34-8 Filed 09/07/18 Page 14 of 28

USCA Case #25-5279    Document #2176641    Filed: 06/03/2026    Page 138 of 390

### When the numerical limit of visas is reached, will my petition be rejected and have to be refiled?

USCIS will continue to process each petition, even after the numerical limit of visas has been reached. When your petition has been approved, it will be sent to NVC. If visas are available, NVC will contact you to schedule the visa interview. If visas are no longer available, NVC will hold the petition.

### What is the difference between Part 1 and Part 3 of the Form I-360? Should both parts be completed?

Part 1 and Part 3 contain similar information, but Part 3 includes additional required information. Both parts should be completed.

### In Part 2, what box should be checked?

You should check box "N" - Special Immigrant Afghan National who was employed by or on behalf of the U.S. Government or the International Security Assistance Force (ISAF) in Afghanistan.

### What are the fees associated with filing the petition?

Under this particular program, there are no filing or biometric fees associated with filing the petition.

SA 134

### If I am an Afghan refugee already in the United States, can I file Form I-485 with USCIS to apply for adjustment from refugee to SIV status?



No. A refugee in the United States is not eligible to file Form I-485 and make an application to adjust from refugee to SIV status. Under U.S. law, an employment-based immigrant must be in valid nonimmigrant status in order to apply for adjustment. Instead, a refugee may adjust to lawful permanent resident (LPR) status one year after his or her refugee admission. (Note: there is no fee for applicants who are filing Form I-485 to adjust to LPR status based on having been admitted to the United States as a refugee.)

See the USCIS website<sup></sup> for further information.

### My question wasn't answered here. Where can I get more information about filing a Form I-360 petition?



If you need further information about the petition filing process, you may email the USCIS Nebraska Service Center at SIVTranslator.NSC@dhs.gov.

Back to Step 2

Back to Top

**STEP 3 - Prepare for Your Visa Application**

ALL **+/−**

### When will my case be ready for visa processing?



Once NVC receives your approved petition from USCIS, NVC will contact you by email to advise you to begin collecting the appropriate documents to move ahead with your visa application. NVC will schedule your immigrant visa interview for you and your family at a U.S. Embassy or Consulate overseas. NVC will forward your SIV case to that U.S. Embassy or Consulate for your visa interview. NVC will work with you to schedule your appointment at the U.S. Embassy or Consulate in the country in which you reside or to which you can easily travel.

You must provide an email address to facilitate communication with NVC. You may contact NVC by email at NVCSIV@state.gov.

SA 135

Case 1:18-cv-01388-TSC Document 34-8 Filed 09/07/18 Page 16 of 28
USCA Case #25-5279 Document #2176641 Filed: 06/03/2026 Page 140 of 390

## What documents do I need to send to NVC for visa processing?

You must submit the following forms and documents **for yourself and all family members also applying for visas**. If you have previously submitted any of these documents to NVC, you do not need to submit them to NVC again.

- Form DS-260, Immigrant Visa and Alien Registration Application.
  - Preview a sample  DS-260 (PDF - 6.4MB);
- A copy of the biodata page from the passport of each applicant (Each passport must be valid for at least 12 months beyond the anticipated visa interview date, and applicants must provide new Afghan machine-readable e-passports.);
- Scanned copies of a birth certificate/*taskera* for each applicant, and any other civil documents showing the relationship between you and your spouse and/or minor children (e.g. marriage (*Nikah Khet*) and divorce certificates, adoption decrees, etc.);
- Police certificates are **NOT** required if you are a resident of Afghanistan. However, if you have lived in a different country for more than 12 months since reaching the age of 16, then you must submit a police certificate from the authorities of that locality. See additional information how to obtain a police certificate.
- A completed Refugee Benefits Election Form (PDF - 56 KB);
- A completed DS-0234, Special Immigrant Visa Biodata Form (PDF - 312 KB) (if you elect to receive Resettlement Benefits; see explanation below).

All documents must be accompanied by an English translation. The translation must include a statement signed by the translator that the translation is accurate, and the translator is competent to translate.

## I have a question about which documents I need for the visa interview.

If you have questions about gathering the necessary documents for the visa application, please contact the National Visa Center at NVCSIV@state.gov.

## How do I submit my documents to NVC?

Please scan and send all documentation to NVC via email at NVCSIV@state.gov. Do not mail any original documents or photos to NVC. You should hand-carry your original documents and photos with you to your visa interview.

SA 136

## Am I eligible for Resettlement Benefits? ⊖

Yes. Afghan special immigrants are eligible for the same resettlement assistance, entitlement programs, and other benefits as refugees admitted under the U.S. Refugee Admissions Program, for a period of up to eight (8) months after being admitted to the United States.

If you wish to participate in the U.S. Department of State's Reception and Placement (R&P) Program, which covers only your first 30-90 days in the United States, you must apply for it before you arrive in the United States.

To apply, you must return scanned, signed copies of the Refugee Benefits Election Form  (PDF - 56 KB) (signature required) and the Special Immigrant Visa Biodata Form (DS-0234) (PDF - 312 KB), included in the visa instruction packet, to NVC **as soon as possible but no later than 10 calendar days after the date your visa is issued.** In addition, you must submit to NVC a scanned copy of your **visa as soon as possible but no later than 30 calendar days prior to the visa's expiration. You should not wait to submit the Refugee Benefits Election Form and the Special Immigrant Biodata Form (DS-0234) until visa issuance.** All three items must be received by NVC prior to the deadlines indicated above. **Failure to do so will result in the denial of any future request for Department of State-funded resettlement benefits.** Additional information about Department of State-funded benefits can be found here⊡.

If you decline to receive Department of State-funded resettlement benefits, you may still be eligible to receive benefits funded by the U.S. Department of Health and Human Services, Office of Refugee Resettlement (HHS/ORR). Unlike Department of State-funded benefits, HHS/ORR-funded benefits can be claimed upon arrival in the United States. Additional information about HHS/ORR-funded benefits can be found here⊡.

## I submitted an SIV petition. How do I find out the status of my application? ⊖

When your approved petition reaches NVC, you will be advised by email and provided with instructions. If you believe that you have an approved petition, but you have not been contacted by NVC, or you have questions about your pending SIV case after the petition has been approved, please email NVC at NVCSIV@state.gov or call 1-603-334-0828 and provide your USCIS receipt number, full name, and date of birth. Customer Service Representatives at NVC are available from 7:30 a.m. to midnight (EST). The hours for congressional inquiries are from 7:30 a.m. to 9:00 p.m. (EST).

## My question wasn't answered here. Where can I get more information about my approved petition? ⊖

You may email NVC at NVCSIV@state.gov.

Back to Step 3

SA 137

Back to Top

**Step 4 - The Visa Interview**

ALL +/−

### Is a personal interview required?

Yes. After USCIS has approved your petition, an interview is required to determine if you are eligible for a visa. You must appear in person at a U.S. Embassy or Consulate where a consular officer will interview you. U.S. law also requires you to submit fingerprints, which will be taken at the interview. The consular officer will also require evidence that you plan to resign from your position in order to immigrate to the United States.

Each family member who is applying for a visa with you must also appear at the embassy or consulate for an interview.

### If I am in Afghanistan, can my interview be conducted at the U.S. Embassy in Kabul?

Yes. The U.S. Embassy in Kabul, Afghanistan, conducts interviews for and issues immigrant visas. If you are in another country, the interview will be conducted at the closest U.S. Embassy or Consulate that adjudicates immigrant visa applications. You can find a list of our embassies and consulates at http://www.usembassy.gov.

### May my family accompany me or follow to join me in the United States?

Yes, your spouse, as well as your unmarried minor children under age 21, may accompany you to the United States or follow to join you in the United States. These family members must also attend the visa interview. You must provide proof of the marriage relationship to your spouse and the relationship to your children. Your family members may not precede you in entering the U.S.

**NOTE:**  If your interview is going to take place at the US embassy in Afghanistan, applicants under 14 years of age are not permitted to attend the interview.

We strongly advise you to bring your spouse and children over the age of 14 with you to your visa interview for all other interviews outside of Afghanistan. This will facilitate having all eligible family members travel to the United States together. If it is not possible for your family members to travel to the interview with you, they will be required to schedule interviews at a later date and may follow-to-join you in the United States at a later time.

If you marry after your petition is approved but before you travel to the United States, your new spouse may be added to the original petition. You should immediately contact the U.S. Embassy or Consulate where your interview took place, to notify consular officials that your new spouse should be added to the petition and an interview scheduled. If you marry a foreign national after you have already traveled to the United States, you will need to file a new petition for your spouse.

SA 138

Case 1:18-cv-01388-TSC   Document 34-8   Filed 09/07/18   Page 19 of 28

USCA Case #25-5279        Document #2176641              Filed: 06/03/2026        Page 143 of 390

### What happens if the principal applicant dies after approval of the petition?

Your spouse or children may, in some circumstances, still be eligible for a visa if a petition had been approved by USCIS, but the petition was revoked or terminated after its approval due to the death of the principal applicant.

### What documents should I bring to the visa interview?

Please bring your passport, any military photo identification (if available), civilian identification badges, and originals of any civil documents, such as marriage certificates, *taskeras* or death certificates, including all documents that were submitted by email to the NVC. (Applicants must provide new Afghan machine-readable e-passports.) At the visa interview, you will also be expected to provide written evidence of your intent to immigrate promptly to the United States.

**In addition, you should bring two recent photographs of each applicant, which meet the [Photo Requirements](#).**

### May an attorney or other representative accompany me to the visa interview?

An attorney or other accredited representative may represent you during the SIV application process, including at relevant interviews and examinations. Such representation is not to be the expense of the U.S. government.

### Will the U.S. government pay the cost of my travel to the interview or provide accommodations at the interview site?

No. When preparing for your visa interview, please plan for the possibility that you may need to stay for more than one day in the city where your interview takes place. You will not be able to complete your medical examination and interview on the same day. Some medical exams may require tests with delayed results.

SA 139

Case 1:18-cv-01388-TSC Document 34-8 Filed 09/07/18 Page 20 of 28

USCA Case #25-5279 Document #2176641 Filed: 06/03/2026 Page 144 of 390

## Can the U.S. Embassy arrange for my entry visas and guarantee admission to another country for my visa interview?



No. While embassies and consulates work closely with their host-country counterparts to ensure coordination on important programs, such as this SIV program, the final decision about whom to admit into a country rests with the government of that country. If you have difficulty entering another country for your visa interview, you should remain in close contact with the U.S. Embassy or Consulate to which your case has been assigned.

## Is there a visa application fee?



No. Under this particular program, there is no immigrant visa application fee. You are required to pay all costs associated with the medical examination.

## Will I receive my visa on the same day as my interview?

At the conclusion of your interview, the consular officer will let you know if there are any problems with your case that might prevent issuance of a visa, or if there is missing documentation that you need to provide. However, even if your visa interview is successful, you will not receive your visa on the same day. All SIV cases require additional [administrative processing] after the interview.

## My question wasn't answered here. Where can I get more information about my pending visa?

If you have received COM approval, had your petition approved by USCIS, and NVC has scheduled your case for an interview, you should directly contact the U.S. embassy or consulate to which your case has been assigned:

| If your case has been assigned to: | You may contact the Embassy at: |
| --- | --- |
| U.S. Embassy Kabul | [KabulIV@state.gov] |

Otherwise, go to [http://www.usembassy.gov] to locate contact information for the U.S. Embassy or Consulate that is handling your case.

[Back to Step 4]

[Back to Top]

### STEP 5 - Arrival in the United States

SA 140

ALL **+**/**−**

### As an Afghan Special Immigrant Visa (SIV) recipient, am I eligible for any benefits?

Yes. Afghan SIV recipients are eligible for the same resettlement assistance, entitlement programs, and other benefits as refugees admitted under the U.S. Refugee Admissions Program (USRAP). Resettlement assistance is available under section 602(b) of Division F, Title VI, of the Omnibus Appropriations Act for Fiscal Year 2009, Public Law 111-8 to Afghans who are admitted to the United States on Special Immigrant Visas, for a period not to exceed eight months. For more information about the relevant U.S. law, see References - U.S. Laws, number 7.

The U.S. Department of State's Reception and Placement (R&P) Program covers only your first 30-90 days in the United States.

### How do I apply to receive these benefits?

If you would like to participate in the R&P Program, you must complete, sign, and return scanned copies of the following two forms, included in the visa instruction packet:

- Refugee Benefits Election Form (PDF - 56 KB)
- Special Immigrant Visa Biodata Form (DS-0234) (PDF - 312 KB).

**You should complete these two forms as soon as possible while you are still overseas before your visa has been issued**, or upon your arrival in the United States. You should send the forms to one of the following offices, so that we can begin processing of your case and book your travel after your visa has been issued:

- the NVC at NVCSIV@state.gov, or
- the Refugee Processing Center (RPC) at SIV@wrapsnet.org.

**You must also provide a copy of your visa after it has been issued.**

Additional information about Department of State-funded benefits can be found here.

### The instructions on the "Special Immigrant Visa Biodata Form (DS-0234)" state that it is to be completed by each beneficiary. Does that mean each member of my family needs to complete a form or is one form sufficient for all family members included on the SIV case?

You must complete a separate form for each family member and return it to NVC at NVCSIV@state.gov or the RPC at SIV@wrapsnet.org. NVC will provide you with the Special Immigrant Visa Biodata Form (DS-0234) (PDF - 312 KB) ;as part of the visa application packet. This form can also be found on the Refugee Processing Center's (RPC) website.

SA 141

Case 1:18-cv-01388-TSC   Document 34-8   Filed 09/07/18   Page 22 of 28
USCA Case #25-5279      Document #2176641      Filed: 06/03/2026      Page 146 of 390

## I would like to be resettled in a specific city/state. What should I do?  ⊖

These are the options that will influence where you will be placed in the United States.

## How do I obtain a travel loan?  ⊖

The International Organization for Migration (IOM) will prepare your travel loan and arrange your travel to the United States after your visa has been issued, if you elected to receive travel and resettlement assistance from the Department of State by submitting scanned, signed copies of the Refugee Benefits Election Form  (PDF - 56 KB) and the Special Immigrant Visa Biodata Form (DS-0234) (PDF - 312 KB) to the NVC or the RPC. This interest-free travel loan is a benefit provided through the U.S. Department of State's Reception and Placement (R&P) Program, for which you must apply while you are still overseas. Additional information about Department of State-funded benefits can be found here⬈.

## What if I have to travel immediately and cannot arrange travel through the International Organization for Migration (IOM)?  ⊖

Under certain circumstances, we understand you may not have time to declare your intention to participate in the R&P Program while still overseas. If you elect to arrange your own flight, you may still be eligible for Department of State resettlement benefits or benefits funded by the Department of Health and Human Services, Office of Refugee Resettlement (HHS/ORR). **To determine if you qualify, please contact a resettlement affiliate as soon as possible after your arrival in the United States as your eligibility is time-limited.** We recommend you contact a resettlement affiliate within 30 days after your arrival. The list of resettlement affiliates can be found on http://www.wrapsnet.org/⬈ or click here .

## At what point can I begin to make travel arrangements, sell property, and/or give up my job?  ⊖

You should NOT sell property and/or give up employment until the U.S. Embassy or Consulate General has issued a visa and the Refugee Processing Center has referred your case to IOM for travel arrangements.

SA 142

Case 1:18-cv-01388-TSC   Document 34-8   Filed 09/07/18   Page 23 of 28

## How will I know which agency is responsible for providing services to me in the U.S.? ⊖

If you choose to receive Department of State-funded Reception and Placement (R&P) services, you must fill out and return scanned copies of the Refugee Benefits Election Form (PDF - 56 KB), the Special Immigrant Visa Biodata Form (DS-0234) (PDF - 312 KB), and of your visa, after it has been issued, to NVC or the RPC while still overseas. Once you submit the copy of your issued visa, your case will be assigned to a resettlement agency before you depart for the United States. Prior to departure, the entity responsible for processing your case for R&P benefits - either a Resettlement Support Center (RSC) or the RPC - will provide you with an Assurance Form indicating your final destination in the United States and the resettlement agency that will provide services to you upon your arrival.

## If I elect to receive refugee benefits, what help will I receive once I am in the U.S., and from whom? ⊖

The Department of State funds nine (9) Resettlement Agencies that participate in the Reception and Placement (R&P) Program under a cooperative agreement. These agencies have over 300 affiliated Reception and Placement offices across the United States. The resettlement agency is responsible for providing initial reception and placement services and assisting refugees and SIV beneficiaries to achieve economic self-sufficiency as quickly as possible. All refugees and SIV recipients who elected to participate in the program are provided with sponsorship and resettlement services appropriate to their personal circumstances by one of these organizations.

The U.S. government has established guidelines and provides funding for the resettlement services that you will receive upon arrival in the United States. Your resettlement agency will have a local office in or near the town where you will be resettled and will provide basic living assistance and support for **up to the first 30-90 days after you arrive.** The following are some of the things you should expect to do and/or receive during your first weeks in the United States.

The resettlement agency to which you are assigned will:

- Receive U.S. government funds and use these funds to pay for your rent and/or basic necessities. A portion of these funds may be given directly to you in cash. The resettlement agency will ensure you have a small amount of money for daily needs.
- Ensure you have housing for your first 30 days.
- Assist with enrolling your children in school.
- Assist you with access to English language classes, if necessary.

With assistance from the resettlement agency, if needed, you will need to:

- Apply for a social security card, required for work.
- Learn about and be assisted with access to employment services. (While the resettlement agency will assist in whatever way it can, it is ultimately your responsibility to find and maintain employment.)
- Learn to use public transportation (a car will not be provided).
- Begin to learn about U.S customs and law.
- Learn about and be assisted with access to community services that can help you, including social services, cash and medical assistance, and food stamps, if necessary.
- Find out about other government services and programs and how to access services.

SA 143

The program would not succeed without volunteers in communities across the United States to assist with these activities. The following organizations provide initial resettlement services to refugees and SIV recipients. You may learn more about them from information provided in their websites.

| U.S. Refugee Resettlement Agencies | |
| --- | --- |
| Church World Service (CWS) | www.churchworldservice.org |
| Episcopal Migration Ministries (EMM) | www.episcopalchurch.org/emm |
| Ethiopian Community Development Council (ECDC) | www.ecdcinternational.org |
| Hebrew Immigrant Aid Society (HIAS) | www.hias.org |
| International Rescue Committee (IRC) | www.rescue.org |
| Lutheran Immigration & Refugee Service (LIRS) | www.lirs.org |
| U.S. Committee for Refugees and Immigrants (USCRI) | www.refugees.org |
| United States Conference of Catholic Bishops (USCCB) | http://usccb.org/about/migration-and-refugee-services/ |
| World Relief (WR) | www.wr.org |

### What if I already have a file with UNHCR or a UN number? What should I do? ⊖

If you meet the eligibility criteria of the SIV Program, you may apply for an SIV even if you are already registered with the United Nations High Commissioner for Refugees (UNHCR) and/or have an application pending with the U.S. Refugee Admissions Program (USRAP).

### Are other benefits available to me, if I decline benefits from the Department of State? ⊖

If you decline to receive Department of State-funded resettlement benefits, you may still be eligible to receive benefits funded by the U.S. Department of Health and Human Services, Office of Refugee Resettlement (HHS/ORR). ORR-funded benefits are administered by states and are available through state benefit-granting agencies. After arrival in the United States, you may apply for these benefits in the state in which you reside. SIV recipients who elect to participate in the U.S. Department of State R&P Program will be assisted in applying for ORR-funded benefits by the resettlement agency providing their R&P services. If you do not elect to participate in the Department of State's R&P Program, you must apply for these benefits on your own by contacting the State Refugee Coordinator in the state in which you live.

SA 144

## If admitted to the United States, do I get U.S. citizenship? If so, how long does it take? ⊖

As an SIV recipient, you will have Lawful Permanent Resident (LPR) status upon admission into the United States. Once you are admitted to the United States you will be mailed your Permanent Resident Card (also known as Green Card). You are normally eligible to apply for U.S. citizenship after residing for five (5) years in the United States. For more information, see naturalization information⊠ on the USCIS website.

Back to Step 5

Back to Top

**Contact Information**

| If you: | Please contact: | At: |
|---|---|---|
| have questions on how to receive Chief of Mission (COM) approval, | National Visa Center (NVC) | AfghanSIVapplication@state.gov |
| have questions regarding filing requirements and instructions for an SIV Form I-360 petition, | USCIS Nebraska Service Center | sivtranslator.nsc@dhs.gov |
| have an approved Form I-360 petition and have questions regarding your case status, | National Visa Center (NVC) | NVCSIV@state.gov |
| have questions about your immigrant visa interview, | the U.S. Embassy or Consulate where the interview will be scheduled | You can find a list of our U.S. Embassies and Consulates at: http://www.usembassy.gov |
| would like information about SIV resettlement benefits and post-arrival services, | the Refugee Processing Center | SIV@wrapsnet.org |
| are a supervisor of an SIV applicant that has received COM approval and would like to submit additional information in support of the pending visa application | Visa Office | SIV-Applicant-Supervisor@state.gov |

Back to Top

**Quarterly Reports on Status of Afghan Program**

**2018**

- Report of Afghan SIV Program - April 2018🗎 (PDF - 46 KB)
- Report of Afghan SIV Program - January 2018🗎 (PDF - 112 KB)

SA 145

Case 1:18-cv-01388-TSC   Document 34-8   Filed 09/07/18   Page 26 of 28

USCA Case #25-5279     Document #2176641     Filed: 06/03/2026     Page 150 of 390

**2017**

- Report of the Afghan SIV Program - October 2017 (PDF - 207 KB)
- Report of the Afghan SIV Program - July 2017 (PDF - 119 KB)
- Report of the Afghan SIV Program - April 2017 (PDF - 200 KB)
- Report of the Afghan SIV Program - January 2017 (PDF - 204 KB)

**2016**

- Report of the Afghan SIV Program - October 2016 (PDF - 203 KB)
- Report of the Afghan SIV Program - July 2016 (PDF - 133 KB)
- Report of the Afghan SIV Program -  April 2016 (PDF - 211 KB)
- Report of the Afghan SIV Program - January 2016 (PDF - 162 KB)

**2015**

- Report of the Afghan SIV Program - October 2015 (PDF - 131 KB)
- Report of the Afghan SIV Program - July 2015 (PDF - 239 KB)
- Report of the Afghan SIV Program - April 2015 (PDF - 213 KB)
- Report of the Afghan SIV Program - January 2015 (PDF - 212 KB)

**2014**

- Report of the Afghan SIV Program - October 2014 (PDF - 202 KB)
- Report of the Afghan SIV Program - July 2014 (PDF - 205 KB) (Sent to Congress December 2014)
- Report of the Afghan SIV Program - April 2014 (PDF - 243 KB) (Sent to Congress July 2014)

Back to Top

### References – U.S. Laws

The chart below contains a list of U.S. laws relevant to Special Immigrant Visas (SIVs) for eligible Iraqi or Afghan nationals who were employed by or on behalf of the U.S. government in Iraq or Afghanistan, respectively. You can find more detailed information about each of these laws by going to the National Archives Office of the Federal Register website.

| | Law: | Information about the Law: |
|---|---|---|
| 1 | National Defense Authorization Act for FY 2018, Section 1213 of Public Law 115-91. | This law, signed on December 12, 2017, authorizes the issuance of 3,500 additional visas to Afghan principal applicants with no end date by which they must be issued. |
| 2 | Consolidated Appropriations Act for FY 2017, Section 7083 of Public Law 115-31 | This law, signed on May 5, 2017, authorizes the issuance of 2,500 additional visas to Afghan principal applicants with no end date by which they must be issued. |
| 3 | National Defense Authorization Act for FY 2017, Section 1214 of Public Law 114-326 | This law, signed on December 23, 2016, extends and amends the Afghan SIV Program.  It authorizes the issuance of 1,500 additional visas to principal applicants with no end date by which they must be issued.  It also extends the date by which applicants must apply for Chief of Mission approval from December 31, 2016 to December 31, 2020.  It amends eligibility for Afghans employed by or on behalf of the U.S. government who submit an application for Chief of Mission approval on or after December 23, 2016 to applicants whose employment required them to serve as an interpreter or translator for personnel of the Department of State or USAID; to serve |

SA 146

9/6/2018
Case 1:18-cv-01388-TSC Document 34-8 Filed 09/07/18 Page 27 of 28
Special Immigrant Visas for Afghans - Who Are Employed by/on Behalf of the U.S. Government
USCA Case #25-5279     Document #2176641        Filed: 06/03/2026       Page 151 of 390

| | | |
|---|---|---|
| | | as an interpreter or translator for U.S. military personnel; or to perform sensitive and trusted activities for the U.S. government. |
| 4 | National Defense Authorization Act for FY 2016, Section 1216 of Public Law 114-92 | This law, signed on November 25, 2015, extends and amends the Afghan SIV Program. It authorizes the issuance of 3,000 additional visas to principal applicants with no end date by which they must be issued. It also extends the date by which applicants must apply for Chief of Mission approval from December 31, 2015 to December 31, 2016 and increases the required length of service from one year to two years between October 7, 2001 and December 31, 2016. It expands SIV program eligibility to certain Afghans who were employed by a successor mission to the International Security Assistance Force (ISAF). |
| 5 | National Defense Authorization Act for FY 2015, Section 1227 of Public Law 113-291 | This law, signed on December 19, 2014, extended the Afghan SIV Program. It authorized the issuance of 4,000 visas to principal applicants by September 30, 2016. It also extended the date by which applicants must apply for Chief of Mission approval from December 31, 2014 to December 31, 2015 and expanded SIV program eligibility to certain Afghans who were employed by the International Security Assistance Force (ISAF). |
| 6 | Emergency Afghan Allies Extension Act of 2014, Section 1 of Public Law 113-160 | This law, signed on August 8, 2014, extended the Afghan SIV Program. It authorized the issuance of 1,000 visas to principal applicants by December 31, 2014. It also extended the date by which applicants must apply for Chief of Mission approval from September 30, 2014 to December 31, 2014. |
| 7 | The Consolidated Appropriations Act, 2014, Section 7034(o) of Division K, Title VII of Public Law 113-76 | This law, signed on January 17, 2014, extended the Afghan SIV Program. It authorized the issuance of 3,000 visas to principal applicants in fiscal year (FY) 2014 and allowed that any unissued visas from FY 2014 be allocated to FY 2015. It also established that the employment period must have commenced on or after October 7, 2001 and been completed on or before December 31, 2014 and that applicants must apply for Chief of Mission approval no later than September 30, 2014. |
| 8 | The National Defense Authorization Act for Fiscal Year 2014, Section 1219 of Division A, Title XII, Subtitle B of Public Law 113-66 | This law included provisions for: consideration of a credible sworn statement depicting dangerous country conditions, together with official evidence of such country conditions from the U.S government, as a factor in a determination of whether an applicant has experienced or is experiencing an ongoing serious threat as a consequence of employment by the U.S. government; not more than one written appeal of a COM denial, within 120 days of receiving the denial letter; and representation during the application process, including at relevant interviews and examinations, by an attorney or other accredited representative. |
| 9 | The Afghan Allies Protection Act of 2009, Section 602(b) of Division F, Title VI, of the | This law allowed up to 1,500 Afghan nationals who provided faithful and valuable service to the U.S. government, while employed by or on behalf of the U.S. government in Afghanistan after October 7, 2001, for not less than one year, and who have experienced or are experiencing an ongoing serious threat as a consequence of that employment, to receive special immigrant visas |

SA 147

| | | |
|---|---|---|
| | Omnibus Appropriations Act, 2009, (Public Law 111-8) | (SIVs) annually through FY 2013, with the allocation of any unused visas from FY 2013 to FY 2014. The period of qualifying employment was later extended under subsequent legislation. See law above. |
| 10 | The Consolidated Appropriations Act, 2008 (Public Law 110-161 of December 26, 2007) | This law initially made Afghan and Iraqi SIV holders eligible for the same resettlement assistance, entitlement programs, and other benefits as refugees admitted under the U.S. Refugee Admissions Program for up to six (6) months from their date of admission or date of adjustment if applying domestically. The period of eligibility was later extended under subsequent legislation. See law below. |
| 11 | The Omnibus Appropriations Act, 2009 (Public Law 111-8 of March 10, 2009) | This law extended the period of eligibility of Afghan SIV holders for resettlement assistance, entitlement programs, and other benefits to up to eight (8) months from their date of admission or date of adjustment if applying domestically. For Afghan SIV holders already in the U.S. to be eligible for uninterrupted benefits for an additional two (2) months beyond the original six months (6) allowed under previous law, you must have been admitted to the U.S. on or after September 10, 2008, or if applying domestically, have a date of adjustment of September 10, 2008 or later. |

Back to Top

## Travel.State.Gov

Travel.State.Gov
U.S. Passports
International Travel
U.S. Visas
Intercountry Adoption
International Parental Child Abduction

## Popular Links

Home
Travel Advisories
Newsroom
About Us
Contact Us
Careers
Find U.S. Embassies & Consulates

## Stay Connected

★ f ⚫ y 📺 𝔑

## Legal Resources

Legal Information
Info for U.S. Law Enforcement

Privacy | Copyright & Disclaimer | FOIA | No FEAR Act Data | Office of the Inspector General | USA.gov⧉ | GobiernoUSA.gov⧉ |
This site is managed by the U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

