[ORAL ARGUMENT NOT YET SCHEDULED]
**No. 25-5279**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AFGHAN AND IRAQI ALLIES, UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, *On Their Own and On Behalf of Others Similarly Situated*,

*Plaintiffs-Appellees*,

v.

MARCO A. RUBIO, in his official capacity as Secretary of the United States Department of State, et al.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court for the District of Columbia
No. 1:18-cv-1388 (Hon. Tanya S. Chutkan)

---

**BRIEF OF AMICUS CURIAE AMBASSADOR RYAN C. CROCKER
SUPPORTING APPELLEES**

---

Iain McPhie
Jeffrey S. Oliver
Qiuyang Wang
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, DC 20001
(202) 639-1146
iain.mcphie@bakerbotts.com

*Counsel for Amicus Curiae*

### CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1), the undersigned certifies as follows:

## A. Parties and Amici

Except for newly filing amici parties in this Court, all parties, intervenors, and amici appearing before the district court and before this Court in the present appeal are listed in the Certificate as to Parties, Rulings, and Related Cases included in the Brief for Defendants-Appellants.

## B. Rulings Under Review

References to the rulings at issue appear in the Certificate as to Parties, Rulings, and Related Cases included in the Brief for Defendants-Appellants.

## C. Related Cases

The history of this case before the Court appears in the Certificate as to Parties, Rulings, and Related Cases included in the Brief for Defendants-Appellants. Counsel for Amicus Curiae are not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

Dated: June 10, 2026

/s/ *Iain McPhie*
Iain McPhie
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, DC 20001
(202) 639-1146
iain.mcphie@bakerbotts.com

**TABLE OF CONTENTS**

**Page**

Table of Contents ........................................................................................... i

Table of Authorities ...................................................................................... ii

Glossary of Abbreviations, Acronyms, and Terms................................... vi

Interest of Amicus Curiae ..............................................................................1

Summary of Argument ...................................................................................3

Argument.........................................................................................................5

I.     The SIV programs embody the United States' commitment to its Afghan and Iraqi allies as a continuing national-security imperative.................................5

II.    Individual differences among SIV applicants do not alter the shared threat they face or the common harm inflicted by systemic delay. .........................11

III.   The government's own record supports that chronic under-resourcing, not vetting alone, has driven years of unreasonable delay. ...............................15

IV.    A refusal under 8 U.S.C. § 1201(g) for administrative processing is, in practice, an interim hold that does not discharge the government's duty.....21

V.     The government's changed-circumstances argument underscores rather than undermines the need for continued judicial oversight.................................25

Conclusion ....................................................................................................30

Certificate of Compliance .............................................................................32

Certificate of Service ....................................................................................33

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Afghan & Iraqi Allies v. Blinken*,
103 F.4th 807 (D.C. Cir. 2024)..............................................................7

*DL v. District of Columbia*,
860 F.3d 713 (D.C. Cir. 2017).............................................................11

*Nine Iraqi Allies Under Serious Threat v. Kerry*,
168 F. Supp. 3d 268 (D.D.C. 2016).................................................23, 24

*Telecomms. Rsch. & Action Ctr.*,
750 F.2d 70 (D.C. Cir. 1984)......................... 3, 11, 12, 15, 16, 20, 21

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)...........................................................................12

**Statutes**

Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, 123 Stat.
807 (2009) (codified as note to 8 U.S.C. § 1101)..................................6

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub.
L. No. 119-4, 139 Stat. 9 (2025).........................................................7

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47,
138 Stat. 460 (2024)......................................................................7, 27

National Defense Authorization Act for Fiscal Year 2014, Pub. L. No.
113-66, 127 Stat. 672 (Dec. 26, 2013)..............................................6, 7

Refugee Crisis in Iraq Act of 2007, Pub. L. No. 110-181, 122 Stat.
395 (2008) (codified as note to 8 U.S.C. § 1157)...................................6

**Other Authorities**

167 Cong. Rec. S91-3684 (June 9, 2016).................................................10

ii

*Administrative Processing Information*, U.S. State Dep't,
   https://travel.state.gov/content/travel/en/us-visas/visa-information-
   resources/administrative-processing-information.html ....................................22

*Afghanistan's Taliban Responsible for Revenge Killings, Torture of
   Former Officials*, UN News (Aug. 22, 2023),
   https://news.un.org/en/story/2023/08/1139962 ..................................................14

Ahmad Mukhtar, *Former Afghan Interpreter Says Taliban Tortured
   Him for Weeks but U.S. Still Won't Give Him a Visa*, CBS NEWS
   (updated Sept. 1, 2023, 9:19 AM EDT),
   https://www.cbsnews.com/news/afghanistan-interpreter-taliban-
   torture-us-denies-special-immigration-visa/................................................13, 14

Bayliss Wagner, *John Cornyn and Wesley Hunt Backtrack on Support
   for Afghan Refugees Amid Trump Crackdown*, San Antonio
   Express-News (updated Dec. 23, 2025, 9:51 AM),
   https://www.expressnews.com/politics/article/cornyn-hunt-afghan-
   refugees-senate-race-21252733.php .......................................................................8

Fahim Abed et al., *Hunted by the Taliban*, Lighthouse Reports (Oct.
   15, 2025),
   https://www.lighthousereports.com/investigation/hunted-by-the-
   taliban/.............................................................................................................12, 13

Monika Evstatieva, *Three Years After the U.S. Withdrawal, Former
   Afghan Forces Are Hunted by the Taliban*, NPR (Sept. 25, 2024, at
   4:35 PM ET), https://www.npr.org/2024/09/25/nx-s1-
   5099028/former-afghan-army-and-police-hunted-by-the-taliban ......................14

Off. of Inspector Gen., *Compliance Follow-Up Review of the Afghan
   Special Immigrant Visa Program*, U.S. State Dep't, Rep. No.
   AUD-MERO-23-01 (Oct. 2022),
   https://www.stateoig.gov/uploads/report/report_pdf_file/aud-mero-
   23-01.pdf.............................................................................................................18