SA 148

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
- - - - - - - - - - - - - - -+
                             |
AFGHAN AND IRAQI ALLIES      |
UNDER SERIOUS THREAT         |
BECAUSE OF THEIR FAITHFUL    |
SERVICE TO THE UNITED        |
STATES, ON THEIR OWN AND     |
ON BEHALF OF OTHERS          |
SIMILARLY SITUATED,          |
                             |
        Plaintiffs,          |   Case Number:
                             |
   vs.                       |   18-cv-01388-TSC
                             |
MICHAEL R. POMPEO, et al,    |
                             |
        Defendants.          |
                             |
- - - - - - - - - - - - - - -+
```

Rule 30(b)(6)

Videotaped Deposition of

DEPARTMENT OF STATE

by and through its designated representative,

LAREINA OCKERMAN

Washington, D.C.

Thursday, April 4, 2019 – 9:58 a.m.

Reported by:

Laurie Donovan, RPR, CRR, CLR

Job no: 24935

USCA Case #25-5279      Document #2176641         Filed: 06/03/2026      Page 155 of 390

Page 54

A   Yeah.

Q   And who maintains that database?

A   That was maintained by U.S. Embassy Kabul.

Q   Okay.  Was it used to generate letters for both the Iraqi and the, and the Afghan programs?

A   No.  It was only used on the Afghan program to generate letters.

Q   Do you know how the Iraqi program generated letters before June 2017 when the case management system was adopted?

A   So this system applies only to Afghan --

Q   Okay.

A   -- Chief of Mission applications --

Q   Okay.

A   -- but I don't know how the Iraqi system was generating their, the letters.

Q   Okay.  That's helpful.

So then just to clarify -- I think you said this, but I lost it in the chain.

The case management system is used to generate letters with respect to the COM phase only and only for Afghan SIV applicants?

A   Yes.  Correct.

Page 55

Q   Does the NVC database in CCD link to the -- sorry -- yeah, the NVC database in the CCD link to the SQ-SIV application system?

A   No, it doesn't.

Q   Does the NVC database in CCD link to the visa processing application in CCD?

A   No.  They're, they're separate.  They're separate.

Q   You mentioned that you moved on to a case management system now for generating COM letters.

Is the -- does the access database you mentioned still exist?

A   It exists as an archive, but it's not in use.

Q   Is it accessible?  Even like -- it's not in use, but would someone still be able to access it?

A   Yes.

Q   Does it do anything beyond generate letters?

A   It's used to generate correspondence.

Q   Okay, and that's just correspondence relating to the COM phase?

A   Correct.

Page 56

Q   Okay.  Great.

So I might have some more questions about this stuff later, but if you could walk me through the process of applying for an SIV from start to finish.

A   Starting with --

Q   Let's start there.

A   -- the Chief of Mission?

Q   Mm-hmm.

A   Okay.  So let's talk about Chief of Mission, and just to clarify, I'm speaking specifically about the Afghan program at this point.

Q   Okay.  I will ask you after to describe the Iraqi program --

A   Okay.

Q   -- but let's start with Afghan.

A   Okay, perfect.

So the Chief of Mission application is initiated by the individual applicant who emails AfghanSIVapplication@state.gov with supporting documents based on the information on our website that includes instructions on what is needed to apply.  That inbox is managed by the National Visa Center, and so they will review information, and

Page 57

once the application is complete, they will notify the Chief of Mission, basically, by saying that the case is documentarily complete.

Q   Okay.  So let's break that down a little bit.

So you mentioned that the process is initiated by the individual applicant via email, and that the applicant sends documents to the NVC email address that you provided, and that the website provides information or instructions on what's needed to apply.

Where do those, those requirements come from?

A   The requirements of -- the, the document requirements?

Q   Mm-hmm.

A   Those are based on what the, the applicant needs to establish to establish their eligibility for Chief of Mission approval.

Q   Okay, and you said there's guidance provided on the website; is that right?

A   Correct.

Q   Is there any other guidance that State provides on how to apply for Chief of Mission approval?

15 (Pages 54 to 57)

Page 58

A   No.  The guidance is on the website.

Q   Okay.  How often is that guidance updated?

A   There's not a regular schedule.  It's, it's based on when information becomes outdated.

Q   And who is in charge of updating that information?

A   It could be the embassy.  It could be the Visa Office.

Q   In which situations do either of those entities update the instructions on the website?

A   So the Chief of Mission process is really owned by the Chief of Mission, and so those changes would be driven by Embassy Kabul based on what they need to be able to make decisions about applications.  There's other information on that site that's specific to applying for an SIV in front of a consular officer, and the Visa Office would have control of that information.

Q   Okay.  So what happens when the application materials are received in that email inbox?

A   They're reviewed and decided if the applicant has provided all of the documents they need for, for a COM approval application.

Page 59

Q   Is a file created at that time?

A   All of the documents are uploaded into SQ-SIV.

Q   Okay.  Is any kind of case number generated at that time?

A   Yes.

Q   What's the form of that number?  Is there like a prefix?

A   Yes.  It -- the number will begin with NVCSIV.

Q   And how does the State -- is there a term you use to refer to that case number?

A   We call it the "COM application number."

Q   All right.  So you said then that the application materials that were submitted are reviewed and they're reviewed by NVC?

A   For completeness.

Q   For completeness, and then NVC will follow up with the applicant when the application is deemed complete?

A   Yes.  They will notify the applicant whether there is -- the, the application is insufficient for some reason or if it is complete.

Q   Do they notify the applicant of receipt of the original application materials?

Page 60

A   Yes.  There is an automatic response that the applicant will receive, and then that's followed up later by an individual response based on the documents provided.

Q   An individual response as to completeness --

A   Yes.

Q   -- of the documents provided?

At what point is the application deemed to be complete?

A   It's complete once the applicant has complied with the instructions that are on the website for both the type of documents and the content of those documents.

Q   Okay.  So they're not just reviewing for the presence of documents, they're also reviewing the content of the documents?

A   They are not reviewing the content of the documents for eligibility --

Q   Okay.

A   -- but for completeness of the contents.

Q   Can you describe some ways in which they would find the documents incomplete based on the contents?

A   Absolutely.

Page 61

So many of the applications for COM approval are for individuals who are not employed by the U.S. government directly and don't work on any kind of U.S. government installation.  So if you are employed by, say, a local Afghan construction company and your job is, you know, to build a road, we need additional information to determine that that employment qualifies under the statute.

So, for instance, if they submitted that letter, it didn't have the dates of employment to be able to establish that the applicant had two years of employment, it didn't provide any kind of information tying it to the U.S. government to establish employment on behalf of the U.S. government, both of which are required in our document checklist, then NVC would notify the applicant that their -- that that letter was deficient.

Q   Okay.  So to use an example from what you just said, like the dates of employment, is NVC reviewing for the presence of dates, or are they actually measuring the dates?

So the dates of employment, when they're, they're reviewing those, are they

16 (Pages 58 to 61)

Page 134

Q   And is that in the comments field?

A   It's in both the comments field and in the letter that's uploaded.

Q   And does the reason that's given in the comments field track the reason that is in the letter that's uploaded?

A   Yes, it would be the same reason.  There may be potentially, you know, slight differences, but the, the fundamental deficiency would be the same.

Q   Okay.  Does SQ-SIV have a field that indicates when the 120-day deadline for appealing a COM determination would have lapsed?

A   No, it doesn't.

Q   Does your unit or NVC track the timeliness of appeals?

A   Yes.

Q   How do you do that?

A   NVC has the, I would say the first order of responsibility for that, so when they receive an appeal, they verify in the application to see when the initial non-approval letter was sent, and verify that the appeal has been received within 120 days.  If it hasn't, then they send information to the applicant on how they can

Page 135

reapply for Chief of Mission.

There's no limit on how many times someone can attempt to establish their eligibility.  If -- when the case comes to us, if the appeal has been accepted, if we have any questions about the timeliness of the appeal, on rare occasions we'll ask NVC to give us the original correspondence, but typically we don't have a lot of issues with the timeliness of appeals.

Q   And the reason that you would ask NVC for the original correspondence is because the date of submission is not logged in SQ-SIV; is that correct?

A   That's correct.  So typically we're looking at the comments field, which is the date that someone is reviewing the appeal document, not necessarily the date that it was received.

Q   Okay.  The email that the applicant sends with their appeal material, is that saved into SQ-SIV?

A   It is not saved into SQ-SIV.

Q   Okay.  Other than what you described earlier regarding general training and a Chief of Mission SOP, are there any other instructions that

Page 136

exist for logging information pertinent to COM appeals?

A   Not to my knowledge.

Q   Is any information from COM appeals shared with other departments at State?

A   No, other than the members of the COM committee.

Q   And other than the members of the COM committee, is any information shared with other agencies -- is any information from COM appeals shared with other agencies?

A   No.

Q   Is there any auditing of the data that's entered in SQ-SIV for COM appeals?

A   So again, I'm sorry.  Can you just remind me of what you mean by "audit"?

Q   Sure.  So I think before I had mentioned quality control.  Is there any review of the data that's entered as to COM appeals for its correctness, integrity, anything else?

A   Okay.  So during the review of the application, we're looking at everything that has been submitted then, but there is not a formal audit of the data.

Q   Okay.  Are any reports generated from

Page 137

the COM appeals process?

A   Not to my knowledge.

Q   And is there any other recordkeeping for the COM appeals process that we haven't discussed just now?

A   No.

Q   All right.  So after an applicant receives COM approval, whether from an initial application or an appeal, what happens next?

A   So the NVC will send the applicant their approval notification, which includes instructions on submitting their I-360 application.  From that point, the State Department doesn't have any visibility on the application until we receive an approved petition, and at that point we would begin the routine process to gather the documents needed to begin their SIV application.

Q   Okay.  So you said State has no visibility into the I-360 process; is that right?

A   That's right.

Q   Does State have any involvement in the I-360 process?

A   No, we don't.

Q   Do you know if any other agencies are involved in the I-360 process?

35 (Pages 134 to 137)

Page 138

A   I can't speak to that.
Q   Do you know that DHS is involved in the I-360 process?
A   Yes, I do.
Q   Is the State Department notified when an I-360 petition is filed?
A   No, not to my knowledge.
Q   Do you have access to the USCIS database that tracks an I-360 petition?
A   We don't have direct access to CLAIMS. We have the ability to see some limited information logged to CLAIMS.
Q   Can you describe what type of information you are able to see in CLAIMS?
A   Yes.  So there's some -- there is another application within the CCD that gives some access to CLAIMS information, and it would allow you to do a search on a specific applicant to be able to verify basic information in an application, such as the petition receipt date and the outcome of the petition.
Q   If you were going to verify information like what you just described, how would you search for the applicant?
A   You would have to either have the

Page 139

receipt number, their biographic information, or an A number.
Q   And when you say "receipt number," can you tell me what you mean by that?
A   The receipt number that was generated by USCIS when they were adjudicating the petition.
Q   Okay.  Does that start with the letters LIN?
A   For SIV applications, typically yes.
Q   And when you say you could search by "biographic information," what do you mean specifically?
A   Name and date of birth and sometimes passport number.
Q   And then you also mentioned an "A number."  By that do you mean an alien number?
A   Yes, I do.
Q   So if State were to use this application within CCD to see information in CLAIMS 3, at what point in the SIV application process would State do that?
A   It's not information that we would routinely look up, so the only situations that I can think of where that would be consulted is if there was a question about the validity of the,

Page 140

the petition information.
Q   So you said that State has no involvement until the I-360 petition is approved, so what happens once the petition is approved?
A   USCIS sends a copy of the petition to NVC, and NVC will log that into their system and will begin to contact the applicant to give them instructions on preparing to submit their visa application.
Q   How does USCIS send the copy of the petition to NVC?
A   It's hard copy.
Q   And do they send an electronic copy?
A   No.
Q   And so NVC, when they get the hard copy, they -- how do they put that into their system?
A   They scan it, and then there are some elements of the information that would be entered into kind of a hard field, like their biographic information and the classification, in this case, SQ and some of the basic elements of the application.
Q   And when you say they enter it into their system, are you talking about the visa processing application in CCD?

Page 141

A   This is an application that NVC uses before it goes into the visa application system, so it's a, it's a predecessor, I guess, to that stage.
Q   So is this another application in CCD?
A   Yes.
Q   Okay, and what do you or NVC call this application?
A   It's called IVIS.
Q   Do you know what that stands for?
A   I don't.
Q   Do you know if it stands for something?
A   I'm guessing it does stand for something that starts with "immigrant visa," but beyond that I'm stumped.
Q   That's fair.
Who else other than NVC has access to IVIS?
A   It's in the CCD, so users that have access to that specific report would be able to see that information.
Q   And does IVIS link to SQ-SIV?
A   No, it doesn't.
Q   Does IVIS link to the visa processing application in CCD?

36 (Pages 138 to 141)

USCA Case #25-5279      Document #2176641          Filed: 06/03/2026      Page 159 of 390

Page 142

A   No, it doesn't link, but the information from that will be -- at least some of the information from that will be rolled over into the immigrant visa processing system.

Q   And when you say "rolled over," is that an automated process, or is that -- does that occur manually?

A   It's partially an automated process, so once the application -- so this system is used by NVC to track correspondence, and this is when they start contacting the applicant to request the documents that they will need to apply for an immigrant visa, in this case an SIV.

Once the application is documentarily qualified and an interview date has been sent, then NVC will push the application packet with all of the relevant information into the immigrant visa processing system.

Q   Okay.  If I could backtrack a little, you had mentioned this morning an NVC database that's in CCD.

Is that different from IVIS?

A   No.  That was IVIS.

Q   Okay.  So the correspondence that NVC has during the COM process is also logged in IVIS;

Page 143

is that correct?

A   No.

Q   Okay.  So IVIS contains NVC's correspondence with an applicant, but only after the I-360 phase; is that correct?

A   Correct.

Q   So the petition is granted, the hard copy is sent to NVC, NVC uploads that into IVIS, and then at some point they send materials to the applicant about how to complete the DS-260; is that correct?

A   That's correct.

Q   At what point in time will they send that email?

A   As soon as the, the application -- well, I should say the petition is processed in as part of the information that goes out to the applicant, it will include all of the information on the documents that they need to submit.

Q   Is there any -- does NVC do any verification of the, the I-360 petition that it receives?

A   No, not to my knowledge.

Q   And is there any other information that NVC waits for before it would send the email to

Page 144

the applicant with the instructions for the DS-260?

A   Not to my knowledge.

Q   After the -- after NVC -- sorry.  When NVC sends that email to the applicant, is that logged in IVIS?

A   It would be logged as a case note in IVIS.

Q   Is that email uploaded to IVIS?

A   No.

Q   Does I-360 approval ever expire?

A   That would be a question for DHS.

Q   So can I confirm that you don't know?

A   I don't know that.

Q   Okay.

If the I-360 petition is denied, does State receive a copy of it?

A   I don't know the answer to that.

Q   Does State learn of an I-360 denial at any point?

A   I, I'm not sure.

Q   Okay.  Is there anything else involved in the I-360 process that you know about that we have not discussed so far?

A   For the I-360 process, I'm afraid I'm

Page 145

not the expert, so I --

Q   Okay, and what you described in terms of what NVC does with sending out the instructions for the DS-260 once it receives a hard copy approved I-360 petition, does that reflect the current process?

A   Yes, it does.

Q   And have there been any changes to how that process is conducted over time?

A   No, not to my knowledge.

Q   And would that process be the same for both an Iraqi and an Afghan SIV applicant?

A   Yes, it would.

Q   So at the point where NVC receives the approved I-360 petition, is a new file created?

A   Could you clarify what you mean by "file"?

Q   You mentioned that the correspondence -- that NVC tracks correspondence following the approval of an I-360 petition in IVIS.

Does it create a record for the applicant in IVIS at that time?

A   Yes, it does.

Q   And is there a case identifier or case number created at that time?

37 (Pages 142 to 145)

Page 146

A   Yes, there is.

Q   What is that case number called?

A   So that case number will also become the immigrant visa case number once the case is documentarily qualified, so for applications that are going to be interviewed in Kabul, that would be a KBL number.

Q   And for cases that are going to be interviewed in Baghdad, that would be a BGH number?

A   Correct.

Q   And what about applicants who reside outside of those two countries?

A   So those applicants, if it's identified in the petition that they will be interviewed somewhere other than Baghdad or Kabul, they would be -- they would receive an ID case number that would pertain to that embassy or consulate where the interview is going to take place.

Q   Okay.  Is the COM case number beginning with NVCSIV that you identified before included in the IVIS record?

A   No, it isn't.

Q   Do you -- I asked that.
    The record that's created in IVIS at

Page 147

this time, does that also create a record in the visa processing application in CCD?

A   Not initially.  It will after the interview is scheduled and that information is transferred into the visa processing system.

Q   Okay.  Other than forwarding the hard-copy approved I-360 petition to NVC, does USCIS share any other information with State from the I-360 phase?

A   Not to my knowledge.

Q   You mentioned that State would have visibility into a certain information -- through CCD, into certain information pertaining to the I-360 process.
    Can you tell me if State would be able to see the fact that an I-360 petition has been filed by an applicant?

A   If we searched and that application had been registered in CLAIMS, yes.

Q   Would State be able to see the date that the I-360 petition was filed?

A   Yes.

Q   Would State be able to see the data the petition is approved or denied?

A   I, I'm not sure if what we see is the

Page 148

complete record internally, but we would be able to see a decision letter and a date associated with that.

Q   Is that date on the letter?  Is it in a hard field?

A   In the system?

Q   Mm-hmm.

A   It's, it's -- all we can see is what's in the hard field.  We can't see any of the supporting documents.

Q   Okay.  Can you see any fields other than what I just described, so the filing date and the decision date?

A   There's other information in there.  The dates of -- if the Request for Evidence was sent, there's limited biographic information.  It would show the service center, but I'm -- this is coming from CLAIMS, so I'm not the expert on this data.  We can only see a mirror image.

Q   Okay.  You mentioned the date the Request for Evidence was sent.  Can you see any information, whether it's the date or otherwise, as to when someone responded to a Request for Evidence?

A   Not to my knowledge.

Page 149

Q   Does State ever generate any reports from that mirror of CLAIMS 3?

A   No.  We don't have that capability.

Q   And is there any other recordkeeping relating to the I-360 process other than the mirror that you're able to see in CCD and NVC's logging of the approved petition in IVIS?

MR. CARILLI:  I'm going to object to the question as vague in what you mean by the term "recordkeeping" and whether you mean recordkeeping at Department of State or recordkeeping maintained at another agency.

BY MS. ALAGESAN:

Q   You can answer if you can, and then I can try again.

MR. CARILLI:  Please.

THE WITNESS:  The only other thing we would have would be the copy of the petition that would be scanned.

BY MS. ALAGESAN:

Q   Does State keep any other records than what we've described -- than what you've described, rather -- in the IVIS application?

A   I might be missing a couple of fields that are contained there, but the, the purpose of

38 (Pages 146 to 149)

Page 150

the system and the general data that is stored there is . . .

Q   Do you know offhand any fields in IVIS that are involved in this phase of the process that we haven't discussed yet?

A   I mean just the general -- it just contains the very bare bones biographic information and case information.

Q   Okay.  After an I-360 petition is approved and the letter is logged and NVC sends the instruction packet, what happens next?

A   So once the applicant submits all of the required documentation, then the case would be considered documentarily qualified, and the case would be scheduled for a visa interview.

Q   So before the application is deemed documentarily qualified, NVC conducts a review of the application materials submitted; is that right?

A   That's right.

Q   And what are they reviewing for?

A   They are again reviewing for completeness with the DS-260 application and that the applicant has submitted the required supporting documents, and by that I mean

Page 151

specifically their identity documents for themselves and their family members.

Q   When they're reviewing for completeness, is that for the presence of all the required information, or are they evaluating the substance of the information as well?

A   Just the presence of the required information.

Q   When they deem that to be complete, do they send a notification to the applicant?

A   They, they do, yes.

Q   And do they log that notification or the -- do they log that notification anywhere in CCD?

A   There is definitely a case note that says that the case is -- "doc qualified" is the annotation that they put.  I'm not sure offhand if that's captured in the hard field in the system as well.

Q   And that is in IVIS?

A   Yes.

Q   And would they also record the date that they determined it to be doc qualified in the comments field as well?

A   Yes.

Page 152

Q   Is -- are the embassies involved in assessing the completeness of the DS-260 materials at this phase at all?

A   No.

Q   So after the DS-260 is deemed documentarily complete, what happens next?

A   Once the application is documentarily qualified, then it's scheduled for a visa interview.

Q   Who schedules the interview?

A   NVC.

Q   What factors influence interview scheduling?

A   There are a variety of factors that influence interview scheduling.  That is driven by the embassy or consulate where the visa interview will take place.  So the embassy or consulate will tell NVC how many -- the volume of appointments that they can accept, and then NVC will process those visa interviews based on the cases that have been waiting the longest.

Q   When the embassies tell NVC about the volume of appointments they can accept, is that communicated through the CCD system, or is that communicated in some other way?

Page 153

A   It's communicated by email.

Q   And how often do they let NVC know about the interview volume that they can accept?

A   On a monthly basis.

Q   And so would they let NVC know what their availability is for the next month?

A   Yes.  Typically we try to schedule interviews farther in advance.  Especially in the context of Afghanistan where people are traveling overland in very difficult conditions, we want to give people as much time as we can to prepare for that trip, but interviews are typically scheduled at least six to eight weeks in advance, and sometimes as much as three months in advance.

Q   Are there any circumstances that interviews would be scheduled in a shorter time frame?

A   That wouldn't be the regular practice, but certainly the embassy would have the discretion to do that if there were cases that needed to be expedited for some reason.

Q   When we're talking about six to eight weeks versus three months, is NVC making the determination of which cases to schedule sooner rather than later?

39 (Pages 150 to 153)

USCA Case #25-5279    Document #2176641    Filed: 06/03/2026    Page 162 of 390

Page 154

A   No.  It's based on the availability that they have been given by the embassy or consulate.

Q   Okay.  Assuming that NVC allows for some reasonable amount of time, maybe six to eight weeks before an interview is scheduled, are they then looking to schedule at the first possible date, or is there some other protocol?

A   They would be scheduling -- they're going to be scheduling from the cases that have been waiting the longest, and they will schedule those for the first available date.

Q   Do you know the current approximate backlog for interviews at Kabul?

A   It's current.

Q   So can you explain what you mean by "current"?

A   Yes.  So currently cases are being scheduled as soon as they are documentarily qualified.

Q   So that means that they're scheduled as soon as they are qualified.  What does that mean as to the interview date?

A   So it would be typically between six weeks and three months.

Q   And for Baghdad?

Page 155

A   For Baghdad they're also current.  There are fewer Iraqi SIV applicants that are appearing for interview at this point.

Q   And is the range of how far out the interview is scheduled about the same as what you mentioned, between six weeks and three months?

A   To the best of my knowledge, yes.

Q   And do you know what scheduling looks like for applicants who are located outside of Iraq or Afghanistan?

A   It would be the same process.  There isn't a unique scheduling process that applies only to SIVs.  It's the same system that applies to our IV processing worldwide.

Q   The NVC employees who are scheduling interviews at this point, are they the same NVC employees who work on the COM process?

A   I believe so.

Q   So would -- are embassies other than Kabul and Afghanistan -- sorry -- Kabul and Baghdad regularly reporting their availability for SIV interview scheduling to the NVC employees who work on SIV cases?

A   They would be reporting their availability for immigrant visa interviews

Page 156

generally and SIV applications which would be slotted into those available appointments.

Q   Is it fair to say that the NVC employees who are scheduling interviews for SIV applicants are also scheduling interviews for other visa applicants?

A   They, they work specifically on SIV applications.

Q   Okay.  What happens if an applicant requests a different date after they receive an interview notice?

A   So if they need to change their appointment date, that correspondence and the rescheduling would go to the embassy or consulate who will be doing the interview, not back to NVC.

Q   Is that correspondence about the interview date recorded anywhere?

A   It would typically be recorded in the immigrant visa application system.

Q   So that's IVIS?

A   No.

Q   Okay.

A   At this point, once the interview has been scheduled, it then -- the information from IVIS moves into the immigrant visa processing

Page 157

system, and that's where any correspondence after the scheduling date would be recorded.

Q   Okay.  So let me back up then to the interview scheduling.

So when the interview is scheduled, is a file created in the visa processing application in CCD?

A   After the interview is scheduled, that's when all of the documents that have been collected so far in IVIS would be moved into the immigrant visa processing system in preparation for that applicant appearing in front of a consular officer.

Q   So in terms of functionally what happens when the information is moved over, is a new record created in the processing application?

A   Yes, it is a new record, but it retains the same case number that was generated from the IVIS system.

Q   Okay.  So that's the case number where the first three letters are -- indicate the embassy where the case is being processed?

A   That's correct.

Q   Okay, and there is some information from IVIS that is then transferred over into that

40 (Pages 154 to 157)

Page 158

record in the immigrant visa processing application?

A   That's correct.

Q   Can you tell me which, what information from IVIS would make it over into this new file in the immigrant visa processing application?

A   Sure.  So IVIS is primarily a database that's used by NVC for the purposes of getting the applicant ready for their interview, so what would be transferred then, when they are ready for their interview, would be all of the supporting documents that they provided, and then their basic biographic information, the case number, but all of the, any notes about, you know, dates that documents were requested, that, that wouldn't be transferred.  It's just the, the elements of the case itself.

Q   Okay.  Does -- do the embassies -- are the embassies able to view the IVIS records themselves?

A   They could query it if they, if they wanted or needed to.

Q   So what happens on the day of the interview?

A   A big day, sure.  Would you like just a

Page 159

walk-through of the process?

Q   Sure.

A   So the interview is the date on which the applicant is actually executing their, their application for a Special Immigrant Visa, so they're sworn in by the consular officer, their biometrics are collected, and then there is a detailed interview with the consular officer to establish their eligibility.

At the end of that interview, they are given a decision about whether their application has been approved or denied, and then any follow-on happens after that.

Q   Are any SIV applications approved after the interview?

A   After the -- at the same time as the interview?

Q   Mm-hmm.

A   Not typically.

Q   When the interview happens, does the interviewing officer enter any information into the immigrant visa processing application?

A   Yes.

Q   What information do they enter?

A   They would enter their case notes from

Page 160

the interview and any log of, of information that's needed to complete the application.

Q   Like what types of information would be needed to complete the application?

A   So if, for instance, the applicant was requested to provide a specific document or if additional information is needed, that would be recorded there, and the applicant would also receive a decision letter in writing, explaining why their application had been denied, and that same information would be recorded in the, in the processing system.

Q   So it would be -- the officer would record that they requested more information and what the information requested was?

A   Yes.

Q   And that would be recorded in the comments field or in the hard field?

A   In the comments field, and also the, the decision itself would be recorded as a hard field.  So if the applicant received the decision, if their application was denied during interview, that would be recorded in the system as well.

Q   Is the basis for that denial recorded at that time?

Page 161

A   The section of law for the basis of that denial is captured in the system.

Q   So when I asked about whether any SIV applications were, or whether any SIVs, SIV applications were granted at the time of the interview, you said not typically.

Could you estimate in like what percentage of situations they are granted?

A   I don't have that information available.

Q   Are you aware of any circumstance where any, any application that was granted coming out of the SIV interview?

A   Not for a principal applicant, but for following-to-join derivatives -- no, that's true.  Even in following-to-join derivatives, they would have to provide a medical exam.

Q   So then --

A   So I revise my earlier answer to say I can't think of a situation where information is typically always going to be required after the initial interview to establish eligibility for a visa.

Q   So everyone coming out of the interview is getting a denial; is that right?

A   Yes.

41 (Pages 158 to 161)

Page 162

Q   Okay, and you brought up that the following-to-join applicant who would still need to provide a medical examination.

Is that recorded as a denial also?

A   Yes, that would be a denial.  They would not be able to establish their eligibility for a visa until the medical exam was completed.

Q   And a denial for needing to provide additional information is under 1201(g); is that correct?

A   I -- so as a consular officer, we typically use the sections of law under the INA, so that would be a denial under section 221(g) of the INA.

Q   The denial -- are all of the denials received by SIV applicants at the time of the interview 221(g) denials?

A   No, not necessarily.  It would depend on the circumstances of that individual application.

Q   Are all of the denials under 221(g) at the time of the interview for -- because they need to provide additional information to demonstrate eligibility?

A   So section 221(g) is a final denial under the Immigration and Nationality Act.  In

Page 163

some cases, the applicant may be able to provide additional evidence to establish their eligibility, but we would consider that a final basis for denial.

Q   But all SIV applicants who ultimately receive Special Immigrant Visas receive a 221(g) denial at the time of their interview; is that correct?

A   Yes, that's correct.

Q   Are there any cases where an applicant would be denied at the interview other than under 221(g)?

A   Absolutely.  So the interview is a critical component of the national security imperatives, which are really, really important in the context of Afghanistan and Iraq where we're engaged in open warfare and there are, unfortunately, sectors of groups that are directly opposed to the interest of the United States.

So at the time of interview, we are -- the consular officer is looking across the board at all potential bases for ineligibility, which could include suspicions of -- it could include findings that the person has committed a criminal offense and are ineligible, that they are

Page 164

misrepresenting facts of their application -- any section of the law can be applied by the consular officer at that time.

Q   Okay.  What happens if -- sorry.  If the basis of the denial is something other than 221(g), what happens to the file in the immigrant visa application?

A   The basis for refusal would be recorded, and at that point the, the file would be archived.

Q   And for, for applicants who receive a 221(g) denial, is administrative processing initiated immediately?

A   It depends on the application.

Q   Okay.  What are the circumstances on which it depends?

A   Well, so, for instance, we talked about some basis for 221(g) denials where it may be additional documentation is necessary.  In some cases, the administrative processing may be initiated, but this is a stage at which additional evidence is being collected to establish the applicant's eligibility.

Q   So when -- if a consular officer requests additional information at the interview, does administrative processing then not begin

Page 165

until that documentary deficiency has been satisfied?

A   That would be typically correct. Administrative processing is a process internal to the State Department, and a request for documentation is, is a request that the applicant is required to fulfill.

Q   I guess what I'm asking is:  Is that request for additional documentation considered part of the administrative processing process?

A   Potentially.

Q   Okay.  Is there any reason that administrative processing would not start immediately following the interview?

A   I don't want to make generalizations, because it really depends on the finding of the consular officer, which is specific to that individual in front of them.

Q   So the consular officer -- maybe this question wasn't clear before.  If the -- let me look.

Does the consular officer make the decision to initiate administrative processing?

A   Yes.

Q   And it's possible that the officer would

42 (Pages 162 to 165)

USCA Case #25-5279      Document #2176641        Filed: 06/03/2026      Page 165 of 390

Page 206

Q   Is the -- is it an email that's sent to the applicant?

A   It is an email.

Q   And is that email uploaded to the immigrant visa processing application?

A   It's not uploaded, but a case note is entered once the applicant has been contacted.

Q   Is anyone other than the applicant notified when a decision on the -- when the consular official makes their determination on the visa application?

A   No.

Q   If the consular official decides to refuse the visa after administrative processing, how is that recorded?

A   So that would be recorded also in the system, so at that point, if there is a decision made to deny a visa, it's most likely because someone has been determined to be a member of a terrorist organization, and so that's a very serious finding that isn't entered into lightly.

If there are other bases for ineligibility that are identified, those would be recorded in the system.  The applicant would receive a letter notifying them of the section of

Page 207

law under which they were found ineligible, and then at that point the, the actual case file itself would be archived.

Q   Okay.

MR. CARILLI:  To the extent we're getting close to a natural break, I would please ask that we --

MS. ALAGESAN:  Sure.  Sure.

BY MS. ALAGESAN:

Q   Do you know if the State Department makes any -- records at any point in the SIV application process whether an application is considered high risk under the meaning of either the AAPA or the RCIA?

A   There is no requirement under the AAPA that the -- or the RCIA that the department designate an application as high risk or high threat.  I can't remember the statutory language off the top of my head.  Once the, the process has concluded, that would be the point at which we have determined that, that the application is not high risk.

Q   So it does not make any record in the databases we described --

A   That's correct.

Page 208

Q   -- that the application is high risk?

A   That's correct.

Q   Nor any other files other than databases?

A   Right.  There is no such designation, because it's not required.

Q   Right.  So you said there is no such designation.  Okay.  We can stop now.  We will probably come back to just kind of, when we resume, to recap a little, but we can stop.

THE VIDEOGRAPHER:  We are going off the record at 5:29 p.m.

(Whereupon, a short recess was taken.)

MS. ALAGESAN:  We're stopping for the day.  We're holding the deposition open to be resumed another date.

(Signature having not been waived, the Rule 30b6 video deposition of The Department of State, by and through its designated representative, LAREINA OCKERMAN, was concluded at 5:29 p.m.)

Page 209

ACKNOWLEDGEMENT OF WITNESS

I, Lareina Ockerman, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

_____  _____

(DATE)            (SIGNATURE)

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

SA 161

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED, | Civil Action No. 18-cv-01388-TSC |
| Plaintiffs, | |
| v. | |
| MICHAEL R. POMPEO, et al. | |
| Defendants. | |

## DECLARATION OF LAURA ONKEN
## IN SUPPORT OF PLAINTIFFS' SUPPLEMENT IN
## FURTHER SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746, Laura C. Onken deposes and says:

1.      I am a senior associate at Freshfields Bruckhaus Deringer US LLP (*Freshfields*), counsel for Plaintiffs and the Class in this action.  I am licensed by Maryland and the District of Columbia.

2.      I respectfully submit this declaration (the *Declaration*) to describe the way in which Plaintiffs analyzed the data contained in two Excel workbooks produced by Defendants (the *Data*), and, in particular, to provide the Court with a description of the calculations performed to compute the duration of various stages throughout the Special Immigrant Visa (*SIV*) application process.

3.      This declaration is based on my review of the Data produced by the Defendants in this action in response to Plaintiffs' Requests for Production, Nos. 1-3 (ECF No. 35-2).[1]  To assist me in conducting the calculations described below, I was provided with, and relied on, a chart connecting the various fields in the Data to specific milestones in the SIV application process.  That chart, which provides the title and a description of each field in the Data, is attached as Exhibit 1.

## A.      COM Application Data

4.      Defendants produced to Plaintiffs a workbook titled "RFP No.1-3 COM State (Protected).xlsx" on April 18, 2019 (the **COM Workbook**).  I understand that the COM Workbook contains data reflecting Defendant Department of State's (**State**) processing times for adjudicating Chief of Mission (**COM**) applications and appeals.  The COM Workbook contained two spreadsheets, one labeled AAPA that I understand contains data relating to Afghan SIV applicants, and one labeled RCIA that I understand contains data relating to Iraqi SIV applicants.

5.      I understand that the COM Workbook contains a row for each COM application submitted to State since January 1, 2013.  I understand that each spreadsheet in the Workbook contains eight columns corresponding to the following fields: (i) a unique identifier for each application, (ii) the date an application was received by State, (iii) the date of the most recent case status update, (iv) the date the National Visa Center (**NVC**), a component of Defendant

---

[1]      Due to the size of the files, Plaintiffs are unable to print out the Excel sheets and attach them here.  To the extent the Court wishes to review the original data or the calculations described in this Declaration, Plaintiffs will make the native Excel files available to the court to facilitate the Court's review.  As these files are protected as Attorneys' Eyes Only pursuant to the parties' Protective Order, March 18, 2019, ECF No. 51, Plaintiffs would seek to file these documents under seal.

State, recorded the application as complete,[2] (v) the date the application received COM approval, (vi) the date the application was denied COM approval, (vii) the date COM approval was withdrawn, and (viii) the date State recorded an applicant's appeal of a COM denial as complete. Not every field is populated for every application.  The columns are the same for the spreadsheets for Afghan and Iraqi applicants.  I understand that these milestones represent Steps 1-4 in the SIV application process—from an applicant's submission of a COM application (Step 1) through State's adjudication of that application (Step 4)—in addition to appeals of COM denials.

6.      I categorized the data in the COM Workbook to group the applications into four groups: (i) applicants who had received a decision on their COM application, whether positive or negative, but who had not submitted an appeal; (ii) pending COM application with no decision; (iii) applicants who had submitted an appeal of a COM denial and had received a decision on that appeal; and (iv) applicants who had submitted an appeal of a COM denial and had not yet received a decision on their appeal.  The steps I took to categorize these applications and my calculations with respect to each group are outlined below.

### Adjudicated, Non-Appealed COM Applications

7.      To identify Adjudicated, Non-Appealed COM Applications, I identified entries for which: (i) at least one of the fields for the date the application received COM approval, the date the application was denied COM approval, or the date the COM approval was withdrawn (together, *COM Adjudication Fields*) was populated; and (ii) the field for the date on which State recorded an appeal of a COM denial was not populated.