Off. of Inspector Gen., *Evaluation of Adjustments to the Afghan
   Special Immigrant Visa Program From 2018 Through 2022*, U.S.
   State Dep't, Rep. No. AUD-MERO-23-23 (Aug. 2023),
   https://www.stateoig.gov/uploads/report/report_pdf_file/aud-mero-
   23-23.pdf.............................................................................................................18

Off. of Inspector Gen., *Review of the Afghan Special Immigrant Visa Program*, U.S. State Dep't, Rep. No. AUD-MERO-20-35 (June 2020), https://www.stateoig.gov/uploads/report/report_pdf_file/aud-mero-20-35_7.pdf ..................................................................................................17

Rep. Jason Crow, *Congressman Crow Leads Bipartisan Effort to Honor Promises to America's Afghan Allies* (May 16, 2025), https://crow.house.gov/media/press-releases/congressman-crow-leads-bipartisan-effort-to-honor-promises-to-america-s-afghan-allies ......................................................................................................7, 8

Rep. Jason Crow, *Crow Introduces Bipartisan Legislation to Help Afghans who Assisted American Servicemembers Resettle in U.S.* (Aug. 5, 2025), https://crow.house.gov/media/press-releases/crow-introduces-bipartisan-legislation-to-help-afghans-who-assisted-american-servicemembers-resettle-in-us .............................................28

*Report to Congress on the Status of the Afghan Special Immigrant Visa Program*, U.S. State Dep't (May 21, 2026), https://www.state.gov/wp-content/uploads/2026/05/Report-Status-of-the-Afghan-SIV-Program-007285-HRC1400836-Accessible-05.21.2026.pdf ...........................................................................28, 29

S. 1651, 110th Cong. § 2(4) (2007) ..........................................................6

Sen. Amy Klobuchar, *Klobuchar, Murkowski, Colleagues Introduce Bipartisan Legislation to Support Wartime Afghan Allies* (Aug. 7, 2025), https://www.klobuchar.senate.gov/public/index.cfm/2025/8/klobuchar-murkowski-colleagues-introduce-bipartisan-legislation-to-support-wartime-afghan-allies .............................................................8

Sen. Chris Coons, *Senator Coons Sends Bipartisan Letter Urging Inclusion of 20,000 Additional Visas for Afghan Allies* (Mar. 14, 2024), https://www.coons.senate.gov/news/press-releases/senator-coons-sends-bipartisan-letter-urging-inclusion-of-20000-additional-visas-for-afghan-allies/ ....................................................27

*Visa Denials*, U.S. State Dep't, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visa-denials.html.............................................................23

iv

*Written Statement of Andrew J. Sullivan, Director of Advocacy, No One Left Behind Before House Foreign Affairs Committee, Subcommittee on Oversight & Accountability "Roundtable on Taliban Reprisals"* (Jan. 31, 2024), https://foreignaffairs.house.gov/sites/evo-subsites/republicans-foreignaffairs.house.gov/files/migrated/uploads/2024/01/Andrew-Sullivan-Taliban-Reprisals-Roundtable-Witness-Testimony.pdf ......................26

## GLOSSARY OF ABBREVIATIONS, ACRONYMS, AND TERMS

AAPA            Afghan Allies Protection Act of 2009

COM             Chief of Mission

JA              Joint Appendix

NVC             National Visa Center

OIG             Office of Inspector General

RCIA            Refugee Crisis in Iraq Act of 2007

SA              Supplemental Appendix

SIV             Special Immigrant Visa

*TRAC*          *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)

**INTEREST OF AMICUS CURIAE**

Amicus curiae is former United States Ambassador Ryan C. Crocker.[1] Ambassador Crocker served in the United States Foreign Service for nearly forty years, half of them as the U.S. Ambassador to six countries in the Middle East and Central Asia: Afghanistan (2011-2012), Iraq (2007-2009), Pakistan (2004-2007), Syria (1998-2001), Kuwait (1994-1997), and Lebanon (1990-1993). In 2004, the Senate confirmed President Bush's nomination of Ambassador Crocker as a Career Ambassador, the highest rank available for an American diplomat.

Ambassador Crocker's experience is directly relevant to the issues before this Court and the two statutes that underlie this litigation. He was the U.S. Ambassador to Iraq when the Refugee Crisis in Iraq Act was enacted and signed into law by President Bush on January 28, 2008, and he became the United States' Ambassador to Afghanistan shortly after the Afghan Allies Protection Act of 2009 was implemented. During his tenure, while working closely with American military leaders in both countries, Ambassador Crocker witnessed the crucial role of Iraqi and Afghan allies—men and women who supported the United States by acting as translators, guides, and in other roles, despite the constant threat of violence and

---

[1] No party or party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E). Counsel to Ambassador Crocker represented him in this matter on a pro bono basis. Amicus received consent from all parties to file this brief.

1

death against them and their families. He also recognized how deleterious it was to our national security for those allies to suffer unduly lengthy delays in visa processing when their service made it untenable for them to continue living in their own countries.

During and after his tenure as Ambassador, therefore, Ambassador Crocker strongly advocated for legislation authorizing the Special Immigrant Visa program. He continues to advocate for reform and expeditious implementation of this program to adequately protect U.S. national-security interests, including through his service on the bipartisan Afghanistan War Commission and by filing an amicus brief in the prior appeal in this litigation. Based on his longstanding experience and interest in this program, Ambassador Crocker now respectfully submits this amicus brief to advise the Court of the importance of timely Special Immigrant Visa processing to U.S. national-security interests and to the credibility of America's commitments to Iraqi and Afghan allies.