---

[2]      According to Defendants, this field may be updated after the application is deemed complete when additional information is received.  See Ex. 1.

8.        For these entries, I calculated: (i) the earliest COM Adjudication Field (*First Adjudication*); and (ii) the earliest COM Adjudication Field that occurred simultaneous with or later than the field indicating the date that State recorded the corresponding application as complete (*First Adjudication Post-Doc Complete*).[3]

9.        For those entries for which the First Adjudication occurred on or after the Effective Date,[4] I then calculated the number of days between (i) the later of the Effective Date or the date on which State received the application and (ii) the First Adjudication.  For those entries for which the First Adjudication Post-Doc Complete occurred on or after the Effective Date, I calculated the number of days between (i) the later of the Effective date or the date State recorded the application as complete and (ii) the First Adjudication Post-Doc Complete.

10.        Based on those calculations, I computed the statistics included in Tables 1(A) and 1(B).

**Table 1(A) – Adjudicated, Non-Appealed COM Applications.**  Timeframe: Days between (i) the later of the Effective Date or State's receipt of the application and (ii) First Adjudication.

|  | Afghan & Iraqi | Afghan | Iraqi |
|---|---|---|---|
| Overall | | | |
| Total Number of COM Applications Adjudicated Post-2013 Amendments | 23,277 | 20,802 | 2,475 |
| Average Days from Case Received/Effective Date to First Adjudication | 325 | 315 | 411 |
| Median Days from Case Received/Effective Date to First Adjudication | 254 | 238 | 378 |
| 25th Percentile (Days) | 126 | 117 | 220 |

---

[3]        For some applications, the date on which State recorded the application as complete post-dates all COM Adjudication Fields.  I did not calculate any First Adjudication Post-Doc Complete dates for these entries.

[4]        For all of my calculations, I calculate the start of a stage for a given application as the later of the date the AAPA and RCIA were amended to require Defendants to adjudicate SIV Applications within nine months (December 26, 2013) (the *Effective Date*) or the date the applicant reached the particular milestone that triggered the start of that particular step (here, the submission of a COM application).

| | | | |
|---|---|---|---|
| 75th Percentile (Days) | 429 | 412 | 626 |
| 90th Percentile (Days) | 634 | 603 | 707 |
| Percent of Cases That Pended Longer Than Nine Months | 48% | 45% | 70% |
| Applications That Waited Longer Than Nine Months for a COM Adjudication | | | |
| Total Number of COM Applications That Pended Longer Than Nine Months | 11,125 | 9,402 | 1,723 |
| Average Days from Case Received to First Adjudication | 528 | 530 | 517 |
| Median Days from Case Received to First Adjudication | 439 | 430 | 474 |
| 25th Percentile (Days) | 353 | 351 | 363 |
| 75th Percentile (Days) | 602 | 577 | 636 |
| 90th Percentile (Days) | 795 | 820 | 745 |
| Number of COM Applications That Pended Longer Than One Year | 7,888 | 6,613 | 1,275 |
| Percent of COM Applications That Pended Longer Than One Year[5] | 71% | 70% | 74% |

**Table 1(B) – Adjudicated, Non-Appealed COM Applications.** Timeframe: Days between (i) the later of the Effective Date or State recording the application complete and (ii) the First Adjudication Post-Doc Complete.

| | Afghan & Iraqi | Afghan | Iraqi |
|---|---|---|---|
| Overall | | | |
| Total Number of COM Applications Adjudicated Post-2013 Amendments | 23,228 | 20,769 | 2,459 |
| Average Days from Application Complete/Effective Date to Next Adjudication | 86 | 79 | 146 |
| Median Days from Application Complete/Effective Date to Next Adjudication | 49 | 43 | 143 |
| 25th Percentile (Days) | 17 | 15 | 45 |
| 75th Percentile (Days) | 131 | 119 | 215 |
| 90th Percentile (Days) | 193 | 183 | 297 |
| Percent of Cases That Pended Longer Than Nine Months | 4% | 3% | 13% |
| Applications That Pended Longer Than Nine Months for a COM Adjudication | | | |
| Total Number of COM Applications That Pended Longer Than Nine Months | 940 | 631 | 309 |
| Average Days from Application Complete/Effective Date to Next Adjudication | 415 | 455 | 335 |
| Median Days from Application Complete/Effective Date to Next Adjudication | 345 | 386 | 302 |
| 25th Percentile (Days) | 301 | 323 | 298 |

---

[5]   Throughout this declaration, figures described as the percent of applications that pended or are pending longer than one year at a certain stage are taken as a percentage of those applications that pended or are pending longer than nine months.  Here, for example, 71% of Adjudicated, Non-Appealed COM Applications that pended longer than nine months for adjudication, pended longer than one year.

| | | | |
|---|---|---|---|
| 75th Percentile (Days) | 461 | 499 | 335 |
| 90th Percentile (Days) | 660 | 775 | 467 |
| Number of COM Applications That Pended Longer Than One Year | 409 | 351 | 58 |
| Percent of COM Applications That Pended Longer Than One Year | 44% | 56% | 19% |

### Pending COM Applications

11.    I identified as pending applications those applications for which: (i) no COM Adjudication Field was populated; (ii) the field for the date on which State recorded an applicant's appeal of a COM denial was not populated; and (iii) State recorded the application as complete (***Pending COM Applications***).[6]

12.    For Pending COM Applications, I calculated the number of days between (i) the later of the date State received the application or the Effective Date and (ii) April 18, 2019, the day that State produced the data in the COM Workbook.  For Pending COM Applications, I also calculated the number of days between (i) the later of the date State recorded the application as complete or the Effective date and (ii) April 18, 2019.

13.    Based on those calculations, I computed the statistics included in Tables 2(A) and 2(B).

**Table 2(A) – Pending COM Applications.**  Timeframe: Days between (i) the later of the Effective Date or the date State received the application and (ii) April 18, 2019.

| | Afghan & Iraqi | Afghan | Iraqi |
|---|---|---|---|
| Overall | | | |
| Total Number of COM Applications Pending | 6,660 | 6,646 | 14 |
| Average Days from Case Received/Effective Date to April 18, 2019 | 772 | 769 | 1,921 |
| Median Days from Case Received/Effective Date to April 18, 2019 | 544 | 542 | 1,939 |

---

[6]    The COM Workbook contains a total of 15,227 COM applications that have been received by State and which do not have any associated COM Adjudication Field populated.  State has recorded as complete 6,660 of these applications.

| | Afghan & Iraqi | Afghan | Iraqi |
|---|---|---|---|
| 25th Percentile (Days) | 324 | 324 | 1,916 |
| 75th Percentile (Days) | 1,375 | 1,361 | 1,939 |
| 90th Percentile (Days) | 1,682 | 1,681 | 1,939 |
| Percent of Cases Pending Longer Than Nine Months | 80% | 80% | 100% |
| COM Applications Pending Longer Than Nine Months for a COM Adjudication | | | |
| Total Number of COM Applications Pending Longer Than Nine Months | 5,331 | 5,317 | 14 |
| Average Days from Case Received/Effective Date to April 18, 2019 | 920 | 917 | 1,921 |
| Median Days from Case Received/Effective Date to April 18, 2019 | 683 | 681 | 1,939 |
| 25th Percentile (Days) | 459 | 457 | 1,916 |
| 75th Percentile (Days) | 1,563 | 1,560 | 1,939 |
| 90th Percentile (Days) | 1,699 | 1,698 | 1,939 |
| Number of COM Applications Pending Longer Than One Year | 4,750 | 4,736 | 14 |
| Percent of COM Applications Pending Longer Than One Year | 89% | 89% | 100% |

**Table 2(B) – Pending COM Applications.** Timeframe: Days between (i) the later of the Effective Date or the date State recorded an application as complete and (ii) April 18, 2019.

| | Afghan & Iraqi | Afghan | Iraqi |
|---|---|---|---|
| Overall | | | |
| Total Number of COM Applications Pending | 6,660 | 6,646 | 14 |
| Average Days from Application Complete/Effective Date to April 18, 2019 | 285 | 282 | 1659 |
| Median Days from Application Complete/Effective Date to April 18, 2019 | 245 | 245 | 1819 |
| 25th Percentile (Days) | 190 | 190 | 1515 |
| 75th Percentile (Days) | 328 | 328 | 1837 |
| 90th Percentile (Days) | 444 | 444 | 1900 |
| Percent of Cases Pending Longer Than Nine Months | 41% | 41% | 100% |
| COM Applications Pending Longer Than Nine Months for a COM Adjudication | | | |
| Total Number of COM Applications Pending Longer Than Nine Months | 2,739 | 2,725 | 14 |
| Average Days from Application Complete/Effective Date to April 18, 2019 | 430 | 423 | 1659 |
| Median Days from Application Complete/Effective Date to April 18, 2019 | 350 | 350 | 1819 |
| 25th Percentile (Days) | 304 | 304 | 1515 |
| 75th Percentile (Days) | 443 | 442 | 1837 |
| 90th Percentile (Days) | 615 | 611 | 1900 |
| Number of COM Applications Pending Longer Than One Year | 1,199 | 1,185 | 14 |

7

| | | | |
|---|---|---|---|
| Percent of COM Applications Pending Longer Than One Year | 44% | 43% | 100% |

**Adjudicated COM Appeals**

14. I identified as Adjudicated COM Appeals those applications for which State recorded an appeal of a COM denial and for which: (i) the latest populated COM Adjudication Field post-dates the date on which the appeal was recorded or (ii) the latest populated COM Adjudication Field indicates that the application was approved and is simultaneous with the date on which State recorded the appeal (*Adjudicated COM Appeals*).[7]

15. For these entries, I calculated the earliest COM Adjudicated Field that occurred simultaneously with or subsequent to the date on which State recorded the appeal (*First Appeal Adjudication*).

16. For Adjudicated COM Appeals with a First Appeal Adjudication on or after the Effective Date, I calculated the number of days between (i) the later of the date on which State recorded the appeal or the Effective Date and (ii) the First Appeal Adjudication.

17. Based on those calculations, I computed the statistics included in Table 3.

**Table 3 – Adjudicated COM Appeals.** Timeframe: Days between (i) the later of the Effective Date and the date that State recorded an appeal was complete and (ii) the date of First Appeal Adjudication.

| | Afghan & Iraqi | Afghan | Iraqi |
|---|---|---|---|
| Overall | | | |
| Total Number of Adjudicated Appeals | 296 | 290 | 6 |
| Average Days from Appeal Recorded/Effective Date to First Appeal Adjudication | 217 | 218 | 159 |
| Median Days from Appeal Recorded/Effective Date to First Appeal Adjudication | 54 | 54 | 138 |
| 25th Percentile (Days) | 30 | 30 | 4 |
| 75th Percentile (Days) | 224 | 214 | 276 |

---

7      There were nine entries for which the latest COM Adjudication Field is simultaneous with the date an appeal was recorded. In one of those nine entries, the latest COM adjudication Field indicates that the application was approved.

8

| | | | |
|---|---|---|---|
| 90th Percentile (Days) | 830 | 835 | 340 |
| Percent of Cases That Pended Longer Than Nine Months | 24% | 23% | 33% |
| COM Appeals That Pended Longer Than Nine Months for an Adjudication | | | |
| Total Number of Adjudicated Appeals That Pended Longer Than Nine Months | 70 | 68 | 2 |
| Average Days from Appeal Recorded/Effective Date to First Appeal Adjudication | 739 | 751 | 340 |
| Median Days from Appeal Recorded/Effective Date to First Appeal Adjudication | 740 | 764 | 340 |
| 25th Percentile (Days) | 439 | 460 | 311 |
| 75th Percentile (Days) | 976 | 983 | 370 |
| 90th Percentile (Days) | 1,160 | 1,163 | 387 |
| Number of Appeals That Pended Longer Than One Year | 58 | 57 | 1 |
| Percent of Appeals That Pended Longer Than One Year | 83% | 84% | 50% |

### Pending COM Appeals

18.     I identified as Pending COM Appeals those applications for which State recorded an appeal of a COM denial and for which: (i) all of the populated COM Adjudication Fields predate the date on which the appeal was recorded; or (ii) the latest COM Adjudication Field indicates the application was denied or withdrawn and is simultaneous with the date on which the appeal was recorded (*Pending COM Appeals*).

19.     For Pending COM Appeals, I calculated the number of days between: (i) the later of the date on which State recorded the appeal or the Effective Date and (ii) the date the COM Workbook was produced, April 18, 2019.

20.     Based on those calculations, I computed the statistics included in Table 4.

**Table 4 – Pending COM Appeals.**  Timeframe: Days between (i) the later of the Effective Date and the date State recorded an appeal and (ii) April 18, 2019.

| | Afghan & Iraqi | Afghan | Iraqi |
|---|---|---|---|
| Overall | | | |
| Total Number of Pending COM Appeals | 6,615 | 6,418 | 197 |
| Average Days From Appeal Recorded/Effective Date to April 18, 2019 | 963 | 952 | 1,322 |
| Median Days From Appeal Recorded/Effective Date to | 1,050 | 1,039 | 1,427 |

| April 18, 2019 | | | |
|---|---|---|---|
| 25th Percentile (Days) | 652 | 633 | 1,217 |
| 75th Percentile (Days) | 1,193 | 1,185 | 1,487 |
| 90th Percentile (Days) | 1,469 | 1,445 | 1,532 |
| Percent of Cases Pending Longer Than Nine Months | 95% | 95% | 98% |
| COM Appeals Pending Longer Than Nine Months for an Adjudication | | | |
| Total Number of COM Appeals Pending Longer Than Nine Months | 6,315 | 6,121 | 194 |
| Average Days From Appeal Recorded/Effective Date to April 18, 2019 | 1,002 | 991 | 1,341 |
| Median Days From Appeal Recorded/Effective Date to April 18, 2019 | 1,070 | 1,060 | 1,427 |
| 25th Percentile (Days) | 758 | 749 | 1,243 |
| 75th Percentile (Days) | 1,198 | 1,191 | 1,487 |
| 90th Percentile (Days) | 1,477 | 1,458 | 1,532 |
| Number of Appeals Pending Longer Than One Year | 5,964 | 5,770 | 194 |
| Percent of Appeals Pending Longer Than One Year | 94% | 94% | 100% |

## B.      Application Data from I-360 Petition to Final Adjudication

21.      Defendants produced to Plaintiffs a Workbook titled "(Protected – AEO) RFP No. 1 I-360 Visa (Protected – AEO)" on May 30, 2019 (the ***Post-COM Workbook***).  I understand that the Post-COM Workbook contains data reflecting Defendant United States Citizenship and Immigration Services' (***USCIS***) and Defendant State's processing times for adjudicating SIV applications from the date an applicant files an I-360 petition until the date on which the applicant completes administrative processing and receives a final decision.[8]  Unlike the COM Workbook, the Post-COM Workbook does not distinguish between Afghan and Iraqi applicants. Analysis of the Post-COM Workbook therefore does not distinguish between Afghan and Iraqi applicants.

22.      I understand that the Post-COM Workbook contains a row for each applicant who submitted an I-360 petition, starting on January 2, 2013.  The Post-COM Workbook contains columns corresponding to fields including: (i) the date an I-360 petition was filed, (ii) the last

---

[8]      See Exhibit 1.

action taken on that I-360 petition, (iii) the date of that last action on the I-360 petition, (iv) the date a case record was created for an SIV applicant with an approved I-360 petition in the database maintained by the NVC, (v) the date NVC transfers the application to the U.S. embassy where the application will be adjudicated, (vi) the date that State mails instructions for completing a DS-260 application, (vii) the date that State certifies that an applicant has submitted all required documents for completing a DS-260 application, (viii) the date that an applicant is notified of their interview date, (ix) the date an applicant attends their interview, (x) the most recent date an applicant's visa was refused, (xi) the dates on which State requests administrative processing, (xii) the dates on which State received responses to its requests for administrative processing, (xiii) the date an application was adjudicated following a visa interview, and (xiv) the date on which State issued a visa.

23.    I analyzed processing times corresponding to four distinct stages: (i) the adjudication of an applicant's I-360 petition; (ii) the period between State's confirmation that an applicant submitted all required materials for a DS-260 application and the date that State notifies the applicant of their interview date; (iii) the period between State notifying the applicant of their interview date and the visa interview; and (iv) the period between an applicant's interview date and final adjudication (collectively, the ***Post-COM Stages***).

**I-360 Petition**

24.    I calculated the time that an applicant awaits adjudication of their I-360 petition, which I understand to correspond to Step 7 of the SIV application process.

25.    First, I identified all I-360 petitions with a status of "approve," "approved," "BCU approve," "denied," or "BCU denied" (***Adjudicated I-360 Petitions***).  To determine which I-360

11

petitions remain pending, I identified all I-360 petitions with a "Last Action" status that is not populated or equals "BCU" or "CFDO" (***Pending I-360 Petitions***).[9]

26.    I excluded from my calculations any petitions for which the earlier of the I-360 petition last action date and the date of NVC's creation of a case record for an approved I-360 petition (***I-360 Adjudication Date***)[10] predates the I-360 filing date or the Effective Date.  For all other Adjudicated I-360 Petitions, I calculated the number of days between (i) the later of the Effective Date and the date on which an applicant submitted an I-360 petition and (ii) the I-360 Adjudication Date.

27.    For Pending I-360 Petitions, I calculated the number of days between (i) the later of the Effective Date and the date on which an applicant submitted an I-360 petition and (ii) May 30, 2019, the date on which the Post-COM Workbook was produced.

28.    Based on those calculations, I computed the statistics included in Tables 5(A) and 5(B).

**Table 5(A) – Adjudicated I-360 Petitions.** Timeframe: Days between (i) the later of the Effective Date or an applicant's submission of an I-360 petition and (ii) the I-360 Adjudication Date.

| Overall | |
|---|---|
| Total Number of Petitions Adjudicated Post-2013 Amendments | 18,059 |

[9]    I excluded 18 applications with a status that would indicate the petition remained pending but for which the Post-COM Workbook showed that the applicant had nonetheless progressed to subsequent steps in the SIV adjudication process.  I assumed these applications reflected an error in data entry, as an applicant could not progress to steps beyond the I-360 petition without a decision on that petition.

[10]   For nearly 25% of all entries in the Post-COM Workbook, the I-360 "Last Action Date" equals December 4, 2014, a date that often post-dates steps that I understand to be subsequent in the SIV adjudication process.  I assume this was an error in data entry.  I understand that the date of NVC's creation of a case record roughly correlates to the date of adjudication for an I-360 petition.  Accordingly, I use the earlier of the I-360 petition last action date and the NVC case record creation date as the I-360 Adjudication date for Adjudicated I-360 Petitions.

| | 66 |
|---|---|
| Average Days from I-360 Submission/Effective Date to I-360 Adjudication Date | |
| Median Days from I-360 Submission/Effective Date to I-360 Adjudication Date | 49 |
| 25th Percentile (Days) | 18 |
| 75th Percentile (Days) | 89 |
| 90th Percentile (Days) | 121 |
| Percent of Petitions that Pended Longer Than Nine Months | 2% |
| Adjudicated Petitions that Pended Longer than Nine Months for I-360 Adjudication | |
| Total Number of Petitions that Pended Longer than Nine Months | 451 |
| Average Days from I-360 Submission/Effective Date to I-360 Adjudication Date | 437 |
| Median Days from I-360 Submission/Effective Date to I-360 Adjudication Date | 352 |
| 25th Percentile (Days) | 343 |
| 75th Percentile (Days) | 473 |
| 90th Percentile (Days) | 654 |
| Number of Petitions that Pended Longer Than One Year | 214 |
| Percent of Petitions that Pended Longer Than One Year | 47% |

**Table 5(B) – Pending I-360 Petitions**. Timeframe: Days between (i) the later of the Effective Date or an applicant's submission of an I-360 petition and (ii) May 30, 2019.

| Overall | |
|---|---|
| Total Number of I-360 Petitions Pending | 258 |
| Average Days from I-360 Submission/Effective Date to May 30, 2019 | 148 |
| Median Days from I-360 Submission/Effective Date to May 30, 2019 | 92 |
| 25th Percentile (Days) | 86 |
| 75th Percentile (Days) | 128 |
| 90th Percentile (Days) | 278 |
| Percent of Cases Pending Longer Than Nine Months | 11% |
| Petitions Pending Longer than Nine Months for I-360 Adjudication | |
| Total Number of Petitions Pending Longer than Nine Months | 29 |
| Average Days from I-360 Submission/Effective Date to May 30, 2019 | 471 |
| Median Days from I-360 Submission/Effective Date to May 30, 2019 | 374 |
| 25th Percentile (Days) | 311 |
| 75th Percentile (Days) | 405 |
| 90th Percentile (Days) | 894 |
| Number of Cases Pending Longer Than One Year | 15 |
| Percent of Cases Pending Longer Than One Year | 52% |

**Interview Scheduling**

29.    I then calculated the wait times between Defendant State's confirmation of completion of a DS-260 Application and the scheduling of a visa interview, which I understand corresponds to Step 11 of the SIV application process.

30.    I first identified all applications for which: (i) State certified completion of the DS-260 application; (ii) State informed the applicant of their interview date on the same day or subsequent to certification of DS-260 application completion;[11] and (iii) State informed the applicant of their interview date on or after the Effective Date (collectively, *Completed Interview Scheduling*).  I also identified all applications for which: (i) State certified completion of the DS-260 application; (ii) the interview date was not scheduled; and (iii) no SIV adjudication is entered (*Pending Interview Scheduling*).[12]

31.    For Completed Interview Scheduling, I calculated the number of days between (i) the later of the Effective Date or the date on which NVC recorded that an applicant had submitted all required documents to complete a DS-260 application and (ii) the date on which NVC informed the applicant of their interview date.

32.    For Pending Interview Scheduling, I calculated the number of days between (i) the later of the Effective Date or the date on which NVC recorded that an applicant had submitted all required documents to complete a DS-260 application and (ii) May 30, 2019, the date on which the Post-COM Workbook was produced.

33.    Based on those calculations, I computed the statistics included in Tables 6(A) and 6(B).

---

[11]    State informed the applicant of their interview date prior to certification of DS-260 application completion for 11,564 applicants.

[12]    I understand that an adjudicated SIV is indicated by: (i) any most recent refusal date that is subsequent to a date on which State received responses to its requests for administrative processing or (ii) any date for application adjudication.

**Table 6(A) – Completed Interview Scheduling.** Timeframe: Days between (i) the later of the Effective Date or NVC's recording completion of a DS-260 petition and (ii) NVC notifying an applicant of their interview date.

| Overall | |
|---|---:|
| Total Number of Applications Scheduled for Interview Post-2013 Amendments | 9,269 |
| Average Days from DS-260 Confirmation/Effective Date to Interview Scheduling | 259 |
| Median Days from DS-260 Confirmation/Effective Date to Interview Scheduling | 259 |
| 25th Percentile (Days) | 74 |
| 75th Percentile (Days) | 378 |
| 90th Percentile (Days) | 483 |
| Percent of Cases That Pended Longer Than Nine Months | 44% |
| Applications That Pended Longer than Nine Months for Interview Scheduling | |
| Total Number of Applications That Pended Longer Than Nine Months | 4,083 |
| Average Days from DS-260 Confirmation/Effective Date to Interview Scheduling | 452 |
| Median Days from DS-260 Confirmation/Effective Date to Interview Scheduling | 394 |
| 25th Percentile (Days) | 337 |
| 75th Percentile (Days) | 463 |
| 90th Percentile (Days) | 665 |
| Number of Applications That Pended Longer Than One Year | 2,538 |
| Percent of Applications That Pended Longer Than One Year | 62% |

**Table 6(B) – Pending Interview Scheduling.** Timeframe: Days between (i) the later of the Effective Date or NVC recording completion of a DS-260 petition and (ii) May 30, 2019.

| Overall | |
|---|---:|
| Total Number of Applications Pending Interview Scheduling Post-2013 Amendments | 38 |
| Average Days from DS-260 Confirmation/Effective Date to May 30, 2019 | 1,265 |
| Median Days from DS-260 Confirmation/Effective Date to May 30, 2019 | 1,443 |
| 25th Percentile (Days) | 729 |
| 75th Percentile (Days) | 1,795 |
| 90th Percentile (Days) | 1,933 |
| Percent of Cases Pending Longer Than Nine Months | 92% |
| Applications Pending Longer than Nine Months for Interview Scheduling | |
| Total Number of Applications Pending Interview Scheduling for Longer Than Nine Months | 35 |
| Average Days from DS-260 Confirmation/Effective Date to May 30, 2019 | 1,356 |
| Median Days from DS-260 Confirmation/Effective Date to May 30, 2019 | 1,674 |
| 25th Percentile (Days) | 882 |

15

| | |
|---|---|
| 75th Percentile (Days) | 1,804 |
| 90th Percentile (Days) | 1,935 |
| Number of Applications Pending Longer Than One Year | 34 |
| Percent of Applications Pending Longer Than One Year | 97% |

**Visa Interview**

34.     I next calculated the wait times between when an applicant is informed of their interview date and the applicant's interview date.  I first identified all applicants for which: (i) State sent notification of their interview date; (ii) the applicant's interview date was populated in the Post-COM Workbook; (iii) the interview appointment date is on or after the applicant's date of notification regarding the interview;[13] and (iv) the interview appointment date is on or after the Effective Date.

35.     For those entries, I calculated the number of days between (i) the later of the Effective date and the date on which State informed the applicant of their interview date and (ii) the recorded interview date.  Based on those calculations, I computed the statistics included in Table 7.

**Table 7 – Visa Interview.** Timeframe: Days between (i) the later of the Effective Date or the scheduling of an interview and (ii) the recorded interview date.

| Overall | |
|---|---|
| Total Number of Interviews Conducted Post-2013 Amendments | 18,826 |
| Average Days from Interview Scheduling/Effective Date to Interview Date | 39 |
| Median Days from Interview Scheduling/Effective Date to Interview Date | 40 |
| 25th Percentile (Days) | 21 |
| 75th Percentile (Days) | 55 |
| 90th Percentile (Days) | 67 |
| Percent of Applications That Pended Longer Than Nine Months | .03% |
| Applications That Pended Longer Than Nine Months Between Interview Scheduling and Interview | |
| Total Number of Applications That Pended Longer than Nine Months for Interview | 6 |

---

[13]     The scheduled interview predates the date of applicant notification of the interview date for 60 applications.

| | |
|---|---|
| Average Days from Interview Scheduling/Effective Date to Interview Date | 515 |
| Median Days from Interview Scheduling/Effective Date to Interview Date | 376 |
| 25th Percentile (Days) | 371 |
| 75th Percentile (Days) | 544 |
| 90th Percentile (Days) | 845 |
| Number of Applications That Pended Longer Than One Year | 5 |
| Percent of Applications That Pended Longer Than One Year | 83% |

### **Administrative Processing to Final Adjudication**

36.    First, I identified all entries for which: (i) the most recent refusal date is subsequent to a date on which State received responses to its requests for administrative processing or (ii) the date for application adjudication is populated (together, *SIV Adjudications*).

37.    To identify Post-Interview Pending SIV Applications, I identified all applications that had a recorded interview date but no SIV Adjudication.

38.    For SIV Adjudications, I excluded from my calculations any entries for which the SIV Adjudication date predates the interview appointment date or the Effective Date.  For the remaining SIV Adjudications, I calculated the number of days between: (i) the later of the interview appointment date or the Effective Date and (ii) the SIV Adjudication date.  For other SIV Adjudications, I calculated the number of days between (i) the later of the Effective Date and the recorded interview date and (ii) the SIV Adjudication date.

39.    For Post-Interview Pending SIV Applications, I calculated the number of days between (i) the later of the Effective Date and the recorded interview date and (ii) May 30, 2019, the date the Post-COM Workbook was produced.

40.    Based on those calculations, I computed the statistics included in Tables 8(A) and 8(B).

**Table 8(A) – SIV Adjudications. Timeframe:** Days between (i) the later of the Effective Date or the recorded interview date and (ii) the SIV Adjudication date.

| Overall | |
|---|---:|
| Total Number of SIV Applications Adjudicated Post-2013 Amendments | 16,540 |
| Average Days from Interview/Effective Date to SIV Adjudication | 167 |
| Median Days from Interview/Effective Date to SIV Adjudication | 137 |
| 25th Percentile (Days) | 74 |
| 75th Percentile (Days) | 211 |
| 90th Percentile (Days) | 323 |
| Percent of Applications That Pended Longer Than Nine Months | 14% |
| Applications That Pended Longer than Nine Months Post-Interview for Adjudication | |
| Total Number of Applications That Pended Longer Than Nine Months | 2319 |
| Average Days from Interview/Effective Date to SIV Adjudication | 463 |
| Median Days from Interview/Effective Date to SIV Adjudication | 397 |
| 25th Percentile (Days) | 315 |
| 75th Percentile (Days) | 543 |
| 90th Percentile (Days) | 726 |
| Number of Applications That Pended Longer Than One Year | 1,315 |
| Percent of Applications That Pended Longer Than One Year | 57% |

**Table 8(B) – Post-Interview Pending SIV Applications. Timeframe:** Days between (i) the later of the Effective Date or the recorded interview date and (ii) May 30, 2019.

| Overall | |
|---|---:|
| Total Number of SIV Applications Pending Post-Interview | 2,373 |
| Average Days from Interview/Effective Date to May 30, 2019 | 810 |
| Median Days from Interview/Effective Date to May 30, 2019 | 554 |
| 25th Percentile (Days) | 226 |
| 75th Percentile (Days) | 1,417 |
| 90th Percentile (Days) | 1,981 |
| Percent of Cases Pending Longer Than Nine Months | 69% |
| Applications Pending Longer than Nine Months After Interview | |
| Total Number of Applications Pending Longer Than Nine Months | 1,640 |
| Average Days from Interview/Effective Date to May 30, 2019 | 1,097 |
| Median Days from Interview/Effective Date to May 30, 2019 | 1,008 |
| 25th Percentile (Days) | 477 |
| 75th Percentile (Days) | 1,796 |
| 90th Percentile (Days) | 1,981 |
| Number of Applications Pending Longer Than One Year | 1,386 |
| Percent of Applications Pending Longer Than One Year | 85% |

**Total Processing Time for Post-COM Stages**

41. I calculated the total processing across the Post-COM Stages defined above, including for applications currently pending in a Post-COM Stage.

42. First, I identified applications with a SIV Adjudication. For each of these adjudicated SIV applications, I summed the counts of days that each application pended at each of the above stages included in the Post-COM Workbook. To the extent included in the above calculations, this included the number of days from: (i) submission of an I-360 petition to I-360 adjudication; (ii) confirmation of completion of DS-260 materials to notification of interview date; (iii) notification of interview date to interview; and (iv) interview to final adjudication (*Adjudicated SIV Applications*).[14]

43. Next, I identified: (i) Pending I-360 Petitions; and (ii) SIV applications without a SIV Adjudication (together, *Pending SIV Applications*). For each of these Pending SIV Applications, I summed the counts of the days that each application pended or remains pending at each of the above stages included in the Post-COM Workbook.

44. Finally, I identified Post-Interview Pending SIV Applications, as defined in Paragraph 37 above. For each of these Post-Interview Pending SIV Applications, I summed the counts of the days that each application pended or remains pending at each of the above stages included in the Post-COM Workbook. Based on those calculations, I computed the statistics included in Tables 9(A), 9(B), and 9(C).

---

[14]   All total wait times for Adjudicated SIV Applications and Pending SIV Applications reflect the same parameters noted for each of the components above.

SA 180

**Table 9(A) – Adjudicated SIV Applications.** Timeframe: Combined value of the total number of days an Adjudicated SIV Application pended in any of the Post-COM Stages defined above.

| Overall | |
| --- | --- |
| Total Number of SIV Adjudications with Pending Time Post-2013 Amendments | 18,282 |
| Average Days Pending in Post-COM Stages | 335 |
| Median Days Pending in Post-COM Stages | 287 |
| 25th Percentile (Days) | 165 |
| 75th Percentile (Days) | 455 |
| 90th Percentile (Days) | 611 |
| Percent of Applications Pended Longer Than Nine Months | 52% |
| Applications That Pended Longer Than Nine Months Since I-360 Submission | |
| Total Number of Applications That Pended Longer Than Nine Months | 9,585 |
| Average Days Pending in Post-COM Stages | 495 |
| Median Days Pending in Post-COM Stages | 448 |
| 25th Percentile (Days) | 370 |
| 75th Percentile (Days) | 566 |
| 90th Percentile (Days) | 723 |
| Number of Applications That Pended Longer Than One Year | 7,289 |
| Percent of Applications That Pended Longer Than One Year | 76% |

**Table 9(B) – Pending SIV Applications.** Timeframe: Combined value of the total number of days a Pending SIV Application pended or is pending in any of the Post-COM Stages defined above, as of May 30, 2019.

| Overall | |
| --- | --- |
| Total Number of SIV Applications Pending | 2,671 |
| Average Days Pended or Pending in Post-COM Stages as of May 30, 2019 | 994 |
| Median Days Pended or Pending in Post-COM Stages as of May 30, 2019 | 892 |
| 25th Percentile (Days) | 537 |
| 75th Percentile (Days) | 1,442 |
| 90th Percentile (Days) | 1,981 |
| Percent of Applications Pending Longer Than Nine Months | 89% |
| Applications Pending Longer than Nine Months Since I-360 Submission | |
| Total Number of Applications Pending Longer Than Nine Months | 2,381 |
| Average Days Pended or Pending in Post-COM Stages as of May 30, 2019 | 1,100 |
| Median Days Pended or Pending in Post-COM Stages as of May 30, 2019 | 980 |
| 25th Percentile (Days) | 659 |
| 75th Percentile (Days) | 1,588 |
| 90th Percentile (Days) | 1,981 |
| Number of Applications Pending Longer Than One Year | 2,303 |

| Percent of Applications Pending Longer Than One Year | 97% |
|---|---|

**Table 9(C) – Post-Interview Pending SIV Applications.** Timeframe: Combined value of the total number of days a Post-Interview Pending SIV Application pended or is pending in any of the Post-COM Stages defined above, as of May 30, 2019.

| Overall | |
|---|---|
| Total Number of Post-Interview Pending SIV Applications | 2,373 |
| Average Days Pended or Pending in Post-COM Stages as of May 30, 2019 | 1,082 |
| Median Days Pended or Pending in Post-COM Stages as of May 30, 2019 | 962 |
| 25th Percentile (Days) | 637 |
| 75th Percentile (Days) | 1,545 |
| 90th Percentile (Days) | 1,981 |
| Percent of Applications Pending Longer Than Nine Months | 98% |
| Applications Pending Longer than Nine Months Since I-360 Submission | |
| Total Number of Applications Pending Longer Than Nine Months | 2,317 |
| Average Days Pended or Pending in Post-COM Stages as of May 30, 2019 | 1,104 |
| Median Pended or Pending in Post-COM Stages as of May 30, 2019 | 983 |
| 25th Percentile (Days) | 674 |
| 75th Percentile (Days) | 1,582 |
| 90th Percentile (Days) | 1,981 |
| Number of Applications Pending Longer Than One Year | 2,254 |
| Percent of Applications Pending Longer Than One Year | 97% |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 11, 2019.

_Laura C. O_

Laura C. Onken

21

SA 182

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> v. <br><br> ANTONY BLINKEN, *et al.*, <br><br> Defendants. | Civil Action No. 1:18-cv-01388-TSC |

## DEFENDANTS' NOTICE OF LODGING PROGRESS REPORT

Defendants, through their undersigned counsel, file this notice of lodging for Defendants'

Progress Report pursuant to the Court's June 14, 2020 Order, ECF No. 113, and the Court's June

14, 2020 and September 3, 2020 Minute Orders.

Defendants' Progress Report covers the period of April 1, 2021 to June 30, 2021.  A copy

of the Progress Report is attached as Exhibit A.

SA 183

Date: July 12, 2021

Respectfully submitted,

CHANNING D. PHILLIPS
D.C. Bar No. 415793
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

/s/ Joseph F. Carilli, Jr.
JOSEPH F. CARILLI, JR.
N.H. Bar No. 15311
Assistant United States Attorney
Civil Division
555 4th St. N.W.
Washington, D.C. 20530
Telephone: (202) 252-2561
Facsimile: (202) 252-2599
E-mail: joseph.carilli@usdoj.gov

*Counsel for Defendants*

2

# Exhibit A

## PROGRESS REPORT

Defendants submit this Progress Report as required under the Court's June 14, 2020 Order (Docket No. 113) and the Court's June 14, 2020 and September 3, 2020 Minute Orders.  The Progress Report is for the period of April 1 to June 30, 2021.

**I.      Class Member Breakdown[1]**

Afghan Allies Protection Act of 2009

| | Number of Class Members at the beginning of reporting period (as of April 1, 2021) | Number of Class Members at the end of reporting period (as of June 30, 2021) | Number of Class Members who entered the step during the reporting period | Number of Class Members who completed the step during the reporting period | Number of Class Members who began and ended the reporting period in the step |
|---|---|---|---|---|---|
| **Step 4** | [3,159] | [3,271] | [1,167] | [1,055] | [2,104] |
| **Step 7** | [481][2] (awaiting government action)<br><br>[60] (awaiting applicant action)<br><br>[11] (national security cases | [342] (awaiting government action)<br><br>[39] (awaiting applicant action)<br><br>[5] (national security cases | [1,134] | [1,267] (approved)<br><br>[25] (denied) | [9][3] (awaiting government action)<br><br>[22] (awaiting applicant action)<br><br>[5] (national security cases |

---

[1] The parties acknowledge that this report may include SIV applicants outside of the Joint Adjudication Plan's class definition that the parties have nonetheless agreed to treat as class members because no class identification methodology can perfectly capture class members given the manner in which Defendants maintain records for SIV applicants.

[2] Values in Step 7 Column 1 fluctuate due to changes in class member status. Petitions that originally were identified as being part of the class are later identified during the adjudication process as not being part of the class. Additionally, USCIS's Matrix database is updated through a manual draw from data in CLAIMS 3 and is a static capture of a fluid workload, which results in minor variances in the data between reports.

[3] Two class members who began and ended the reporting period in Step 7 were awaiting government action and were not considered national security cases. These petitions were pending COM verification with the National Visa Center.

|  | | | | | |
|---|---|---|---|---|---|
|  | pending between 90 to 180 days)<br><br>[1] (national security cases pending between 181 to 240 days)<br><br>[2] (national security cases pending greater than 241 days) | pending between 90 to 180 days)<br><br>[1] (national security cases pending between 181 to 240 days)<br><br>[1] (national security cases pending greater than 241 days) | | | pending between 90 to 180 days)<br><br>[1] (national security cases pending between 181 to 240 days)<br><br>[1] (national security cases pending greater than 241 days) |
| **Step 11** | [1,297] (awaiting interview scheduling)<br><br>[0] (awaiting interview) | [443] (awaiting interview scheduling)<br><br>[1,881] (awaiting interview) | [455] | [1,881] | [60] (awaiting interview scheduling)<br><br>[0] (awaiting interview) |
| **Step 13** | [339] (cases in administrative processing)<br><br>[246] (national security cases pending greater than 120 days)<br><br>[229] (national security cases pending greater than 180 days)<br><br>[218] (national security cases pending greater than 1 year) | [500] (cases in administrative processing)<br><br>[282] (national security cases pending greater than 120 days)<br><br>[255] (national security cases pending greater than 180 days)<br><br>[211] (national security cases pending greater than 1 year) | [2,385] | [2,386] | [321] (cases in administrative processing)<br><br>[282] (national security cases pending greater than 120 days)<br><br>[255] (national security cases pending greater than 180 days)<br><br>[211] (national security cases pending greater than 1 year) |
| **Step 14** | | | | | [657] principal applicants issued (SQ1)<br><br>[2,168] derivative applicants issued (SQ2 and SQ3) |

2

## II.   Performance Standards for the Afghan SIV Program

### A.   Standards Met

For the period of this Progress Report, Defendants met the performance standards in the Joint Adjudication Plan for government-controlled Steps 2, 3, 5, 7, 8, 10, and 12.

### B.   Standards Not Met

For the period of this Progress Report, Defendants did not meet the performance standards in the Joint Adjudication Plan for Steps 4, 11, and 13.

### Step 4

a. *Performance Standard*: "The COM Committee will adjudicate a completed application or appeal within 120 days of receipt from the NVC.  For class members currently in Step 4, the COM Committee will adjudicate the completed application or appeal within 120 days of the date of the Court's approval of the Plan."

b. *Actual Performance*: The COM Committee continued to adjudicate completed applications or appeals, as feasible, and with support from staff located in Washington, DC., processing a total of 1,839 (litigation and non-litigation) cases.   On average during this reporting period, the COM Committee adjudicated a completed application or appeal from a class member within 850 days of receipt from NVC, as compared to 722 days during the previous reporting period.

c. *Explanation*: The COM Committee continued to adjudicate completed applications or appeals, as feasible.  Fluctuations in staffing related to the COVID-19 pandemic, training required for new employees, high caseload volume, and implementation of the congressionally-mandated prioritization plan (which requires high-priority tiers to be processed first, leaving low priority tiers to wait longer for review and analysis) contributed to the Department of State's inability to meet the target timeframe. The increase in wait times is also tied to COM Committee clearing out some long-term appeals cases.  Within the next reporting period, COM anticipates 48 additional staff working on COM approval processing to augment its current staff.  This will positively contribute to the volume and turnaround time of the COM process.

The increased staffing has not yet improved performance compliance due to the time currently being devoted to recruiting, onboarding, and training personnel.

Step 11

a. *Performance Standard*: "After the NVC determines the application is complete, the NVC will offer the applicant the next available interview within 10 days of making that determination.  The NVC will schedule the interview within 60 days of contacting the applicant unless the applicant requests a different interview location or interview time or unless there are reasonable circumstances for the delay as explained in the Progress Reports."

b. *Actual Performance*: During this quarter, the U.S. Embassy in Kabul interviewed 1,730 SIV principal applicants between April 1, 2021 and June 10, 2021.  The backlog of SIV cases that built up during the Embassy's suspension of interviews from March of 2020 until February of 2021 was eliminated.

c. *Explanation:*  Embassy Kabul received additional temporary consular staffing during the quarter, which significantly increased the Embassy's capacity for SIV interviews.  By mid-April, Embassy Kabul had eliminated the COVID backlog of cases built up from March 2020 until February 2021.  For the entire reporting period post scheduled cases at maximum capacity.  Unfortunately, a COVID-19 outbreak at Embassy Kabul that caused the death of one locally employed staff resulted in the suspension and cancellation of interviews from June 13, 2021 through the end of the reporting period.  Despite the suspension of interviews, the Embassy continued SIV processing that did not require lengthy in-person contact, such as reviewing medical exams, and printing and passing back printed visas to applicants.  From the period of June 13-29, 2021, the Embassy approved and printed 1,202 completed visas.  The Embassy plans to interview 90 principal applicants the week of July 11, 2021, and to continue increasing interview capacity as long as COVID conditions allow.  The Embassy plans to resume interviews the week of July 11, 2021 and will reschedule interviews which were cancelled in June.  NVC did schedule, and will continue scheduling, interviews at other U.S. embassies as they reopen to the public, as feasible.

Step 13

a. *Performance Standard*: "All cases refused under INA section 221(g) for administrative processing that is solely within the Department of State's control, including Advisory Opinions, will be completed within 90 days.  For class members currently in Step 13 who are in administrative processing that is solely with the Department of State's control, administrative processing will be completed within 90 days of the date of the Court's approval of the Plan.  All cases refused under INA section 221(g) for administrative processing that is not solely with the Department of State's control and which require additional

4