**SUMMARY OF ARGUMENT**

The district court's Revised Adjudication Plan properly safeguards the national-security interests served by the Special Immigrant Visa (SIV) programs, including U.S. foreign-policy priorities and the lives of our Iraqi and Afghan allies. The SIV programs are not ordinary immigration benefits; they are statutory expressions of a national-security promise to people who placed themselves and their families in grave danger because they aided the United States. Congress created these programs with broad bipartisan support, amended them over the years without retreating from the need for efficient processing, and established a nine-month benchmark reflecting its judgment that careful vetting and timely processing can coexist. That bipartisan endorsement persists: as recently as 2025, members of Congress from both parties urged additional SIV authorizations and reaffirmed that honoring these commitments is critical to maintaining America's credibility with future allies.

The government's principal challenge to class certification based on individual differences among applicants fundamentally misunderstands what unites this class and glosses over the relevant *TRAC* factors that weigh most decisively in favor of relief. Whatever administrative distinctions exist in the processing pipeline, every class member shares the central fact that prolonged delay leaves them and their families exposed to retribution because of their service to the United States. Public

reporting and findings by international organizations confirm that Taliban reprisals remain ongoing years after the U.S. withdrawal and that the consequences of delay are not merely individual but far-reaching.

Nor can the government attribute years of delay solely to the demands of security vetting. State Department oversight reports have repeatedly identified inadequate staffing, insufficient coordination, and deficient program management as major contributors to the backlog, findings that stretch back years before the withdrawal from Afghanistan. Those findings show that delay is not the inevitable byproduct of national-security review; it is instead the result of resource-allocation and program-management failures within the government's control. Congress's nine-month benchmark is not unrealistic; the agencies have simply not organized the programs to meet the timeline Congress required.

The government's contention that a refusal under 8 U.S.C. § 1201(g) for administrative processing constitutes a "final decision" discharging further obligations is equally unavailing. In practice, a Section 1201(g) refusal functions as an interim hold, a mechanism by which a consular officer pauses a case while additional checks are completed. The State Department's own guidance, its public communications to applicants, and deposition testimony in this case all confirm that administrative processing is a step toward a later eligibility determination, not the conclusive end of the visa process. Accepting the government's recharacterization

4

would provide a ready mechanism to circumvent the processing that Congress directed.

Finally, the government's changed-circumstances argument—that the withdrawal from Afghanistan, the closure of Embassy Kabul, and the surge in applications justify eliminating the plan's timing benchmarks—ignores that those same developments have made life more dangerous for the very applicants the plan protects. Congress, with support from members from both parties, has responded by expanding the Afghan SIV program, extending its deadlines, and reaffirming the need for prompt processing, while the scale of the continuing pipeline underscores that structured oversight remains vital. The district court properly rejected the government's proposal to eliminate individual timing benchmarks entirely, retaining instead a plan that ensures accountability while accommodating changed circumstances with flexibility.

Ambassador Crocker respectfully urges the Court to affirm the district court's judgment with full confidence that the Revised Adjudication Plan advances, rather than impairs, the national-security interests of the United States.

**ARGUMENT**

## I.    The SIV programs embody the United States' commitment to its Afghan and Iraqi allies as a continuing national-security imperative.

From the inception of the Refugee Crisis in Iraq Act, Congress recognized that our allies in the Middle East "have been killed or injured in reprisals for their

5

support of the American effort. Many more Iraqis associated with the United States have fled Iraq in fear of being killed or injured." S. 1651, 110th Cong. § 2(4) (2007). The premise of the Afghan and Iraqi SIV programs is that eligible individuals who served the United States or supported U.S.-led missions abroad face a lethal threat precisely because of that service. Congress incorporated this judgment into the eligibility criteria themselves, opening the programs to applicants who have "experienced or [are] experiencing an ongoing serious threat as a consequence of [their] employment" on behalf of the U.S. government. *See* Refugee Crisis in Iraq Act of 2007, Pub. L. No. 110-181, § 1244(b)(1)(D), 122 Stat. 395, 396-97 (2008) ("RCIA") (codified as note to 8 U.S.C. § 1157); Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, § 602(b)(2)(A)(iv), 123 Stat. 807 (2009) ("AAPA") (codified as note to 8 U.S.C. § 1101).

Congress's commitment did not end with the programs' creation; it is reflected in amendments to the governing statutes that emphasized the urgency of efficient processing. Especially relevant here, Congress amended both statutes in 2013 to instruct that SIV applications be "processed so that all steps under the control of the respective departments incidental to the issuance of such visas . . . should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa." National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113-66, §§ 1218, 1219, 127

Stat. 672, 910, 914 (2013). Notably, since the government's unsuccessful interlocutory appeal in 2024, *see Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807 (D.C. Cir. 2024), Congress has twice amended the AAPA while leaving the relevant processing deadline and other central provisions intact. In 2024, Congress amended the AAPA to extend the Chief of Mission (COM) application deadline to December 31, 2025, and to increase the total number of SIVs from 38,500 to 50,500. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 7034(d)(9), 138 Stat. 460, 789-90 (2024). The AAPA was amended again in 2025, but that amendment updated only the heading of the relevant subparagraph, leaving the central provisions unchanged. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 11208(b), 139 Stat. 9, 38 (2025).

Support from members of Congress from both sides of the aisle has also persisted. In May 2025, Democratic Representative Jason Crow, an Iraq and Afghanistan veteran, led a bipartisan effort joined by Republican Representative Zach Nunn and more than 100 other House members urging Congress to provide 20,000 additional Afghan SIVs, explaining that Afghan SIV holders provided "significant faithful service to our security and strength" and that additional visas were "critical to keeping the program operational in order to secure these wartime allies." Rep. Jason Crow, *Congressman Crow Leads Bipartisan Effort to Honor*