processing time to reconcile any national security concerns, see AAPA § 602(b)(4)(B), RCIA § 1242(c)(2), will be identified in the progress report in the following manner: number of cases pending greater than 120 days; number of cases pending greater than 180 days; and number of cases pending greater than one year.  For the purpose of progress reporting, the beginning date for these cases is the date the consular officer placed the case in administrative processing."

b.  *Actual Performance*: Notwithstanding the constraints due to the COVID-19 pandemic, the Department of State continued the administrative processing of cases in Step 13, as feasible.  On average, administrative processing for those cases was completed within 35 days.  During this period, 96 percent of Afghan cases were closed within the 90-day processing time, but the average figure is inflated by the closure of a handful of cases over a year old.

c.  *Explanation*: Factors that contributed to the Department of State's inability to meet the target timeframe for administrative processing under Step 13 included securing appropriate clearances and access for two temporary employees and one full-time employee and training the full-time employee and one of the temporary employees on complex interagency case processes, This surge in staff is intended to improve the throughput and turnaround of administrative processing, once these onboarding processes are completed. Additionally, when the administrative processing of old cases is completed in Step 13, the average processing time reflects the age of those cases.  The majority of cases in Step 13 was completed within the 90-day target timeframe for this quarter. However, the closure of 102 Afghan cases that were created between 2015 and early 2021 resulted in longer-than-average processing times for some cases.

5

**PROGRESS REPORT**

Defendants submit this Progress Report as required under the Court's June 14, 2020 Order (Docket No. 113) and the Court's June 14, 2020 and September 3, 2020 Minute Orders. The Progress Report is for the period of April 1, 2021 to June 30, 2021.

I.      **Class Member Breakdown**[1]

Refugee Crisis in Iraq Act of 2007

|  | Number of Class Members at the beginning of reporting period (as of April 1, 2021) | Number of Class Members at the end of reporting period (as of June 30, 2021) | Number of Class Members who entered the step during the reporting period | Number of Class Members who completed the step during the reporting period | Number of Class Members who began and ended the reporting period in the step |
|---|---|---|---|---|---|
| **Step 4** | [0] | [0] | [0] | [0] | [0] |
| **Step 7** | [3][2] (awaiting government action) | [41] (awaiting government action) | [55] | [7] (approved)

[1] (denied) | [1] (awaiting government action) |
|  | [15] (awaiting applicant action) | [24] (awaiting applicant action) |  |  | [13] (awaiting applicant action) |
|  | [0] (national security cases pending between 90 to 180 days) | [1] (national security cases pending between 90 to 180 days) |  |  | [1] (national security cases pending between 90 to 180 days) |
|  | [0] (national security cases | [0] (national security cases |  |  | [0] (national security cases |

---

[1] The parties acknowledge that this report may include SIV applicants outside of the Court's class definition that the parties have nonetheless agreed to treat as class members because no class identification methodology can perfectly capture class members given the manner in which Defendants maintain records for SIV applicants.

[2] USCIS's Matrix database is updated through a manual draw from data in CLAIMS 3 and is a static capture of a fluid workload, which results in minor variances in the data between reports.

SA 191

| | | | | | |
|---|---|---|---|---|---|
| | pending between 181 to 240 days)<br><br>[0] (national security cases pending greater than 241 days) | pending between 181 to 240 days)<br><br>[0] (national security cases pending greater than 241 days) | | | pending between 181 to 240 days)<br><br>[0] (national security cases pending greater than 241 days) |
| **Step 11** | [8] (awaiting interview scheduling)<br><br>[0] (awaiting interview) | [38] (awaiting interview scheduling)<br><br>[0] (awaiting interview) | [2] | [0] | [36] (awaiting interview scheduling)<br><br>[0] (awaiting interview) |
| **Step 13** | [69][3] (cases in administrative processing)<br><br>[63] (national security cases pending greater than 120 days)<br><br>[59] (national security cases pending greater than 180 days)<br><br>[43] (national security cases pending greater than 1 year) | [63] (cases in administrative processing)<br><br>[55] (national security cases pending greater than 120 days)<br><br>[54] (national security cases pending greater than 180 days)<br><br>[39] (national security cases pending greater than 1 year) | [20] | [21] | [55] (cases in administrative processing)<br><br>[55] (national security cases pending greater than 120 days)<br><br>[54] (national security cases pending greater than 180 days)<br><br>[39] (national security cases pending greater than 1 year) |
| **Step 14** | | | | | [6] principal applicants issued (SQ1)<br><br>[9] derivative applicants issued (SQ2 and SQ3) |

---

[3] This number differs from the number reported in Column 2 of the previous report. U.S. Embassy Kabul interviewed applicants on April 1, 2021 and therefore additional cases were referred to administrative processing.

2

II.      **Performance Standards for the Iraqi SIV Program**

A.      Standards Met

For the period of this Progress Report, Defendants met the performance standards in the Joint Adjudication Plan for government-controlled Steps 2, 3, 4, 5, 7, 8, 10, and 12.

B.      Standards Not Met

For the period of this Progress Report, Defendants did not meet the performance standards in the Joint Adjudication Plan for Steps 11 and 13.

C.   Step 11

a.   *Performance Standard*: "After the NVC determines the application is complete, the NVC will offer the applicant the next available interview within 10 days of making that determination.  The NVC will schedule the interview within 60 days of contacting the applicant unless the applicant requests a different interview location or interview time or unless there are reasonable circumstances for the delay as explained in the Progress Reports."

b.   *Actual Performance*: NVC did not schedule interviews at Embassy Baghdad for applicants of any visa classification and therefore could not schedule interviews within 10 days of determining an application to be complete.

c.   *Explanation*: As of December 31, 2019, Embassy Baghdad suspended all consular services due to considerable damage done to the Embassy compound in the course of an attack by Iranian-backed militia supporters.  Public visa services will not resume until the Consular CAC is reconstructed, approximately 18-24 months from the start of construction; this project has not commenced due to difficulties associated with the global pandemic and the security situation in Iraq.  Some cases that were near completion at the time of the attack were able to be processed to completion by Consulate General Erbil, although it is not an IV processing post.  In June 2021, Embassy Baghdad was able to process three SIV cases which had been interviewed before the suspension of consular services.  Due to the attack on Embassy Baghdad, all immigrant visa paper files were destroyed to protect the identities of the applicants.  NVC and Embassy Baghdad must re-create the cases and transfer them to other regional posts for processing.  No applicant requested transfer of their case to an alternative processing post, but applicants may do so

3

understanding that COVID is still impacting post's operations and ability to travel internationally.

D. Step 13

a. *Performance Standard*: "All cases refused under INA section 221(g) for administrative processing that is solely within the Department of State's control, including Advisory Opinions, will be completed within 90 days. For class members currently in Step 13 who are in administrative processing that is solely with the Department of State's control, administrative processing will be completed within 90 days of the date of the Court's approval of the Plan. All cases refused under INA section 221(g) for administrative processing that is not solely with the Department of State's control and which require additional processing time to reconcile any national security concerns, *see* AAPA § 602(b)(4)(B), RCIA § 1242(c)(2), will be identified in the progress report in the following manner: number of cases pending greater than 120 days; number of cases pending greater than 180 days; and number of cases pending greater than one year. For the purpose of progress reporting, the beginning date for these cases is the date the consular officer placed the case in administrative processing."

b. *Actual Performance*: The Department continued the administrative processing of cases in Step 13, as feasible. On average, administrative processing for those cases was completed within 139 days. During this period, 66 percent of Iraqi cases were closed within the 90-day processing time.

c. *Explanation*: Factors that contributed to the Department of State's inability to meet the target timeframe for administrative processing under Step 13 included securing appropriate clearances and access for two temporary employees and one full-time employee and training the full-time employee and one of the temporary employees on complex interagency case processes. This surge in staffing is intended to improve the throughput and turnaround of administrative processing, once these onboarding processes are completed. Additionally, when the administrative processing of old cases is completed in Step 13, the average processing time reflects the age of those cases. The Department closed two cases from 2019 and five cases from 2020 while also processing 14 cases within 90 days. This shows a balance in processing incoming cases as well as old cases. As a result of Department efforts to increase Afghan SIV case processing, numerous Afghan cases have required administrative processing which can detract from time spent in the review of Iraqi SIV cases.

4

# EXHIBIT A

## PROGRESS REPORT

Defendants submit this Progress Report as required under the Court's November 30, 2022, Order (Docket No. 190).  The Progress Report is for the period of July 1, 2021 to November 30, 2022.

### a. Afghan Allies Protection Act of 2009 Class Member Breakdown[1]

|  | Number of AAP Class Members at the beginning of reporting period (as of July 1, 2021) | Number of AAP Class Members at the end of reporting period (as of November 30, 2022) | Number of AAP Class Members who entered the step during the reporting period | Number of AAP Class Members who completed the step during the reporting period | Number of AAP Class Members who began and ended the reporting period in the step |
|---|---|---|---|---|---|
| Step 4[2] | [3,271] | [824] | [1,667] | [4,257] | [263] |

---

[1] "AAP Class Members" are those persons previously reported on under the Approved Adjudication Plan (AAP) (ECF # 113), namely, all people who applied for an Afghan or Iraqi SIV by submitting an application for Chief of Mission ("COM") approval, and whose applications have been awaiting government action for longer than nine months as of May 21, 2020.  As the Court and the parties previously acknowledged under the AAP, this report may include SIV applicants outside of the Court's class definition because no class identification methodology can perfectly capture class members given the manner in which Defendants maintain records for SIV applicants.

[2] As of July 20, 2022, Afghan SIV applicants no longer need to submit an I-360 petition with U.S. Citizenship and Immigration Services. Instead, Afghan SIV applicants need only submit a DS-157 form along with their COM approval application, and the Department of State processes this form both for COM approval and as a special immigration petition. This applies to all applicants except those who either had already submitted an I-360 to USCIS prior to July 20, 2022, or who are seeking to adjust status within the United States (and are therefore **not** seeking a visa). Therefore, Steps 4 and 7 of the AAP are no longer reflective of the current process. This report includes COM **and** petition approval figures under Step 4 for those applicants who submitted a DS-157 for both their COM application and petition processes during the reporting period.

1

| | Number of AAP Class Members at the beginning of reporting period (as of July 1, 2021) | Number of AAP Class Members at the end of reporting period (as of November 30, 2022) | Number of AAP Class Members who entered the step during the reporting period | Number of AAP Class Members who completed the step during the reporting period | Number of AAP Class Members who began and ended the reporting period in the step |
|---|---|---|---|---|---|
| **Step 7**[3] | [347] (awaiting government action)<br><br>[39] (awaiting applicant action)<br><br>[5] (national security cases pending between 90 to 180 days)<br><br>[1] (national security cases pending between 181 to 240 days)<br><br>[1] (national security cases pending greater than 241 days) | [134] (awaiting government action)[4]<br><br>[163] (awaiting applicant action)[5] | [15,881] | [13,597] (approved)<br><br>[2,050] (denied) | [148] (awaiting government or applicant action) |

---

[3]     This figure includes applicants processing inside and outside of the United States, although those inside the United States are not part of the plaintiff class and are not seeking an SIV, but instead seek to adjust status to that of a lawful permanent resident.

[4]     This figure reflects those awaiting government action in step 7 as of December 21, 2022.

[5]     This figure reflects those cases awaiting applicant action in step 7 as of December 21, 2022.

SA 197

| | Number of AAP Class Members at the beginning of reporting period (as of July 1, 2021) | Number of AAP Class Members at the end of reporting period (as of November 30, 2022) | Number of AAP Class Members who entered the step during the reporting period | Number of AAP Class Members who completed the step during the reporting period | Number of AAP Class Members who began and ended the reporting period in the step |
|---|---|---|---|---|---|
| Step 11[6] | [444] (awaiting interview scheduling)<br><br>[123] (awaiting interview) | [756] (awaiting interview scheduling)<br><br>[98] (awaiting interview) | [1193] | [908] | [5] (awaiting interview scheduling)<br><br>[0] (awaiting interview) |
| Step 13 | [170] (cases in administrative processing)<br><br>[96] (national security cases pending greater than 120 days)<br><br>[80] (national security cases pending greater than 180 days)<br><br>[64] (national security cases pending greater than 1 year) | [57] (cases in administrative processing)<br><br>[30] (national security cases pending greater than 120 days)<br><br>[23] (national security cases pending greater than 180 days)<br><br>[14] (national security cases pending greater than 1 year) | [904] | [1,017] | [2] (cases in administrative processing)<br><br>[2] (national security cases pending greater than 120 days)<br><br>[2] (national security cases pending greater than 180 days)<br><br>[2] (national security cases pending greater than 1 year) |

---

[6]    Following the suspension of operations of the U.S. Embassy in Kabul on August 31, 2021, the Department of State no longer has the ability to provide consular services, including immigrant visa processing, within Afghanistan. Therefore, it is incumbent upon applicants to travel to a third country with an immigrant visa-designated embassy or consulate before they may undergo an immigrant visa interview. The Department schedules interviews at an immigrant visa-designated embassy or consulate of the applicant's choice, upon confirmation from the applicant of the destination to which they are able to travel. The Department does not control the amount of time prior to which an applicant indicates a destination to which they are able to travel, nor the amount of time that may pass before an applicant in fact travels to and arrives in that destination for interviewing. This step as reported is therefore overinclusive of pending time that is attributable to the Government.

|  | Number of AAP Class Members at the beginning of reporting period (as of July 1, 2021) | Number of AAP Class Members at the end of reporting period (as of November 30, 2022) | Number of AAP Class Members who entered the step during the reporting period | Number of AAP Class Members who completed the step during the reporting period | Number of AAP Class Members who began and ended the reporting period in the step |
|---|---|---|---|---|---|
| Step 14 |  |  |  | [2,092] principal applicants issued (SQ1)<br><br>[7,612] derivative applicants issued (SQ2 and SQ3) |  |

4

**PROGRESS REPORT**

Defendants submit this Progress Report as required under the Court's November 30, 2022,

Order (Docket No. 190).  The Progress Report is for the period of July 1, 2021 to November 30,

2022.

    a.   **Refugee Crisis in Iraq Act of 2007 Class Member Breakdown[1]**

|  | Number of AAP Class Members at the beginning of reporting period (as of July 1, 2021) | Number of AAP Class Members at the end of reporting period (as of November 30, 2022) | Number of AAP Class Members who entered the step during the reporting period | Number of AAP Class Members who completed the step during the reporting period | Number of AAP Class Members who began and ended the reporting period in the step |
|---|---|---|---|---|---|
| **Step 4[2]** | [28] | [0] | [3] | [31] | [0] |

---

[1]    "AAP Class Members" are those persons previously reported on under the Approved Adjudication Plan (AAP) (ECF # 113), namely, all people who applied for an Afghan or Iraqi SIV by submitting an application for Chief of Mission ("COM") approval, and whose applicants have been awaiting government action for longer than 9 months as of May 21, 2020. As the Court and the parties previously acknowledged under the AAP, this report may include SIV applicants outside of the Court's class definition because no class identification methodology can perfectly capture class members given the manner in which Defendants maintain records for SIV applicants.

[2]    These numbers have been revised since the previous corrected FY 2021 Q3 report. While reviewing the COM process in Baghdad, the Department of State became aware of a group of cases that were currently pending decisions on appeals with the Baghdad COM. The Baghdad COM has since reviewed and decided these cases.

SA 200

|  | Number of AAP Class Members at the beginning of reporting period (as of July 1, 2021) | Number of AAP Class Members at the end of reporting period (as of November 30, 2022) | Number of AAP Class Members who entered the step during the reporting period | Number of AAP Class Members who completed the step during the reporting period | Number of AAP Class Members who began and ended the reporting period in the step |
|---|---|---|---|---|---|
| Step 7[3] | [41] (awaiting government action)<br><br>[24] (awaiting applicant action)<br><br>[1] (national security cases pending between 90 to 180 days)<br><br>[0] (national security cases pending between 181 to 240 days)<br><br>[0] (national security cases pending greater than 241 days) | [4] (awaiting government action)[4]<br><br>[28] (awaiting applicant action)[5] | [139] | [42] (approved)<br><br>[110] (denied) | [24] (awaiting government or applicant action) |
| Step 11 | [3] (awaiting interview scheduling)<br><br>[0] (awaiting interview) | [3] (awaiting interview scheduling)<br><br>[1] (awaiting interview) | [12] | [11] | [0] (awaiting interview scheduling)<br><br>[0] (awaiting interview) |

---

[3]     This figure includes applicants processing inside and outside of the United States, although those inside the United States are not part of the plaintiff class and are not seeking an SIV, but instead seek to adjust status to that of a lawful permanent resident.

[4]     This figure reflects those awaiting government action in step 7 as of December 21, 2022.

[5]     This figure reflects those cases awaiting applicant action in step 7 as of December 21, 2022.

|  | Number of AAP Class Members at the beginning of reporting period (as of July 1, 2021) | Number of AAP Class Members at the end of reporting period (as of November 30, 2022) | Number of AAP Class Members who entered the step during the reporting period | Number of AAP Class Members who completed the step during the reporting period | Number of AAP Class Members who began and ended the reporting period in the step |
|---|---|---|---|---|---|
| Step 13 | [9] (cases in administrative processing)<br><br>[9] (national security cases pending greater than 120 days)<br><br>[9] (national security cases pending greater than 180 days)<br><br>[9] (national security cases pending greater than 1 year) | [28] (cases in administrative processing)<br><br>[26] (national security cases pending greater than 120 days)<br><br>[25] (national security cases pending greater than 180 days)<br><br>[15] (national security cases pending greater than 1 year) | [70] | [51] | [0] (cases in administrative processing)<br><br>[0] (national security cases pending greater than 120 days)<br><br>[0] (national security cases pending greater than 180 days)<br><br>[0] (national security cases pending greater than 1 year) |
| Step 14 |  |  |  | [75] principal applicants issued (SQ1)<br><br>[236] derivative applicants issued (SQ2 and SQ3) |  |

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AFGHAN AND IRAQI ALLIES UNDER SERIOUS
THREAT BECAUSE OF THEIR FAITHFUL SERVICE
TO THE UNITED STATES, ON THEIR OWN AND ON
BEHALF OF OTHERS SIMILARLY SITUATED,

                    Plaintiffs,                          Case No. 18-cv-01388-TSC

        – against –

ANTONY BLINKEN, *et al.*,

                    Defendants.

## DEFENDANTS' NOTICE OF LODGING NEW PROPOSED ADJUDICATION PLAN

Defendants file this notice of lodging a new proposed adjudication plan ("Revised Plan") (Exhibit A) pursuant to the Court's November 30, 2022 Order.  ECF No. 190.  The Defendant agencies are taking every available measure to assist Afghans and Iraqis who are facing credible threats based on their faithful and valuable service to the United States.  The Revised Plan is one such mechanism.  Defendants have developed the Revised Plan based on the Court's guidance as well as Defendants' expertise and experience in administering the Afghan and Iraqi Special Immigrant Visa ("SIV") programs.  Although the Revised Plan addresses the same basic elements as the original Approved Adjudication Plan ("AAP"), Defendants have proposed updates to address many real-world impacts and improvements to application processing.

Primarily, the Revised Plan takes into account the significant influx of SIV applicants after August 2021.  Specifically, after the U.S. withdrawal from Afghanistan, Defendants received a record number of inquiries and submissions about the SIV program and other requests.  Because SIV applications are prioritized at every stage of the SIV process, Defendants surged resources to clear the e-mail backlog impacting Step 2 of the original Plan, ECF No. 188-1 at 3, but given the

SA 203

size, as the Court noted, "even relatively newer applicants have now been waiting for more than nine months." ECF No. 190 at 10. The Revised Plan accounts for this increase. The reporting parameters under the Revised Plan also have been modified. Under the AAP, the parties recognized that the class member identification methodology was both over- and underinclusive, given the limitations in Defendants' data systems, which do not specifically identify whether and for how long an SIV applicant has been at a Government- or an applicant-controlled step. *See* ECF No. 113-1. In addition, because Defendants utilize multiple data systems to process SIV applicants, they experienced significant issues with tracking a subset of SIV applicants under the AAP. Accordingly, the Revised Plan would include all Afghan and Iraqi SIV applicants in the reporting to reduce these issues and account for the large influx of new applicants entering the class after May 21, 2020.

The Department of State, U.S. Citizenship and Immigration Services, and other U.S. government departments and agencies involved in the SIV program are committed to helping Afghans and Iraqis who have taken significant risks to support our military and civilian personnel. Despite many challenges with the Afghanistan humanitarian crisis, expanded interest in the Afghan SIV program, and the last stages of the Iraqi program, the Revised Plan solidifies Defendants' commitment to expeditiously process SIV applications across all steps. Defendants will endeavor in good faith to process SIV applications in accordance with this proposal and will utilize the measures discussed in prior filings, which include increased resources and streamlined processes, to adjudicate the applications as quickly and as efficiently as possible while ensuring proper review for security considerations. And Defendants will continue to look for opportunities to improve the SIV programs to further reduce processing times.

Dated: February 2, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director
Office of Immigration Litigation,
District Court Section

YAMILETH G. DAVILA
Assistant Director

STEVEN A. PLATT
Senior Litigation Counsel

RUTH ANN MUELLER
VAUGHN D. SPENCER
Trial Attorneys

*/s/Sean L. King*
SEAN L. KING
State Bar of Texas No. 24097939
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box. 868, Washington, DC 20044
202-353-9369
sean.king@usdoj.gov

*Attorneys for Defendants*

# EXHIBIT A

**[PROPOSED] REVISED ADJUDICATION PLAN**

## I.   CLASS MEMBER IDENTIFICATION

Pursuant to the Court's Order of February 5, 2020, class members in this matter are "all people who have (1) applied for an Afghan or Iraqi [Special Immigrant Visa ("SIV")] pursuant to the Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, 123 Stat. 807 ("AAPA"), and the Refugee Crisis in Iraq Act of 2007, Pub. L. No. 110-181, 222 Stat. 395 ("RCIA"), by submitting an application for [Chief of Mission ("COM")] approval, and (2) whose applications have been awaiting government action for longer than nine months."

The Adjudication Plan approved on June 14, 2020, applied to certain class members, including those who had applied for COM approval prior to August 19, 2019. Defendants reported on the progress of this limited class through a 14-step adjudication process ("AAP Class"). Given the limitations on the data systems in which Defendants maintain records for SIV applicants, which do not specifically identify whether and for how long an applicant has been at a government or an applicant-controlled step or part of step, the parties recognized that the AAP Class was both over- and underinclusive. In addition, because multiple systems are involved, tracking this same AAP Class from quarterly report to quarterly report proved to be difficult and unduly burdensome for Defendants. This resulted in discrepancies that required a significant amount of time and resources on the part of Defendants to resolve. In addition, since the Adjudication Plan was originally approved, the volume of SIV applications has grown significantly. The Court also has ordered the new methodology to include those applicants who joined the class after May 21, 2020. In light of

SA 207

this prior experience and these new developments, for purposes of this Revised Adjudication Plan, Defendants will include all Afghan and Iraqi SIV applicants in their reporting.[1]

## II.  REVISED ADJUDICATION PLAN STANDARDS

For individuals applying for Iraqi SIVs, Defendants Department of State and U.S. Citizenship and Immigration Services ("USCIS") will endeavor to meet the performance standards below in section A. For individuals applying for Afghan SIVs, Defendant Department of State will endeavor to meet the performance standards below in section B, and for individuals with COM approval dates before July 20, 2022, and who filed I-360 petitions, USCIS will endeavor to meet the performance standards below in section C.

A. Refugee Crisis in Iraq Act of 2007

| Stage | Step | Description | Revised Adjudication Plan Performance Standard |
|---|---|---|---|
| COM application process, including appeals | 1 | Applicant submits a complete COM application or appeal package to State's National Visa Center ("NVC"). | N/A: Applicant-Controlled |
| | 2 | NVC reviews documents for completeness. | NVC will complete review within 15 business days of receipt of the applicant's submission (a submission is an application or an appeal, or additional documentation if such documentation was requested by NVC). |
| | 3 | NVC sends completed application or appeal package to the COM Designee for Iraq SIV applicants. | NVC will send the application or appeal to the COM Designee within 5 business days of determining the application or appeal to be documentarily complete. |
| | 4 | COM staff reviews the COM application, and the COM Designee makes a decision. The applicant is | The COM Designee will adjudicate a completed application or appeal within 60 calendar days of receipt from NVC. |

---

[1] The Iraq SIV program sunsetted in 2014 and is no longer accepting new applications.

SA 208

| | | | |
|---|---|---|---|
| | | automatically informed of the decision. | |
| Form I-360 Petition adjudication process | 5 | Applicant submits Form I-360 to USCIS | N/A: Applicant-Controlled |
| | 6 | USCIS adjudicates petition and sends to NVC if approved. | Upon receipt of a petition from the applicant, USCIS will adjudicate the petition and send an approved petition to NVC within 60 calendar days unless USCIS issues a Request for Evidence ("RFE") or a Notice of Intent to Deny ("NOID") to the applicant.<br><br>Upon receipt of a response to an RFE or a NOID, USCIS will adjudicate the petition and send an approved petition to NVC within 60 calendar days.<br><br>Cases that require additional processing time to reconcile any national security concerns, see AAPA § 602(b)(4)(B); RCIA § 1242(c)(2), will be identified on the progress reports in the following manner: number of cases pending between 90-180 calendar days; number of cases pending between 181-240 calendar days; number of cases pending between 241 calendar days or more. For the purpose of progress reporting, the timeframes will be calculated starting from the date of receipt of the applicant's petition. USCIS will request that third party agencies prioritize the vetting of these cases. USCIS cannot require a third-party agency to complete vetting in any particular timeframe.<br><br>Based on these target timeframes, all cases awaiting USCIS adjudication as of the date of the beginning of each reporting period will be adjudicated before the end of the same reporting period, unless USCIS issued an RFE or a NOID or the case requires additional processing time to reconcile any national security concerns. |
| Visa interview process, including pre- and | 7 | NVC sends an instruction packet to applicant requesting standard immigrant visa documentation, including Form DS-260. | Upon receipt of the petition from USCIS, NVC will send an instruction packet to the applicant within 15 business days. |

3

| | | | |
|---|---|---|---|
| post-interview | | | |
| | 8 | Applicant submits all required documentation, per the instruction packet, to NVC. | N/A: Applicant-Controlled |
| | 9 | NVC reviews documents for completeness, corresponding with applicant when additional documentation is needed. | Upon receipt of the Form DS-260 or further information requested by NVC, NVC will determine whether the case is documentarily complete within 15 business days of receipt. |
| | 10 | NVC schedules applicant for next available visa application interview at U.S. embassy or consulate. | After the NVC determines the case is documentarily complete, the NVC will offer the applicant the next available interview within 10 business days of making that determination.<br><br>The NVC will schedule the interview within 60 calendar days of contacting the applicant unless the applicant requests a different interview location or interview time or unless there are reasonable circumstances for the delay as explained in the progress reports. |
| | 11 | Applicant is interviewed and biometrics are collected by consular officer on the scheduled appointment date. Administrative processing, if needed, is initiated following the interview. | After completion of the visa application interview, if the consular officer refuses the visa application under INA section 221(g) (8 U.S.C. § 1201(g)) for administrative processing, the consular officer will initiate any administrative processing within 5 business days.<br><br>If the applicant is required to provide any additional information or documentation, the consular officer will initiate any administrative processing within 5 business days of receipt of all necessary information or documentation. |
| | 12 | The applicant's case undergoes administrative processing. | All cases refused under INA section 221(g) (8 U.S.C. § 1201(g)) for administrative processing that is solely within the Department of State's control will be completed within 90 calendar days.<br><br>All cases refused under INA section 221(g) (8 U.S.C. § 1201(g)) for administrative processing that is not solely within the Department of State's control, and which require additional processing time to reconcile any national security concerns, see |

4

| Stage | Step | Description | |
|---|---|---|---|
| | | | AAPA § 602(b)(4)(B), RCIA § 1242(c)(2), will be identified in the progress reports in the following manner: number of cases pending greater than 120 calendar days; number of cases pending greater than 180 calendar days; and number of cases pending greater than one year.<br><br>For the purpose of progress reporting, the beginning date for these cases is the date the consular officer placed the case in administrative processing.<br><br>The Department of State will request that third party agencies expedite the processing of applicants. The Department of State cannot require a third-party agency to complete their actions in any particular timeframe. |
| Visa issuance to eligible applicants | 13 | Upon completion of administrative processing, applicant is instructed to obtain a medical exam. The visa is issued if applicant is eligible. In some cases, the passport will have expired and requires renewal by the applicant. | N/A: Applicant-Controlled |

B. Afghan Allies Protection Act of 2009

| Stage | Step | Description | Revised Adjudication Plan Performance Standard |
|---|---|---|---|
| COM application process, including appeals | 1 | Applicant submits a COM application or appeal package to State's NVC. | N/A: Applicant-Controlled |
| | 2 | NVC reviews documents for completeness. | NVC will complete review within 15 business days of receipt of the applicant's submission (a submission is an application or an appeal, or additional documentation if such documentation was requested by NVC). |
| | 3 | NVC marks completed application or appeal as "document complete" and COM | NVC will mark the application or appeal as "document complete" as soon as the application or appeal is determined to be documentarily complete. |

5

| | | | |
|---|---|---|---|
| | | staff process the application or appeal for review. | |
| | 4 | COM staff reviews the COM application or appeal package and DS-157 petition for special immigrant status, and the COM Designee makes a decision. The applicant is automatically informed of the decision. | COM staff will adjudicate 4,500 completed applications and/or appeals per quarter. |
| Visa interview process, including pre- and post-interview | 5 | NVC sends instruction packet to applicant requesting standard immigrant visa documentation, including Form DS-260. | Upon receipt of COM approval and Form DS-157 petition, NVC will send an instruction packet to the applicant within 15 business days. |
| | 6 | Applicant submits all required documentation, per the instruction packet, to NVC. | N/A: Applicant-Controlled |
| | 7 | NVC reviews documents for completeness, corresponding with applicant when additional documentation is needed. | Upon receipt of the Form DS-260 or further required information requested by NVC, NVC will determine whether the case is documentarily complete within 15 business days of receipt. |
| | 8 | Applicant informs NVC of alternate immigrant visa processing post where the applicant will be able to personally appear and make a visa application. An applicant may keep their case assigned to Kabul, however, such | N/A: Applicant-Controlled |

6

| | | | |
|---|---|---|---|
| | | a case would not be considered pending government action unless and until the U.S. Embassy in Kabul is able to resume visa processing. | |
| | 9 | NVC schedules applicant for next available visa application interview at applicable U.S. embassy or consulate. | NVC will provide an interview date to the applicant within 60 calendar days. However, at posts where the demand for interview slots exceeds capacity, NVC will provide an interview date to the applicant within 60 calendar days of the availability being reported to NVC. |
| | 10 | Applicant is interviewed and biometrics are collected by consular officer on the scheduled appointment date.  Administrative processing, if needed, is initiated following the interview. | After completion of the visa application interview, if the consular officer refuses the visa application under INA section 221(g) (8 U.S.C. § 1201(g)) for administrative processing, the consular officer will initiate any administrative processing within 5 business days.<br><br>If the applicant is required to provide any additional information or documentation, the consular officer will initiate any administrative processing within 5 business days of receipt of all necessary information or documentation. |
| | 11 | The applicant's case undergoes administrative processing. | All cases refused under INA section 221(g) (8 U.S.C. § 1201(g)) for administrative processing that is solely within the Department of State's control will be completed within 90 calendar days.<br><br>All cases refused under INA section 221(g) (8 U.S.C. § 1201(g)) for administrative processing that is not solely within the Department of State's control and which require additional processing time to reconcile any national security concerns, see AAPA § 602(b)(4)(B), RCIA § 1242(c)(2), will be identified in the progress reports in the following manner: number of cases pending greater than 120 calendar days; number of cases pending greater than 180 calendar days; and number of cases pending greater than one year. |

| | | | For the purpose of progress reporting, the beginning date for these cases is the date the consular officer placed the case in administrative processing. The Department of State will request that third party agencies expedite the processing of applicants. The Department of State cannot require a third-party agency to complete their actions in any particular timeframe. |
| Visa issuance to eligible applicants | 12 | Upon completion of administrative processing, applicant is instructed to obtain a medical exam, if required. The visa is issued if applicant is eligible. In some cases, the passport will have expired and requires renewal by the applicant. | N/A: Applicant-Controlled |

C. Afghan Allies Protection Act of 2009: Form I-360 Petitions Reviewed By USCIS

| Stage | | Description | Revised Adjudication Plan Performance Standard |
|---|---|---|---|
| | | USCIS adjudicates petition and sends to NVC if approved. | Upon receipt of a petition from the applicant, USCIS will adjudicate the petition and send an approved petition to NVC within 60 calendar days unless USCIS issues a Request for Evidence ("RFE") or a Notice of Intent to Deny ("NOID") to the applicant.<br><br>Upon receipt of a response to an RFE or a NOID, USCIS will adjudicate the petition and send an approved petition to NVC within 60 calendar days.<br><br>Cases that require additional processing time to reconcile any national security concerns, see AAPA § 602(b)(4)(B); RCIA § 1242(c)(2), will be identified on the progress reports in the following manner: number of cases pending between 90-180 calendar days; number of cases pending between 181-240 calendar days; number of cases pending between 241 calendar days or more. For the purpose of progress reporting, the timeframes will be calculated starting from the date of receipt of the applicant's petition. |

8

| | | | USCIS will request that third party agencies prioritize the vetting of these cases. The parties understand that USCIS cannot require a third-party agency to complete vetting in any particular timeframe. |
| | | | Based on these target timeframes, the parties expect that all cases awaiting USCIS adjudication as of the date of the beginning of each reporting period will be adjudicated before the end of the same reporting period, unless USCIS issued an RFE or a NOID or the case requires additional processing time to reconcile any national security concerns. |

## III.    PROGRESS REPORTS

Beginning 90 days after approval of this Proposed Revised Adjudication Plan and every 90 days thereafter, Defendants shall file a progress report with the Court within 30 days of the end of the 90-day reporting period. The progress report will include Defendants' performance under the Revised Adjudication Plan Standards in section II during the prior 90-day period. If Defendants' performance does not meet the standard for any particular step, the progress report will include an explanation regarding why Defendants' performance did not meet the standard and, if appropriate, include actions to be taken to improve performance to bring it in line with the standard. The template for the progress report is attached hereto.

If Defendants meet their standards for four consecutive quarters, Defendants shall thereafter file a progress report with the Court every 180 days (instead of every 90 days).

If Defendants' performance does not meet the standard, and Plaintiffs on a good faith basis believe that Defendants have not substantially complied with the Revised Adjudication Plan, within fourteen (14) days after filing of the progress report, Plaintiffs must notify Defendants in writing, specifying the basis for Plaintiffs' challenge to Defendants' performance. Within fourteen (14) days of receipt of Plaintiffs' correspondence—or at another time mutually agreed upon by the

parties—the parties will meet and confer to attempt to resolve any differences. No party may file an enforcement motion or otherwise seek judicial relief related to the allegations of substantial noncompliance until after this meet and confer, and failure by a party to meet any of the above deadlines constitutes waiver of the right to seek judicial relief with respect to an allegation.

SA 216

**TEMPLATE PROGRESS REPORT**

Defendants submit this Progress Report as required under the Court's Order of [DATE].

This Progress Report is for the period of [Month Day, Year] to [Month Day, Year] and includes

reporting on all Afghan and Iraqi SIV applicants and not just those who are class members in

*Afghan Allies & Iraqis v. Blinken.*

I. Refugee Crisis in Iraq Act of 2007

A. Report

| | Number at the beginning of reporting period (as of Month DD, Year) | Number at the end of reporting period (as of Month DD, Year) | Number entering the step during the reporting period | Number completing the step during the reporting period | Number beginning and ending the reporting period in the step |
|---|---|---|---|---|---|
| **Step 4** | [x] | [x] | [x] | [x] | [x] |
| **Step 6** | [x] (Total number of petitions pending at the beginning of the reporting period (as of Month DD, Year))<br><br>[y] awaiting government action)<br><br>[z] (awaiting applicant action)<br><br>[a] (national security cases pending between 90 to 180 days)<br><br>[b] (national security cases pending between 181 to 240 days) | [x] (Total number of petitions pending a final action at the end of the reporting period (as of Month DD, Year))<br><br>[y] (awaiting government action)<br><br>[z] (awaiting applicant action) | [x] (Number of petitions receipted during the reporting period) | [x] (Total number of petitions approved, denied, or administratively closed during the reporting period)<br><br>[y] (approved)<br><br>[z] (denied)<br><br>[a] (administratively closed) | [x] (Total number of petitions receipted before the reporting period and pending final action as of the end of the reporting period)<br><br>[y] (awaiting government action)<br><br>[z] (awaiting applicant action)<br><br>[a] (national security cases pending between 90 to 180 days)<br><br>[b] (national security cases pending between 181 to 240 days) |

1

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | [c] (national security cases pending greater than 241 days) |  |  |  | [c] (national security cases pending greater than 241 days) |
| **Step 10** | [x] (awaiting interview scheduling)<br><br>[y] (awaiting interview) | [x] (awaiting interview scheduling)<br><br>[y] (awaiting interview) | [x] | [x] | [x] (awaiting interview scheduling)<br><br>[y] (awaiting interview) |
| **Step 12** | [x] (Total number of cases in administrative processing)<br><br>[a] (national security cases pending greater than 120 days)<br><br>[b] (national security cases pending greater than 180 days)<br><br>[c] (national security cases pending greater than 1 year) | [x] (Total number of cases in administrative processing)<br><br>[a] (national security cases pending greater than 120 days)<br><br>[b] (national security cases pending greater than 180 days)<br><br>[c] (national security cases pending greater than 1 year) | [x] | [x] | [x] (Total number of cases in administrative processing)<br><br>[a] (national security cases pending greater than 120 days)<br><br>[b] (national security cases pending greater than 180 days)<br><br>[c] (national security cases pending greater than 1 year) |
| **Step 13** |  |  |  | [x] (visas issued) |  |

B.      Performance Standards

1.      Standards Met

For the period of this Progress Report, Defendants met the performance standards in the Revised Adjudication Plan for Steps [list steps].