7

*Promises to America's Afghan Allies* (May 16, 2025).[2] In August 2025, Democratic Senator Amy Klobuchar and Republican Senator Lisa Murkowski likewise introduced the bipartisan Fulfilling Promises to Afghan Allies Act to create a path to permanent protection in the United States for Afghan wartime allies evacuated by the U.S. government during the 2021 withdrawal. *See* Sen. Amy Klobuchar, *Klobuchar, Murkowski, Colleagues Introduce Bipartisan Legislation to Support Wartime Afghan Allies* (Aug. 7, 2025).[3] As Senator Murkowski put it, "[w]e must stand by those who stand with us in times of war." *Id.* And even amid recent political headwinds, a prominent Republican voice has continued to stress the importance of honoring our nation's commitments to Afghan allies, with Representative Michael McCaul, the former chair of the House Committee on Foreign Affairs, reiterating that "[t]he credo in the military is 'No man left behind,' and we promised them that we will protect them." *See* Bayliss Wagner, *John Cornyn and Wesley Hunt Backtrack on Support for Afghan Refugees Amid Trump Crackdown*, San Antonio Express-News (updated Dec. 23, 2025, 9:51 AM).[4]

---

[2] https://crow.house.gov/media/press-releases/congressman-crow-leads-bipartisan-effort-to-honor-promises-to-america-s-afghan-allies

[3] https://www.klobuchar.senate.gov/public/index.cfm/2025/8/klobuchar-murkowski-colleagues-introduce-bipartisan-legislation-to-support-wartime-afghan-allies

[4] https://www.expressnews.com/politics/article/cornyn-hunt-afghan-refugees-senate-race-21252733.php

The commitment that the SIV programs represent is widely understood—by allies, adversaries, and those who may be asked to assist the United States in future conflicts. The United States asked Iraqi and Afghan partners to accept grave risks in support of American missions. Many did so because they believed that, if circumstances became dire, the United States would not abandon them. That belief is not only a matter of honor; it is a matter of national security. If the United States fails to fulfill its obligations to those who served alongside it in Iraq and Afghanistan, future partners will reasonably ask whether American assurances can be trusted. And when local partners hesitate to step forward, American servicemembers and diplomats are placed in greater danger.

From Ambassador Crocker's vantage point, the programs' importance is not just humanitarian; they are practical instruments of American power. The need for reliable local allies is not abstract. In Iraq and Afghanistan, translators, guides, and other on-the-ground partners made possible the work of American diplomats and servicemembers. They interpreted languages, explained local conditions, identified threats, facilitated movement, and helped U.S. personnel operate in places where Americans could not safely or effectively act alone. In modern military and diplomatic operations, knowing where to go, when to go, and how to get there can be the difference between a successful mission and catastrophe. Interpreters and

9

other local partners are indispensable to those judgments, and their assistance came at extraordinary personal risk.

National-security interests are not one-sided. Careful vetting is necessary, but so too is the credibility of America's commitment to those who accept substantial risks in reliance on U.S. assurances. If the SIV process becomes synonymous with years of unexplained uncertainty, America's promises lose practical force. Potential future local partners will understand that service to the United States may make them and their families targets, but that the protection promised in return may arrive only after years of delay, if at all. As General John Nicholson warned while commanding U.S. forces in Afghanistan, "abandoning this program would significantly undermine our credibility" and the "sacrifice by thousands of Afghans on behalf of Americans and Coalition partners." Letter from General John Nicholson to Senator John McCain (May 20, 2016), *reprinted in* 162 Cong. Rec. S91-3684 (June 9, 2016).

In short, the SIV programs are not ordinary immigration benefits. They are statutory expressions of a national-security promise to people who placed themselves and their families in danger because they served the United States. The credibility of that promise matters beyond the individual cases in this litigation. It matters to future interpreters, contractors, and civil-society partners who will decide whether reliance on American commitments is justified. It also matters to the American servicemembers and diplomats who will depend on those partners in

10

future missions. In environments like Iraq and Afghanistan, where local knowledge and language capability are critical, failure to honor past commitments can place future American personnel in peril.

## II.    Individual differences among SIV applicants do not alter the shared threat they face or the common harm inflicted by systemic delay.

The government insists that the certified class is improperly treated as homogeneous because SIV applications involve individualized circumstances affecting timing, processing, and national-security review, including so-called "high-risk" cases. *See* Appellants' Br. 22-26. Appellees have established that every class member has experienced the same system-wide unreasonable delay, and the resulting "common harms" are "subject to common proof," which is equally relevant to the *TRAC* factors. Appellees' Br. 18-21 (quoting *DL v. District of Columbia*, 860 F.3d 713, 724 (D.C. Cir. 2017)). Ambassador Crocker supplements those arguments with the perspective of a career diplomat who has witnessed these dynamics on the ground, and to address in particular the third and fifth *TRAC* factors—"human health and welfare" and the "nature and extent of the interests prejudiced by delay," *Telecomms. Rsch. & Action Ctr.*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*")— which the government largely ignores. *See* Appellants' Br. 44 (asserting in passing and without analysis that these factors favor the agencies); Appellees' Br. 41-42.

Whatever distinctions the government identifies in the processing pipeline, they are dwarfed by what every class member shares: each is a person whom

11

Congress recognized as facing a serious threat because of service to the United States, and each suffers a common, escalating harm the longer their application remains unresolved—prolonged exposure to retribution, uncertainty, and danger that Congress created the SIV programs to end. As Appellees explain, even "myriad factual differences" between class members do not defeat commonality when class members raise common questions "apt to drive the resolution of the litigation." Appellees' Br. 19 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Ambassador Crocker provides additional insight, grounded in decades of field experience, into the common threats facing SIV applicants that make the third and fifth *TRAC* factors weigh decisively in favor of continued relief. Indeed, in the years since the United States withdrew from Afghanistan, public reporting and findings by international organizations have confirmed that Taliban reprisals are ongoing against those associated with U.S. and international forces. No administrative distinction between applicants can alter that shared and escalating peril.