2.      Standard Not Met

For the period of this Progress Report, Defendants did not meet the performance standards in the Revised Adjudication Plan for Steps [list steps]

a.      Step [list Step Number]

i. Performance Standard [list Standard]
ii. Actual Performance [list Performance]
iii. Explanation [explain why Defendants did not meet standard and, if appropriate, actions to bring performance back in line with the standard.]

II. Afghan Allies Protection Act of 2009

A. Report

| | Number at the beginning of reporting period (as of Month DD, Year) | Number at the end of reporting period (as of Month DD, Year) | Number entering the step during the reporting period | Number completing the step during the reporting period | Number beginning and ending the reporting period in the step |
|---|---|---|---|---|---|
| Step 4 | [x] (new applications and reapplications, excluding appeals) | [x] (new applications and reapplications, excluding appeals) | [x] (new applications and reapplications, excluding appeals) | [x] (new applications and reapplications)<br><br>[y] (appeals) | [x] (new applications and reapplications)<br><br>[y] (appeals) |
| Step 9 | [x] (awaiting interview scheduling)<br><br>[y] (awaiting interview)<br><br>[z] (awaiting interview scheduling at post where demand exceeds capacity)<br><br>[a] (awaiting interview at post where demand exceeds capacity) | [x] (awaiting interview scheduling)<br><br>[y] (awaiting interview)<br><br>[z] (awaiting interview scheduling at post where demand exceeds capacity)<br><br>[a] (awaiting interview at post where demand exceeds capacity) | [x] | [x] | [x] (awaiting interview scheduling)<br><br>[y] (awaiting interview)<br><br>[z] (awaiting interview scheduling at post where demand exceeds capacity)<br><br>[a] (awaiting interview at post where demand exceeds capacity) |
| Step 11 | [x] (Total number of cases in administrative processing) | [x] (Total number of cases in administrative processing) | [x] | [x] | [x] (Total number of cases in administrative processing) |

SA 219

| | | | | | |
|---|---|---|---|---|---|
| | [a] (national security cases pending greater than 120 days)<br><br>[b] (national security cases pending greater than 180 days)<br><br>[c] (national security cases pending greater than 1 year) | [a] (national security cases pending greater than 120 days)<br><br>[b] (national security cases pending greater than 180 days)<br><br>[c] (national security cases pending greater than 1 year) | | | [a] (national security cases pending greater than 120 days)<br><br>[b] (national security cases pending greater than 180 days)<br><br>[c] (national security cases pending greater than 1 year) |
| **Step 12** | | | | [x] (visas issued) | |

B.      Performance Standards

1.      Standards Met

For the period of this Progress Report, Defendants met the performance standards in the Revised Adjudication Plan for Steps [list steps].

2.      Standard Not Met

For the period of this Progress Report, Defendants did not meet the performance standards in the Revised Adjudication Plan for Steps [list steps]

        a.      Step [list Step Number]

        i.      Performance Standard [list Standard]
        ii.     Actual Performance [list Performance]
        iii.    Explanation [explain why Defendants did not meet standard and, if appropriate, actions to bring performance back in line with the standard.]

III. Form I-360 Petitions Reviewed by USCIS

A. Report

| | Number at the beginning of reporting period (as of Month DD, Year) | Number at the end of reporting period (as of Month DD, Year) | Number entering the step during the reporting period | Number completing the step during the reporting period | Number beginning and ending the reporting period in the step |
|---|---|---|---|---|---|
| | [x] (Total number of petitions pending at the beginning of the reporting period (as of Month DD, Year))<br><br>[y] (awaiting government action)<br><br>[z] (awaiting applicant action)<br><br>[a] (national security cases pending between 90 to 180 days)<br><br>[b] (national security cases pending between 181 to 240 days)<br><br>[c] (national security cases pending greater than 241 days) | [x] (Total number of petitions pending a final action at the end of the reporting period (as of Month DD, Year))<br><br>[y] (awaiting government action)<br><br>[z] (awaiting applicant action) | [x] (Number of petitions receipted during the reporting period) | [x] (Total number of petitions approved, denied, or administratively closed during the reporting period)<br><br>[y] (approved)<br><br>[z] (denied)<br><br>[a] (administratively closed) | [x] (Total number of petitions receipted before the reporting period and pending final action as of the end of the reporting period)<br><br>[y] (awaiting government action)<br><br>[z] (awaiting applicant action)<br><br>[a] (national security cases pending between 90 to 180 days)<br><br>[b] (national security cases pending between 181 to 240 days)<br><br>[c] (national security cases pending greater than 241 days) |

B.      Performance Standard

1.      Standard Met

For the period of this Progress Report, Defendants met the performance standards in the Revised Adjudication Plan for Steps [list steps].

2.      Standard Not Met

For the period of this Progress Report, Defendants did not meet the performance standards in the Revised Adjudication Plan for Step [list step]

a.      Step [list Step Number]

i.      Performance Standard [list Standard]
ii.     Actual Performance [list Performance]
iii.    Explanation [explain why Defendants did not meet standard and, if appropriate, actions to bring performance back in line with the standard.]

6

SA 223

# Exhibit 5

to the Declaration of Deepa Alagesan in Support of Plaintiffs'
Objections to Defendants' Proposed Revised Adjudication Plan

*Afghan and Iraqi Allies Under Serious Threat Because of Their Faithful Service to
the United States v. Blinken, et al.*, Case No. 18-cv-01388-TSC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -+
                                |
AFGHAN AND IRAQI ALLIES         |
UNDER SERIOUS THREAT            |
BECAUSE OF THEIR FAITHFUL       |
SERVICE TO THE UNITED           |
STATES, ON THEIR OWN AND        |
ON BEHALF OF OTHERS             |   Case Number:
SIMILARLY SITUATED,             |
                                |   1:18-cv-01388
          Plaintiffs,           |
                                |
    vs.                         |
                                |
ANTONY BLINKEN, et al,          |
                                |
          Defendants.           |
                                |
- - - - - - - - - - - - - - -+

Deposition of

MELISSA A. SCHUBERT

Thursday, January 19, 2023

9:00 a.m.

Job No. 6356

Reported by:  Laurie Donovan, RPR, CRR, CLR

SA 224

Page 24

not something that is at the top of my brain right now.

Q    Okay, and when you said that there's reporting, do you have any understanding of the reporting that is involved in the plan?

A    A bit.  It's slightly different from the Congressional reports we do.

Q    Okay.  We can talk more about that later.

Is there anything else that you understand that is required of the State Department under the plan?

A    Not really.

Q    What is your understanding of the plan based on?

A    Reading the documents.

Q    Did your understanding of the plan ever change?

MR. PLATT:  Objection; ambiguous.

THE WITNESS:  I didn't spend a whole lot of time trying to figure out the plan that was, since anything that I would have to deal with would be in the plan that is to be, so I've been waiting for the plan that is to be.

BY MS. ALAGESAN:

Q    Got it.

Page 25

Do you have any -- do you have an understanding of what, if any, are the consequences of failing to meet the plan?

A     No.

Q     Okay.  Because you started your role in August 2021, is it fair to say that you weren't involved in the implementation of the plan right after it was adopted?

A     That is fair to say.

Q     Are you aware of any actions that DOS took to implement the plan when it was adopted?

A     I know that they tagged cases that are supposed to be identified and tracked in the old plan.

Q     And when you say "they," who are you talking about?

A     Whoever was in charge of the program at the time, and particularly in the computer systems, since there's apparently an automatic tagging procedure when we ingest cases.

Q     Okay.  So they would be -- because you're talking about ingesting cases, that would be tagging by ASIV; is that right?

A     I'm not entirely sure.

Q     Does the ASIV unit receive instructions relating to the plan?

Page 26

A    Again, like there was a stay, so -- and everything right now is in flux, so I can't say I have received any instructions in my tenure.

Q    Are you aware of any instructions that DOS has issued internally regarding the plan?

A    Not off the top of my head, no.

Q    Other than what you mentioned before about the automatic tagging process, are you aware of any changes that DOS has made to the processing of COM applications because of the plan?

A    One of the things we've done under my tenure is seek an exception, a small exception to the tiered prioritization, so we can devote basically one day a week to the longest pending cases, regardless of tier, just so nothing hangs around that long.

Q    Okay.  We can talk more about that later, because I know you mention it in your declaration, but when you say "seek an exception," what is the exception to?

A    Congress had a prioritization plan that they wanted ASIV to do, whereas different applicants, based on the perceived closeness of their relationship to the United States government, would get prioritized over ones that had a more distant role.

So there's the tier prioritization, where

SA 227

Page 27

tier 1 is supposed to be processed before tier 2, before tier 3, and so on, and so we got official sort of permission to continue with the project we had started, which was where once a week we focused our efforts on the longest pending cases.

Q    Who did you have to get permission from?

A    I believe it went through DMR.

Q    Can you tell me what "DMR" means?

A    Deputy assistant secretary of management and resources, or just deputy secretary of management and resources.

Q    Okay, and that change you made because of the adjudication plan; is that right?

A    Yeah, just wanted to make sure it was okay.

Q    Got it, and --

A    Oh.  Well, I mean the adjudication plan, and also just because we didn't want to have cases laying around never getting seen either, which the tier prioritization scheme sort of didn't seem to allow for the fact that if we have to keep prioritizing tier ones, some of those tier fives are going to start aging.

Q    But you sought this while the plan was stayed; is that right?

A    Yes, yes.

Page 28

Q   Got it.

I know you said it's been stayed for the bulk of your time in the office, but has the plan affected your work in any other way than what you just described?

A   I don't believe so.

Q   Have you had any involvement in the progress reporting that DOS submits pursuant to the plan?

A   No, and I guess just this last one, after the stay was lifted and we had to put something together, so that one, yeah.

Q   You were involved in the January 2023 report?

A   Yeah.

Q   Do you have knowledge of like the process that the ASIV unit used for its progress reports under the plan?

A   Yes.

Q   Okay.  You mentioned the stay earlier.  How, if at all, did the stay of the plan affect the processing of COM approval applications?

A   Well, the less time we have to spend on reporting and trying to measure things, the more time we have to actually do the casework and get them processed, so it was nice not to have to do an extra

Page 29

duty.

Q    But only with respect to reporting?  It didn't change the unit's processing in any other way?

A    No.

Q    Okay.  Now I'd like to turn to some of the topics that you cover specifically in your declaration.

            (Exhibit 6 was marked for

                identification.)

BY MS. ALAGESAN:

Q    I'm handing you a document that's been marked for identification as Exhibit 6.  The reason it's number 6 is we're going sequentially across the depositions, not that you missed anything.

            Would you take a minute to just look through it, and let me know when you have.

            (Witness peruses document.)

            THE WITNESS:  I seem to be missing a page. Did we just skip number 8?

BY MS. ALEGESAN:

Q    I don't know.

A    Technology and -- 5, 6, 7 --

Q    It's not intentional.

A    Okay.

Q    Let me take a look at the other copies and

Page 62

A    I think some of them might have been REAs, so they were full-time as much as an REA can be full-time.

Q    But you said that those are formerly retired staff who might be working like capped hours.

A    Yes.  So some of them might allocate it across a year so they can work part-time the full year.  Some of them might work full-time but just for a shorter period until they can reset their hours and then come back, so it varied.

Q    Okay, and those 40 staff members would also all be program analysts?

A    Yes.

Q    Do you have an approximate breakdown -- sorry.  Withdraw.

You wrote here that there is "a mix of U.S. government direct-hire employees as well as contractors."

Do you know the approximate breakdown between how many are direct hire versus contractors?

A    Most of the time I've been here, we've had 12 contractor positions, which is an increase.  I think back when there were eight dedicated staff, I think two of them were contractors, so they added ten contractor spots.

Page 63

Q    And the direct hires are also time-limited positions based on the rotations you described?

A    The Y tours would be.  Some of them are regular foreign service postings, and then there are the civil service, which would not have been time-limited.

Q    So if I'm understanding correctly, the foreign service analysts would have a time limit on their role in the ASIV unit; is that right?

A    Yeah, if it was a regular foreign service posting -- it's normally a two-year for a domestic assignment.  The Y tours would be 12 months.

Q    Okay, but the civil service analysts would not have any time limitation on their role; is that right?

A    Correct.

Q    And the contractors, would they have any time limit on their role?

A    Not really.  Just in terms of the contracts being extended every year, but I haven't heard of like a hard stop for the contract.

Q    Okay, and then you say in the second sentence that "the ASIV unit is continuing to take steps to hire additional staff."

Do you see that?

Page 64

A    Yes.

Q    Is that just what you mentioned before with always trying to seek more staff?

A    And we're doing additional hiring.

Q    Right now?

A    Yeah.

Q    Okay.  What staffing changes, if any, have taken place since you submitted this declaration in May 2022?

A    We've had 20 EFM civil service non-compete exemption, or NCE -- I'm not entirely sure what that stands for -- approved, and we're engaged in the hiring process for that; additional Y tour positions, such as I mentioned that we're waiting to get people interested in, and we're looking at adding I think up to 60 new contractors.

Q    And -- sorry.  You said EFM?

A    Eligible family members, so the spouses or adult children or whatever falls under that descriptive of foreign service officers.

Q    I see.

That would be, in addition to the 40, roughly 46 members that are currently in the ASIV unit?

A    Correct.  Yeah, I think we're up to about 50

USCA Case #25-5279      Document #2176641         Filed: 06/03/2026      Page 239 of 390

Page 65

something right now.

Q    Do you have any expectation in terms of the timeline of when those positions, the 20 civil service positions, for example, might be filled?

A    From my point of view, it's always as soon as possible, but because I'm not in charge of the department's hiring processes, I don't know what that actually turns into.  I can say that we've gotten many resumes from interested EFMs, so . . .

Q    And then you mentioned that you're looking to add up to maybe 60 contractors.

Do you have a sense of the timeline for when those folks might start with the unit?

A    It's still in negotiation internally, and then they have to put the contract out to bid, so however that process works.

Q    Okay.  I'm looking now at the third sentence of paragraph -- sorry.  No.  I'm looking at the -- yes, the third sentence of paragraph 4 where you describe the training that new staff receive.

Do you see that?

A    Mm-hmm.

Q    Can you describe the training?

A    As I mentioned before, there's usually one-on-one, or if there's a group of people onboarding

Page 66

at the same time, one on five or six or however many, over Teams, because most of our people are remote.  So over Teams with screen-sharing, going through the process, they have had a chance to read the SOP beforehand, and they do the practice cases with the QC and the follow-up.

Q   Is there any different training for handling appeals?

A   It is a different step on the data entry. So you do data entry, and once you sort of have mastered that step, then you do data entry for appeals, and then you move on to verifications.

Q   Is there different training for revocations?

A   No.  I think it just gets treated as a variation of the appeal process.

Q   Do program analysts specialize at all with respect to new applications versus appeals?

A   No.

Q   And with respect to revocation?

A   No.

Q   You wrote in the last sentence of paragraph 4 that the training "takes approximately 90 days."

Do you see that?

A   Correct.

Q   Is that the process -- is that -- how does

Page 151

cases where a COM appeal was denied, the processing time you used would not have included the time that their initial COM application was pending?

A    We shouldn't have, no.

Q    I should ask also, I guess:  By that same token, for cases in which a COM appeal was approved, the processing time as reflected in this calculation would not include the time that the ASIV unit took to process that applicant's initial application; is that right?

A    Correct.

Q    Now turning to paragraph 12, the first sentence here says, "This trend has continued."

What did you mean by that?

A    Continuing to reduce average processing time.

Q    And when you calculated the processing times over a six-month period, were you looking at the processing times for each month in that six-month window or just across the -- just all of the cases across that six-month period?

A    Across the --

MR. PLATT:  Objection; ambiguous.

THE WITNESS:  We were collecting data with a start time and end time of the entire six months.

Page 152

BY MS. ALAGESAN:

Q   Okay.  So then in paragraph 12, I understand you're talking here about the second quarter of fiscal year 2022; is that right?

A   Correct.

Q   And just to confirm, that covers the period from January 1 to March 30, 2022?

A   The cases that completed processing on those dates, yes.

Q   Okay, and in this three-month period, the ASIV unit processed 4,896 cases; is that right?

A   Correct.

Q   In terms of the way that you calculated the number of cases processed, is that the same as the calculation method you described to me in the prior paragraph other than this being a three-month window instead of a six-month window?

A   Correct.

Q   And with respect to the average processing time of 173 days you describe in this paragraph, was the calculation method you used the same that you described to me with respect to paragraph 11, except for this being a three-month window instead of a six-month window?

A   Yes.

Page 153

Q    Okay, and when you are calculating the average processing times here -- "here" meaning both in paragraph 11 and paragraph 12 -- you're looking only at cases that were decided in that window of time; is that right?

A    Correct.  They completed processing with the COM decision during that period.

Q    So the averages reported don't include the time that a pending case has been pending with the ASIV unit; is that right?

MR. PLATT:  Objection; asked and answered.

THE WITNESS:  Yeah, you can't measure how long a case took to process until the processing is completed, so . . .

BY MS. ALAGESAN:

Q    But in terms of the time an applicant has been waiting for adjudication of their application, that's not included in the average processing time, just the processing time from start to adjudication; is that right?

MR. PLATT:  Objection; asked and answered, ambiguous.

THE WITNESS:  Once we complete processing on the case, measuring the average processing time starts with the document complete date.

Case 1:18-cv-01388-TSC-MAU    Document 217-6    Filed 03/09/23    Page 19 of 33
USCA Case #25-5279    Document #2176641    Filed: 06/03/2026    Page 245 of 390

Page 154

BY MS. ALAGESAN:

Q    And ends with the decision date; is that right?

A    Correct.

Q    Okay.  I'm sorry.  Before, when I said that quarter 2 goes from January 1 to March 30, I understand that March actually has 31 days.

So did you include March 31 in that as well?

A    Yes.

Q    Okay.  I'm sorry.

All right.  Turning to paragraph 13, you note that "there is no efficient way to calculate the time at Step 4 that is attributable to government-controlled actions."

Do you see that?

A    Yes.

Q    Could you describe what you mean by "no efficient way"?

A    For every case we process during the time that we are waiting for responses to our verification requests, the only way you could accurately sort of stop the clock and restart it would be to go into each individual case and look at the case notes and count up the time it took, and then add another column and transcribe that number into another calculation for

Page 155

each case.  That would not be possible in an efficient manner.

Q    So there's no way to record the time in and out of government control in the existing ASIV unit systems; is that right?

A    Correct.  So our average processing time is an overstatement of what the government has control of.

Q    And these systems that you're using to record this information, they are controlled by CST; is that right?

A    For the verification part, it is controlled by EX.

Q    And we talked earlier about a series of digital updates and process improvements.

Why doesn't the ASIV unit track the information that would enable the unit to calculate this in an efficient manner?

A    Because tracking this information doesn't help us process cases any quicker and, if anything, would slow down the processing to include this additional step.

Q    If you did it based on the existing systems and the manual review that you described?

A    Yes.

Page 156

Q    Okay.  Turning to paragraph 14, here you describe a system of prioritization for processing Afghan SIV applicants.

Could you describe that scheme for us.

A    There are the five different tiers.  I can't remember what the different tiers are without looking at notes, but I know the first tier is the interpreters and linguists who worked directly with U.S. military, U.S. government, and then the last tier is the most remote, so employees of subcontractors who never actually worked on a U.S. government installation or anything like that.

Q    And that scheme is outlined in the Foreign Affairs Manual; is that right?

A    I'm not entirely sure.

Q    Do you know if it's documented anywhere publicly available?

A    I don't know if it's publicly available.

Q    When you note here in paragraph 14 that it organizes applicants based on their relationship with the U.S. government, you're talking about those classifications you just described of people's employment; is that right?

A    Correct.

Q    And when you referenced "intrinsic threats"

Page 157

that are faced "due to the nature of someone's qualifying employment," can you explain what you mean by that?

A    I believe that was from Congress' instructions, what their understanding was that if you were an interpreter working with the U.S. military every day, your visibility and consequent threats to your safety would be higher than someone who was working not on a U.S. government installation and not necessarily interacting personally with identifiable U.S. government officials.

Q    And what instructions are you referring to from Congress to DOS?

A    I don't know precisely, because this whole thing came about before my tenure started.

Q    Do you know if that was in the statute itself?

A    I don't believe it's in the statute.

Q    Okay.  How does the ASIV unit implement the prioritization you just described in practice?

A    There is an automatic tier generator when we ingest the cases, and then the data entry step people double-check the tiering system to see if it matches with the information that they have seen in the letter of employment and the letter of recommendation.

Case 1:18-cv-01388-TSC-MAU   Document 217-6   Filed 03/09/23   Page 23 of 33
USCA Case #25-5279   Document #2176641   Filed: 06/03/2026   Page 249 of 390

Page 158

Q    How does automatic tiering work if it's based on the nature of someone's employment?

A    One of the information fields we have is who the employer is, but honestly, I do not know the details of how this process works.

Q    Okay.  So it's assess for the time -- for what tier it belongs in at the time that data is entered when ASIV first gets the application; is that right?

A    Correct.

Q    And then it -- when you say that people "double-check the tiering system," that would be at the data entry stage itself; is that right?

A    Correct.

Q    Is the person's tier ever assessed again in the application review process?

A    I'm not entirely sure.

Q    And then what action does the ASIV unit takes once a tier is assigned?

A    When we process the cases, we do them in priority of tier, other than on the one day a week where we look at the longest pending cases.

Q    In practice, how does that work?  Assuming that cases are pending from multiple tiers at all periods of time, what does that processing in priority

Page 159

of tier look like?

MR. PLATT:  Objection; ambiguous.

THE WITNESS:  The analysts would work on the tier 1 cases at that level, the data entry or verification or analysis first, before moving on to the second tier, before moving on to the third tier.

BY MS. ALAGESAN:

Q   So is it based on the batch ingesting, then, that as a batch is ingested, the first tier gets done first, then the second tier, then third, et cetera?

MR. PLATT:  Objection; asked and answered.

THE WITNESS:  It's based on the documents that are in their queue, and that's how different cases get assigned is when cases are ingested. There's a process for assigning, and then as different work is done, they're sort of marked with different indicators.  Then people take from different filtering systems, but again in order of tier, because you can filter by tier.

BY MS. ALAGESAN:

Q   And then how does it work with -- you know, when you have to like wait for a response from like an employer verifying a letter, would you wait until you get that response and can process a tier 1 case to

Page 160

completion before you then turn to tier 2, or is it just kind of like in the daily prioritization of someone's work?

MR. PLATT:  Objection; ambiguous, compound.

THE WITNESS:  Yeah, you keep working with what you have, so if you've sent out the letters and your verifications, then you would continue on to send out letters for your tier 2 people, and then when you get responses, you deal with the responses.

BY MS. ALAGESAN:

Q    Do you know how applications were prioritized before the scheme was implemented?

A    I do not know.

Q    Do you know if this prioritization scheme is used at other steps of the SIV adjudication process?

A    I do not know.

Q    Okay.  Turning to this chart that you have in paragraph 14 -- sorry.  Right above the chart, you say that "when average processing times are broken down by tier . . . the reduction in processing times is even more apparent."

Could you explain what you mean by that?

A    That we've gone bigger jumps from -- say tier 2 went from 302 days average processing time down

Page 161

to just 35 days.  222 days of tier 1 went down to 61

days.  Tier 5 was still the longest, but there are

more tier 5 cases, so that makes sense.

Q    And here when you're talking about number of

cases processed, is this using the all-cases

parameters you described before or just new

applications and appeals?  Sorry.  Gosh.  Just new

applications and reapplications.

MR. PLATT:  Objection; ambiguous.

THE WITNESS:  I do not remember.

BY MS. ALAGESAN:

Q    Does the ASIV unit use the prioritization

tiers also for appeals?

A    It's used for all our cases.

Q    Okay.  I am going to hand you another

document.

(Exhibit 8 was marked for

identification.)

BY MS. ALAGESAN:

Q    The document you just got has been marked

Exhibit 8 for identification.

A    Okay.

Q    Have you seen this document before?

A    Yes, I have.

Q    What is it?

Page 162

A    It is my second declaration.

Q    How can you tell that's what it is?

A    Because it has my name on it and my signature, and I remember looking at it and revising it, reviewing, and approving it.

Q    Who wrote this document?

A    I provided the substance, and the attorneys provided the form.

Q    Why did you submit this second declaration?

MR. PLATT:  Objection.

Actually, one moment.  I apologize.

Withdraw the objection.

THE WITNESS:  Primarily to highlight the progress made with devoting resources to the longest pending cases once a week.

BY MS. ALAGESAN:

Q    Can you explain more about that decision?

A    That was something we started talking about in January 2022 and looked into it, thought it would be feasible, gave it a try, started doing it, as well as starting the groundwork for getting official approval for doing that because of the inherent tension with the tier prioritization scheme, because with the tier prioritization scheme, since every time we have new cases, we have new tier 1 cases, there is

Page 163

a very real concern that some of the tier 5 cases, you could just never get to them, so we wanted to make sure that there was a way to keep things somewhat balanced.

Q    And what prompted you to start exploring this in January 2022?

A    Part of it has to do with the weirdness of calculating the average processing time, because you don't -- since you can't calculate it until you complete processing, by definition, if you complete processing on a case that's been languishing a long time, your average processing time goes up.

And so our processing times had been going down, but I wanted to make sure that we could keep them actually down so we could basically deal with the longest languishing ones, tolerate a temporary bump up in our average processing time if that's what it caused, but get a number that was more reflective of actually how long it was taking.

Q    So by allocating time for the longest pending cases, they're not deferred until some later point where they're all decided at the same time; is that right?

MR. PLATT:  Objection; misstates testimony.

THE WITNESS:  We didn't want there to be a

Page 164

huge range in average processing time, so if you've got new cases coming in that go through quickly, we try to get to a point where it would be more or less the same processing time for all cases.  Like that was the goal.

BY MS. ALAGESAN:

Q    And the longest pending cases, when decided, are going to have the longest processing times, right?

A    Yes.

Q    And then having those longer processing times affects the average calculation; is that right?

A    Yes.

Q    How did you decide on 20 percent?

A    It's easier to tell people to change what they're doing one day a week versus a couple hours here and there or a certain number of cases.

Q    Was that your decision to --

A    Yes.

Q    Does the longest pending cases that are reviewed on this one day include appeals as well?

A    Yes.

Q    Does it include revocations?

A    Yes.

Q    What was the effect of formalizing the decision in June 2022?

Page 165

Sorry.  I withdraw that.

In paragraph 5, the last sentence, it says that "On July 21, 2022, the Deputy Secretary of State for Management and Resources took the formal decision to make this a continuing practice."

Do you see that?

A    Yes.

Q    What was the effect of that formal decision?

A    The effect was basically that we didn't have to stop.

Q    And had it not been for that decision, would you have had to stop?

A    If DMR disagreed with our practice, yes, I would have had to stop.

Q    You mentioned earlier that you sought an exemption to do this.  Is this 20 percent allocation what you were talking about then?

A    Yes.

Q    And so was this decision to make it a formal practice a decision on the exemption request?

MR. PLATT:  Objection; ambiguous.

THE WITNESS:  I don't entirely understand your question.

BY MS. ALAGESAN:

Q    I was asking if the request for an exemption

Page 179

ACKNOWLEDGEMENT OF WITNESS

I, Melissa A. Schubert, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

| 2/1/2023 | /s/ Melissa Schubert |
| --- | --- |
| (DATE) | (SIGNATURE) |

Page 180

E R R A T A   S H E E T

IN RE:   AFGHAN AND IRAQI ALLIES VS. BLINKEN, et al

RETURN BY:

PAGE         LINE                          CORRECTION AND REASON

12           19          "was" should be "is", as I am still a foreign service officer

13           2,3         "vice counsel" should be "vice consul"

20           1           should be a comma in "office, in CST" as they are separate

26           21              "whereas" should be "where"

64           20          "description" not "descriptive"

80           10          "used in", not "using"

133          16          "changed to us", not "changed us"

138          3               "ASIV unit", not "ASIV units"

149          17          "post writes a" not "post rights of"

(DATE)              (SIGNATURE)

# Exhibit 13

to the Declaration of Deepa Alagesan in Support of Plaintiffs'
Objections to Defendants' Proposed Revised Adjudication Plan

*Afghan and Iraqi Allies Under Serious Threat Because of Their Faithful Service to
the United States v. Blinken, et al.*, Case No. 18-cv-01388-TSC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - -+
                                |
AFGHAN AND IRAQI ALLIES         |
UNDER SERIOUS THREAT            |
BECAUSE OF THEIR FAITHFUL       |
SERVICE TO THE UNITED           |
STATES, ON THEIR OWN AND        |
ON BEHALF OF OTHERS             |    Case Number:
SIMILARLY SITUATED,             |
                                |    1:18-cv-01388
        Plaintiffs,             |
                                |
   vs.                          |
                                |
ANTONY BLINKEN, et al,          |
                                |
        Defendants.             |
                                |
- - - - - - - - - - - - - - - -+

Rule 30(b)(6) Deposition of

The Department of State,

by and through its designated representative

MELISSA A. SCHUBERT

Wednesday, March 8, 2023

9:00 a.m.

Job No. 6734

Reported by:  Laurie Donovan, RPR, CRR, CLR

SA 257

Page 39

Q    Okay.  As an initial matter, I understand that, in the language I just read, COM staff would be more accurately represented by the COM designee; is that correct?

A    Yes.

Q    Why did the State Department eliminate the 120-day timeline for Afghan applicants at step 4?

A    To reflect the current reality of the situation we find ourselves in, it's sort of two different prongs.  One is that since August 2021, you can look at the Congressional reports we've done, and you can see that our average processing time has indeed been brought down and was under 120 days of receipt.

So if things had sort of continued as normal, we probably would have looked at the same sort of metric, but because we have received a recent and massive influx in new cases, we've got about 67,000, 68,000 right now awaiting review from the ASIV unit, it's just not feasible that we could pick a target average processing time that would be realistic and attainable.

So we didn't see any point in sort of setting something out, now that we know we would

Page 40

not be able to meet going forward, and so it seems, you know, at least if we're still processing cases, then, you know, there's a certain minimum level of activity that everybody knows is going on, and actually would give some meaningful reflection as to what the ASIV unit is actually doing as opposed to an average processing time that just keeps increasing because of the massive influx in cases we received.

Q   So to be clear, the two prongs you're describing are the prior reduction in processing time and then the current influx and increase in applications; is that correct?

A   Yes.

Q   So as to the increase in applications, you just mentioned that there are roughly 67,000 cases pending at ASIV for review; is that correct?

A   Correct.

Q   And how do you know that?

A   Because if you look at our SIV Manager, it tells you how many active cases we have.

Q   And does that number include appeals?

A   Yes.

Q   And does that number include revocations?

Case 1:18-cv-01388-TSC-MAU   Document 217-14   Filed 03/09/23   Page 5 of 46
USCA Case #25-5279   Document #2176641   Filed: 06/03/2026   Page 264 of 390

Page 41

A    Yes.

Q    So you can tell at any point in time how many active cases, including appeals and revocations, there are; is that correct?

A    Yes.

Q    All right, and then instead of a timeline, the revised performance standard in the proposed plan is a number of applications that ASIV will process each quarter; is that correct?

A    Correct.

Q    Why did ASIV decide to include a throughput standard?

A    Because that would provide more meaningful data than an average processing time measure, and because it would function as a canary in a coal mine.  If we were not meeting those targets which basically reflect what we've been able to do since August 2021, then there would truly be an issue going on with ASIV unit processing that would be worthy of further discussion.

Q    Okay.  First, can you tell me -- you said that that data would be "more meaningful than an average processing time."

Could you explain that a bit more?

Case 1:18-cv-01388-TSC-MAU    Document 217-14    Filed 03/09/23    Page 6 of 46
USCA Case #25-5279    Document #2176641    Filed: 06/03/2026    Page 265 of 390

Page 42

A    Yeah, average processing time, as I mentioned with the 67,000-case deluge, when we calculate average processing time, it's from the end, when it's on an agenda date, going back to the documentarily complete date, unless it's an appeal or a withdrawal of status.  So since we're ingesting the cases, that documentarily complete date doesn't reflect when we actively start reviewing the case.  It reflects when it showed up in the SIV Manager.

So we know with the 67,000 cases, you know, even if we are still processing them, once we start, within a hundred days or so of starting, that would not be reflected, because we wouldn't be able to start on say like the last 20,000 cases.

Assuming we didn't even get any more new ones, we just kept working on whittling down this pile.  You know, the first couple thousand would have better average processing times, but by the time we got to the last stack, it would be a much larger average processing, which wouldn't necessarily reflect --

(Reporter clarification.)

THE WITNESS:  By the time we began

SA 261

Page 43

processing the last 20,000 cases, probably, you know, a very long time would have elapsed since their document complete date, but we hadn't actively started processing it until much later.

So we'd have the cumulative time as the average processing time reported for that case, but it wouldn't truly reflect how long it took us to actively process the case.

(Reporter clarification.)

THE WITNESS:  So the average processing time would be cumulative from the documentarily complete date to the agenda date, which would not reflect the time that the ASIV unit spent actively processing the case.

MS. DAVILA:  Does that complete your answer?

THE WITNESS:  I believe so.

BY MS. ALAGESAN:

Q    So the reason that it wouldn't accurately capture the processing time is because there would be a period of time when the applicant's application was complete and awaiting review, but it was not actively being reviewed,

Page 44

because it was just waiting for someone to free up to review it; is that correct?

MS. DAVILA:  Objection; ambiguous.

THE WITNESS:  Correct.  If the idea of the average processing time is to have the measure of how efficient the ASIV unit is working, this would not give you very useful information.

BY MS. ALAGESAN:

Q    Okay, but the time that the application is documentarily complete and awaiting review, it's still in the government's control; is that correct?

A    Correct.

Q    And so is it the State Department's view that this government controlled step should only reflect time where ASIV is actively reviewing the case and not the time that the application is awaiting review by ASIV?

A    I think this step should show that the ASIV unit is continuing to operate efficiently, so as we've been doing since August 2021, if we continue to do this many cases, we would be continuing at least at the same level we had since August 2021.

Case 1:18-cv-01388-TSC-MAU   Document 217-14   Filed 03/09/23   Page 9 of 46
USCA Case #25-5279   Document #2176641   Filed: 06/03/2026   Page 268 of 390

Page 45

And it would give you more information, because as the number we report that we do every quarter increases, then you know that we're doing more cases; whereas if we were still doing average processing time, that number would keep going up, but it wouldn't necessarily reflect what we're doing and any changes in what we're doing, because that has such a long tail of catching up with anything, because you only calculate the average processing time when you finish a case, so by definition, when you do longer lasting cases, the average processing time is longer.

Q     But to my question before, which is a yes-or-no question, is it the State Department's view that this government-controlled step should only reflect time where the ASIV staff is actively reviewing the case and not the time that the documentarily complete application is awaiting review by an ASIV analyst?

MS. DAVILA:  Objection; ambiguous. Objection; compound.  Objection; mischaracterizes testimony.

You can answer.

THE WITNESS:  The government-controlled time does include when it's

Page 46

documentarily complete.  I just would add

that it's a rather meaningless term if it's

not more nuanced.

BY MS. ALAGESAN:

Q    And that's because the time that an

analyst is actually spending on the case is

shorter than the full time the applicant is

waiting for a COM decision; is that correct?

MS. DAVILA:  Objection;

mischaracterizes testimony.

BY MS. ALAGESAN:

Q    You may answer.

A    Please repeat the question.

Q    Sure.  I said "and that's because the

time that an analyst is actually spending on

reviewing the case is shorter than the full time

the applicant is waiting for a COM decision"; is

that correct?

A    Yes.

Q    Okay.  Why did DOS propose that the

standard be 4,500 applications per quarter, that

number specifically?

A    Because that reflects our productivity

since August 2021 when we instituted many

different efficiencies, we geared up to a higher

Page 47

staffing level that had stayed consistent pretty much for the year after that.

So it's a standard that is meaningful. We know we should be able to maintain it, and it shows -- you know, it's a baseline of healthy productivity, because it's roughly six times the number of cases that the ASIV unit was adjudicating back in fiscal year 2019 when the old plan had been being put together.

Q   Okay, and the 4,500 is roughly the level of cases that ASIV has been processing each quarter since about August 2021; is that correct?

A   Roughly.

Q   Okay, and you said earlier that there is about 67,000 applications currently pending; is that correct?

A   Yes.

Q   So if ASIV reviews 4,500 per quarter, how many quarters would it take to get through 67,000?

A   I find the math to be easier if you sort of approximate 20,000 cases a year, so 67,000 cases, it's three years and some change.

Q   So three years and change to get through the cases currently pending; is that correct?

Page 48

A    If we stayed at just that level of productivity, yes.

Q    Okay.  So under this proposal to adjudicate 4,500 application per quarter, the State Department plans to take at least three years to adjudicate the documentarily complete COM applications and appeals presently before it; is that correct?

MS. DAVILA:  Objection; misstates testimony.  Objection; mischaracterizes the proposed adjudication plan.

THE WITNESS:  Yes.  That is not correct, because the 4,500 is not a target.  It's not something where we'll hit 45 cases and then stop.  It is a floor, not a ceiling.

We are gearing up to adjudicate more, hire more, make increased efficiencies, so we fully intend to finish the 67,000 cases, as well as the additional ones that come in, faster than three years.

BY MS. ALAGESAN:

Q    But all the State Department is proposing to commit to for purposes of the proposed plan is 4,500 per quarter, correct?

A    Correct.

Page 49

Q   And that would come out to more than three years to adjudicate just these applications if no new applications are ingested; is that correct?

A   If we did not make any changes and we did not manage to adjudicate any more than that per quarter.

Q   So just, just meeting the standard that the State Department has put forth in this proposed plan and not exceeding it, it would take at least three years to adjudicate the applications presently before ASIV; is that correct?

MS. DAVILA:  Objection; mischaracterizes testimony.

THE WITNESS:  There's a lot of hypotheticals, but yes.

BY MS. ALAGESAN:

Q   Okay, and the ASIV unit is ingesting new applications and appeals on a weekly basis; is that correct?

A   Correct.