In October 2025, an investigation documented at least 110 former members of Afghanistan's National Defense and Security Forces killed since 2023, including members of elite units who worked in close partnership with U.S. and allied Special Forces, uncovering "an ongoing pattern of killings and concerning evidence that former soldiers are being systematically hunted by the Taliban." Fahim Abed et al.,

*Hunted by the Taliban*, Lighthouse Reports (Oct. 15, 2025).[5] Victims included individuals who had sought evacuation or other protection, or who remained exposed despite known affiliations with U.S. and allied forces. *Id.* One former soldier, Ali Gul Haideri, had served in an elite Afghan unit that partnered with American Special Forces, a relationship that the investigation reported "put a target on his back" after Kabul fell. *Id.* He and his family struggled to board an evacuation flight, but he was later captured, tortured for over a month, released, forced to flee to a neighboring country, deported back to Afghanistan after mass expulsions, and ultimately shot dead in Kabul in early 2024. *Id.*

The human toll of delay is not confined to former soldiers or combatants. "Massoud," an Afghan interpreter who worked for the U.S. military from 2011 to 2013, including a year with U.S. Navy SEALs, sought protection through the SIV process, but his situation remained unresolved as he was seized by Taliban intelligence officers in Kabul and imprisoned for more than three months, where he was "beaten, struck with electric shock sticks, electrocuted, waterboarded and hanged upside down." Ahmad Mukhtar, *Former Afghan Interpreter Says Taliban Tortured Him for Weeks but U.S. Still Won't Give Him a Visa*, CBS News

---

[5] https://www.lighthousereports.com/investigation/hunted-by-the-taliban/

13

(updated Sept. 1, 2023, 9:19 AM EDT).[6] His apparent "crime," Taliban interrogators told him, was helping Americans. *Id.* Massoud's story underscores the common consequence of delay: for U.S.-affiliated partners, unresolved applications can prolong exposure to those who target them because of their service.

The United Nations Assistance Mission in Afghanistan separately found credible reports of 218 extrajudicial killings, 144 instances of torture and ill-treatment, and hundreds of arbitrary arrests and detentions of former officials and security personnel between August 2021 and June 2023, despite the Taliban's professed "amnesty." *Afghanistan's Taliban Responsible for Revenge Killings, Torture of Former Officials*, UN News (Aug. 22, 2023).[7] Even years following the U.S. withdrawal, former Afghan soldiers and police were reportedly still "hunted by the Taliban" and forced into hiding. Monika Evstatieva, *Three Years After the U.S. Withdrawal, Former Afghan Forces Are Hunted by the Taliban*, NPR (Sept. 25, 2024, at 4:35 P.M. ET).[8] This evidence demonstrates that delay does not merely leave individual applicants vulnerable; it can have cascading consequences, because the prolonged exposure of one applicant may endanger others who served alongside

---

[6] https://www.cbsnews.com/news/afghanistan-interpreter-taliban-torture-us-denies-special-immigration-visa/. The article did not use "Massoud's" real name to protect him from further retaliation by the Taliban.

[7] https://news.un.org/en/story/2023/08/1139962

[8] https://www.npr.org/2024/09/25/nx-s1-5099028/former-afghan-army-and-police-hunted-by-the-taliban

them. These facts also bear directly on the *TRAC* analysis. *See* Appellees' Br. 41-42. The government's insistence on treating each application as a discrete, individually distinguishable case ignores the interconnected reality of how armed groups identify and target those associated with the United States and its partners.

Ultimately, the government asks this Court to believe that factual differences among SIV applicants make the consequences and urgency of delay too individualized for class-wide process relief. *See* Appellants' Br. 22-26. Having witnessed local colleagues, interpreters, and guides risk their lives because they trusted American promises, Ambassador Crocker disagrees with that premise. Every applicant who served the United States or supported U.S.-led missions in Iraq or Afghanistan did so in reliance on the same compact, every one of them faces the same category of threat, and each additional day of unresolved delay prolongs that vulnerability. The government's administrative distinctions—the steps in the process, the nature of the qualifying employment, the presence or absence of an undefined "high-risk" label—matter for evaluating individual eligibility and security concerns. But they do not alter the reality that systemic delay inflicts a common, escalating harm on every member of this class.

## III.   The government's own record supports that chronic under-resourcing, not vetting alone, has driven years of unreasonable delay.

Ambassador Crocker does not dispute the need for stringent vetting and does not ask this Court to require the government to cut corners on national security. As

a career diplomat who served in countries where threats were constant and real, he knows that background checks must be thorough, fraud detection must be vigorous, and security screening must reflect current intelligence. But those requirements are not inherently incompatible with the nine-month benchmark Congress established. Congress directed the agencies to improve efficiency while preserving additional time for genuinely high-risk cases, *see* Appellees' Br. 6-7, reflecting its judgment that careful vetting and timely processing can coexist. The government's contrary narrative treats delay as the inevitable byproduct of security screening—an argument it deploys primarily through the first two *TRAC* factors. *See* Appellants' Br. 38-43. The government's oversight materials tell a different story: those challenges are real, but inadequate staffing, insufficient coordination, and deficient program management have repeatedly been identified as major drivers of unreasonable delay.

The government would have this Court believe that nine months is simply too little time to process SIV applications responsibly, especially given national-security review, interagency coordination, and changed circumstances after the withdrawal. *See* Appellants' Br. 39-43, 51-53. But the government's own record shows that the pace of processing is not fixed. The State Department's oversight body identified personnel shortages as a significant contributor to delay, a problem that predated the withdrawal. In 2020, the State Department's Office of Inspector General (OIG) reported that five Congress-identified obstacles remained impediments to achieving

the statutory nine-month benchmark, including staffing deficiencies, and that those obstacles existed "in part, because the Department's Senior Coordinating Official position, which is intended to oversee and direct the Afghan SIV program, has been vacant since January 2017." Off. of Inspector Gen., *Review of the Afghan Special Immigrant Visa Program*, U.S. State Dep't, Rep. No. AUD-MERO-20-35, at 6 (June 2020).[9] The OIG report explained that, while "[v]arious offices from different bureaus contribute to processing Afghan SIVs," "the Afghan SIV program has been generally understaffed and unable to meet legislative demands of processing SIV applicants within the 9-month timeframe established by Congress." *Id.* at 14. In October 2019, "approximately 30 percent" of Embassy Kabul's Consular Section positions were vacant, and during a staff reduction that year, the number of Consular Officers was cut from five to three—even as the Embassy reported it was "operating at capacity" and could not accommodate additional immigrant visa interviews. *See id.* at 15. The same OIG report noted that personnel levels at various offices contributing to the SIV process had "remained constant" since 2016, even as the backlog grew. *See id.* at 6.