Q   And applications that are ingested going forward won't necessarily go to the back of that 67,000 application line; is that correct?

Page 50

A   The additional cases that get ingested are prioritized according to the tiering system.

Q   Right, so they won't necessarily be adjudicated after these 67,000 are completed?

A   Correct.

Q   And that's because, as you said, they are going to be adjudicated in accordance with this tiering system that prioritizes -- with this tiering system, correct?

A   Correct.

Q   And that tiering system prioritizes review based on the nature of an applicant's employment; is that correct?

MS. DAVILA:  Objection; mischaracterizes testimony.

THE WITNESS:  Based on the applicant's employment insofar as the connection and identification with the U.S. government was stronger or weaker.

BY MS. ALAGESAN:

Q   I see, so based on the perceived closeness of their relationship to the U.S. government; is that correct?

MS. DAVILA:  Objection; mischaracterizes testimony.

Page 51

THE WITNESS:  More or less correct.

BY MS. ALAGESAN:

Q    Okay.  Are there any other circumstances other than the tiering system under which a COM application or appeal would be processed before another earlier filed COM application or appeal?

MS. DAVILA:  Objection; ambiguous.

THE WITNESS:  Depending on the mechanisms where we received employment verifications or letters of recommendation.

BY MS. ALAGESAN:

Q    And when you say mechanisms for receiving employment verifications or letters of recommendation, what do you mean by that?

A    Cases we get through Project Rabbit and similar . . .

Q    Okay.  So would applicants who are matched through Project Rabbit jump forward in the application queue?

A    Yes.

Q    And would that be the same for the analogous State Department and Voice of America programs?

A    Yes.

Q    Are appeals prioritized any differently

SA 270

Page 52

than new applications and reapplications?

A   No.

Q   Is there anything else you can think of, any other circumstances you can think of under which a COM application would be processed before an earlier filed one, other than the tiering system or the Project Rabbit and analogous programs?

A   Occasionally we get word of humanitarian interest cases where someone has an urgent medical case or -- because so many of the applicants are still in Afghanistan with no way forward, but if we hear about applicants that are already outside of Afghanistan, ready to proceed further with the process, if they get COM approval, sometimes we can expedite some of those cases based on those considerations.

Q   And what is the mechanism by which those cases would -- the humanitarian interest cases would be identified to the ASIV unit?

A   There's no formal mechanism; it's just people who know this information reach out, and it eventually gets to us.

Q   And would it be the program analyst that makes the decision of whether to, as you said,

Page 53

expedite the review?

A     It's the director or deputy director's decision.

Q     And then same question for any expediting of review of COM applications for people outside of the United States [sic], how those get flagged to the ASIV unit.

A     I'm sorry --

MS. DAVILA:  Objection; ambiguous.

THE WITNESS:  Yeah, "outside of the United States"?

BY MS. ALAGESAN:

Q     Oh, sorry.  Gosh.  What I meant was outside of Afghanistan.

You mentioned that sometimes a case will be flagged of someone who is outside of Afghanistan where it makes sense, for whatever reason, to expedite review of their COM application; is that correct?

A     Yes.

Q     And how would those cases be identified to the ASIV unit?

A     There is a variety of different ways where people reach out and, through various email chains, eventually get to us.  Sometimes it's from

SA 272

Page 54

the consular section of the country where the Afghan applicants have found themselves, because they have reached out to the embassy or consulate and sort of mentioned their interest in proceeding but that they haven't gotten COM approval yet, and then the section will reach out to me.

Q   And if the ASIV director or deputy makes the decision to expedite review of one of these cases, practically speaking, what would happen?

A   It would be expedited, so it would be -- if it hasn't already started the data entry process, it would start data entry, go for verification, and then from there on to analysis.

Q   In terms of the analyst's review, would those cases of humanitarian interest or people outside of Afghanistan be prioritized over say a Tier 1 case?

A   It's usually not a zero sum game, because we have enough analysts, and the tier 1 cases tend to go through pretty quickly, so . . .

Q   All right.  So you said earlier that the change to the performance standard at step 4 is because of the increase in pending applications and also the reduction of the time that the ASIV unit spends reviewing a case; is that correct?

Page 55

A    Correct.

Q    We talked about the increase in pending applications, but turning to the reduction in processing time, how did that inform the State Department's decision to change to a throughput standard?

A    As I mentioned before, the average processing time would no longer be an accurate reflection because of the huge influx, but before that huge influx, what the ASIV unit was doing that was reflected in the Congressional reporting, we did bring down average processing time, so sort of our baseline productivity with those 4,500 cases per quarter does have us doing average processing times under 120 days when we actually can start touching the case.

Q    I see.  Is it fair to say that -- I'll withdraw.

Is it fair to say then that the time ASIV takes to review and process a case, once it starts actively reviewing the case, would be roughly the same as what you were previously reporting as the processing time at step 4?

A    Yes.

Q    Okay, and so the thought is that -- I

Page 56

think you said the processing times had come down to under 120 days?

A    Yes.

Q    And it would still take roughly that time to process COM applications and appeals once they begin review, but because of the increase in applications, it will be longer until they begin review; is that correct?

A    Correct.

MS. DAVILA:  Objection; ambiguous.

BY MS. ALAGESAN:

Q    Okay, and the ASIV unit will continue to report on the processing times at step 4 for purposes of the Congressional reports; is that correct?

A    Correct.

Q    And that would measure the time from when an application is documentarily complete to the time of a decision on the application; is that correct?

A    Correct.

Q    So the influx in applications doesn't affect the unit's ability to calculate processing time from the time of documentary completion to the time of the decision; is that correct?

Page 57

MS. DAVILA:  Objection; mischaracterizes testimony.

THE WITNESS:  You said the influx does not affect the ability to calculate based on agenda date minus document complete date.  That is correct.  It does not affect our ability.

MS. ALAGESAN:  Okay.  We've been going a little over an hour.  Can we take like a ten-minute break?

MS. DAVILA:  Counsel, we're thinking at the one and a half -- hour and a half in a five-minute break if that's . . . we can continue going.

MS. ALAGESAN:  I was asking to take a break now if you're all right with that. It would make sense for me.

MS. DAVILA:  Can we do five minutes?

MS. ALAGESAN:  Sure.

MS. DAVILA:  Okay, great.  Thank you.

(Whereupon, a short recess was taken.)

Page 58

BY MS. ALAGESAN:

Q    I want to turn next to the proposed template for progress reports in the proposed plan.  Can you turn to page 14 of 17 of Exhibit 24, please, and look at the row for step 4.

A    Okay.

Q    And what is your understanding of what's represented in this row, step 4?

A    As it says, it would be the number of new applications and reapplications, excluding appeals, for the first three boxes; the new applications and reapplications as well as appeals in the fourth box; and in the fifth box it says new applications and reapplications and appeals, but it should actually still exclude appeals.

Q    Okay.  So just to clarify, you're saying that the State Department intended for the last column of step 4, which would represent the "number beginning and ending the reporting period in the step," to say "new applications and reapplications," excluding appeals; is that correct?

A    Yes.

Q    And then turning back to the progress report template in the previous plan, so that's

SA 277

Page 59

Exhibit 1, page 12 of 14 at the top, and looking again at step 4, there is no exclusion of appeals in the first -- for the first three statistics; is that right?

A    I do not see any exclusions, no.

Q    Okay, and then the last two columns with the last two statistics don't break out appeals from new applications and reapplications; is that right?

A    Correct.

Q    Okay.  Why is the State Department proposing to exclude COM appeals when it reports on the number of applicants in step 4?

A    Because of the realities of the data that we have available and the accuracy, when we identify the cases, it's based on the documentation complete date, which is an accurate identifier for the applications and reapplications, but for the appeals, which includes the revocation cases as well, the actual trigger date would not be the documentarily complete date, because that actually refers back to the original adjudication, not the appeal for revocation/adjudication.

The actual sort of start date for an

Page 60

appeal case or revocation case is what, in the SIV Manager, we input as the appeal date, so that's essentially the date that the appeal or revocation became documentarily complete. So we put that in the appeal date, and so we can't really tell -- you need the correct appeal date in order to make the determination as to whether it would be in or during this reporting group or during this reporting period, but we can't get the appeal date until we've actually done the data entry on the case, because it's something that is obtained manually and input manually.

So we only know that we have the correct appeal date in order to do the calculation when we have actually completed adjudication on that case during the period, because obviously we've completed the adjudication. We did the data entry on it.

Q   Okay. I'm going to ask you to break that down a little bit.

So you said to identify cases, you need the document complete date. Could you explain why that is?

A   Well, if you're asking what cases did the ASIV unit have as of January 1, 2020, if it

Page 61

was documentarily complete, then we look for documentarily complete as of January 1, 2020 or before, because we would have had it before, and if it's still active with us, then we've had it as of that date.

So again, the documentation complete date is accurate for the new cases and reapplications, but for an appeal case, it would only be accurate if we looked at the appeal date, because that's when we actually got the appeal or revocation case that it became documentarily complete, and we would have ingested it, but because that doesn't become automatically input when we ingest an appeal case, it doesn't get updated until it's done manually as part of the data entry process.

We would only be able to accurately designate appeal and revocation cases during that reporting period once we have completed adjudication, because then we know that the data entry for that case was performed.

Q   Okay.  So the reason that filtering for appeal dates after say January 1 wouldn't accurately capture the number of pending appeals on January 1 is because there is some universe of

Page 62

appeals that will not have gone through data entry

yet, and so it didn't have that date populated; is

that right?

    A    Correct.

    Q    You mentioned earlier that you are able

to know the number of pending cases at ASIV at any

moment in time through SIVM; is that correct?

    A    Yes.

    Q    And that number of cases includes

appeals; is that right?

    A    Yes.

    Q    So if you wanted to know the number of

cases that were pending before ASIV on January 1,

you could just look at SIVM, and that number would

include all cases, including appeals; is that

correct?

    A    I can look at SIVM on any given day and

tell you what's pending on that day.  I can't

really go back for the historical data.

    Q    I see.  So you wouldn't be able to run a

report to determine the number of appeals pending

on January 1 at the end of that quarter because of

the problem with the -- with them lacking an

appeal document complete date that you described

before; is that correct?

Page 63

MS. DAVILA:  Objection; ambiguous.

THE WITNESS:  So if I was looking at SIVM on the last day of the reporting period, I could see what appeals cases we had, but I wouldn't necessarily be able to tell when they entered and if they -- they would be identified as appeal cases, but I still wouldn't know sort of when they had entered.

BY MS. ALAGESAN:

Q   Okay, and then similarly, if you were to look at SIVM on the first day of a reporting period, you could see the number of cases including appeals that existed that day, correct?

A   Yes.

Q   But you wouldn't be able to see when the appeal is entered; is that correct?

A   I wouldn't, I wouldn't be able to see when it became -- when it had become documentarily complete, yes.  I would just know that it was in our system and active that particular day.

Q   Okay.  So looking back at Exhibit 24, the proposed plan, step 4, in the second column, the "number at the beginning of the reporting period."

Page 64

Do you see that?

A    Could you repeat that?

Q    So just the first column in the template on page 3 -- oh, gosh.  Sorry.  Page -- what's labeled page 4 of 17 [sic] of Exhibit 24.

A    Yes.

Q    Okay, and then looking at the bolded heading for that table, in the first text that appears, it's in the second column, and it says "number at the beginning of the reporting period (as of month, date, year)."

Do you see that?

A    Yes.

MS. DAVILA:  Objection; ambiguous. Counsel said "4 of 17."  The record says "4 of 17," so I just want to clarify it's 14 --

MS. ALAGESAN:  Oh, sorry.  Thank you.  I was supposed to say "14 of 17," so let's start fresh.

BY MS. ALAGESAN:

Q    I am looking at page 14 of 17 of Exhibit 24, and I'm looking at the table that appears under the underlined heading, Roman numeral II, "Afghan Allies Protection Act of 2009," and then there's an "A" that says "Report," and then a

Page 73

recorded in SIV Manager manually.  That is the only appeal date that we can access when we're running an ad hoc report in SIV Manager to obtain data.

BY MS. ALAGESAN:

Q    Okay, but the day of the applicant contacting NVC for appeal is not recorded by NVC?

A    That is in the case notes.  It's not searchable.  You have to open the case and look through the case notes.

Q    Okay.

All right.  So then turning back to Exhibit 24, page 14 of 17 at the top, looking at step 4 row, in the -- for that first statistic, ASIV could accurately report that number if they checked SIV Manager on a certain day, but that would exclude appeals marked documentarily complete since the last weekly ingest; is that correct?

MS. DAVILA:  Objection; ambiguous.  Objection; compound.  Objection; mischaracterizes testimony.

THE WITNESS:  More or less correct, and as well, we would never be able to duplicate it later, so if we needed to

Page 74

double-check numbers, that would be impossible.

BY MS. ALAGESAN:

Q    Okay, but you could check on any given day what cases are currently pending, and that number would include the appeals presently before SIV; is that right?

A    Yes.

Q    As we discussed earlier, the statistic -- the corresponding statistic in the previous plan, so looking at Exhibit 1, page 12 of 14, where it says "number of class members at the beginning of reporting period."

Do you see that?

A    I do.

Q    Was the ASIV unit not including appeals in this statistic under prior litigation reporting?

A    I have no idea.

Q    Okay.

So I understand your testimony to be that there's no way of calculating this number accurately to include appeals now; is that correct?

A    Correct.

Page 75

Q    And to your knowledge, is that because of a change to the Department of State's systems?

A    I don't know if it's a result of the systems.  It's just a reflection of how they actually work right now.

Q    Okay.  This is -- the exclusion of appeals is a change that the State Department has made to the statistic, and so is it the State Department's testimony that the inability to exclude -- sorry -- the inability to include appeals is new from the time the previous plan was entered?

A    It is a refining of exactly what data we can generate and what we can't.

When I was looking at the tags, I think when we did the December report, it was overly inclusive of cases that shouldn't properly have been included, because they were tagged based on the documentarily complete date for appeal cases and not an eventual correct appeal date.

Q    Okay, so you don't know whether, under the State Department's compliance with the previous plan, whether appeals were, in fact, being included in this -- for this statistic at step 4; is that correct?

Page 76

A      I do not know about anything supplied prior to August 2021.

MS. ALAGESAN:  Okay.  I'm going to mark the transcript here for supplemental testimony on whether the statistic, as reported under the previous plan, included appeals based on the State Department's proposal to exclude appeals from this calculation in the proposed plan.

MS. DAVILA:  The government objects to that request, noting that the witness has testified to justifications regarding the changes to the new plan, and that the magistrate and district court have limited discovery to the new plan.

MS. ALAGESAN:  And the changes from the old plan.  So just to be clear, this is a change the State Department has proposed to limit the statistic to new applications and reapplications, excluding appeals, which limitation did not exist in the previous plan, so I just want to make that clear for the record.

MS. DAVILA:  The magistrate's quoted language is "justifications for

Page 77

modification."  The witness has so testified.

MS. ALAGESAN:  Okay.  We can talk more about this later.

BY MS. ALAGESAN:

Q    Looking back at the proposed plan in the fifth column, is there a specific reason that the State Department is proposing to distinguish new applications and reapplications from appeals when reporting this statistic?

A    Just if you're looking to compare across the prior boxes which exclude appeals, it would make it easier to have apples and apples, with oranges separate.

Q    Okay, and this doesn't involve the system limitations you discussed earlier, because it's calculated at the time of -- because it refers to the time of adjudication; is that correct?

A    Right.  It only concerns cases that have completed adjudication during the reporting period.

Q    Okay.

You mentioned earlier that the date the applicant contacts NVC for the appeal is recorded in the case notes.  Is that date added to the file

Page 78

through the data entry process?

A    No.   We use different definitions of appeal dates for different purposes.

For NVC's purposes, they're looking at the date they were contacted by the applicant to say that they want an appeal and making sure that they have received that communication or the communication was sent within the 120-day window. So for their purposes, they are thinking about the appeal date as the date the applicant asked for.

For our purposes, we are thinking of the appeal date as the date that that appeal case was, in turn, documentarily complete, because once they ask for an appeal within the 120-day window, that case stays active, but just like any other case, they need to continue to supply whatever document or information was needed.

So if they were -- if the denial was because they couldn't prove that they had completed a year of employment, and they want to appeal that, then they need to send in additional evidence, saying no, here, you can see there's definitely over a year employment here.

And then once NVC receives that, then they mark the appeal case documentarily complete,

Page 79

and it's at that point that we would continue that -- count that date as our appeal date, is when NVC has made that other one documentarily complete, which again we can only get looking at the case notes.

Q    I know you said you consider like these two different dates.  When the ASIV staff is entering the date of appeal was documentarily complete, is it in the same field as NVC's appeal date, or where is that recorded?

A    There is no field for NVC's appeal date. It's just something that's in their case notes. For us, it's in SIV Manager.  They manually input it in a data field that is labeled "Appeal Date," and so -- but what that is substantively is the date that was in the case notes for SQ SIV --

(Reporter clarification.)

THE WITNESS:  The appeal date refers to the case note entered by NVC, saying, you know, on February 2, the appeal case was documentarily complete, and so we would take that February 2 and enter that as our appeal date.

BY MS. ALAGESAN:

Q    Is that a field that exists only in SIV

Page 80

Manager?

A    Only in SIV Manager, yes.

Q    And so -- and the time that that date is entered will be after the ingest process and then after that particular case is undergoing the data entry process of ASIV review; is that correct?

A    Yes.

MS. DAVILA:  Objection; ambiguous, compound.

BY MS. ALAGESAN:

Q    When I asked before if you knew if the State Department was previously reporting, including appeals at this -- for this statistic under the previous plan, who would you ask to find out that information?

MS. DAVILA:  Objection; ambiguous.

THE WITNESS:  I, I'm not quite sure.  I guess I'd have to track down who was responsible for generating the data for that report and ask them.

BY MS. ALAGESAN:

Q    Okay, and if you were talking to the person who was responsible for generating the data for those previous reports, they would know how that reporting is done?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
SA 292

Page 81

MS. DAVILA:  Objection; calls for speculation.

THE WITNESS:  Yeah, I mean it was quite a while ago, and it's a very involved process, so assuming they'd even remember at this point.

BY MS. ALAGESAN:

Q    But that person wouldn't necessarily be a person who knows how reporting is done today; is that correct?

A    Correct.

Q    And that's because you're in charge of the reporting that is done today?

A    Correct.

MS. ALAGESAN:  Okay.  I think we can take another break.  I would like to speak to counsel first, off the record, if you don't mind stepping out.

(Whereupon, a short recess was taken.)

BY MS. ALAGESAN:

Q    So you testified earlier that you don't know whether the State Department was previously including appeals at step 4 in the litigation reports under the previous plan; is that right?

Page 82

A    I think that is what I testified.

Q    Okay.

Is it fair to say then that the State Department didn't consider whether it was reporting appeals previously under the prior plan in making the decision to exclude appeals in the reporting under the proposed plan?

MS. DAVILA:  Objection; mischaracterizes testimony.

THE WITNESS:  Yeah, upon further reflection, when we were putting together documents for the report in December, the tags that get generated to identify class members were being applied to appeal cases, so whether or not that would have technically been correct based on the splitting of hairs with the appeal date and all that, regardless, those cases were being tagged, so it would make sense that, as tagged cases, they were being included in the reporting at a prior time.

BY MS. ALAGESAN:

Q    Okay.  So --

A    Just like we included them in our December reporting.

Page 83

Q    Okay.  So you know that appeal cases were included in the step 4 reporting under the previous plan; is that correct?

A    I -- you mean they were included in the plan as written, the previous plan?

Q    Sorry.  I'm talking about when the State Department was reporting the number of COM cases at step 4 in its progress reports under the previous plan, whether appeal cases were being included in those statistics.

A    I mean I can't say I know, because I was not involved with the preparation of those reports, but I know that appeals cases were being tagged, so I infer that it was very likely that they were being included.

Q    Okay, and that inference is based on your experience filtering for tagged cases and preparing the January 2023 report; is that correct?

A    Yes.

Q    And the tags on the cases are added by ASIV staff; is that right?

A    As part of the ingest process.

Q    Okay, through the ingest process.  You said, though, that while you can infer that

Page 84

appeals were included in prior reporting, you can't speak to accuracy; is that correct?

A   Correct.  I believe it was probably overly inclusive, because, as I mentioned, further refining of the appeal dates to actually identify when ASIV would have received those cases.

Q   Right, so because, under prior ASIV practice, the appeal date field was being populated with the date that the applicant contacted NVC for the appeal, it would be overinclusive?

A   Well, it would, again, not have been updated until there was the manual data entry process, so I believe that whatever tag process goes through relies on the documentation complete date, even with respect to the appeal date, what the appeal cases, when it's tagging them, which would result in cases being tagged that probably weren't necessarily . . .

Q   I see.  So people would be able to identify appeal cases, but the date they would be looking at for inclusion in the progress report was the documentarily complete date of the initial application; is that correct?

A   That is what I would surmise likely

happened.

Q   Okay, and then because those tags have already been applied, you could continue to report on appeals for the class members covered by the previous plan by using those existing tags; is that right?

MS. DAVILA:  Objection; ambiguous.

THE WITNESS:  Yeah, I find your question a little confusing.  Could you restate?

BY MS. ALAGESAN:

Q   I understood, from what you testified before, that you were able to identify appeals for inclusion in the January 2023 report, because they had previously been tagged as class members for purposes of the previous plan; is that right?

A   Correct.  We just relied on the tags.

Q   Okay.  So you could feasibly rely on the tagging of class members, under the previous plan, to include appeals in reporting as to that subset of applicants; is that correct?

A   Sorry.  Could you repeat that last part?

Q   Yes.  So I'm just basically trying to figure out if those tags -- I understand from your testimony that the existence of those tags would

Page 86

allow you to report on appeals for that subset of

class members covered by the previous plan,

because those tags already exist.

Is that accurate?

MS. DAVILA:  Objection;

mischaracterizes testimony.  Objection;

ambiguous.

THE WITNESS:  Yeah, they might have

been included in the reporting, but I think

that largely would have been something that

made the reporting inaccurate.

BY MS. ALAGESAN:

Q    I see, and you said it would have been

inaccurate, because it's overinclusive, and could

you describe that element of the inaccuracy a

little more?

A    Yes, because when we sort of looked at a

couple of the cases that had been tagged, their

documentarily complete dates were, you know, just

a couple weeks old.  So I don't know if it

triggered on the application date and something

else, but yeah, these were appeal cases that we

had not had with us very long, and it looked like

they hadn't even been documentarily complete on

the first iteration that long, and yet they were

Page 87

still being tagged.

So we didn't really have the time to dig deeper in a forensic manner, but it seemed clear that if we're reporting these as case numbers, we're likely overstating the number of case numbers that existed at that point in time.

Q    In that example you just described where you said, for example, there was a case that had been tagged, and the documentarily complete dates were only a couple weeks old, but these were appeal cases that you hadn't had for very long, you said "they hadn't even been documentarily complete on the first iteration."

What do you mean by that?

A    I mean like the first adjudication that was then being appealed?

Q    Yes.

A    That first adjudication wasn't even that old.  Like that first case had been documentarily complete, maybe, you know, four months ago, and then it had a SIVM decision that was appealed, and then we got the appeal case quickly, and yet it still wound up being tagged.

Q    Did you look into that any further?

A    There really wasn't time to -- I mean I

Page 88

looked into it to the extent that like figuring out exactly how the automatic tagging and everything worked would be a lot, so . . .

Q    Is there anything about the proposed plan that you were prepared to testify about that we have not covered so far?

A    I don't believe so, no.

Q    When you were talking a little bit earlier about those unusual cases and how they hadn't been documentarily complete for a long time, did you look to see whether the first adjudication took longer than nine months so that the tagging would be correct?

MS. DAVILA:  Objection; ambiguous.

THE WITNESS:  The documentarily complete date, which refers to that initial adjudication, was nowhere near nine months prior, so . . .

BY MS. ALAGESAN:

Q    And do you know whether NVC ever overwrites the document complete date based on the document complete date of the appeal?

MS. DAVILA:  Objection; calls for speculation.

THE WITNESS:  I don't think they

Page 89

have ever done that or could.

BY MS. ALAGESAN:

Q    Do you know why else the document complete -- or why the document complete date would have been so recent, compared to when you were looking at it?

A    I mean that would have been the correct document complete date.  Why it was tagged and what triggered the tagging is the unknown.

Q    Okay.

Did you review any documents during the deposition, including during breaks, other than the exhibits I handed to you?

A    No.

Q    Were there any documents you wish you could have looked at today to support your testimony?

A    No.

Q    Did you communicate with anyone about the deposition today, including during breaks?

A    No.

Q    Is there anything from your testimony that you would like to correct?

A    I do not think so.

Q    Is there anything that you would like to

# Tab 1 - Modified Revised Adjudication Plan Clean Version

## [PROPOSED] REVISED ADJUDICATION PLAN

### I.   CLASS MEMBER IDENTIFICATION

Pursuant to the Court's Order of February 5, 2020, class members in this matter are "all people who have (1) applied for an Afghan or Iraqi [Special Immigrant Visa ("SIV")] pursuant to the Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, 123 Stat. 807 ("AAPA"), and the Refugee Crisis in Iraq Act of 2007, Pub. L. No. 110-181, 222 Stat. 395 ("RCIA"), by submitting an application for [Chief of Mission ("COM")] approval, and (2) whose applications have been awaiting government action for longer than nine months."

The Adjudication Plan approved on June 14, 2020, applied to certain class members, including those who had applied for COM approval prior to August 19, 2019. Defendants reported on the progress of this limited class through a 14-step adjudication process ("AAP Class"). Given the limitations on the data systems in which Defendants maintain records for SIV applicants, which do not specifically identify whether and for how long an applicant has been at a government or an applicant-controlled step or part of step, the parties recognized that the AAP Class was both over- and underinclusive. In addition, because multiple systems are involved, tracking this same AAP Class from quarterly report to quarterly report proved to be difficult and unduly burdensome for Defendants. This resulted in discrepancies that required a significant amount of time and resources on the part of Defendants to resolve. In addition, since the Adjudication Plan was originally approved, the volume of SIV applications has grown significantly. The Court also has ordered the new methodology to include those applicants who joined the class after May 21, 2020. In light of this prior experience and these new developments, for purposes of these clarifications to the

Revised Adjudication Plan, Defendants will include all Afghan and Iraqi SIV applicants in their reporting.[1]

## II.    REVISED ADJUDICATION PLAN STANDARDS

For individuals applying for Iraqi SIVs, Defendants Department of State and U.S. Citizenship and Immigration Services ("USCIS") will endeavor to meet the performance standards below in section A. For individuals applying for Afghan SIVs, Defendant Department of State will endeavor to meet the performance standards below in section B, and for individuals with COM approval dates before July 20, 2022, and who filed Form I-360 petitions, USCIS will endeavor to meet the performance standards below in section C.[2]

A. Refugee Crisis in Iraq Act of 2007

| Stage | Step | Description | Revised Adjudication Plan Performance Standard |
|---|---|---|---|
| COM application process, including appeals | 1 | Applicant submits a complete COM application or appeal package to State's National Visa Center ("NVC"). | N/A: Applicant-Controlled |
| | 2 | NVC reviews documents for completeness. | NVC will complete review within 15 business days of receipt of the applicant's submission (a submission is an application or an appeal, or additional documentation if such documentation was requested by NVC). |
| | 3 | NVC sends completed application or appeal package to the COM Designee for Iraq SIV applicants. | NVC will send the application or appeal to the COM Designee within 5 business days of determining the application or appeal to be documentarily complete. |
| | 4 | COM staff reviews the COM application, and the COM Designee makes a | The COM Designee will adjudicate a completed application or appeal within 60 calendar days of receipt from NVC. |

[1] The Iraq SIV program sunsetted in 2014 and is no longer accepting new applications.
[2] USCIS has a steadily diminishing role in the Afghan SIV application process. As of July 20, 2022, all new SIV applications are filed with the Department of State via Form DS-157, consolidating the COM approval and petition adjudication responsibilities to Department of State.

2

| | | | |
|---|---|---|---|
| | | decision. The applicant is automatically informed of the decision. | |
| Form I-360 Petition adjudication process | 5 | Applicant submits Form I-360 to USCIS | N/A: Applicant-Controlled |
| | 6 | USCIS adjudicates petition and sends to NVC if approved. | Upon receipt of a petition from the applicant, USCIS will adjudicate the petition and send an approved petition to NVC within 60 calendar days unless USCIS issues a Request for Evidence ("RFE") or a Notice of Intent to Deny ("NOID") to the applicant.<br><br>Upon receipt of a response to an RFE or a NOID, USCIS will adjudicate the petition and send an approved petition to NVC within 60 calendar days.<br><br>Cases that require additional processing time to reconcile any national security concerns, see AAPA § 602(b)(4)(B); RCIA § 1242(c)(2), will be identified on the progress reports in the following manner: number of cases pending between 90-180 calendar days; number of cases pending between 181-240 calendar days; number of cases pending between 241 calendar days or more. For the purpose of progress reporting, the timeframes will be calculated starting from the date of receipt of the applicant's petition. USCIS will request that third party agencies prioritize the vetting of these cases. USCIS cannot require a third-party agency to complete vetting in any particular timeframe.<br><br>Based on these target timeframes, all cases awaiting USCIS adjudication as of the date of the beginning of each reporting period will be adjudicated before the end of the same reporting period, unless USCIS issued an RFE or a NOID or the case requires additional processing time to reconcile any national security concerns.<br><br>Following approval of these clarifications to the Revised Adjudication Plan and every 90 days thereafter, Defendants shall file a progress report with the Court within 30 days of the end of the 90-day |

3

| | | | reporting period. The progress report will include Defendants' performance under the clarified Revised Adjudication Plan standards in section III during the prior 90-day period. |
|---|---|---|---|
| Visa interview process, including pre- and post-interview | 7 | NVC sends an instruction packet to applicant requesting standard immigrant visa documentation, including Form DS-260. | Upon receipt of the petition from USCIS, NVC will send an instruction packet to the applicant within 15 business days. |
| | 8 | Applicant submits all required documentation, per the instruction packet, to NVC. | N/A: Applicant-Controlled |
| | 9 | NVC reviews documents for completeness, corresponding with applicant when additional documentation is needed. | Upon receipt of the Form DS-260 or further information requested by NVC, NVC will determine whether the case is documentarily complete and notify the applicant within 15 business days of receipt. |
| | 10 | NVC schedules applicant for next available visa application interview at U.S. embassy or consulate. | After the NVC determines the case is documentarily complete, the NVC will offer the applicant the next available interview within 10 business days of making that determination.<br><br>The NVC will schedule the interview within 60 calendar days of contacting the applicant unless the applicant requests a different interview location or interview time or unless there are reasonable circumstances for the delay as explained in the progress reports. |
| | 11 | Applicant is interviewed and biometrics are collected by consular officer on the scheduled appointment date. Additional national security screening, if needed, is initiated following the interview. | After completion of the visa application interview, if the consular officer refuses the visa application under INA section 221(g) (8 U.S.C. § 1201(g)) for additional national security screening, the consular officer will initiate it within 5 business days.<br><br>If the applicant is required to provide any additional information or documentation, the consular officer will initiate any additional national security screening within 5 business days of receipt of all necessary information or documentation. |

4

| | 12 | The applicant's case undergoes additional national security screening, if needed. | All cases refused under INA section 221(g) (8 U.S.C. § 1201(g)) for additional national security screening that is solely within the Department of State's control will be completed within 90 calendar days.<br><br>All cases refused under INA section 221(g) (8 U.S.C. § 1201(g)) for additional national security screening that is not solely within the Department of State's control, and which require additional processing time to reconcile any national security concerns, see AAPA § 602(b)(4)(B), RCIA § 1242(c)(2), will be identified in the progress reports in the following manner: number of cases pending greater than 120 calendar days; number of cases pending greater than 180 calendar days; and number of cases pending greater than one year.<br><br>For the purpose of progress reporting, the beginning date for these cases is the date the consular officer submitted the case for additional national security screening.<br><br>The Department of State will request that third party agencies expedite the processing of applicants. The Department of State cannot require a third-party agency to complete their actions in any particular timeframe. |
| Visa issuance to eligible applicants | 13 | Upon completion of additional national security screening, applicant is instructed to obtain a medical exam. The visa is issued if applicant is eligible. In some cases, the passport will have expired and requires renewal by the applicant. | N/A: Applicant-Controlled |

5

SA 307

B. Afghan Allies Protection Act of 2009

| Stage | Step | Description | Revised Adjudication Plan Performance Standard |
|---|---|---|---|
| COM application process, including appeals | 1 | Applicant submits a COM application or appeal package to State's NVC. | N/A: Applicant-Controlled |
| | 2 | NVC reviews documents for completeness. | NVC will complete review within 15 business days of receipt of the applicant's submission (a submission is an application or an appeal, or additional documentation if such documentation was requested by NVC). |
| | 3 | NVC marks completed application or appeal as "document complete" | NVC will mark the application or appeal as "document complete" as soon as the application or appeal is determined to be documentarily complete. |
| | 4 | COM staff processes and reviews the COM application or appeal package and DS-157 petition for special immigrant status, and the COM Designee makes a decision. The applicant is automatically informed of the decision. | COM Designee will adjudicate 4,500 completed applications and/or appeals per quarter. |
| Visa interview process, including pre- and post-interview | 5 | NVC sends instruction packet to applicant requesting standard immigrant visa documentation, including Form DS-260. | Upon receipt of COM approval and Form DS-157 petition, or an approved Form I-360 petition from USCIS, NVC will send an instruction packet to the applicant within 15 business days. |
| | 6 | Applicant submits all required documentation, per the instruction packet, to NVC. | N/A: Applicant-Controlled |
| | 7 | NVC reviews documents for completeness, corresponding with | Upon receipt of the Form DS-260 or further required information requested by NVC, NVC will determine whether the case is documentarily complete |

6

| | | | |
|---|---|---|---|
| | | applicant when additional documentation is needed. | and notify the applicant within 15 business days of receipt. |
| | 8 | Applicant informs NVC of alternate immigrant visa processing post where the applicant will be able to personally appear and make a visa application. An applicant may keep their case assigned to Kabul, however, such a case would not be considered pending government action unless and until the U.S. Embassy in Kabul is able to resume visa processing. | N/A: Applicant-Controlled |
| | 9 | NVC schedules applicant for next available visa application interview at applicable U.S. embassy or consulate. | NVC will provide an interview date to the applicant within 60 calendar days. However, at posts where the demand for interview slots exceeds capacity, NVC will provide an interview date to the applicant within 60 calendar days of the availability being reported to NVC. |
| | 10 | Applicant is interviewed and biometrics are collected by consular officer on the scheduled appointment date.  Additional national security screening , if needed, is initiated following the interview. | After completion of the visa application interview, if the consular officer refuses the visa application under INA section 221(g) (8 U.S.C. § 1201(g)) for administrative processing, the consular officer will initiate any administrative processing within 5 business days.

If the applicant is required to provide any additional information or documentation, the consular officer will initiate any administrative processing within 5 business days of receipt of all necessary information or documentation. |
| | 11 | The applicant's case undergoes additional national security screening, if needed . | All cases refused under INA section 221(g) (8 U.S.C. § 1201(g)) for additional national security screening that is solely within the Department of State's control will be completed within 90 calendar days. |

7

| | | | All cases refused under INA section 221(g) (8 U.S.C. § 1201(g)) for administrative processing that is not solely within the Department of State's control and which require additional processing time to reconcile any national security concerns, see AAPA § 602(b)(4)(B), RCIA § 1242(c)(2), will be identified in the progress reports in the following manner: number of cases pending greater than 120 calendar days; number of cases pending greater than 180 calendar days; and number of cases pending greater than one year.<br><br>For the purpose of progress reporting, the beginning date for these cases is the date the consular officer submitted the case for additional national security screening.<br><br>The Department of State will request that third party agencies expedite the processing of applicants. The Department of State cannot require a third-party agency to complete their actions in any particular timeframe. |
|---|---|---|---|
| Visa issuance to eligible applicants | 12 | Upon completion of additional national security screening, applicant is instructed to obtain a medical exam, if required. The visa is issued if applicant is eligible. In some cases, the passport will have expired and requires renewal by the applicant. | N/A: Applicant-Controlled |

8

C. Afghan Allies Protection Act of 2009: Form I-360 Petitions Reviewed By USCIS

| Stage | | Description | Revised Adjudication Plan Performance Standard |
|---|---|---|---|