More recent oversight confirms that these problems did not end with the withdrawal. In an October 2022 compliance follow-up to its 2020 review, OIG found that the Department had taken some corrective actions, including conducting a

---

[9] https://www.stateoig.gov/uploads/report/report_pdf_file/aud-mero-20-35_7.pdf

staffing assessment and using a Department of Defense database for employment verification, but that the Senior Coordinating Official still was "not sufficiently coordinating and monitoring the implementation of improvements to the SIV program" and had not ensured sufficient staffing to address the Afghan SIV backlog. Off. of Inspector Gen., *Compliance Follow-Up Review of the Afghan Special Immigrant Visa Program*, U.S. State Dep't, Rep. No. AUD-MERO-23-01 (Oct. 2022).[10] OIG also found continuing data problems, including inconsistent methods for calculating processing times and insufficient internal controls for verifying Afghan SIV data. *Id.* And in an August 2023 evaluation, OIG reported that, after the August 2021 surge in Afghan SIV applications, the Department "had inadequate staffing to process those applications," and warned that "[w]ithout additional dedicated resources to address the situation, the growing backlog in Afghan SIV applications will remain a significant challenge." Off. of Inspector Gen., *Evaluation of Adjustments to the Afghan Special Immigrant Visa Program From 2018 Through 2022*, U.S. State Dep't, Rep. No. AUD-MERO-23-23, at 7 (Aug. 2023).[11] These findings matter because they separate the legitimate need for careful vetting from avoidable operational constraints. National-security review takes time, but limited

---

[10] https://www.stateoig.gov/uploads/report/report_pdf_file/aud-mero-23-01.pdf

[11] https://www.stateoig.gov/uploads/report/report_pdf_file/aud-mero-23-23.pdf

processing capacity, inconsistent data practices, and delayed implementation of staffing plans are administrative failures, not national-security judgments.

Ambassador Crocker understands what an overburdened system means in practice: applications sit in queues while personnel attend to other duties, employment verifications are delayed because no one is available to reach former employers, and background checks may languish not because they are unimportant, but because the officials assigned to complete them are overextended. The deposition testimony in this case illustrates the problem: the Afghan Special Immigrant Visa Unit had only roughly forty-six to fifty staff members processing approximately 67,000 to 68,000 cases awaiting review. SA 234-35, Tr. 64:21-65:1; SA 258, Tr. 39:16-23. No amount of dedication by individual civil servants can overcome a structural deficit of that magnitude. As one State Department official testified, the Department was "looking at adding . . . up to 60 new contractors," SA 234, Tr. 64:14-16, but the timeline for when those positions would actually be filled was "still in negotiation internally," after which the Department still had to "put the contract out to bid." SA 235, Tr. 65:14-16. That testimony confirms the point reflected in the OIG reports: the obstacle was not simply the existence of vetting requirements, but the government's failure to build and sustain the capacity needed to perform them promptly.

19

Ambassador Crocker does not minimize the difficulty of interagency coordination. The SIV process requires the Departments of State, Defense, and Homeland Security to work together, and the government is correct that this requires care. *See* Appellants' Br. 43. But these challenges are not a reason to abandon meaningful benchmarks. They are among the problems Congress addressed by requiring efficiency improvements, reporting, and accountability. *See* Appellants' Br. 10-12. The government's argument that the nine-month benchmark is unrealistic therefore proves too much. If accepted, chronic staffing and coordination failures would become a basis for dissolving the very procedural protections Congress enacted to overcome them. The resource-related challenges documented by OIG also speak directly to the fourth *TRAC* factor, which considers "the effect of expediting delayed action on agency activities of a higher or competing priority." *TRAC*, 750 F.2d at 80. As Appellees note, the government has offered only "conclusory assertion[s] of competing priorities" without demonstrating that any specific agency activity would be adversely affected by prompt SIV processing. *See* Appellees' Br. 35, 43-44. OIG's findings confirm that delays cannot be dismissed as the unavoidable product of legitimate resource trade-offs; they stem, at least in substantial part, from preventable operational gaps and delayed corrective action— problems that cannot justify continued delay under the *TRAC* framework.

In short, the agencies' failure to meet the nine-month benchmark does not show that the benchmark is unreasonable. It is evidence that the agencies have not consistently built the infrastructure Congress's judgment required. The consequences of that failure fall on applicants, and they are grave. Every month that government-controlled steps go unresolved, applicants stay exposed to threats because of their service to the United States. The nine-month benchmark reflects Congress's judgment that these individuals should not be left in peril for years while the government works through preventable administrative obstacles. Ambassador Crocker agrees with that judgment. The government's answer to the *TRAC* factors cannot be that it lacked or delayed the capacity needed to complete the vetting Congress envisioned, and that the Court should therefore excuse the resulting delay. That approach would convert resource-allocation shortfalls into a license for indefinite inaction, at the cost of human lives and American national-security interests.

## IV.    A refusal under 8 U.S.C. § 1201(g) for administrative processing is, in practice, an interim hold that does not discharge the government's duty.