| | | USCIS adjudicates petition and sends to NVC if approved. | Upon receipt of a petition from the applicant, USCIS will adjudicate the petition and send an approved petition to NVC within 60 calendar days unless USCIS issues a Request for Evidence ("RFE") or a Notice of Intent to Deny ("NOID") to the applicant.<br><br>Upon receipt of a response to an RFE or a NOID, USCIS will adjudicate the petition and send an approved petition to NVC within 60 calendar days.<br><br>Cases that require additional processing time to reconcile any national security concerns, see AAPA § 602(b)(4)(B); RCIA § 1242(c)(2), will be identified on the progress reports in the following manner: number of cases pending between 90-180 calendar days; number of cases pending between 181-240 calendar days; number of cases pending between 241 calendar days or more. For the purpose of progress reporting, the timeframes will be calculated starting from the date of receipt of the applicant's petition. USCIS will request that third party agencies prioritize the vetting of these cases. The parties understand that USCIS cannot require a third-party agency to complete vetting in any particular timeframe.<br><br>Based on these target timeframes, the parties expect that all cases awaiting USCIS adjudication as of the date of the beginning of each reporting period will be adjudicated before the end of the same reporting period, unless USCIS issued an RFE or a NOID or the case requires additional processing time to reconcile any national security concerns.<br><br>Following approval of these clarifications to the Revised Adjudication Plan and every 90 days thereafter, Defendants shall file a progress report with the Court within 30 days of the end of the 90-day reporting period. The progress report will include Defendants' performance under the clarified Revised Adjudication Plan standards in section III during the prior 90-day period. |

### III.    PROGRESS REPORTS

Beginning 90 days after approval of this Proposed Revised Adjudication Plan and every 90 days thereafter, Defendants shall file a progress report with the Court within 30 days of the end of the 90-day reporting period. The progress report will include Defendants' performance under the Revised Adjudication Plan Standards in section II during the prior 90-day period. If Defendants' performance does not meet the standard for any particular step, the progress report will include an explanation regarding why Defendants' performance did not meet the standard and, if appropriate, include actions to be taken to improve performance to bring it in line with the standard. The template for the progress report is attached hereto.

If Defendants meet their standards for four consecutive quarters, Defendants shall thereafter file a progress report with the Court every 180 days (instead of every 90 days).

If Defendants' performance does not meet the standard, and Plaintiffs on a good faith basis believe that Defendants have not substantially complied with the Revised Adjudication Plan, within fourteen (14) days after filing of the progress report, Plaintiffs must notify Defendants in writing, specifying the basis for Plaintiffs' challenge to Defendants' performance. Within fourteen (14) days of receipt of Plaintiffs' correspondence—or at another time mutually agreed upon by the parties—the parties will meet and confer to attempt to resolve any differences. No party may file an enforcement motion or otherwise seek judicial relief related to the allegations of substantial noncompliance until after this meet and confer, and failure by a party to meet any of the above deadlines constitutes waiver of the right to seek judicial relief with respect to an allegation.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

AFGHAN AND IRAQI ALLIES UNDER
SERIOUS THREAT BECAUSE OF
THEIR FAITHFUL SERVICE TO THE
UNITED STATES, ON THEIR OWN
AND ON BEHALF OF OTHERS
SIMILARLY SITUATED,

        Plaintiffs,

    v.

MICHAEL R. POMPEO, *et al.*,

        Defendants.

Civil Action No. 18-01388 (TSC) (MAU)

---

## OPINION & ORDER

Plaintiffs—a class of Afghan and Iraqi Special Immigrant Visa (SIV) Applicants whose applications have been pending for more than nine months—brought this class action to compel Defendants to process and adjudicate their SIV applications in accordance with Congress's instructions. Plaintiffs move to strike three declarations attached to Defendants' Motion for Relief from Judgment. Pls.' Mot. to Strike ("Mot. to Strike") at 1, ECF No. 216. Because Defendants' motion for relief from judgment has been resolved by this court and the D.C. Circuit, the court will **DENY** Plaintiffs' Motion to Strike as **MOOT**.

In 2019, the court granted summary judgment to Plaintiffs on Counts One and Two of their Amended Complaint. *Afghan & Iraqi Allies v. Pompeo*, No. 18-CV-01388 (TSC), 2019 WL 4575565 (D.D.C. Sept. 20, 2019) (*Afghan & Iraqi Allies II*). The court ordered the parties to develop a joint plan for "promptly processing and adjudicating the applications of current class members, *id.* at *11, and, in June 2020, the court approved the parties' proposed joint plan, ECF

Page **1** of **3**

No. 113.  In May 2022, Defendants moved for relief from the judgment, Mot. for Relief from J., ECF No. 163, attaching declarations from nine officials from the Department of State or Department of Homeland Security.  *See* Exs. A – I, ECF Nos. 163-1–9.

The court denied Defendants' motion and referred the case to a magistrate judge for the development of a new plan, including discovery into the declarations and any other justifications for proposed modifications to the adjudication plan.  *Afghan & Iraqi Allies v. Pompeo*, 643 F. Supp. 3d 148, 157 (D.D.C. 2022) (*Afghan & Iraqi Allies III*), *aff'd*, 103 F.4th 807 (D.C. Cir. 2024). The D.C. Circuit recently affirmed that decision, *id.,* and development of a modified proposed adjudication plan is underway, *see* Notice of Modifications to Defs.' Proposed Adjudication Plan, ECF No. 243.

While Defendants' appeal was pending, Plaintiffs moved to strike three of the declarations attached to Defendants' motion for relief from judgment: the Declaration of Maren Brooks, ECF No. 163-1, and in part the Declarations of Neal Vermillion, ECF No. 163-7, and Evelyn Martin, ECF No. 163-8 (collectively, the "Declarations").  *See* Mot. to Strike at 1.  Plaintiffs argue that depositions revealed the declarants lacked personal knowledge of the information in their declarations.  *Id.*  For instance, Declarant Brooks stated that she did not review any documents underlying the declaration, Ex. 4 to Decl. of Kimberly Grano, ECF No. 216-5 at 26; she was not provided with any information other than the draft of the declaration, *id.* at 26–27; and her knowledge of certain facts was "informed only by the declaration," *id.* at 40.

Because Defendants' motion for relief from judgment has been resolved and the Court of Appeals issued the mandate, the court will deny Plaintiffs' motion to strike as moot.  Striking the Declarations at this stage would have no effect. The underlying motion, which the Declarations sought to bolster, has been denied.  *See Citibank, N.A. v. FDIC*, 827 F. Supp. 789, 789 n.1 (D.D.C.

1993) ("Because the Declaration related only to the cross-motions, plaintiff's argument is moot and the Motion to Strike is denied."); *Mills v. Billington*, No. 04-CV-2205 (FJS-AK), 2013 WL 12312811, at *2 (D.D.C. May 23, 2013) (motion to strike declarations "was rendered moot" when the underlying motion was denied); *cf. Cause of Action v. Nat'l Archives & Recs. Admin.*, 926 F. Supp. 2d 182, 189 (D.D.C. 2013) (denying motion to strike as moot when declarations did not impact resolution of underlying motion).

As Plaintiffs note, Defendants have not submitted the challenged Declarations in support of their modifications to the proposed adjudication plan. *See* Mot. to Strike at 4–5; Notice of Modifications to Defs.' Proposed Adjudication Plan. To the extent Defendants rely on the Declarations to justify their proposal, the magistrate judge will resolve disputes in accordance with the court's referral for the development of a new plan. Minute Order (Dec. 1, 2022). Plaintiffs' Motion to Strike, ECF No. 216, is **DENIED** as **MOOT**.


Date: October 9, 2024

*Tanya S. Chutkan*
_____
TANYA S. CHUTKAN
United States District Judge

SA 315

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Afghan and Iraqi Allies Under    ) Civil Action
Serious Threat Because of    ) No. 1:18-cv-01388-TSC-MAU
Their Faithful Service to the    )
United States, on Their Own    )
and on Behalf of Others    )
Similarly Situated,    )
    ) **Adjudication Plan**
                Plaintiffs,    )
    )
vs.    )
    )
Michael R. Pompeo, *et al.*,    ) Washington, D.C.
    ) **October 10, 2024**
                Defendants.  ) Time:  2:10 p.m.

_____

**Transcript of Adjudication Plan
Held Before
The Honorable Moxila A. Upadhyaya
United States Magistrate Judge**

_____


A P P E A R A N C E S

For the Plaintiffs:    Kimberly R. Grano
                Deepa Alagesan
                INTERNATIONAL REFUGEE ASSISTANCE
                PROJECT
                One Battery Park Plaza
                New York, New York 10004

                Rebecca C. Kerr
                FRESHFIELDS BRUCKHAUS DERINGER US LLP
                3 World Trade Center
                175 Greenwich Street
                New York, New York 10007

                Mia Tsui
                FRESHFIELDS BRUCKHAUS DERINGER US LLP
                855 Main Street
                Redwood City, California 94063

APPEARANCES (continued):

For the Defendants:     Ruth Ann Mueller
                        UNITED STATES DEPARTMENT OF JUSTICE
                        Office of Immigration Litigation
                        450 Fifth Street, Northwest
                        Washington, D.C. 20001

                        David J. Byerly
                        Richard G.W. Ingebretsen
                        Caroline McGuire
                        UNITED STATES DEPARTMENT OF JUSTICE
                        Civil Division
                        P.O. Box 868 Ben Franklin Station
                        Washington, D.C. 20044

_____

Stenographic Transcribing Court Reporter:
                        Nancy J. Meyer
                        Registered Diplomate Reporter
                        Certified Realtime Reporter

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Good afternoon, Your Honor.  This is Civil Case 18-1388, Afghan and Iraqi Allies v. Pompeo, et al.  This matter is set for a hearing on adjudication plan.

Parties, please introduce yourselves for the record, in other with plaintiffs' counsel.

MS. GRANO:  Yes.  My name is Kimberly Grano from the International Refugee Assistance Project.  I'm joined here by Deepa Alagesan, also from the International Refugee Assistance Project, and plaintiffs' counsel Rebecca Kerr and Mia Tsui from Freshfields are appearing in other Zoom windows.

THE COURT:  Okay.  Good afternoon, Counsel.

Ms. Grano, are you going to be the one primarily addressing the Court?

MS. GRANO:  Yes.

THE COURT:  Okay.  Great.  Thank you.

MS. MUELLER:  And good afternoon, Your Honor.  Ruth Ann Mueller on behalf of the defendants.  I'm joined in the conference room today with Richard Ingebretsen, Caroline McGuire, and David Byerly.

THE COURT:  Okay.  Good afternoon, Counsel.

And you'll be addressing the Court on behalf of the government; correct?

MS. MUELLER:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Thank you, all, for being here.  I have set this hearing on -- to try to get to a resolution on -- to get some sort of final resolution, hopefully, on an adjudication plan on this case.

This case was referred to me by Judge Chutkan, and the scope of her referral was for me to resolve any discovery issues, as well as oversee the construction of or finalization of an adjudication plan.  And we dealt with some discovery issues last year.  I do not believe I have any additional discovery issues before me.  But what I do have before me is an updated plan, which includes the defendants' modifications to their original proposed adjudication plan and plaintiffs' objections to any modifications to the plan.

I am guided by Judge Chutkan's order that the revised plan include four basic elements of the 2020 plan -- or implement the four basic elements of the 2020 plan.

Number one, a methodology for identifying class members, which shall include plaintiffs who have joined the class before and after May 21, 2020.

Number two, timing benchmarks for the government-controlled steps of the special immigrant visa adjudication process, which the government may propose modifying to reflect its increased caseload and difficulties

scheduling in-person applicant interviews and which the government may propose modifying to correspond with the changes in internal processes that it has made in recent years.

Number three, tracking and reporting requirements, which the government may propose modifying to correspond with the changes in internal processes that has made -- that it has made in recent years and mandatory explanation --

Number four, mandatory explanation and proposed remedies in the event of government failure to meet the timing benchmarks.

Truly, this is a case in which it's very difficult to just rule one way or the other without having a hearing because I have defendants' clarifications, which I'm not sure they're all clarifications -- but we'll get to that -- to the plan that they had previously submitted, as well as defendants' [sic] objections to those -- those changes.

And so my inclination -- and just -- just so that I have -- everyone's kind of on the same approximate page, do we all agree that those are the four factors Judge Chutkan stated in her order were to guide the creation of a plan?

MS. GRANO:  Yes, Your Honor, the plaintiffs agree with that.

MS. MUELLER:  As do defendants.  Yes, Your Honor.

THE COURT:  Okay.  Great.

So we're all going to be guided by those principles, and my inclination is to just go through the plan and the changes that have been made.  Some of them I'm going to -- some of the changes I'm going to want to hear very briefly from the parties on.  Some of them I'm not going to need to hear from the parties on.  But what I would like you-all to do is to keep track of the rulings that I make on each change so that you-all submit a final joint plan which incorporates my rulings.

Does that make sense?

MS. GRANO:  Yes, Your Honor.

MS. MUELLER:  Yes, Your Honor.

THE COURT:  Okay.  So what I am working off of is ECF No. 244-2, which is the plaintiffs' annotation of defendants' proposed modified revised adjudication plan. This document, to me, had the clearest example and clearest illustration of where you-all disagree, what changes have been made and where the party -- where the plaintiffs or the defendants disagree on certain change -- changes to the plan.

And so my intention is to work off of ECF 244-2, and we're just going to go through each page, and I'm going to make rulings.  And then as I mentioned, I will ask you-all to incorporate those and submit a final plan for Judge Chutkan's -- Judge Chutkan's approval.

Okay.  So as long as everyone has that before them, I'm going to go first to page 3, which is the first place that there are some changes.  At the bottom of page 3, there is language that it appears that the government included from the previous plan.  These largely are, in my view, legal arguments, and I don't think they're necessary to be in the plan.  So I am going to strike that language and accept the plaintiffs' request.

Page -- so I'm going to go based on the top of the -- the page numbers -- I'm sorry, on the top of the ECF stamp.  So that was page 3.

Does that make it easier for everyone?

MS. GRANO:  Thank you, Your Honor.

MS. MUELLER:  Thank you, Your Honor.

THE COURT:  Yeah, we'll go by the ECF stamps.  I think that will make it a lot easier.

Okay.  All right.  Now I'm on ECF Stamp No. 4 of 31.  Does the plaintiff object to the language up at the top, "significantly" and "also"?

MS. GRANO:  Your Honor, I understand that the -- the "significantly" is just the end of the previous sentence from the last page that was part of defendants' arguments.  And so this was just the plaintiffs' suggestion to strike the -- the "also," and that is just to revert to the language of the original plan.

SA 322

THE COURT: Okay. All right. So I will strike that language.

Okay. What is -- all right. So then -- so maybe it would be helpful to have the plaintiffs explain to me, with respect to this next language, that's the -- the sentence that begins "In light of." Is that objection separate and apart from the objection to the inclusion of the next paragraph?

MS. GRANO: To clarify, Your Honor, we are objecting to the sentence and defendants' overall proposal to get rid of the class member identification methodology and reporting on specifically class members, and then plaintiffs have asked that we retain the following paragraph that include the class member identification methodology.

And so plaintiffs' objection to this failure to include a class member identification methodology is based on what Your Honor has already mentioned, which is that Judge Chutkan was very clear about the required elements of the plan. Defendants don't dispute this. Class member identification methodology is a requirement of the plan, and that is crucial to both defendants actually being able to identify who is subject to the Court's order and who they need to move through the process, and also that the class member -- or so that the Court and the parties can understand where and what process has been made with respect

to moving class members through the process and be able to tell whether the objective of the Court's order is being fulfilled, mainly to get -- specifically this group of class members, not the entire pipeline of the applicants -- to a conclusion now that the Court has determined that their applications are unreasonably delayed.

THE COURT:  So the only changes are -- to the previous plan are the ones that in blue?  Is that right?

MS. GRANO:  Yes.  So what plaintiffs tried to represent here is in yellow; that reflects returning to what the previous plan had in blue.  The blue indications are some suggestions that plaintiffs think the Court could adopt to update the plan while accommodating the -- the Court's order to update it.

So, for example, in this section that goes over the class member identification methodology, that just updates the dates to reflect the Court's requirements that the new plan include class members through November 30th, 2022.

THE COURT:  So just so that I understand it, the defendants' current proposal is to only have the language that begins "In light of this prior experience" and these new developments to the end of that sentence.  And then they would have it end there.  Plaintiffs are suggesting that that language be -- that sentence be stricken and that you add those next couple paragraphs to say -- that begin "Class

members" to the end of page 5?

MS. GRANO: Yes. So that would be adding it to the defendants' proposal, but retaining that language from the original plan is the underlined portion that starts with "Class members covered by."

THE COURT: Okay. So the defendants' current proposal would have just stopped with the word "reporting"?

MS. MUELLER: Yes, Your Honor.

THE COURT: Okay. And what was the reason, Ms. Mueller, for taking out all of that language from the prior plan and making it somewhat more vague here in terms of how the government was going to identify class members?

MS. MUELLER: Thank you, Your Honor.

The government's modifications here actually clarify who is being (unintelligible) reporting on, which is all SIV applicants.

Judge Chutkan's order required a methodology for identifying class members, including class members post-May 2020. Individuals who were in the original injunction were all individuals who were pre-May 2020. And so because of the huge influx in applications in August and September 2021, over 300,000 SIV employees [sic] were received by the government at that time.

Judge Chutkan allowed defendants to modify that methodology. And in order to -- to report on class members,

the government is able to -- in order to -- to report on all class members based off that huge influx, the government here has proposed that it will report on all SIV applicants.

THE COURT:  How does that prejudice plaintiffs?  Isn't that --

MS. GRANO:  Your Honor --

THE COURT:  I guess that's a question for plaintiffs.  How -- how is that over inclus- -- isn't that overinclusive from what the plaintiffs are seeking?

MS. GRANO:  Yes, Your Honor, that is -- it definitely prejudices plaintiffs and kind of completely eviscerates the whole purpose of the remedy, which is to move this fixed group of class members who now are those who are waiting for over 9 months, as of November 30th, 2022.  To move that fixed group through the process to a final resolution; not to provide overall information about the SIV process as a whole.

So without having class members identified, not only will plaintiffs and the Court be unable to see where the class members are in the process, but defendants also will not have any way of knowing who the class members are so they won't be able to fulfill their obligations under the plan, specifically to class members.

THE COURT:  Ms. Mueller.

MS. MUELLER:  Your Honor.

THE COURT: Yes.

MS. MUELLER: Yes, Your Honor.

Your Honor, based off the amount of individuals that are currently waiting more than 9 months, I would like to direct the Court's attention to the most recent quarterly progress reports that are on the State Department's website. Those individuals who have been waiting longer than 9 months, that is the correct class definition. So the state -- Department of State has represented that the -- the number of individuals who are class members under the definition of class members, a number of individuals who have applied for SIV, there's very little overlap -- there's (unintelligible) overlap there, Your Honor.

So because of this huge influx of individuals, the government cannot manually track and tag class members who may have been waiting 9 months after November 2022. So in balancing the government's resources, the government has proposed a way to provide the narrowly curable remedy that has been afforded to plaintiffs here while being able to still have the resources for adjudicating SIVs.

And I can refer the Court's attention to one piece of evidence that's in the record. This is -- (unintelligible) class methodology. This is at ECF 217-2 through -12. This is at page 526 of the McGeary 30(b)(6) Department of State deposition that discusses why the Department of State cannot

manually track (unintelligible).  Because of this influx, the Department of State has proposed this methodology that includes (unintelligible) applicants.

THE COURT:  Ms. Grano, what do you have to say to that?

MS. GRANO:  The class is currently -- is now defined as all SIV applicants who are waiting the government's controlled steps for longer than 9 months on or before November 30th, 2022.  So defendants' proposal to report on the entire SIV pipeline just is not -- that is not reporting on class members.  And I would also say that I think it's important to also remember that this was not a (unintelligible) process.

So just because some SIV applicants are moving through the stages doesn't mean that class members are; and that's why it's so important that we have a way of identifying who is actually in the class, the number of people actually in the class.  And that's why the Court explicitly required a methodology for identifying class members and concluded in her previous order that the reporting burden that defendants already raised in their motion for relief does not justify modification of the plan.

Judge Chutkan decided that that purported burden that they were pointing to did not outweigh the need to (unintelligible) compliance with the plan requirements, and

that is why she ordered defendants to include a methodology to actually identify those SIV applicants who were specifically subject to the Court's order to bring their cases to a prompt resolution, now that she found that they've been unreasonably delayed.

THE COURT:  Does -- do -- do the plaintiffs have the ability to tell the government who's in that class so that the government can actually identify them?

MS. GRANO:  We do not have any information about who class members are; that is information that's totally within the government's control.  And I would say that under the previous plan, defendants were able to identify class members through the methodology that was included in the previous plan.

And so that's why we are suggesting that the courts should maintain that same methodology and just update the dates so that it would reflect individuals who newly entered the class up through November 30th, 2022.  And so the Court recognized that that was the methodology that they had used previously, but she still determined that reporting on class members was justified.

THE COURT:  Okay.  Just a minute.

MS. MUELLER:  Your Honor.

THE COURT:  Yes.

MS. MUELLER:  If I may.  Judge Chutkan granted a

modification of the plan, and Judge Chutkan granted

modification of the plan because of the technical changes to

the SIV process, as well as the number of applications that

the Department of State received in August and September of

2021.

So, really, any reversion back to the original plan

really provides the district court's decision here that some

modification is appropriate.  And in doing that, the

government -- the government agrees that part of the plan

must include any methodology for tracking class members, and

that's exactly what we propose here.

And in doing that, we are proposing all SIV

applicants because that allows the government to balance its

resources while providing plaintiffs the relief they've been

awarded in this -- in this case, as well as continuing to

adjudicate SIV applications at the pace that they're doing

right now.

And I can add, Your Honor, that just by -- it is a

preliminary number, but in fiscal year 2024, the government

has issued up to 33,000 SIV issuances, and that's without a

plan in place.  So I do think that being able to continue on

a pace with adjudication that the Department of State is

doing right now, along with the report and the plan that we

presented today allows the government to -- to work on both

tracks.  So it will provide plaintiffs the relief that

they've been awarded, as well as continuing to adjudicate individuals with applications.

THE COURT: Well, without -- without -- the broad language that the government's suggesting, however, isn't really a methodology for identifying class members. It's just saying we're going to -- we're going to include all SIV applicants. That's not a methodology. That's just saying we're going to -- we're going to consider and include all SIV applicants, depending on -- without any real regard for how long they've been waiting. And -- and the delay here is a problem, in my view, and in the district court's view, apparently.

So I'm -- I'm going to deny the government's language and adopt the plaintiffs' language, which, frankly, I think is truer and -- and closer to satisfying the Element No. 1 of Judge Chutkan's order.

Now, as for the dates, that's something I -- I would suggest you-all talk about if that has changed at all since it was submitted to me.

MS. GRANO: Yes, we're happy to discuss that with defendants, Your Honor.

THE COURT: Okay. All right. That takes me to page 6 of 31. I'm going to reject the language that the government will endeavor to meet the performance standards. This is a plan the government is required to meet, if she

approves it.  So at the top of 6, I'm going to reject that -- those insertions.

Okay.  Bottom of 6, there is a change from calendar days -- from business days to calendar days.  I guess the government is seeking a change to 15 business days, and the plaintiffs are requesting the NVC review would be complete within 15 calendar days.  Is that correct?

MS. GRANO:  Yes, Your Honor.  The original plan just said 15 days, but as we explained in our objections, we had meet-and-confers about this.  We confirmed that the parties were counting calendar days.  So this would be a change.  We've also suggested that if defendants want to report in an equivalent number of business days, that plaintiffs have no objection to that.

THE COURT:  So what would be the compromise position then?

MS. GRANO:  Your Honor, I would also just add that this is, effectively, an extension of the timeline if we change from 15 calendar days to business days, and we don't think that defendants have justified that change.  As we outlined in our objections, we -- they haven't connected a need to extend this time frame based on any of the changed circumstances that Judge Chutkan recognized.  And so we are asking the Court to maintain 15 calendar days and give defendants the option to report an equivalent number of

business days.

MS. MUELLER:  Your Honor, if I may?

THE COURT:  Yes.

MS. MUELLER:  Thank you, Your Honor.

First, as plaintiffs' counsel stated, the original June 2020 injunction did not clarify whether it was calendar or business days.  This is an ambiguity that defendants intended to clarify here, that the reporting would be in business days.  That is what's actually occurring on the ground in individuals who are adjudicating these applications.

And in looking at the deposition transcript that's attached from (unintelligible), 217-2, page 47 [sic] -- this is the McGeary deposition for the Department of State 30(b)(6) -- that discusses why business versus -- why the government is seeking business days versus calendar days. It's based off the contract that the government is following with its contractors.

So that's -- that is why the government is seeking this, to clarify the two align with what its deadlines are and to -- to -- to show plaintiffs what's actually occurring on the ground.

THE COURT:  Ms. Grano, what is the material prejudice to a change in 15 business days for this?  So from 10 business days to 15 business days?

MS. GRANO:  Sorry.  The change is from 15 calendar days to 15 business days.  And so the prejudice is, one, I would note that we are looking at the -- the plan for Iraqi applicants.  All of the class members who are covered by the plan have been waiting for -- or first submitted their applications at least 10 years ago now.  So given the egregious delay of those cases, I think there's, frankly, no justification, at least not on this record, for extending even a small amount of additional time for them to complete those applicants, since they've already had 10 years.

And I would also just make the point that the purpose of the adjudication plan is not to reflect the status quo of what defendants are already doing.  They haven't indicated that they are not meeting the timeline.  They haven't put forth any evidence to show that they are unable to.  And so if it's just a matter of administrative convenience of reporting business versus calendar days, plaintiffs believe there's just no justification to extend the timeline by changing to business days when they could just report an equivalent amount of time that would -- under the original plan of the 15 calendar days, just report as 10 business days instead.

THE COURT:  Ms. Mueller, what is -- I mean, why do you need this additional time, if at all?

MS. MUELLER:  Your Honor, the government needs

this time to effectuate its obligations and -- and adjudicate applications. You know, I understand (unintelligible) plaintiffs' concerns, but I think with this proposal and all proposals, these are all speculative concerns. And that, you know, if we move forward (unintelligible) concern with the timing of this, this is not -- we're not providing plaintiffs, you know -- worry about not getting what they need from calendar days -- or business days, they can challenge in due course, but I think all that concern right now is speculative, at best.

MS. GRANO:  Your Honor, could I respond to that?

THE COURT:  Yeah.

MS. GRANO:  I would also want to point out that the information that we got through discovery shows that the (unintelligible) is actually 10 business days, not 15, which is actually not 15 -- sorry, 15 days. And also, just more broadly, I take issue with the defendants' suggestion that the -- they should take into account whatever their -- their speculative future needs may be. But the baseline of this plan is the original plan.

Judge Chutkan provided an opportunity to make modifications to that plan if it were necessary to account for specific changed circumstances -- changed circumstances, that defendants sought relief from that injunction, which is still on the books. Even though that plan is stayed, that

should be where we're working off of it.  Plaintiffs don't need to show a justification for why the plan shouldn't be changed.  It's defendants' burden to show a justification for why time frames in the plan shouldn't be extended.

THE COURT:  All right.  I'm going to keep it -- keep the plan as is.  So it will be 15 calendar days. Would the government prefer between 15 calendar days or 10 business days?  Do you have a preference, Ms. Mueller?

MS. MUELLER:  I -- I can't represent we would be able to comply with anything -- with anything but what we can move forward from before, Your Honor.  So in -- any other time frame here I'd have to take back before (unintelligible).

THE COURT:  Okay.  I see.  All right.  Then let's just revert to the plan then.  15 -- 15 days and I think that's -- seems to be the way that everyone has interpreted that is to be calendar days.

All right.  Top of page 7.  Why does it take 5 business days to send an application or appeal to the designee?  Why does it take -- I'm sorry, why does it take 5 business days to just send that application over? Ms. Mueller.

MS. MUELLER:  Thank you, Your Honor.  Your Honor, I -- I cannot speak to the factual why -- why 5 business days (unintelligible).  I can offer that the Department of

State needs this time to effectuate its applications (unintelligible).

THE COURT:  Okay.  Well, if I don't have a reason, then I'm not going to adopt the change.  So we're going to move back to -- so it's going to say 5 days, which I'm interpreting again as calendar days.

Page 9.  All right.  Just a moment.  Okay.  The dispute here is the amount of time within which the defendants must file a progress report with the Court within the end of the day -- within the end of the 90-day reporting period.  Originally it was -- it -- this reporting was to be done within 30 days of the end of the 90-day period and defendants have suggested that it be changed to --

MS. GRANO:  I'm sorry, Your Honor.

THE COURT:  Oh, I'm sorry.  It was 20 days.  It was 20 days.  Was it 20 or 10?

MS. GRANO:  The original -- I'm sorry.  The original plan was 10 days.

THE COURT:  Okay.

MS. GRANO:  The defendants have asked for 30 days, and plaintiffs are okay with it being 20 days.

THE COURT:  Okay.  And, Ms. Mueller, do you -- are you agreeable to that change from -- from -- instead of 30 to 20, which seems to be the middle part of -- middle -- middle line between what the plaintiffs want and what

defendants want?

MS. MUELLER:  Understood, Your Honor.  However, the government needs 30 days to make sure that the progress reports that we're submitting are carefully reviewed and they're accurately representative.

There's been instances in the past under the 10-day deadline where the government had to file corrected progress reports, and we want to have -- we want to make sure that's not the case here.  So the government can comply with this provision if it's 30 days.

THE COURT:  So why isn't 20 days sufficient?  That's 10 more days than you were getting before.

MS. MUELLER:  Yes, Your Honor.  And I'm happy to bring that back to Department of State, but the Department of State has recommended that they need 30 days, as well as DHS wants 30 days to make sure that these reports are accurately -- accurately reflect what's -- what's correct.

THE COURT:  Ms. Grano, what is the prejudice -- sorry, go ahead, Ms. Mueller.

MS. MUELLER:  That's all, Your Honor.  Thank you.

THE COURT:  Thank you.

Ms. Grano, what is -- what is the real prejudice, if any, to a 10-day difference between the reports being submitted?  You know, because otherwise what's going to happen is possibly the reports get submitted in 20 days and

the government has to file an amendment as opposed to getting the final report within 30 days.

MS. GRANO:  We appreciate the government's concern they want to make sure their reporting is accurate, but I think the prejudice to plaintiffs in the situation is that the practical impact of this would push the time that was -- plaintiffs are getting information about defendants' compliance with the plan further out.  And any extension in that would push the dispute resolution process that is provided for in a later part of the plan out.

And at that point, the longer time that we're waiting for progress reports, the more we're operating off of stale information about the situation of class members from the previous report to the standpoint where if we were to go through the dispute resolution process, we would be, you know, operating under new facts under the subsequent reporting period.  So I think it is important that plaintiffs get that information as quickly as possible. That's why we suggested 20 days is a -- a reasonable middle point between the parties' position as doubling of the amount that they had before and I would just point out the fact that defendants have not justified why they need 30 days specifically and why 20 days is not sufficient.

The Court considered their complaints about the burdens of reporting in previous -- November 2022 order and

did not find that there was a justification from changing (unintelligible).

THE COURT:  Right.  I've also not heard why 20 days won't work.  It is twice as much time as the government's currently getting.  So I'm going to adopt the 20-day deadline.

All right.  Bottom of page 10.

MS. GRANO:  Your Honor, if I could also ask a clarify question?

THE COURT:  Yes.

MS. GRANO:  On the -- in that same paragraph with the 20 days, just under the proposed same language about referring to these clarifications to the revised -- this is a stylistic change, but we suggested deleting clarification because that was to us confusing about what that was referring to, and so just wondering if the Court has a view on whether we should include that deletion or not.

THE COURT:  Yeah.  I mean -- well, there -- I guess I don't really see what the clarifications are.  So it's a bit confusing to me as well.  Now, if it's a modification from 10 to 20, there might be a different word that works there, but -- but clarification, I don't think, makes sense.  So I would -- I would take it out.

All right.  The next issue is the time within which the USCIS sends the instruction packet to an applicant

requesting documentation.  This is pre-interview -- is this pre-interview?  Pre- and post-interview.  Okay.  Why does the government need 15 business days as opposed to the 5 days that existed prior to the change?

MS. MUELLER:  Again, Your Honor, the government is requesting this change because of the increase in applicants that I've referenced before and making sure that the government can effectuate its -- its requirements and obligations under AAPA and RCIA.  RCIA in particular for this plan.

THE COURT:  And why -- why does it need -- I mean, going from 5 days, which were calendar 5 days to 15 business days is actually pretty substantial.  Why is it that -- why is it that it needs to be 15 business days?  Is there a medium ground that we can hit here, Ms. Mueller?

MS. MUELLER:  Your Honor, I have no other (unintelligible) before the Court that the government will -- can agree to comply with, but you're right.  This is a substantial change, and that's analogous to the substantial change of SIV applications that have been -- that the government has been adjudicating since 2021.

MS. GRANO:  If I may, Your Honor, I do want to just remind the Court that we're looking at the Iraqi plan, which there are no new class members that are going to be covered by this plan because the application deadline was 10

years ago.  So I think that there's really no justification for an increase at this step in the process, particularly for the Iraqi plan, but also for the Afghan plan as well because defendants haven't -- simply haven't justified why they need additional time at this step.

THE COURT:  So there are no new applicants in the Iraqi plan?

MS. GRANO:  No, Your Honor.  The plan sunset in 2014 -- or sorry, the -- they stopped accepting new applications in 2014.

THE COURT:  Okay.  So, Ms. Mueller, why -- why is this necessary when you don't really have an influx of applicants under this plan?

MS. MUELLER:  Your Honor, it's the same individuals that are adjudicating the Afghan SIVs and Iraqi SIVs.  So if you look at it as a whole, it's important to -- to keep those resources -- keep those resources before (unintelligible), Your Honor.

THE COURT:  Okay.  What I'm going to do is I'm going to increase the amount of time, but not to -- not to 15 calendar days.  I'm going to change it to 10 calendar days.  I'm sorry.  I'm sorry.  Not to 15 business days.  I will change it to 10 business days to account for the influx, but to keep these applications moving.

Same goes for the review on page 10.  10 business

days.  That's the -- that's the -- No. 9 on the chart.

Okay.  This is the -- No. 10 is important.  This is when the interviews are scheduled.  So the change that is being proposed by the government goes from 10 days to 10 business days; correct?

MS. MUELLER:  Yes, Your Honor.

THE COURT:  Okay.  And what is the basis for that request?

A.  Again, Your Honor, the amount of applications and the amount of individuals that need to be interviewed at various posts and -- and -- Your Honor, it goes back to the fact that there's just a huge influx of these applications.  The government is still working through that backlog.  So here, even within individuals who are in the Iraqi program, the government is trying to make sure that there's an interview -- interviews available depending on where that applicant is asking for an interview -- an interviewing post.

THE COURT:  Okay.  Ms. Grano.

MS. GRANO:  Yes.  Again, Your Honor, this is the -- the Iraqi plan and any increase in applications to the Afghan plan doesn't affect defendants' ability to comply with this time line here.  Also, the -- my understanding is that the embassy in Iraq is operating, unlike the embassy is Afghanistan, and so there really is no justification for an

increase in the time here.  Yeah.

THE COURT:  Ms. Mueller, are you representing that the State Department cannot conduct -- cannot contact these individuals within 10 days, that it's impossible --

MS. MUELLER:  Your Honor --

THE COURT:  -- with that deadline?

MS. MUELLER:  Your Honor, I can represent that what we could -- would accept today is what the government can comply with.

THE COURT:  Okay.  I'm asking if the government is saying that it cannot comply with anything short of 10 business days?

MS. MUELLER:  Your Honor, when it comes to anything less than that, I would have to bring that back to the Department of State to discuss with them.

THE COURT:  Okay.  Who's --

MS. MUELLER:  What I can say -- what I can say is this is what the government can comply with, and anything that's not what's before the Court, the government is not representing that it can comply with it.

THE COURT:  Okay.  Who is the person at the State Department that can speak to these things, because the intention of this hearing was to try to get all these issues ironed out?  And there are questions I don't -- I don't have answers to, and that's -- if I don't have answers to them,

it's not going to be to the government's benefit.

MS. MUELLER:  Understood, Your Honor.  If Your Honor is looking for, you know, additional factual support or an evidentiary hearing, that's something we're happy to discuss, but today what I can do is represent on behalf of the government that this -- that what we put forward at Step 10 is what the government can comply with.

I'm happy to discuss with the Department of State if there are other proposals there, but I cannot represent today that we can comply with anything less than what we have presented before the Court at ECF 243-1.

MS. GRANO:  Your Honor, could I say something?

THE COURT:  Yes.

MS. GRANO:  I just want to remind the Court that we did go through a discovery process in the winter of 2023, over a year ago now.  We submitted our objections containing our disputes and the lack of evidence that the defendants have put forth to justify these changes in March of 2023.  So I don't think that there's any basis for defendants being able to come up with justifications for why they need more time now when they've had an extremely long length of time to justify the changes that they have proposed to the Court.

THE COURT:  Well, here's -- here's my -- here's my concern today, and if we're going to continue in this fashion, then so be it.  But I'm expecting if there's

been -- if there's a change to the plan -- first of all, these were supposed to be clarifications, and I'm not sure these are just clarifications.  I allowed some clarifications to be made for the passage of time.  When I entered that order, I was contemplating date changes, deadlines that accounted for the passage of time.

What I'm seeing are substantive changes to the process, and so I'm not -- given that, you know, the prior plan had been approved by Judge Chutkan, I'm not inclined to change the plan when I don't have any specific reasons that are -- that are being offered, other -- especially given the discovery that's happened, other than we just have more applicants and we have -- we have to do this and there's no real explanation specific or articulable reason other than this is what we can comply with, but I can't tell you what we can't comply with.

And so I feel like the time to have raised that -- and you-all knew this hearing was going to happen and that this had been referred to me for the -- for the overseeing of this plan, and so the time was -- the time is now, and so I'm going to just make these decisions.  I'm reverting to the old plan on this.  So it will be 10 days.

All right.  Page 11.  This is, I think, one of the big objections that plaintiffs had to -- there were two main objections that plaintiffs had to the, quote, unquote,

SA 346

clarifications that defendants made.