The government contends that a refusal under 8 U.S.C. § 1201(g) constitutes a "final decision" on an SIV application and therefore relieves the State Department of any further obligation to process the case under the court's adjudication plan. Appellants' Br. 46. As the government puts it, once a consular officer issues a Section 1201(g) refusal, "the consular office has already acted on an application and

21

has no further required action to take." *Id.* at 19-20. Appellees have persuasively addressed the legal infirmities of this argument, showing that administrative processing is a mandatory intermediate step incidental to visa issuance and that the AAPA and RCIA require completion of all such steps. Appellees' Br. 44-46. Ambassador Crocker offers a practical perspective drawn from decades of diplomatic service in U.S. missions abroad: in practice, a Section 1201(g) refusal for administrative processing functions as an interim hold—a mechanism by which a consular officer pauses a case while additional information is gathered, checks are completed, or interagency coordination takes place. Whatever label the government now assigns to it for litigation purposes, administrative processing is not administered as the conclusive end of the visa process.

The State Department's own publicly available guidance confirms this understanding. The Department's Administrative Processing Information page explains that "a consular officer may determine that additional information from sources other than the applicant may help establish an applicant's eligibility for a visa" and that, "[i]n such cases, refused visa applications warrant further administrative processing." *Administrative Processing Information*, U.S. State Dep't.[12] The page further states that "[u]pon completion of the case-specific

---

[12] https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/administrative-processing-information.html

administrative processing, the consular officer might conclude that an applicant is now qualified for the visa for which he or she applied." *Id.* The Department's own Visa Denials page similarly explains that an application may be denied because "the consular officer does not have all of the information required to determine if the applicant is eligible to receive a visa," and identifies Section 1201(g) as covering incomplete applications or supporting documentation. *Visa Denials*, U.S. State Dep't.[13] That public guidance treats administrative processing as a step toward a later eligibility determination, not as the practical endpoint of the application.

Deposition testimony in this case again confirms the same operational reality. A government witness agreed that "all SIV applicants who ultimately receive Special Immigrant Visas receive a [Section 1201(g)] denial at the time of their interview." SA 160, Tr. 163:5-9. If every successful SIV applicant receives a Section 1201(g) refusal as an intermediate step, the proposition that such a refusal is always a "final decision" discharging the government's duty becomes untenable. In other words, the government cannot simultaneously maintain that a Section 1201(g) refusal is the conclusive end of the road, and that it is a step through which every successful applicant must pass. As Judge Kessler observed in the earlier *Nine Iraqi Allies* litigation, the government cannot "have it both ways," namely, it cannot enjoy

---

[13] https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visa-denials.html

the benefits of calling the refusal "final" for purposes of avoiding judicial review while simultaneously reporting the same step to Congress as an intermediate processing stage. *See Nine Iraqi Allies Under Serious Threat v. Kerry*, 168 F. Supp. 3d 268, 289 (D.D.C. 2016).

Ambassador Crocker further urges this Court to consider the real consequences of accepting the government's characterization. If a Section 1201(g) refusal for administrative processing were treated as a final decision that discharges the government's duty under the AAPA and RCIA, the government would have a ready mechanism to avoid ever completing the processing that Congress directed. A consular officer could issue a Section 1201(g) refusal at the interview, declare the matter concluded, and leave the applicant in indefinite administrative limbo: neither approved nor finally denied in any meaningful practical sense, but outside the reach of any adjudication plan or judicial oversight. The result would be exactly the situation that Congress sought to prevent when it established the nine-month benchmark and required reporting on the progress of applications at every step, including administrative processing. *See* Appellees' Br. 45-47.

Ambassador Crocker has spent a career observing the State Department use Section 1201(g) refusals for exactly the purpose for which they were designed: to hold a case open while consular officers gather the information needed to make an informed decision. That does not mean security checks should be rushed or consular

24

judgments second-guessed. It means only that a case placed in administrative processing is still in process. Neither does the reading of the statutory text or the government's own practices support the government's litigation-driven recharacterization of a routine administrative hold as the conclusive end of a process that Congress mandated the agencies complete. The district court was right to include administrative processing in the adjudication plan, and this Court should affirm that determination.

## V.     The government's changed-circumstances argument underscores rather than undermines the need for continued judicial oversight.

The government contends that the district court abused its discretion by failing to "meaningfully modify" the adjudication plan's timing benchmarks in response to changed circumstances. *See* Appellants' Br. 49-54. Appellees have demonstrated that the government failed to carry its burden of showing that its proposed modifications—which would have eliminated timing benchmarks entirely at two critical steps—were suitably tailored to the changed circumstances it identified. *See* Appellees' Br. 48-53. Ambassador Crocker emphasizes that the very developments the government cites as reasons to relax the district court's oversight are the same circumstances that have made life more dangerous for SIV applicants—their options for reaching safety have been narrowed, making prompt processing not merely important but urgently necessary.

The evidence accumulated since the district court's November 2022 order and through 2024 confirms that Taliban reprisals against individuals associated with U.S. and coalition forces continue unabated, and SIV applicants trapped in the pipeline are among the most exposed. As Andrew Sullivan, current Executive Director of No One Left Behind,[14] testified before the House Foreign Affairs Committee in January 2024, his organization had received reports of 242 extrajudicial killings by the Taliban from a survey of over 13,600 SIV applicants and other Afghans still stuck in Afghanistan, noting that "nearly half the responses involved innocent victims who were in some stage of Special Immigrant Visa processing or had clear prima facie eligibility for an SIV." *Written Statement of Andrew J. Sullivan, Director of Advocacy, No One Left Behind Before House Foreign Affairs Committee, Subcommittee on Oversight & Accountability "Roundtable on Taliban Reprisals"* at 1-2 (Jan. 31, 2024).[15] Sullivan testified that the threat to allies "has dramatically increased" since the U.S. withdrawal, and he specifically recounted the killing of an interpreter named Imdadullah in Jalalabad in September 2021—a man who "had done his SIV visa interview in the Kabul embassy and was waiting for pickup before his hopes were shattered." *Id.* The stark reality is that each day SIV applicants spend

---

[14] Ambassador Crocker is on the Board of Senior Advisors for No One Left Behind, an advocacy organization that aids Afghan and Iraqi allies.

[15] https://foreignaffairs.house.gov/sites/evo-subsites/republicans-foreignaffairs.house.gov/files/migrated/uploads/2024/01/Andrew-Sullivan-Taliban-Reprisals-Roundtable-Witness-Testimony.pdf

in the pipeline without resolution, they continue to carry the marker of U.S. affiliation that the Taliban uses to find them, without receiving the protection that affiliation was supposed to guarantee.

Against that backdrop, Congress's response to the same changed circumstances the government invokes has been unequivocal: expanding the program, extending its deadlines, and maintaining timely processing. In March 2024, Democratic Senator Chris Coons led a bipartisan group of fifteen senators—including Republican Senators Mike Rounds, Thom Tillis, Jerry Moran, Bill Cassidy, and Lisa Murkowski—in urging Senate leadership to include 20,000 additional SIVs in the appropriations package. Sen. Chris Coons, *Senator Coons Sends Bipartisan Letter Urging Inclusion of 20,000 Additional Visas for Afghan Allies* (Mar. 14, 2024).[16] The senators wrote that "[t]here have been credible reports of hundreds of Afghans killed while waiting for the SIV application to be processed," and insisted that "Congress must ensure that the visas are available to bring every eligible SIV applicant—including the surviving spouse in cases where our Afghan ally has already been killed—to the United States." *Id.* Congress later acted by adding visas and extending the COM application deadline. *See* § 7034(d)(9), 138 Stat. at 789-90. That legislation was enacted *after* the withdrawal,

---

[16] https://www.coons.senate.gov/news/press-releases/senator-coons-sends-bipartisan-letter-urging-inclusion-of-20000-additional-visas-for-afghan-allies/

*after* the embassy closure, and *after* the surge in applications—the very circumstances the government relies on here.

Congressional responses have continued even more recently. In August 2025, Representatives Crow and Mariannette Miller-Meeks reintroduced the bipartisan Afghan Adjustment Act, which would extend the SIV program through December 31, 2029, and authorize virtual consular interviews. Rep. Jason Crow, *Crow Introduces Bipartisan Legislation to Help Afghans who Assisted American Servicemembers Resettle in U.S.* (Aug. 5, 2025).[17] Representative Miller-Meeks, a 24-year Army veteran, explained that Afghan allies "fought with us, risked their lives, and now face grave threats from the Taliban because of that service," calling the legislation "a responsible, bipartisan effort to honor our promise and provide a legal, secure pathway for our Afghan partners and their families who bled for our flag." *Id.*

The handling of the continuing pipeline underscores why that congressional mandate requires judicial enforcement. The State Department's 2026 report to Congress states that, through January 31, 2026, the Department had issued approximately 160,000 Afghan SIVs, including principal applicants and derivatives, and that more than fifty percent of those issuances occurred since September 2021,

---

[17] https://crow.house.gov/media/press-releases/crow-introduces-bipartisan-legislation-to-help-afghans-who-assisted-american-servicemembers-resettle-in-us

following the suspension of operations at Embassy Kabul. *Report to Congress on the Status of the Afghan Special Immigrant Visa Program*, U.S. State Dep't at 1 (May 21, 2026).[18] But the same report also reflects the magnitude of the program: as of January 31, 2026, approximately 23,431 COM-approved principal applicants were undergoing National Visa Center (NVC) processing, approximately 67,225 principal applicants were undergoing pre-COM review at NVC, and 64,711 were with COM for review. *Id.* at 2-3. Those numbers reinforce why structured accountability remains vital. A pipeline of that scale, absent timing benchmarks, is a pathway in which individual applications can disappear for years without notice or recourse.

Ambassador Crocker has witnessed, across decades of diplomatic service, the gap that can open between the commitments the United States makes to local partners and the protection it ultimately delivers. The pattern here is familiar: changed circumstances arise, agencies invoke those circumstances to justify loosening benchmarks, and the people who trusted American assurances bear the consequences of delay. Changed circumstances may require practical adjustments, and the Revised Adjudication Plan accomplishes just that: it extends certain timing benchmarks, doubles the time for progress reports, and preserves flexibility for the

---

[18] https://www.state.gov/wp-content/uploads/2026/05/Report-Status-of-the-Afghan-SIV-Program-007285-HRC1400836-Accessible-05.21.2026.pdf

government to explain any failure to comply with a benchmark. *See* Appellees' Br. 13-14, 43-44. But they do not justify dissolving oversight altogether. The district court was not presented with a government that proposed reasonable alternative timelines; it faced a government that sought to eliminate individual timing benchmarks entirely and replace them with an aggregate processing target that would guarantee no particular applicant's case moves forward within any timeframe. *See* Appellees' Br. 49-50, 52. That proposal is the antithesis of what the evidence demands. The adjudication plan remains a modest but essential safeguard—one that preserves America's promises to its Afghan and Iraqi allies in service of our nation's own national-security interests.

## CONCLUSION

This Court should affirm the judgment of the district court and the district court's denial-in-part of Defendants' request to modify the adjudication plan.

Dated: June 10, 2026                    Respectfully submitted,

                                        /s/ *Iain McPhie*
                                        Iain McPhie
                                        Jeffrey S. Oliver
                                        Qiuyang Wang
                                        BAKER BOTTS L.L.P.
                                        700 K Street, NW
                                        Washington, DC 20001
                                        (202) 639-1146
                                        iain.mcphie@bakerbotts.com

                                        *Counsel for Amicus Curiae*
                                        *Ambassador Ryan C. Crocker*

31

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,382 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: June 10, 2026                    /s/ *Iain McPhie*
                                        Iain McPhie

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 10, 2026, I electronically filed the foregoing

Brief of Amicus Curiae Ambassador Ryan C. Crocker Supporting Appellees with

the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by

using the CM/ECF system. All participants in this case registered with CM/ECF will

be served by the CM/ECF system.


Dated: June 10, 2026                         /s/ *Iain McPhie*
                                             Iain McPhie