So, Ms. Grano, do you want to explain to me what material difference occurs if the language is changed from additional national security screening to administrative processing?

MS. GRANO:  Yes.  The defendants are proposing to change the language from administrative processing to a subset of those applicants in government-controlled steps. So -- yes, so administrative processing is, as we discussed in the brief, a (unintelligible) for audit.  In this additional national security screening, there are class members who would be subject to other forms of administrative processing other than additional national security screenings that would not be covered by this -- defendants' proposal.

And I know in defendants' reply they said that they could also report on a couple of other categories of individuals in an evidentiary processing, but that leaves out a -- some unknown subset of class members that are in government-controlled steps at this stage.  There would be no benchmark or reporting for that group, and so no way for the class -- or for plaintiffs to ensure that those cases are getting adjudicated or to even know how many individuals fall into those categories and how long they've been waiting.

And as Your Honor pointed out, this is not so much a clarification of their prior proposal, but just a request to make an additional change that does not appear to be based on any kind of new situation or changed circumstances.

THE COURT:  Okay.  Ms. Mueller.

MS. MUELLER:  Thank you, Your Honor.  So, Your Honor, this is a clarification, a clarification of an ambiguity in the June 2020 injunction.  The Department of State has represented -- and this is a footnote in plaintiffs' objections that were filed about a month ago that the -- the applications that were -- that fall under administrative processing, those -- those applications that were subject to additional national security screening.

And this -- this even came up back in 2023 when the government filed a corrected report, the corrected January 2023 report.  The corrected report was filed on March 2023, and a footnote in that report -- and that's ECF 218 -- the government said that those applicants were those that were subject to additional national security screening.

The Department of State has represented that the majority of SIV applications that are at this step are refused or national -- or -- or undergoing additional national security screening.  The government, as we said in our reply, is willing to also report on cases that are

undergoing fraud review or seeking a formal legal opinion.

But the issue where -- that the government was concerned with reporting on all admin processing is that, one, that would be very manually intensive, that the government would have to go and try to tag so many individuals; as well as administrative processing can also include individuals who are at an applicant-controlled step. So the consular officer determines that the individual needs to provide more documentation.  That would be an individual in an applicant-controlled step, and if the government was reporting on all individuals it had been processing, it would -- it would be overinclusive and include individuals that were also in applicant-controlled steps, not government-controlled steps -- not the government-controlled steps.

So what this clarification does is clarify to the Court and plaintiffs who is being reported on at a government-controlled step for these three categories that largely cover those individuals who are at this step in the SIV process.

MS. GRANO:  If I could respond to that, Your Honor?

THE COURT:  Yes.

MS. GRANO:  Yes, I just wanted to explain that defendants are making this sound like there was some

ambiguity about what the original plan covered, but under the original plan, they did provide reporting on more than just additional national security screening places.  And as to defendants' point that they would also need to report on individuals who are in an applicant-controlled step, the plan is limited to administrative processing that is under government control.

So that was the original language of the plan. Plaintiffs did not agree to some definition of administrative processing which excluded some categories -- category of people.  And that's -- we would, yes, object to defendants' proposal at this step.

THE COURT:  But does it exclude people, or does it -- is it -- is it overinclusive?  Is -- is administrative processing a bigger umbrella term than additional national security screening?

MS. GRANO:  Administrative processing is a bigger umbrella term, but it does -- there are class members who are waiting for the government to finish taking action on their application besides additional national security screening.  So defendants have provided a few examples of that, but there are other class members who are waiting for the government to make a decision on their cases who would not be included by those groups that defendants are -- or proposing to limit their reporting to.

THE COURT:  Give me an example of someone that is not in the group that would be covered by administrative processing but is in the group that is covered by the language of additional national security screening.

MS. GRANO:  Just to clarify, Your Honor, administrative processing is -- the government-controlled administrative processing is the (unintelligible) umbrella, and there's -- additional national security screening is one part of that.  And there is -- there are some other groups that defendants have noted that also fall under administrative processing.

We are asking the Court to order defendants to report on all of the individuals who are subject to government-controlled checks at this stage and, therefore, are waiting for the government to make a decision on their application.  So plaintiffs would like to maintain the language that says administrative processing; whereas defendants are asking to limit it to a step of the administrative processing.

THE COURT:  Okay.  All right.  My apologies.  I misread that the additional national security screening language was the original language.  My apologies.  Okay.

So the original language is administrative processing?

MS. GRANO:  Yes, Your Honor.

THE COURT: Okay. All right. I'm going to reject the government's change. I will include the original language. That's where my -- that's where my confusion was. I was actually thinking it was the other way around.

Okay. All right. There's other language in there about the 5 business days.

Is there any objection to that on plaintiffs' part?

MS. GRANO: Yes, Your Honor, I think for the same reasons we've already discussed, that defendants have not justified this. And, in fact, at this stage, they have said they don't intend to make any substantive change to this step, so we don't think that there's any justification to change it to 5 business days.

THE COURT: Okay. The 5 -- the difference between 5 calendar days and 5 business days isn't as substantial as the change that was being suggested earlier from 10 to 30.

Ms. Mueller, why do you need that -- that specific change?

MS. MUELLER: Again, Your Honor, this change clarifies what is actually occurring on the ground when it -- the Department of State employees are following their guidance and -- at Step 11.

THE COURT: Okay I'm going to adopt the government's language on that. So we'll change it to 5 business days.

Just so -- just so that it's not at all confusing, when you-all send in the final plan incorporating my rulings, you should probably make clear that anything that doesn't otherwise say business days means calendar days or just say calendar days where I've ruled; that should be calendar days.  That way we're not here, you know, a few months from now having this same debate.

Okay.  That takes care, I think, of some changes at the bottom of 11, 12, and 13.

Now we are on the Afghan Allies Protection Act of '09 on page 14.  All right.  Ms. Mueller, this is, again, a change in -- well, is there any objection to this change, Ms. Grano, on the 15 days?

MS. GRANO:  Yes, Your Honor.  I think our objections are, basically, the same as for the Iraqi plan, unless you decide to keep it as is.

THE COURT:  Okay.  I will copy this as is as well.

MS. MUELLER:  Your Honor, if I may.

THE COURT:  Okay, yes.  I'm sorry, Ms. Mueller.  Please.

MS. MUELLER:  Your Honor, at this stage -- I mean, Step 1, Judge Chutkan found that modifications should be granted because a number of inquiries that the government received after September 2021 -- especially in D.C. -- they received over 300,000 SIV inquiries that affects that

preliminary indicates (unintelligible) Step 2.  So the reason the government is asking for more time is to accommodate the fact there are more applications.

THE COURT:  How many more applications?

MS. GRANO:  Your Honor --

THE COURT:  You said 300,000?

MS. MUELLER:  At the time in -- in September 2021.

MS. GRANO:  Your Honor, if I could respond to that?

THE COURT:  Yes.

MS. GRANO:  During discovery or -- yep.  So during discovery we confirmed that NVC was meeting the 10-business-day time frame at the time, and that's when there was the peak of this post-withdrawal from Afghanistan during this inquiry, and the defendants have submitted a declaration that they intend to keep meeting that 10-business-day-turnaround time.  So I don't think there's any justification based on the increase in applications to change this step.

THE COURT:  Well, the real dispute --

MS. MUELLER:  Your Honor.

THE COURT:  Yes, Ms. Mueller.

MS. MUELLER:  I was just going to add, Your Honor, that the -- the government -- while I agree that's what the declaration says, the government needs additional time

SA 354

because of the (unintelligible) program.  In case there is an influx in applications, there is room for the government to have a couple extra days.  So if the government is not able to comply in 10 days, that the parties aren't always coming to the Court.  That there is that -- that area for the government to have breathing room to -- to comply.

THE COURT:  Okay.  Well, what I hear you saying is that it's not based on a current need, it's based on trying to build a buffer, and I'm going to reject that.  I will -- I will adopt -- you know, also basing my ruling on the declaration that was just represented to me.  I will adopt the compromise position that plaintiffs have suggested, which is 10 business days.

Okay.  The next issue is the removal of a timing standard for adjudication.  Let me just take a look at this.  Just a moment.

Well, can -- can -- maybe I should ask you each to explain to me what is the real change.  So the old language read "COM Designee will adjudicate 4,500 completed applications and/or appeals per quarter."  Is that what the language used to say?

MS. GRANO:  No, Your Honor.  That's defendants' suggested change.  The original language was the "COM Designee will adjudicate a completed application or appeal within 120 days of receipt from the NVC."

SA 355

THE COURT:  Okay.  Ms. Mueller, can you just explain to me what -- what the government is seeking.  This is -- this language is a little bit -- this redline is a little confusing.

MS. MUELLER:  Yes, Your Honor.  In the Schubert 30(b)(6) Department of State deposition -- this is Docket Entry 217- --

(Indiscernible simultaneous cross-talk.)

THE COURT:  Go -- before you get to that, can you just read --

(Indiscernible simultaneous cross-talk.)

THE COURT:  Before you get to that, can you just read what the government -- what the government wishes for -- how -- how you wish for it to read.

MS. MUELLER:  Oh.

THE COURT:  Please.

MS. MUELLER:  It will adjudicate completed application or appeal 4- -- within -- 450 [sic] completed applications and appeals per quarter.  So we will be removing the 20 days of receipt from the NVC.

THE COURT:  Okay.

MS. MUELLER:  And instead of 120 days, the timing benchmark would be 450 completed applications and/or appeals per quarter.

THE COURT:  Okay.  Okay.  And sorry.  So please

continue.

MS. MUELLER:  And, again, because of the backlog that the Department of State is working through and that -- that while there was the 120 days of average processing time, a better reflection of what the government is doing at this step would be the 450 -- excuse me, 4500 cases per -- are per quarter.  And the Schubert declaration describes why that quarter -- that reflection is a better (unintelligible) as opposed to the 120 days because of that massive influx.  And that's on page 55, lines 7 through 16 at Docket Entry 217-14.

THE COURT:  But they're not mutually exclusive, are they?  That -- that the -- that the COM designee can both adjudicate a completed application or appeal within 120 days of receipt, as well as adjudicate 4500 completed applications and/or appeals per quarter.  Those -- those don't seem to me to be on different tracks.

MS. MUELLER:  Your Honor, that may be the case.  I can't say today that those are on different tracks.  But what I can say is that the government's preference here is to include the 4500 number based off all the changes and alterations and (unintelligible) SIV -- SIV process, which is (unintelligible) Judge Chutkan's order and in line with the D.C. Circuit's decision here that any plan should be with a light touch.

So here this is the government's -- the government wants to comply with the staff, and it's the government's preference that it would include that timeline that's here.

THE COURT:  But it takes away from any particular applicant an expectation of when that applicant's application or appeal would be completed -- or -- or adjudication would be completed.  So, in other words, the government could be meeting -- this is where I'm having real dissonance here because the government can be meeting 4500 completed applications or appeals per quarter, but there could be someone who's been waiting for four quarters or six quarters to have their adjudication done.  And this doesn't protect that person.  Is that right?

MS. MUELLER:  Yes, Your Honor.  However --

(Indiscernible simultaneous cross-talk.)

THE COURT:  And I would say it could be -- it could very well be someone with a more difficult or complex application would wait longer; right?

MS. MUELLER:  That is -- yes, Your Honor, that is possible.  However, the plan is here -- is providing classwide relief, not relief to any particular individual. It's only classwide, and the timing benchmark that the government has proposed is consistent with that classwide relief.

THE COURT:  Well, I just don't see what -- I mean,

the influx of applicants doesn't really seem to be connected to this justification.  Do you have any other specific justification that you're relying on for this particular change?  This isn't a clarification, by the way.  This is a -- this is a substantial change, in my view.

MS. MUELLER:  Yes, Your Honor.  And -- and this is not -- this is not one of the two clarifications for -- that were -- that was submitted in the past.  This was part of the February 2023 pending plan.  So this was a --

THE COURT:  Oh, okay.

MS. MUELLER:  The change hasn't been before Your Honor.

THE COURT:  Okay.  Fair enough.

MS. MUELLER:  So I do agree this is not a clarification.  This is a modification of Step 4 based off all the underlying reasons why Judge Chutkan granted modification to be (unintelligible).

And, again, I refer the Court to the Schubert deposition.  This is Exhibit 14 that's attached to plaintiffs' objection to Docket Entry 217.

THE COURT:  Okay.

MS. MUELLER:  And while the entire Schubert deposition is not included, the government is happy to submit or (unintelligible) on that deposition for the Court's consideration.

THE COURT: What is the -- which exhibit did you say it was?

MS. MUELLER: This is Exhibit 4 -- this is docketed at 217-14. I believe it may be exactly Exhibit 13, but it's the 217-14.

THE COURT: And what page did you say it was on Ms. Schubert's?

MS. MUELLER: This is page 55 of the deposition of -- it says page 19 of 46.

THE COURT: Okay. Well, Ms. Schubert says that with the baseline productivity of 4500 cases per quarter, that does have -- that does actually equate to 120-day average processing time. So there's no real -- we're kind of talking about something that is not a huge difference, whether it says 120 days or 4500 completed applications. Is that right?

MS. MUELLER: Understood, Your Honor, but I think -- yes, Your Honor, that is what the deposition says, but I think it's important that Schubert did say that the average processing time would no longer be an accurate representation based off of the influx.

And because of that -- and there are additional pages from the deposition I'm happy to submit for the Court, but because of that influx, the 4500 cases per quarter is an accurate -- is an accurate representation of what the

government can comply with and provide the relief that plaintiffs are seeking here.

THE COURT:  Well, 120 days is -- is approximately what the government can comply with anyway, because that's exactly what she just said in that excerpt from her testimony.

What I'm concerned about is what happens to that person I referred to earlier; the person who may not be in that 4500 completed applications or appeals per quarter. It -- this plan does not protect a person who's waiting for longer than 128 [sic] days quarter after quarter for adjudication.  How is that person protected?  And I know we're talking about classwide remedies, but this is a classwide remedy.  That person has no -- you know, that person has no indication of when they would receive an adjudication -- right? -- under -- under your change, Ms. Mueller?

MS. MUELLER:  Yes, Your Honor.  Under this plan, an individual would not know when they would -- may be receiving their individual (unintelligible) which is why the plan is a response to the classwide relief that plaintiffs have sought and have been granted.

THE COURT:  Okay.  Well, Judge Chutkan's order requires me to take into account timing benchmarks for the government-controlled steps of the -- of the SIV

adjudication process, and I -- this is -- this is the very heart of it, it seems.  So I'm going to reject the government's language to adjudicate 4500 completed applications and/or appeals per quarter.

Now, if you want to marry those two and find a compromise between the two -- because it doesn't really seem like -- at least based on Ms. Schubert's testimony, it seems that that's approximately what the government's doing anyway.  I just am concerned that, just as you admitted, Ms. Mueller, there's -- there are individuals who could be waiting a lot longer while other applications are being processed.

That's not to say -- this is -- this is a very skeptical view so I'm not saying this is what the government is or would be doing.  But this allows the government to process the easy applications and sit on some of the more complicated applications, which doesn't seem to be a benchmark that complies with Judge Chutkan's order.  So that's my concern, and that's the reason I'm going to deny that request.

Okay.  Top of page 15.  All right.  Ms. Grano, seems to me some of these timing issues can be agreed upon with the government.  I mean, do we need to really go through every one of these issues?

MS. GRANO:  I don't think so, Your Honor.  I think

our objections are largely the same as what we already discussed with respect to the other plan.

THE COURT: No.

MS. GRANO: So we ask for the same ruling with respect to these, you know --

MS. MUELLER: Yes, Your Honor.

(Indiscernible simultaneous cross-talk.)

MS. GRANO: -- situations.

MS. MUELLER: My apologies.

THE COURT: No problem. Yes, Ms. Mueller.

MS. MUELLER: I just want to note that a lot of plaintiffs' objections were based on -- based on the fact that the Iraqi program is different than the Afghan program. So I'm not sure that -- that -- that we can say that -- I mean, I'm not sure that we can skip over these portions, especially where the Afghan program is so much bigger.

THE COURT: Okay. All right.

MS. GRANO: I -- sorry, if I could respond to that. I think that was one of our justification -- or one of our reasons for objecting to these under the Iraqi plan, but we also have objected to them just on the basis that defendants have justified extending the timeline.

THE COURT: My comment was not that I was going to skip over them. My comment was I can't believe that you-all can't reach an agreement on these. Full stop. So that was

my comment.  But if you can, I'm happy to take a quick break to let you-all see if we can reach resolution.  Otherwise, we can go through this mind-numbing process of talking about calendar days and business days for each and every step, which I'm happy to do.

MS. GRANO:  Plaintiffs will be happy to have a quick break to discuss some of these more minor ones that -- if defendants are amenable to that.

THE COURT:  Ms. Mueller, I highly suggest you have that discussion and get whoever you need to get from the State Department on the phone, if you have to consult with someone and reach agreement on these, or otherwise, I'm going to make rulings on each and every one of these.  And I'm not sure the government is going to be thrilled about it.

MS. MUELLER:  Understood, Your Honor.  I'm happy to take a break and talk with our client and have that conversation.  Are you wanting us to do that now or go through the remainder of the --

THE COURT:  No.  Let's -- if you --

(Indiscernible simultaneous cross-talk.)

MS. MUELLER:  -- stopping now.

THE COURT:  Why don't you-all take a 15-minute break.  I'm going to take -- I'm going to -- with all -- with respect to all the timing issues and, frankly, some of

the rulings I've already made, might give you-all guidance or moot some of the other issues.  So from pages 51 to 31, any objections that have been raised, to try to go through those and see if we can't streamline some of the discussion on this, and then -- and so go ahead.  I'll keep the Zoom open, but I will leave so I will not be hearing -- or if you-all want to have a separate Zoom so you --

Actually, Ms. Butler, that might be better because we do have the courtroom open.  So if you-all would rather have a private discussion, you can get on a separate Zoom and then log back on and -- why don't we -- it's 3:22.  Why don't we say 3:45.  And why don't you-all go through the rest of the objections given the rulings I've made and see if you can't reach some sort of agreement, especially on some of the -- some of the timing issues that -- the 5 calendar days versus 5 business days.  I mean, it would seem to me that -- that you should be able to reach some sort of agreement now that I've resolved what seems to be the two biggest objections to the -- to the proposed clarifications.  All right?

MS. GRANO:  Yes, Your Honor.  Thank you very much.

THE COURT:  We'll see you back at 3:45.  Thank you.

MS. MUELLER:  Thank you, Your Honor.

THE COURT:  Thank you, Ms. Mueller.

(Recess taken.)

THE COURT:  I'll just note that you're my only group of individuals who actually stood when I entered the courtroom on a Zoom hearing, and I thank you for that.  I'll make a comment as to why that is, but I'm not going to -- There's something very similar about all of the individuals in this room, so.

All right.  I -- I left off at page 14 -- 15, Ms. Petrow (phonetic)?

Top of 15.  Okay.  All right.  Have you-all been able to reach any agreements on any of the subsequent -- any of the disputes on the last 15 pages?

MS. MUELLER:  Your Honor, if I may, for the government.  During the break I spoke with State Department agency counsel.  I was not able to get in touch with the (unintelligible) agency counsel, but agency counsel representative, they'll need to go back and speak with the operational client before we can agree to anything else that's not in the plaintiffs' (unintelligible) before the Court.

The Department of State -- I can speak for both the department of -- they're willing to meet with plaintiffs next week in a meet-and-confer, but I cannot make any proposals as to which steps there may be room for negotiation, but I can say that the agencies are open to --

open to a discussion with plaintiffs' next week.

THE COURT:  Okay.  Well, I've held this hearing and set aside this hearing to try to resolve this.  So I appreciate you -- thank you, Ms. Mueller, for -- for looking into that, and I appreciate there is a complication on your end and that you're dealing with different factions, but I've got to -- I've got to resolve these because I'm not going to -- I'm not inclined to have another hearing to resolve further disputes, as I really think it's very important that this process move apace and that we get some sort of resolution.

This case has been pending for quite some time, and the Court is very concerned about the timing of -- of these applicants and where things stand because this has a real effect on the ground.  So I'd like to just go ahead and -- and resolve it.

But thank you, Ms. Mueller, for -- for looking into that.

All right.  So then at the top of page 15, is there any reason these shouldn't just mirror the Iraqi plan?  Ms. Mueller?

MS. MUELLER:  Your Honor -- Your Honor, the Afghan plan is -- is much more (unintelligible) there's many more applications and documents that the government is -- is working with as opposed to the Iraqi plan, and that's why

the proposal here mirrors that huge influx that I previously referenced.

THE COURT:  So when did the huge influx happen? And is it -- is the peak now or is the peak at a point in time in the past?

MS. MUELLER:  So the peak influx was post-withdrawal from Afghanistan in September 2021, but the -- the government is still working through those applications.  So the influx in individuals who are moving through that process -- and that's -- that's articulated in the most recent reports that Congress (unintelligible) website, and that's -- I can say for the Afghan numbers, that as of March 31st, 2024, the total number of SIVs that were issued was 31,000.  Under the preliminary, as of right now, it's 33,000.  So there's still many applications that are moving through the process.  That as of March 2024, there is still a little less than 20,000 SIV slots -- SIVs that were available for applicants.

So the numbers are still large, but the government's working through those.  And that's because of that influx that occurred back in 2021.

THE COURT:  Okay.  Ms. Grano, you're probably in a better position to try to see if we can reach some sort of compromise on this.  The government's asking for 15 business days.  The previous plan was 5 calendar days.  What material

prejudice is there between, say, if I change it to 10 business days from 5 calendar days?

MS. GRANO: Your Honor, we -- I mean, we maintain our objections for the reasons we've already said, but we recognize that the Court has already decided with respect to the Iraqi plan that 10 business days is appropriate and would be fine with that.

THE COURT: Okay. I'll make it 10 business days to accommodate the government's position.

Number 7, this is -- all right. So plaintiffs do not object to the addition of Step 8 -- I'm sorry. What is the dispute here? I guess, Ms. Grano, can you explain to me what the --

MS. GRANO: Yes. So in this step -- so one thing is that change from calendar days to business days, but in addition to that, plaintiffs have suggested that the Court add some language given that in Step 8, which is a new step that plaintiffs do not object to, there's a requirement that the applicant inform the State Department of another embassy that they could appear at. So we're just suggesting that the Court makes sure that in the previous steps that the applicant is informed that they have to do that.

And because under the previous plan there was no requirement that the applicant inform the embassy -- or sorry, inform the State Department that they wanted go to a

different embassy, we just think this makes clear that the applicant will actually know that they have to do that in order to move on with the application process.

THE COURT:  Is there any objection to this, Ms. Mueller?

MS. MUELLER:  When it comes to a time benchmark which would implicate all post embassies, we can't -- we can't agree to that because different posts and different embassies have different schedule burdens.

What I can represent is that the letter that NVC provides the applicants notifies them of what to prepare and for the embassy or post and how they designate that location, that also provides them they would need to notify the embassy.  That's in the letter.  That's also on the State Department's website.

So they are already getting that information, but I can't -- we cannot agree to a benchmark that might be agreeable for one post or embassy but would overburden another (unintelligible).

THE COURT:  Okay.  Just a moment.

MS. GRANO:  Sorry.  If I may, Your Honor.  I would just want to ask for clarification because I'm not sure that the parties' position on this point are actually any different.  I just --

THE COURT:  Yeah, I don't think so either.  I

think it's just -- I think the only thing that is happening -- the only thing that the plaintiffs are asking for is that the applicant is alerted to this Step 8, not that they have to go to any particular embassy.  Is that right?

MS. GRANO:  That's correct, Your Honor.  We just want them to know they have to request to go to another embassy.  I don't think that would differ based on what embassy they are asking about.  And in any event, this is just to notify them of the next step in the process.

THE COURT:  Right.  Ms. Mueller, that's -- that's how I read it.

MS. MUELLER:  And the government that's -- that's -- that that's occurring in the letter that they receive, and it's also on the State Department's website of how to do that.

THE COURT:  Okay.  Well, isn't the letter that they receive going to comply with this, Ms. Grano?  So I mean, there's no -- there's -- okay.  I think we're already spending more time on this than is necessary.

I'm going to adopt the plaintiffs' language because it's already -- what the State Department is saying it's doing.  The letter would comply with that, would it not?

MS. GRANO:  Based on the discussion, I do -- yes, I do think that addresses the concern.

THE COURT:  Okay.  Great.

All right.  Moving on to No. 9?

MS. GRANO:  Sorry.  Just to flag, there was also a --

THE COURT:  Oh, a timing.

(Indiscernible simultaneous cross-talk.)

MS. GRANO:  -- versus calendar days issue at this step as well, about when they will notify the applicant.

THE COURT:  Okay.  Well, I will change it from what -- what it was, which was 15 calendar days, to 10 business days to accommodate the government.  I know it's not all that the government's asking for, but -- as I said, this process needs to get moved along.

All right.  The next is on page 16.  The step wherein the NVC schedules the applicant for the next available visa application interview.  The old plan said that NVC would apply -- would provide an interview date within 60 days -- or interview window within 60 calendar days.

MS. GRANO:  Sorry.  If I may, Your Honor. (Unintelligible) what the sentence is they're proposing.

THE COURT:  Yeah.

MS. GRANO:  Original -- sorry.  I know that the redline is not super readable.  But the original plan says that after the NVC determines the application is complete, the NVC will offer the applicant the next available

interview within 10 days of making that determination, and then the NVC will schedule the interview within 60 days of contacting the applicant and continues until the end of that paragraph.

THE COURT:  And that's what the old plan used to say?

MS. GRANO:  Yes.  That language in yellow is -- that is not crossed out is from the old plan.

THE COURT:  Okay.  All right.  Ms. Mueller, what has changed between the old plan and today that you need 50, five-zero, more days?

MS. MUELLER:  Yes, Your Honor.  As I said in discussing the other step as well, there is more applicants that need interviews.  There's more applicants that need to be notified.  There's more applicants that need to be scheduled for interviews at very different -- various embassies and posts throughout the world.

So in order to accommodate that schedule (unintelligible), the government needs that time to make sure that there are interview slots available.  So an applicant may be able to get a slot at one embassy but not the other if one embassy is overburdened, but not the others.  So this timing here accommodates those embassies that are overburdened.

THE COURT:  Well, actually, I think that the old

plan gives you more time.  Under the old plan, you have 10 days to contact the person and then 60 days after that 10 days to schedule the interview.  Am I reading that wrong?  Whereas your language is saying that you'll -- that NVC will provide an interview date to the applicant within 60 calendar days.

MS. MUELLER:  Yes, Your Honor.  The language that we're proposing here just allows the government that flexible approach in being able to schedule these interviews.  So it's the government's preference based off all the changes that have the new language that we propose.

THE COURT:  But I don't understand what the difference is.  What -- what is it that gives you flexibility?  Which part of your new proposed language accounts for the flexibility that the government is seeking?

MS. GRANO:  Your Honor, if I could?

THE COURT:  That question was for -- that question was for Ms. Mueller.

MS. GRANO:  I apologize.

THE COURT:  That's okay.

MS. MUELLER:  Your Honor, it's easier for the government to comply with this so that there's one deadline, not two deadlines.

THE COURT:  Oh, I see.

MS. MUELLER:  And that's the accommodation.

THE COURT:  Okay.

MS. MUELLER:  I do understand Your Honor's view on this, but that perhaps in reading it, it may seem easier for the government to do it one way, but, you know, (unintelligible) on the ground, it's going to be easier for the government to report and comply with this stuff if there's one deadline.

THE COURT:  Okay.  Ms. Grano, the applicant is getting an interview within 60 days no matter.  In fact, they're getting an interview within 60 days as opposed to potentially 70 days under the old plan.

MS. GRANO:  We understand the (unintelligible) is supposed to be that they'll actually just notify the applicant of the interview date within 60 days if an interview date is available.  So that -- there's -- our understanding of the new proposal is that there's actually no timeline within which the interview would actually have to take place.  It's just they're extending the timeline within which they would notify the applicant of the interview and then have no timeline for when the interview will take place.

And additionally, they are making even that requirement -- even that timeline contingent on whether they -- the embassies indicate they will make interview slots available to the applicants.

THE COURT:  Is that true, Ms. Mueller; is that your language contemplates that the applicant will just get an -- will just get notification of an interview?

(Indiscernible simultaneous cross-talk.)

MS. MUELLER:  -- Your Honor.

THE COURT:  Oh.  Oh.

MS. MUELLER:  I apologize if my words weren't precise.  But it is notification.

THE COURT:  Okay.

MS. MUELLER:  And it has to be notification, not the agreement of scheduling the interview, because, again, it depends on what embassy or post we're talking about.

THE COURT:  Okay.  All right.  I'm going to reject that language; that makes it -- that potentially expands the amount of time that an applicant has to wait for an interview well beyond what the old plan -- well beyond what the old plan contemplated, but I will incorporate to give -- I understand the two steps versus one step, but, you know, I also assume that these individuals have to make plans to travel to wherever -- I mean, traveling for these individuals, I'm assuming, is not as easy as us getting on a plane and going to Chicago or going to Denver.  These are individuals who are traveling from wherever they are -- I understand if I'm -- unless I'm mistaken, that some of them are in hiding or in places where they are not necessarily

able to be openly traveling.  They've got to go and get to the place, and they probably need time and notice.

Am I wrong, Ms. Grano?

MS. GRANO:  So I -- I do think that with respect to Step 8, the previous step, that requires them to (unintelligible) applicant to have already indicated to the State Department that they are available to go to another location and --

Sorry.  One moment, Your Honor.  Oh, sorry.

Yes, and also we do recognize that the difficulties in an applicant situation of getting to an interview, but we do think the existing language accounts for that and provides flexibility to defendants; where you'll see at the bottom of this box that if the applicant requests a different interview location or interview time, that there is no requirement that they schedule the interview within the time frame.

THE COURT:  So if I were not -- if I were to accept the government's language, there's no time frame to hold the interview?  Time frame within which the interview must occur?

MS. GRANO:  Yes, Your Honor.

THE COURT:  Is that right, Ms. Mueller?

MS. MUELLER:  Yes, Your Honor, that's my understanding.

THE COURT:  Okay.  All right.  Then in that case, I'm -- given that I think that having timing benchmarks does -- is required by Judge Chutkan's order, I'm going to adopt the plaintiffs' proposed language, which is the old plan, but I will incorporate the language that is in blue there to say 8 business days, just to the extent that is -- that gives the government some additional time or the applicant completing Step 8, whichever is later.

Okay.  Page 17.  We've resolved all of the language regarding administrative processing versus additional national security screening.  So I don't need to revisit that.

What are the timing issues here, Ms. Grano?  5 calendar versus 5 business days?

MS. GRANO:  Yes.  Yeah, just changing calendar to business days, and we understand that Your Honor has -- with respect to the Iraqi plan already said that 5 business days was appropriate.  So we are fine with that here as well.

THE COURT:  Yes.  I'm going to adopt the government's proposal there.

Okay.  Page 18.  The language, it appears, the plaintiffs object to is not the language above about placing the case in administrative -- well, I guess, really that goes away per my previous ruling; correct?

MS. GRANO:  Yes.

THE COURT:  Okay.  And what is the language of -- what is the objection to class members?

MS. GRANO:  So plaintiffs -- so, actually, defendants have proposed replacing class members with applicants just generally, and so plaintiffs object to this for the same reasons that we think that plaintiffs should be required to report on class members specifically and not all SIV applicants.

THE COURT:  But does -- isn't applicants -- is applicants broader than class members?  Are you getting more -- more --

MS. MUELLER:  Yes.

THE COURT:  -- protections?

MS. MUELLER:  -- Your Honor, if I --

THE COURT:  Yeah.

MS. MUELLER:  So the government does -- the inclusion of the word applicant there goes back to the fact that we would be reporting on all SIV applicants, not just class members.

THE COURT:  So, Ms. Grano, what is the objection there?  You're going to get reporting for class members, but also for other individuals, which may or may not be class members.  I don't know.

MS. GRANO:  Sorry, Your Honor.  Our objection is that they are -- they are saying that they will expedite the

processing of all applicants. They're asking third-party agencies to expedite the processing of all applicants, and so that (unintelligible) actually gives the targeted relief to class members. Because if they're asking for this broader group of all SIV applicants no matter how recently they applied to be expedited, then that doesn't provide the relief specifically to class members.

And as the Court has already decided, the plan has to be focused on providing relief, specifically to the members of the class.

THE COURT: But what -- what material difference is there between applicants and class members? So you believe that -- do you have some basis to believe that class members will be prejudiced by this change in language?

MS. GRANO: I think if the Department of State is asking for all of SIV applicants to be expedited, then that means that -- necessarily that class members' applications that have been pending for longer will not be expedited as much as they would be if the State Department was only asking for the subset of class members to be expedited. So if they ask for all SIV applicants to be in whatever list of, like, expedited cases, then that means that class members can fall to the bottom of that list again and would be left waiting even longer than SIV applicants who applied more recently.

THE COURT:  What was the reason for the change, Ms. Mueller?

MS. MUELLER:  Your Honor, this change is in conjunction with our proposal that the class member allocation include all SIV applicants, which, as Your Honor has said, would provide greater relief than the current remedy that was of the Court in Judge Chutkan's order.

THE COURT:  But earlier I -- I rejected that change in language.

MS. MUELLER:  Yes, Your Honor.

THE COURT:  Okay.  All right.  We're going to keep it at class members then.

Okay.  Page 20 is my next change.  I think the 20 days is what I adopted previously -- right? -- with respect to the Iraqi plan?

MS. GRANO:  Yes, Your Honor.

THE COURT:  So I'll --

MS. MUELLER:  Yes, Your Honor.

THE COURT:  I'll keep the 20 days there, unless there's any specific additional objection.

Page 21.  All right.  So here the plaintiffs are objecting to -- okay -- the defendants reducing the frequency by which they would file the progress report.  I'm going to reject the government's language there.

Now, I will say, Ms. Mueller, if we get to a point

where there does -- there is a material, you know, change in how -- the -- the volume here and these applications get processed, I don't think there's anything preventing the government from petitioning the Court to change the frequency of reporting obligations if there are facts that support it, but I'm not going to adopt it right now.  But.

I'll deny that request without prejudice.

MS. MUELLER:  Understood, Your Honor.

THE COURT:  Okay.  Agree on the next issue as well.  I'm going to revert to the language in the previous plan.  Obviously, plaintiffs have to meet and confer with defendants before bringing any sort of request to the Court.  And I do reject the waiver language on 22.

Okay.  All right.  Page 23.  I think that this is the same issue that we addressed before.  So I will revert to the original plan, which really focuses on the class members.

Okay.  I think the changes on page 25 track my prior rulings, unless I'm wrong here.  You-all can tell me.

MS. GRANO:  That's correct.

THE COURT:  Same with 26, 27, 28, 29, 30, and 31.

Okay.  All right.  Here's what I would like to do.  As Judge Chutkan has -- has tasked me with overseeing the plan and resolving any objections, which I've just done, what I would like the parties to do is to incorporate my

rulings and the language that I've accepted, whether it was me accepting the government's language or the plaintiffs' language or having come up with some sort of middle -- you know, compromise between the two, I would like the parties to submit the final plan as a proposed order to me.  I would like you -- I'd like one side to take the laboring oar by incorporating all of these changes.  So I'll ask plaintiffs' counsel to do that.  And then submit it to the government by Monday at noon, which, hopefully, shouldn't be too cumbersome given that we -- these are all just redlines we're dealing with.

And then the government needs to get back to the plaintiff -- to plaintiffs by Tuesday at noon just to confirm and make sure that they -- the government has seen it and that it confirms that it complies with my -- with my rulings.

And then by, I would say -- just a moment.  Sorry.  I'm sorry.  Monday is a holiday.  Monday is Indigenous People's Day.  I'm sure someone was going to correct me at some point.  So thank you, Ms. Petrow (phonetic), my law clerk who corrected me.

So, Ms. Grano, when can you get the -- when can you get the final plan to the government?  Tuesday morning?

MS. GRANO:  Tuesday morning is fine with plaintiffs.

THE COURT:  Okay.  All right.  If you could get it to the government by Tuesday morning at 9 o'clock, and then I'll ask the government to review and by the next day at 9 o'clock, just say aye or nay.  Or if there's a, you know, difference of opinion on what my ruling said, to confer and discuss it, and then by Wednesday at -- Wednesday end of the day, I'd like you-all to file the final proposed -- final plan.  And then I will propose the final plan, which incorporates my rulings, to Judge Chutkan for execution.

Are there any questions?  Concerns?

MS. GRANO:  Not from plaintiffs, Your Honor.  Thank you.

MS. MUELLER:  And not from the government, Your Honor.  Thank you.

THE COURT:  Okay.  I appreciate you-all working very hard on -- on teeing up these issues.  I'm -- I'm glad that we were able to resolve these and -- and, hopefully, get this case moving.

So I look forward to receiving your filing next week, and as I said, as long as it complies with all of my rulings and there are no issues with respect to anyone's recollection from this hearing, I will take that plan and then propose it as the final plan to Judge Chutkan.  And then she will review it herself.

Okay.  All right.  Thank you, all, for your help.

You-all may be excused.

(Proceedings were concluded at 4:24 p.m.)

CERTIFICATE

I do hereby certify that the foregoing is a true, correct, and complete transcript of the audio-recorded proceedings in this matter, audio recorded on October 10, 2024, and transcribed from the audio recording to the best of my ability, and that said transcript has been compared with the audio recording.

Dated this 11th day of October, 2024.


/s/ Nancy J. Meyer
Nancy J. Meyer, Official Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter